**No. 26-1329**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

COMMUNITY ECONOMIC DEVELOPMENT CENTER OF
SOUTHEASTERN MASSACHUSETTS; NATIONAL PARENTS UNION;
NATIONAL KOREAN AMERICAN SERVICE & EDUCATION
CONSORTIUM; UNDOCUBLACK NETWORK INC.,

Plaintiffs-Appellees,

v.

SCOTT BESSENT, Acting Commissioner of the Internal Revenue Service
and Secretary of the Treasury; SOCIAL SECURITY ADMINISTRATION;
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MARKWAYNE
MULLIN, Secretary of Homeland Security; INTERNAL REVENUE
SERVICE; TODD M. LYONS, Acting Director of U.S. Immigration and
Customs Enforcement; FRANK J. BISIGNANO, Commissioner of the Social
Security Administration; U.S. DEPARTMENT OF HOMELAND SECURITY;
U.S. DEPARTMENT OF THE TREASURY,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Massachusetts

### BRIEF FOR APPELLANTS

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

AUGUST FLENTJE
JACOB CHRISTENSEN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 4629*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 307-0878*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES................................................................ iii

GLOSSARY .................................................................................ix

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD.................x

INTRODUCTION ...........................................................................1

STATEMENT OF JURISDICTION.......................................................3

STATEMENT OF THE ISSUES..........................................................3

STATEMENT OF THE CASE ............................................................5

    A.    Statutory background ............................................................5

        1.    ICE's criminal enforcement of 8 U.S.C. § 1253(a)(1).............................................................5

        2.    ICE's right to tax return information under 26 U.S.C. § 6103(i)(2) ..........................................6

    B.    Factual background .................................................................9

        1.    The Memorandum of Understanding ...........................10

        2.    IRS's August 2025 disclosure .......................................11

    C.    Prior Proceedings .................................................................14

        1.    The complaint ...............................................................14

        2.    The preliminary injunction .........................................15

SUMMARY OF ARGUMENT.............................................................17

STANDARD OF REVIEW..................................................................21

i

ARGUMENT ................................................................................. 22

I.    Plaintiffs have no likelihood of success on the merits ................... 23

    A.    Plaintiffs lack Article III standing ........................................ 23

        1.    CEDC lacks organizational standing .......................... 24

        2.    Plaintiffs lack associational standing ......................... 30

    B.    Plaintiffs do not challenge a final agency action
       reviewable under the APA ..................................................... 34

        1.    The district court erred to the extent it failed to
           specify discrete agency action ..................................... 35

        2.    The MOU and Implementing Agreement are not
           final agency action ....................................................... 36

        3.    IRS's August 2025 disclosure does not support
           the preliminary injunction ........................................... 39

    C.    Plaintiffs' APA claims are foreclosed by the Internal
       Revenue Code's exclusive remedy for § 6103 violations ....... 41

    D.    Plaintiffs' APA claims fail on the merits .............................. 44

        1.    Arbitrary and capricious .............................................. 44

        2.    Section 6103 ................................................................. 46

II.   Plaintiffs failed to establish the remaining preliminary
    injunction factors ........................................................................... 62

    A.    Irreparable harm .................................................................. 63

    B.    Balance of equities and public interest ................................ 66

III.  The district court improperly granted relief to nonparties .......... 68

CONCLUSION ............................................................................ 70

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Agbanc Ltd. v. Berry,*
    678 F. Supp. 804 (D. Ariz. 1988)..........................................................44

*Allen v. Wright,*
    468 U.S. 737 (1984) .............................................................................24

*Bennett v. Spear,*
    520 U.S. 154 (1997) .............................................................35, 39, 40

*Block v. Cmty. Nutrition Inst.,*
    467 U.S. 340 (1984) .............................................................................43

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) .............................................................................41

*Caplan v. Fellheimer Eichen Braverman & Kaskey,*
    68 F.3d 828 (3d Cir. 1995)..................................................................65

*Center for Taxpayer Rights v. IRS,*
    2025 WL 3257096 (D.D.C. Nov. 21, 2025)...........................................15

*Centro de Trabajadores Unidos v. Bessent,*
    167 F.4th 1218 (D.C. Cir. 2026)....1, 8, 18, 34, 36, 37, 44, 45, 47, 49, 56

*Centro de Trabajadores Unidos v. Bessent,*
    No. 25-cv-0677, 2025 WL 1380420 (D.D.C. May 12, 2025).................56

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .............................................................................30

*Cook Cnty., Illinois v. Wolf,*
    962 F.3d 208 (7th Cir. 2020) ...............................................................22

iii

*Deep S. Ctr. for Env't Just. v. EPA*,
    138 F.4th 310 (5th Cir. 2025)..................................................25

*DRG Funding Corp. v. Secretary of Hous. & Urb. Dev.*,
    76 F.3d 1212 (D.C. Cir. 1996) ...............................................38

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024) ......................................... 18, 24, 25, 26, 27, 28, 30

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ..............................................................39

*Grosdidier v. Chairman*,
    560 F.3d 495 (D.C. Cir. 2009) ...............................................43

*Harper v. Werfel*,
    118 F.4th 100 (1st Cir. 2024) ...............................................40

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ..............................................................25

*Kolackovsky v. Town of Rockport*,
    165 F.4th 114 (1st Cir. 2026) ...............................................30

*Lujan v. National Wildlife Fed'n*,
    497 U.S. 871 (1990) ...............................................34, 36, 62

*Maryland v. King*,
    567 U.S. 1301 (2012) ............................................................66

*Murthy v. Missouri*,
    603 U.S. 43 (2024) .....................................................24, 29

*Nken v. Holder*,
    556 U.S. 418 (2009) ..............................................................66

*Nowicki v. Commissioner*,
    262 F.3d 1162 (11th Cir. 2001) ............................................42

*Pub. Co., LLC v. AT & T Corp.*,
   320 F.3d 1081 (10th Cir. 2003) ............................................................ 64

*Reddy v. Foster*,
   845 F.3d 493 (1st Cir. 2017) ................................................................ 31

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
   397 F.3d 56 (1st Cir. 2005) .................................................................. 63

*Rochester Tel. Corp. v. United States*,
   307 U.S. 125 (1939) ............................................................................ 38

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
   102 F.3d 12 (1st Cir. 1996) .................................................................. 64

*Russomano v. Novo Nordisk Inc.*,
   960 F.3d 48 (1st Cir. 2020) .................................................................. 22

*San Francisco Real Est. Invs. v. Real Est. Inv. Tr. of Am.*,
   692 F.2d 814 (1st Cir. 1982) ................................................................ 64

*State v. U.S. Env't Prot. Agency*,
   989 F.3d 874 (10th Cir. 2021) ............................................................. 22

*Tota v. Gonzales*,
   457 F.3d 161 (1st Cir. 2006) .......................................................... 31, 57

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ............................................................................ 23

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ...................................................................... 21, 68

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016) ............................................................................ 37

*United States v. Armstrong*,
   517 U.S. 456 (1996) ............................................................................ 31

v

*United States v. AVX Corp.,*
962 F.2d 108 (1st Cir. 1992) ............................................................... 30

*United States v. Michaelian,*
803 F.2d 1042 (9th Cir. 1986) ............................................................ 42

*United States v. Orlando,*
281 F.3d 586 (6th Cir. 2002) .............................................................. 42

*Vaqueria Tres Monjitas, Inc. v. Irizarry,*
587 F.3d 464 (1st Cir. 2009) ............................................................... 63

*Waite v. Macy,*
246 U.S. 606 (1918) ........................................................................... 67

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ..............................................21, 22, 23, 46, 63, 66, 67

**Statutes:**

5 U.S.C. § 551(1) ............................................................................... 45

5 U.S.C. § 702(1) ............................................................................... 69

5 U.S.C. § 703 ............................................................................. 41, 43

5 U.S.C. § 704 ............................................................................. 34, 41

5 U.S.C. § 705 .......................................................3, 4, 14, 17, 22, 68, 69

5 U.S.C. § 706 ................................................................................... 14

8 U.S.C. § 1101(a)(18) .......................................................................... 5

8 U.S.C. § 1103(a) ................................................................................ 5

8 U.S.C. § 1253 .................................................................................. 62

8 U.S.C. § 1253(a)(1) ............1, 4, 5, 6, 10, 12, 13, 33, 38, 49-52, 54, 56, 66

8 U.S.C. § 1305(a) .............................................................................. 38

8 U.S.C. § 1306(b) .................................................................38

8 U.S.C. § 1357 ......................................................................5

26 U.S.C. § 6103............ 4, 14, 15, 16, 17, 19, 23, 41, 44, 46, 59, 63, vii, 62

26 U.S.C. § 6103(a) ...............................................................6

26 U.S.C. § 6103(b)(2)(A).......................................................7

26 U.S.C. § 6103(b)(9).........................................................45

26 U.S.C. § 6103(c)............................................................ 6, 65

26 U.S.C. § 6103(i)(2).................................... 1, 6, 9, 10, 19, 45, 56, 58, 61

26 U.S.C. § 6103(i)(2)(A)..................................... 7, 8, 51, 54, 55

26 U.S.C. § 6103(p)(4)......................................................... 8, 9

26 U.S.C. § 6103(q) ...................................................53, 58, 60

26 U.S.C. § 6110(f)(3)(A).....................................................43

26 U.S.C. § 7213.............................................................. 42, 58

26 U.S.C. § 7213A ...............................................................42

26 U.S.C. § 7431.................................................................63

26 U.S.C. § 7431(a) .............................................................41

28 U.S.C. § 1292(a)(1).............................................................3

28 U.S.C. § 1331.....................................................................3

28 U.S.C. § 2107(b) ................................................................3

**Regulations:**

8 C.F.R. § 1.2.........................................................................5

8 C.F.R. § 265.1 ................................................................................38

26 C.F.R. § 301.6103(i)-1 ..........................................................56, 61, 69

26 C.F.R. § 301.6212-2(a) ...............................................................49

**Other Authorities:**

*Federal Practice & Procedure* § 2948.1 (1995) ........................................65

S. Rep. No. 94-938 (1976) ...............................................................65

## GLOSSARY

| | |
|---|---|
| A | Appendix |
| APA | Administrative Procedure Act |
| CEDC | Plaintiff Community Economic Development Center of Southeastern Massachusetts |
| DHS | U.S. Department of Homeland Security |
| ICE | U.S. Immigration and Customs Enforcement |
| IRS | Internal Revenue Service |
| MOU | Memorandum of Understanding |

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Counsel believes that oral argument would assist the Court in the proper resolution of this case.

x

## INTRODUCTION

U.S. Immigration and Customs Enforcement (ICE), like other federal agencies, has a statutory right to obtain taxpayer information from the Internal Revenue Service (IRS) for use in its criminal investigations and prosecutions.  26 U.S.C. § 6103(i)(2).  Based on misinterpretation and misapplication of the statute, the district court improperly granted a preliminary injunction that bars ICE from obtaining or using taxpayer address information from IRS in its criminal investigations of aliens who may have committed a felony by overstaying a final removal order in violation of 8 U.S.C. § 1253(a)(1).  The district court's order conflicts with the D.C. Circuit's decision in *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026), which rejected a similar Administrative Procedure Act (APA) challenge that sought to enjoin IRS's disclosure of taxpayer addresses to ICE.

The district court's order was an abuse of discretion and should be vacated on multiple independent grounds.  At the threshold, plaintiffs lack Article III standing because the challenged action complained of does not directly interfere with any plaintiff organization's core

1

business activities, and any injury to plaintiffs' members is based on pure speculation that IRS and ICE officers will commit administrative or legal errors in carrying out their official duties. APA review is precluded in any event because plaintiffs do not challenge any final agency action, and the Internal Revenue Code's exclusive remedy for § 6103 violations provides an adequate remedy that independently bars APA review. Nor can plaintiffs make out any actual violation of the APA on grounds that IRS's disclosure of taxpayer information is arbitrary and capricious or contrary to law where, as here, such disclosure is mandatory under, and in compliance with, § 6103(i)(2). Moreover, the court's finding of irreparable harm is itself grounds to vacate the preliminary injunction because money damages would remedy plaintiffs' alleged harms, and those harms are self-inflicted in any event. The court's sweeping and overbroad injunction impedes federal criminal law enforcement by depriving ICE of information to which it is entitled under § 6103(i)(2) for use in its criminal investigation of potential felonies, and this Court should vacate that order.

2

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331 (A523), but the government contests jurisdiction.  The district court issued its order staying agency action under 5 U.S.C. § 705 and granting a preliminary injunction on February 5, 2026.  (A601-642.) The government timely appealed on March 30, 2026.  (A663.)  *See* 28 U.S.C. § 2107(b).  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

Section 6103 of the Internal Revenue Code (26 U.S.C.) provides generally that tax returns and return information collected by the IRS are confidential and shall not be disclosed.  But the statute makes numerous exceptions that permit, and sometimes require, the IRS to disclose taxpayer information.  At issue here, § 6103(i)(2) requires the IRS, upon receipt of a compliant request, to disclose certain return information—here, taxpayer addresses—for use by another federal agency in nontax criminal investigations and prosecutions.

This case concerns ICE's right to obtain taxpayer addresses from IRS under § 6103(i)(2) for use in its criminal investigation of aliens who

3

are subject to a final removal order for potential felony violations of 8 U.S.C. § 1253(a)(1).  Plaintiffs filed this suit alleging that IRS's policy of sharing taxpayer address information with ICE under § 6103(i)(2), reflected in a 2025 "Memorandum of Understanding" (MOU) between the agencies, is "arbitrary and capricious" and "contrary to law," in violation of the APA.  The district court granted a stay of agency action under 5 U.S.C. § 705 and a preliminary injunction that enjoins ICE from obtaining or using address information obtained from IRS pursuant to § 6103(i)(2).

The issues presented are:

(1)    Whether plaintiffs have Article III standing to assert their APA claims;

(2)    Whether the agencies' address-sharing policy under the MOU is a final agency action that is reviewable under the APA;

(3)    Whether APA review is further precluded by the Internal Revenue Code's exclusive remedy for violations of 26 U.S.C. § 6103;

(4)    Whether the agencies' address-sharing policy under the MOU violates 26 U.S.C. § 6103 or the APA;

4

(5)    Whether plaintiffs faced irreparable harm and satisfied the remaining factors for a preliminary injunction or stay of agency action; and

(6)    Whether the district court granted overbroad relief.

## STATEMENT OF THE CASE

### A.    Statutory background

#### 1.    ICE's criminal enforcement of 8 U.S.C. § 1253(a)(1)

The Secretary of the Department of Homeland Security (DHS) is charged with enforcement of the nation's immigration laws.  8 U.S.C. § 1103(a).  Under the Secretary's direction, ICE officers are "immigration officers," *see* 8 U.S.C. § 1101(a)(18); 8 C.F.R. § 1.2, empowered with law enforcement authority as set forth in 8 U.S.C. § 1357, including the authority to investigate and arrest aliens for felonies and other offenses against the United States.  Relevant here, ICE is charged with the enforcement of 8 U.S.C. § 1253(a)(1), which makes it a felony for an alien to willfully fail or refuse to depart from the United States within 90 days of a final administrative or judicial order of removal; to willfully fail to make timely, good-faith application for travel documents necessary for departure; to take action designed to

5

prevent departure; or to willfully fail or refuse to appear for removal at the time and place required by the Attorney General pursuant to such order.  8 U.S.C. § 1253(a)(1).

### 2.  ICE's right to tax return information under 26 U.S.C. § 6103(i)(2)

Section 6103 provides a general rule that tax "returns" and "return information" shall be confidential and shall not be disclosed except as authorized.  26 U.S.C. § 6103(a).  When enacting § 6103, however, Congress sought to balance taxpayers' interest in confidentiality with governmental agencies' legitimate need for taxpayer information in some circumstances.  S. Rep. No. 94-938, pt. I, at 318 (1976).  The statute thus makes numerous exceptions to the general rule of confidentiality that authorize, and sometimes require, IRS to disclose taxpayer information under a variety of circumstances. *See* 26 U.S.C. § 6103(c)–(o).

At issue here, § 6103(i)(2) *requires* IRS to disclose return information to other federal agencies for their use in nontax criminal investigations, grand jury proceedings, and prosecutions.  Specifically, "upon receipt" of a compliant request, IRS "shall disclose return information (other than taxpayer return information) to officers and

6

employees" of the requesting agency "who are personally and directly engaged in ... any investigation which may result in" a "judicial or administrative proceeding pertaining to the enforcement of a specifically designated Federal criminal statute (not involving tax administration) to which the United States or such agency is or may be a party." 26 U.S.C. § 6103(i)(2)(A) (cross referencing § 6103(i)(1)(A)(i)). Return information disclosed under this provision is "solely for the use of such officers and employees in such … investigation." *Id.* § 6103(i)(2)(A). Nevertheless, officers and employees to whom disclosure is authorized under this provision may, in turn, further disclose the return information to other officers and employees of the agency (including, but not limited to, clerical and supervisory personnel) "to the extent necessary" to obtain, for example, the "services of persons having special knowledge or technical skills" needed for the investigation, among other reasons. 26 C.F.R. § 301.6103(i)-1(b).

Because "return information" that IRS must disclose under § 6103(i)(2) specifically includes a "taxpayer's identity," 26 U.S.C. § 6103(b)(2)(A), (i)(2)(C)—meaning the taxpayer's name, mailing address, taxpayer identification number, or a combination thereof, *id.*

7

§ 6103(b)(6)—a requesting agency like ICE is entitled to obtain taxpayer address information from IRS under this provision, even if addresses are the only information sought.  *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1230-39 (D.C. Cir. 2026).

A request meets the requirements of § 6103(i)(2) if it is made by "the head of any Federal agency" (or other position specified in the statute); is "in writing"; and sets forth "(i) the name and address of the taxpayer with respect to whom the requested return information relates; (ii) the taxable period or periods to which such return information relates; (iii) the statutory authority under which the proceeding or investigation … is being conducted; and (iv) the specific reason or reasons why such disclosure is, or may be, relevant to such proceeding or investigation."  26 U.S.C. § 6103(i)(2)(A), (B).

Federal agencies that receive returns or return information from IRS are required to safeguard that information and to restrict access to "persons whose duties or responsibilities require access" and to whom disclosure is authorized.  26 U.S.C. § 6103(p)(4).  When an agency that has received information under § 6103(i)(2) is finished using the information, it must return the information, make it "undisclosable," or

8

continue to maintain the required safeguards to protect its confidentiality. *Id.* § 6103(p)(4)(F). Unauthorized inspection or disclosure of any return or return information by a government officer or employee may subject the government to civil damages in certain circumstances, *id.* § 7431, and willful, unauthorized inspection or disclosure is a criminal offense, *id.* § 7213, and may result in disciplinary action, *id.* § 7213A.

## B.    Factual background

In February 2025, an ICE Assistant Director contacted IRS for assistance in an "ICE led effort to locate approximately 700,000 individuals who are all under Final Orders of Removal"—an effort being "run out of ICE Headquarters in [Washington] D.C." (A307.) ICE's Acting Director followed up a few days later requesting that IRS provide information, including known home addresses, for "approximately 700 thousand criminal illegal aliens who have standing deportation orders." (A315-316.) Internally, IRS identified 26 U.S.C. § 6103(i)(2) as authorizing disclosure of taxpayer information to ICE for use in criminal enforcement, but it determined that ICE had not made a

fully compliant request under § 6103(i)(2), so IRS did not fulfill the request.  (A318-321.)

### 1.    The Memorandum of Understanding

Soon after, in April 2025, the Department of the Treasury and DHS executed a "Memorandum of Understanding" to facilitate IRS's disclosure of taxpayer address information to ICE under § 6103(i)(2) for use in criminal enforcement.  (A340-354.)  The MOU "sets forth the agreement of the parties with respect to ICE's use of the authority in I.R.C. § 6103(i)(2) for the submission of requests for addresses of persons subject to criminal investigation under 8 U.S.C. § 1253(a)(1) or another specifically designated Federal criminal statute."  (A341.)  The MOU specifies that all ICE requests for disclosure must comply with § 6103(i)(2) and that IRS will not process noncompliant requests. (A342.)

ICE represents in the MOU that address information received from IRS "will only be used by officers and employees of ICE solely for the preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings, pertaining to the enforcement of 8 U.S.C. § 1253(a)(1)" or another federal criminal

10

statute.  (A343.)  ICE also represents that it will follow detailed protocols to safeguard the information it receives from IRS as required by applicable law, including by restricting access solely to authorized persons, and will return or destroy the information in accordance with applicable record retention schedules when it is no longer needed. (A345-349.)

A separate Implementing Agreement executed later the same month sets forth technical specifications and details about procedures for the transfer and retrieval of information under the MOU.  (A358-361.)

### 2.    IRS's August 2025 disclosure

In June 2025, after the MOU and Implementing Agreement were signed, ICE sent multiple data files to IRS seeking address information of individuals identified in the files.  (*See* A392, A397, A399.)  IRS reviewed each file for sufficiency under § 6103(i)(2) and the MOU and informed ICE regarding deficiencies.  (A389-391, A397.)  IRS determined that files seeking address information for the "full alien population" and files that lacked address and taxable period

information did not comply with the MOU or statutory requirements and could not be processed.  (A389-392.)

ICE subsequently submitted a data file to IRS on June 25, 2025, supplemented by a letter dated June 27, 2025, signed by ICE's Acting Director (together, the "request").  (A418-419 (letter), A403-408 (redacted excerpt of ICE data file).)  This request sought the "last known address"—*i.e.*, the most current address in IRS files—of approximately 1.3 million individuals with final removal orders identified in the data file.  (A418, A437.)  The request designated 8 U.S.C. § 1253(a)(1) as the relevant criminal statute and explained that the requested address information is or may be relevant to an investigation because "address information ... is potentially at issue with respect to investigating or proving a violation" of § 1253(a)(1) (A418) and could be used "to verify presence within the United States of America" (A403-405).  In other words, current address information could indicate whether aliens with a final removal order were still present in the United States and had not departed as required by the applicable criminal statute.  ICE's request identified Jesse Williams, Assistant Director of the ICE Enforcement and Removal Operations,

12

Enforcement Division, as an officer or employee "personally and directly engaged in the criminal proceeding or criminal investigation" and to whom disclosure was authorized under § 6103(i)(2).  (A418, A406-408, A459.)  And ICE attested in its request that "the information will only be used by officers and employees of ICE solely for the preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings, pertaining to the enforcement of 8 U.S.C. § 1253(a)(1)."  (A418.)

IRS determined that ICE's request (the June 27 letter coupled with the data file submitted on June 25) satisfied the requirements for disclosure under § 6103(i)(2) for a portion of the individuals identified in the request.  (A409, A413-414, A449-450.)  In August 2025, IRS provided ICE with the last known address of 47,289 individual taxpayers whom IRS was able to match with the identifying information provided by ICE.[1]  (A449-450, A451-452.)  As to the

---

[1] IRS identified a positive match for most of these individuals based on their name and taxpayer identification number supplied by ICE.  IRS has since discovered that ICE supplied potentially incomplete or potentially insufficient address information for a small percentage of these individuals (less than 5%) whom IRS matched based on their taxpayer identification number.  (*See* A657-662.)

13

remaining individuals in ICE's request, IRS was unable to match them with a known taxpayer in its records or concluded that the data supplied by ICE did not meet the MOU's specifications; therefore, IRS did not disclose any information for most of the individuals listed in ICE's request.  (A437, A449.)

### C.    Prior Proceedings

#### 1.    The complaint

Plaintiffs—four membership organizations—filed this suit against IRS, DHS, ICE, the Department of the Treasury, and the Social Security Administration.  The amended complaint asserts that the MOU and its implementation constitutes final agency action that is both "arbitrary and capricious" and "contrary to law"—specifically, 26 U.S.C. § 6103—in violation of the APA.[2]  (A564-566.)  Plaintiffs moved for a stay of agency action under 5 U.S.C. § 705, vacatur under 5 U.S.C. § 706, or a preliminary injunction.  (A12-13.)

---

[2] Plaintiffs asserted other claims in the complaint (A566-570), but the district court did not consider them in issuing its preliminary injunction from which this appeal is taken (A641).

### 2.    The preliminary injunction

The district court granted plaintiffs' motion as to defendants DHS and ICE.[3] (A601-642.)  It held that plaintiff Community Economic Development Center of Southeastern Massachusetts ("CEDC") has organizational standing to sue in its own right and that all four plaintiffs have associational standing to sue on behalf of their members. (A622-624.)

The court further held that plaintiffs were likely to succeed on the merits of their APA claims.  In that regard, the court concluded that the MOU between IRS and ICE constitutes "final agency action" reviewable under the APA and that APA review is not precluded by the Internal Revenue Code's comprehensive remedial scheme for violations of 26 U.S.C. § 6103.  (A626-628.)

As to plaintiffs' arbitrary-and-capricious claim, the court concluded that the MOU reflects an arbitrary and capricious change

---

[3] The district court denied the motion without prejudice as to IRS and Treasury because their implementation of the MOU is already limited by a preliminary injunction issued in *Center for Taxpayer Rights v. IRS*, 2025 WL 3257096 (D.D.C. Nov. 21, 2025), *appeal pending* No. 26-5006 (D.C. Cir.), and it denied the motion without prejudice as to the Social Security Administration.  (A602.)

15

from prior IRS policy that the court said did not permit disclosure of taxpayer addresses to ICE for immigration enforcement and did not permit disclosure of address information, by itself, under § 6103(i)(2). (A629-630.)

Turning to plaintiffs' contrary-to-law claim, the court focused its analysis on IRS's August 2025 disclosure, rather than on the MOU that it held was final agency action, and concluded that IRS's disclosure in that single instance violated § 6103(i)(2) in "multiple ways": (1) ICE's explanation for needing address information was not "specific" enough (A631-632); (2) ICE's designation of "one person as the recipient" of the disclosure did not comport with the statute because, the court surmised, "one individual [cannot] be 'personally and directly' involved with the investigation and prosecution of 1.3 million people" (A630); and (3) the record did not demonstrate that ICE was truly seeking address information to assist with a criminal investigation (A632). The court concluded further that ICE's handling, use, and storage of the information it received from IRS was in violation of § 6103. (A632-636.)

As for the remaining preliminary injunction factors, the court held that plaintiffs would suffer irreparable harm absent a stay (A636-638)

16

and that the balance of the equities and the public interested favored injunctive relief (A638-641).

The district court's sweeping preliminary injunction stays and preliminarily vacates the implementation and enforcement of the MOU while this litigation is pending, and it universally enjoins DHS or ICE from inspecting, viewing, using, copying, distributing, relying on, or otherwise acting upon any return information received from IRS pursuant to the MOU, including the address information IRS already disclosed to ICE in August 2025.  (A641-642.)  The order makes no effort to limit relief to the plaintiffs in this case.

## SUMMARY OF ARGUMENT

The district court's order was an abuse of discretion and should be vacated.

I.     To be entitled to a preliminary injunction or stay under 5 U.S.C. § 705, plaintiffs had to clearly show that they have Article III standing, that IRS's address-sharing policy under the MOU is final agency action for which there is no other adequate remedy, that APA review is not precluded by the Internal Revenue Code's exclusive remedial scheme for violations of 26 U.S.C. § 6103, and that IRS's policy

violates § 6103 or is arbitrary and capricious under the APA.  Plaintiffs are not likely to prevail on *any* of these issues, let alone *all* of them.

A.    At the threshold, plaintiffs lack Article III standing.  CEDC lacks organizational standing because it failed to establish that IRS's challenged action directly affects and interferes with its core business activities, as *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), requires.  And all plaintiffs lack associational standing because the alleged risk that their members will be misidentified due to administrative or legal errors by IRS and ICE rests on pure speculation, lacks support in the record, and flouts the presumption of regularity that public officers will properly discharge their official duties.

B.    Plaintiffs also do not challenge a "final agency action" reviewable under the APA.  Neither the MOU nor its Implementing Agreement qualify as "final" agency action because neither determines anyone's rights or obligations or produces legal consequences.  As the D.C. Circuit held in *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1235-36 (D.C. Cir. 2026), the MOU is a nonbinding policy statement that is not reviewable under the APA, and this Court would

18

create a circuit split by ruling otherwise. The district court did not identify any other discrete agency action that is reviewable final agency action under the APA.

C.    APA review is precluded for the additional reason that the Internal Revenue Code provides the exclusive remedy for violations of 26 U.S.C. § 6103, as well as disciplinary and criminal penalties for willful violations. The Code's remedy is limited to civil damages and does not include injunctive relief that plaintiffs seek here, and plaintiffs cannot circumvent that remedial scheme through an APA action.

D.    Even if plaintiffs could overcome these threshold barriers to the adjudication of their claim, they are not likely to prevail on the merits of their APA claims. As to plaintiffs' arbitrary-and-capricious claim, IRS's policy under the MOU to disclose taxpayer addresses to ICE upon receipt of a compliant request cannot be arbitrary and capricious because such disclosure is mandatory, not discretionary, under 26 U.S.C. § 6103(i)(2). *Centro* so held.

As to plaintiffs' contrary-to-law claim, the MOU is fully consistent with § 6103(i)(2). The district court erred, however, by focusing its contrary-to-law analysis on IRS's August 2025 disclosure (and features

19

unique to that disclosure) rather than on the MOU that it held was the final agency action at issue. And, in any event, the court misinterpreted and misapplied § 6103(i)(2) in concluding that the August 2025 disclosure violated § 6103. First, contrary to the court's conclusion, ICE's request did provide the "specific reason or reasons" why the disclosure "is, or may be, relevant" to its criminal investigation. Second, ICE's designation of one high-level ICE officer to receive IRS's disclosure was fully compatible with § 6103(i)(2). Third, the record establishes that ICE requested address information "solely" for use in a "criminal" investigation or prosecution. Finally, ICE's handling of taxpayer information complied with § 6103 and applicable regulations, ignored by the district court, which permit officers and employees to whom disclosure is authorized to further disclose that information to other officers and employees with specialized knowledge or technical skills needed for the criminal investigation or prosecution.

II.    The district court also misjudged the remaining preliminary injunction factors. Plaintiffs cannot show injury for Article III standing purposes, let alone irreparable injury required for injunctive relief. The availability of monetary damages for any violation of § 6103 weighs

heavily against finding irreparable harm, and the purported harms on which the court based its finding are self-inflicted by plaintiffs at all events, making injunctive relief improper. On the other hand, the court's injunction significantly harms the government, impeding federal criminal law enforcement by depriving ICE of relevant information it is entitled to receive under § 6103(i)(2) for use in its criminal investigations. The balance of the equities and the public interest thus weigh strongly against the court's order.

III.    Further, by combining marginal theories of standing with universal relief, the district court's order cannot be squared with *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), but should have been carefully limited to address only the parties' irreparable harm.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To be entitled to a preliminary injunction, plaintiffs had to clearly show "that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id.* at 20.  This Court reviews a district court's ruling on a motion for a preliminary injunction for abuse of discretion and, within that framework, its legal conclusions de novo and its findings of fact for clear error.  *Russomano v. Novo Nordisk Inc.*, 960 F.3d 48, 53 (1st Cir. 2020).

Under 5 U.S.C. § 705, "to prevent irreparable injury," a district court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  A stay under 5 U.S.C. § 705 is governed by the same standard of review that applies to preliminary injunctions.  *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 883 (10th Cir. 2021); *Cook Cnty., Illinois v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

## ARGUMENT

The district court abused its discretion in granting plaintiffs' motion for a stay under 5 U.S.C. § 705 and for a preliminary injunction, and its order should be vacated.

22

## I.    Plaintiffs have no likelihood of success on the merits

Plaintiffs failed to demonstrate that they are likely to succeed on the merits of their APA claims for multiple reasons.  At the threshold, each plaintiff lacks Article III standing.  Further, plaintiffs do not challenge any final agency action reviewable under the APA, and the Internal Revenue Code's exclusive remedy for violations of 26 U.S.C. § 6103 likewise precludes APA review.  Even if this case were justiciable, IRS's address-sharing policy reflected in the MOU is not arbitrary and capricious under the APA and does not violate § 6103.

Each issue above is independently fatal to plaintiffs' APA claims, and in the absence of a "clear showing" by plaintiffs that they are "likely to succeed" on *all* of them, *Winter*, 555 U.S. at 20, 22, the district court's order was an abuse of discretion and must be vacated.

### A.    Plaintiffs lack Article III standing

Article III of the Constitution gives federal courts power to decide only genuine "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  The standing

requirement ensures federal courts do not become "a vehicle for the vindication of the value interests of concerned bystanders," *Allen v. Wright*, 468 U.S. 737, 756 (1984), and it guards against those who wish to use the courts for "general complaints about the way in which government goes about its business," *id.* at 760.

To establish standing to seek a preliminary injunction, "the plaintiffs must demonstrate a substantial risk that, in the near future, they will suffer an injury that is traceable to [the defendant] and redressable by the injunction they seek." *Murthy v. Missouri*, 603 U.S. 43, 49-50 (2024). At the preliminary injunction stage, the plaintiff must make a "clear showing" that she is "likely" to establish each element of standing. *Id.* at 58. Plaintiffs have not, and cannot, make that showing here.

### 1.    CEDC lacks organizational standing

An organization asserting standing to sue on its own behalf "must satisfy the usual standards for injury in fact, causation, and redressability." *Food & Drug Admin. v. Alliance for Hippocratic Med.* ("*Alliance*"), 602 U.S. 367, 393-94 (2024). To demonstrate injury in fact, an organization must allege a "concrete and demonstrable injury to the

organization's activities" that is "far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The organization must establish that the defendant's challenged action "directly affected and interfered with [the organization's] core business activities." *Alliance*, 602 U.S. at 394, 395.

"*Alliance* significantly clarified the doctrine of organizational standing." *Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 317 (5th Cir. 2025). There, the Supreme Court limited the seminal decision on organizational standing in *Havens* to its specific context. *Alliance*, 602 U.S. at 395-96. In *Havens*, an organization providing housing counseling services was deprived of information to which it had a statutory right when the owner of apartment complexes provided false information about housing availability to the organization's employees. 455 U.S. at 368, 373. *Alliance* clarified that the organization in *Havens* had standing to sue because the apartment owner's act of giving false housing information to the organization, on which the organization relied to provide its services, "directly affected and interfered with [the organization's] core business activities—not dissimilar to a retailer who

25

sues a manufacturer for selling defective goods to the retailer." *Alliance*, 602 U.S. at 395.  The Supreme Court rejected an expansive reading of *Havens* that would support standing merely because a defendant's actions have "impaired" an organization's "ability to provide services and achieve [its] organizational mission[]," even if the organization has "divert[ed] its resources in response to [the] defendant's actions."  *Id.* at 394, 395.  Under *Alliance*, to demonstrate injury in fact, a plaintiff organization must show that the challenged action "directly affected and interfered" with its "core business activities."  *Id.* at 395.

Here, the district court concluded that CEDC has organizational standing based on three theories of injury allegedly caused by IRS's data sharing with ICE:  first, CEDC can no longer "appropriately counsel its members regarding their tax filing obligations"; second, CEDC "has reported a decrease in membership and attendance based on the chilling effect caused by IRS's policy change"; and third, CEDC's "decreased revenue, attributable to reduced tax return filings, ... caused by [IRS's] action."  (A623.)  None of these theories survives *Alliance*'s

26

direct-interference standard for demonstrating injury-in-fact to an organization.

First, IRS's data sharing does not "directly interfere" with CEDC's ability to counsel its members.  At most, it may influence the substance of the advice CEDC wishes to provide.  But that would be true anytime there is a change in tax law or policy and cannot support Article III standing, lest organizations gain universal standing to "challenge almost every federal policy that they dislike."  *Alliance*, 602 U.S. at 395. The declaration of CEDC's executive director confirms that CEDC continues to spend "substantial time" counseling its members, demonstrating that its ability to do so remains unimpeded by IRS's actions; the only thing that may have changed is the nature of the counsel provided.  (A187-188 ("[M]y staff now spends substantial time informing members about the change in the IRS's stance and their information sharing conduct and the attendant risks....  [M]y staff has talked through our current understanding of IRS and ICE's information-sharing arrangement for about a half hour with more than 50 CEDC members.").)

27

Second, any decrease in membership or attendance is also not the result of "direct[]" interference with CEDC's core business activities, *Alliance*, 602 U.S. at 395, but rather is far downstream from how IRS's actions have purportedly affected the independent decisions and behavior of CEDC's members. That kind of indirect injury, far removed from IRS's action and turning on the unfettered choices of third parties not before the Court, is not the "kind of injury" or "impediment" *Alliance* requires, even if it "makes it more difficult" for CEDC to achieve its mission. *Id.* Indeed, the record does not establish any link between IRS's actions and CEDC's alleged decrease in membership and attendance, which could have been caused by any number of factors. Additionally, the number of members and attendance levels are not, of themselves, "core business activities," *id.*—in fact, they are not business activity at all—so the mere reduction in numbers and attendance cannot demonstrate injury in fact under *Alliance*.

Last, CEDC alleges that its funding "is tied to the number of prepared tax returns" and that it "risks losing grant funding if members do not file their taxes." (A557.) The executive director reports filing 1,666 returns in 2024 but only 1,436 in 2025. (A188.) But the director's

28

declaration was signed on November 3, 2025, when there were still two months left before the year's end.  (A191.)  Without a complete tally for 2025, the record cannot possibly establish any reduction at all in the number of tax filings for 2025, which defeats the factual premise of the district court's ruling.  Nor does the record establish that any reduction in the number of returns filed would be the result of fewer aliens with final removal orders filing returns in 2025.  Because address sharing under the MOU applies only to aliens with a final removal order (A341), a reduction in the number of returns filed by other members without such an order fails to demonstrate causation—a necessary element of standing.

Furthermore, the director's bald assertion that "CEDC's funding is directly tied to the number of tax returns filed" by its members (A188), without providing any detail as to how such funding is determined or affected by the number of tax filings, is so perfunctory and conclusory that it cannot suffice to show a "substantial risk" of injury "in the near future." *Murthy*, 603 U.S. at 49-50.  No government official has threatened CEDC's funding.  And without more, this Court can only guess whether and how much any reduction in the number of tax filings

29

would actually impact CEDC's funding. "Broad and vague injury allegations" cannot demonstrate Article III standing, *Kolackovsky v. Town of Rockport*, 165 F.4th 114, 120 (1st Cir. 2026), and "allegations of *possible* future injury are not sufficient," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

In the absence of any "direct[] ... interfere[nce]" to its "core business activities," *Alliance*, 602 U.S. at 395, the district court's ruling on organizational standing impermissibly "extend[s] the *Havens* holding beyond its context," *id.* at 396.

### 2.    Plaintiffs lack associational standing

An organization claiming associational standing to sue on behalf of its members must show, among other requirements, that "at least one of the members" would otherwise "possess[] standing to sue in his or her own right." *United States v. AVX Corp.*, 962 F.2d 108, 116 (1st Cir. 1992).

The district court's ruling on associational standing rests on just one thing: pure speculation that IRS and ICE will commit administrative or legal "errors." (A623-624.) Specifically, the court concluded that plaintiffs' members are at risk of arrest and detention

30

because IRS and ICE might misidentify them "due to administrative errors tied to similarities between names" or because ICE might commit "legal error" by mistakenly prosecuting them based on an "administratively final order of removal that is either still pending judicial review or subject to deferred action." (A624.)  But in addition to not providing a basis to challenge the underlying policy, the district court's premise—that IRS or ICE might commit such administrative or legal errors—is entirely speculative.  There is no standing where an injury is "too speculative for Article III purposes." *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017).

Agencies are entitled to a presumption of regularity, which presumes that public officers will properly discharge their official duties "in the absence of clear evidence to the contrary." *Tota v. Gonzales*, 457 F.3d 161, 168 (1st Cir. 2006) (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).  Plaintiffs provided no evidence that IRS or ICE *has* misidentified anyone based on similar names, resulting in that person's arrest, nor is there any evidence in the record that ICE *has* pursued improper prosecutions.  Instead, as its only support, the district court cited a case in the record that it mischaracterized as

31

"involving removal due to administrative error." (A624, A143-162.) In fact, that case involved neither removal nor administrative error, referencing instead only an "unwitting clerical mistake" made *not by the government* but by the target of a criminal investigation. (A143.) Hence, the only evidence cited by the district court provides no support for its ruling.

Rather, the evidence in the record supports the presumption of regularity that should have governed the outcome here. First, the record shows that IRS does not rely solely on a taxpayer's name to identify an individual before sharing information with ICE. Rather, as 26 U.S.C. § 6103(i)(2)(B)(i) expressly provides, IRS uses a combination of the taxpayer's "name and address" or the taxpayer's name and taxpayer identification number that is unique to each taxpayer (and hence cannot mistakenly confuse two different taxpayers). (A431-433.) The statute reflects congressional policy that the taxpayer's name and address are sufficient for identification purposes, and the record demonstrates that IRS follows that designated approach to identify individuals for whom ICE does not supply a unique taxpayer

32

identification number in its request. The record thus belies plaintiffs' theory of injury based on misidentification, which is speculative at best.

Similarly, the record refutes plaintiffs' theory that its members face more than a speculative risk of being mistakenly arrested and prosecuted by ICE based on a *non*-final order of removal. The district court itself described the careful process ICE employs to investigate and prosecute violations of 8 U.S.C. § 1253(a)(1). According to the court, that process includes "numerous preliminary steps ... before even determining that a crime has been committed," including "establishing a noncitizen's identity ... and immigration status," conducting "relevant database checks ... *to determine whether the alien has a final executable order of removal*," and reviewing "appellate databases ... to ensure that no ongoing appeals might stay the proceedings." (A635 (emphasis added).) Additionally, ICE "conduct[s] thorough review of DHS, court, and appellate databases to ensure final orders can be executed without any impediments, such as ongoing appeals with a stay in place or temporary restraining orders." (A462.) On this record, plaintiffs' theory of injury stemming from a wrongful prosecution based on a removal order that is not final and executable is implausible.

33

The district court erred by failing to apply the presumption of regularity in the face of substantial evidence supporting its application here and by accepting plaintiffs' speculative theories of injury.

### B.   Plaintiffs do not challenge a final agency action reviewable under the APA

The district court additionally lacked authority to adjudicate plaintiffs' APA claims because only "final agency action" is reviewable under the APA, 5 U.S.C. § 704, and the MOU between IRS and ICE does not qualify as final agency action, as the D.C. Circuit held in *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1235-36 (D.C. Cir. 2026).  This court must create a circuit conflict with the D.C. Circuit to hold otherwise.

It is well settled that the APA does not permit broad programmatic attacks against an agency's day-to-day operations or management of government programs.  *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 890-94, 899 (1990).  "Under the terms of the APA, [a plaintiff] must direct its attack against some particular 'agency action' that causes it harm."  *Id.* at 891.  Where, as here, review is sought only under the general review provisions of the APA, the "agency action" in question must be "final agency action."  *Id.* at 882; *see* 5

U.S.C. § 704. To be final and thus reviewable, an agency action must (1) "mark the consummation of the agency's decisionmaking process" and (2) be an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

Here, the district court held that "the inter-agency data-sharing between the IRS and ICE is a final agency action." (A627.) That ruling was erroneous for multiple reasons.

### 1.    The district court erred to the extent it failed to specify discrete agency action

The initial error in the district court's ruling is the lack of specificity in the court's broad and undefined reference to "the inter-agency data-sharing between the IRS and ICE" that the court held was final agency action. (A627.) The court's description fails to specify any discrete agency action that the court ruled was final. The court also broadly referenced "the agencies' operationalization" of the MOU (A626), again failing to describe any discrete agency action. And plaintiffs' own allegations in the amended complaint are similarly flawed. (A564, A565 ("The commitment to and implementation of disclosing taxpayer information to ICE by the IRS … and ICE's policies

35

and procedures regarding treatment of such disclosed information, are final agency actions.").)

As explained above, the APA does not permit "generic challenge[s]" to agency programs; only discrete, "identifiable 'final agency action'" is reviewable. *Lujan*, 497 U.S. at 890 n.2. The district court erred by concluding broadly and generically that "the inter-agency data-sharing" is final agency action, without specifying any discrete agency action.

### 2. The MOU and Implementing Agreement are not final agency action

In contrast to the district court's broad language noted above, the court's discussion on finality does specifically mention the MOU and its Implementing Agreement. (A626-627.) But neither of those is a final agency action reviewable under the APA.

After the district court issued its decision, the D.C. Circuit held in a similar case that the MOU between IRS and ICE is *not* a reviewable final agency action, *Centro*, 167 F.4th at 1235-36, in direct conflict with the district court's ruling here. Rather, "the MOU is a nonbinding, nonfinal policy statement that is not reviewable under the APA." *Id.* at 1236. In arriving at that conclusion, the D.C. Circuit considered

36

multiple factors, including whether the MOU had any "actual legal effect," "the agency's characterization of" the MOU, and whether the agency has applied the MOU "as if it were binding on regulated parties." *Id.* Applying those factors, the D.C. Circuit found that the MOU was not the product of notice-and comment rulemaking and that IRS has never characterized it as a "rule" or relied on it to justify the agency's actions. *Id.* Instead, the MOU "merely outlines the process through which ICE can request addresses from IRS," and its requirements "are consistent with what is plainly contemplated by § 6103(i)(2) … and thus simply clarify existing duties and do not constitute final agency action." *Id.* The court rejected an argument that "the MOU binds IRS" and, therefore, has "actual legal effect" by altering IRS's prior policy that allegedly would have denied a request from ICE seeking only taxpayer addresses. *Id.* The court explained that "an agency's statement that merely expresses its view of what the law requires is not final, and not reviewable," and the MOU "merely reflects IRS's views on what § 6103(i)(2) allows it to do." *Id.*

For all the reasons *Centro* explained, the MOU has no "direct and appreciable legal consequences," *U.S. Army Corps of Eng'rs v. Hawkes*

37

*Co.*, 578 U.S. 590, 598 (2016), for plaintiffs or their members and, therefore, is not final agency action. In fact, federal law already requires aliens in the United States to provide DHS with their current address information, 8 U.S.C. §§ 1305(a), 1103(a)(1); 8 C.F.R. § 265.1; USCIS Form AR-11, "Alien's Change of Address Card," and criminalizes their failure to do so, 8 U.S.C. § 1306(b). So the MOU's procedures for sharing addresses of "aliens" "in the United States" who are "under final orders to remove them from the United States" (A341) has no actual legal consequence for those individuals whom federal law already requires to provide address information to DHS—the same information shared with DHS under the MOU.

To be sure, in investigations under 8 U.S.C. § 1253(a)(1), ICE might *use* the address information it receives from IRS in a way that later affects individuals whose information is shared. But agency action that affects the challenger's rights only "on the contingency of future administrative action" is not final. *DRG Funding Corp. v. Secretary of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)); *see also*

*Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (action must "directly affect the parties").

Likewise, the Implementing Agreement (A358-361) is not final agency action for the same reasons the MOU is not final agency action. Executed shortly after the MOU and referenced therein (A342), the Implementing Agreement merely sets forth technical specifications and procedures for the transfer and retrieval of electronic information under the MOU. It does not determine rights or obligations or have any direct and appreciable legal consequences.

The district court erred in determining that the MOU and the Implementing Agreement are final agency action, and this Court would create a circuit split with *Centro* by ruling otherwise.

### 3.    IRS's August 2025 disclosure does not support the preliminary injunction

The district court did not hold that IRS's August 2025 disclosure was a final agency action. In discussing *Bennett*'s first prong for determining finality, the court did reference "the data-sharing already effectuated" (A626)—presumably a reference to the August 2025 disclosure—but the court went on to discuss *Bennett*'s second prong without ever mentioning the August 2025 disclosure and without

39

determining that it was final either because it determined "rights or obligations" or produced "legal consequences" (A626-627). Critically, both prongs of *Bennett* must be satisfied for agency action to be considered "final." *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024).

Even if the district court had considered the issue, the August 2025 disclosure would not be final agency action because it did not determine rights or obligations or produce legal consequences for plaintiffs or their members. As explained above, aliens in the United States are already legally required to provide DHS with their current address, so DHS's receipt of that information from IRS does not affect their legal rights, and any legal consequences to them is wholly contingent on future administrative action by DHS to later act upon that information in carrying out its enforcement efforts. As demonstrated above, agency action that affects the challenger's rights only on the contingency of future administrative action is not final. Therefore, the August 2025 disclosure was not itself final agency action.

40

### C. Plaintiffs' APA claims are foreclosed by the Internal Revenue Code's exclusive remedy for § 6103 violations

Further, the APA provides a vehicle for review only if "there is no other adequate remedy." 5 U.S.C. § 704; *see also Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (Section 704 "also makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action"). And where a "special statutory review proceeding" exists and is adequate, that proceeding governs. 5 U.S.C. § 703. Here, the Internal Revenue Code provides a comprehensive and carefully delineated remedial scheme for violations of 26 U.S.C. § 6103 that precludes APA review.

Section 7431 authorizes taxpayers to bring a civil action for damages for any violation of § 6103 by any person, whether or not that person is employed by the United States and regardless of whether the violation was knowing or merely negligent. 26 U.S.C. § 7431(a), (c). Congress also crafted specific exceptions to liability, including for a "good faith, but erroneous" interpretation, while also limiting the period for bringing an action. *Id.* § 7431(b), (d). Congress, however, excluded injunctive relief, and that choice must be taken as deliberate.

41

In addition to § 7431, 26 U.S.C. § 7213 makes the unauthorized, willful disclosure, solicitation, or redisclosure of return information a felony that is punishable by a fine, imprisonment, or both, and dismissal for federal government officers and employees.  Similarly, 26 U.S.C. § 7213A makes the unauthorized, willful inspection of return information punishable by a fine, imprisonment, or both, and dismissal for federal government officers and employees.

Considering this highly reticulated scheme, courts have held that the civil and criminal remedies discussed above represent the exclusive recourse for taxpayers aggrieved by the unlawful inspection or disclosure of their return information.  *See United States v. Orlando*, 281 F.3d 586, 596 (6th Cir. 2002) ("Where Congress has provided a particular remedy for the violation of a statute, that remedy … should apply in the absence of a constitutional violation."); *Nowicki v. Commissioner*, 262 F.3d 1162, 1164 (11th Cir. 2001) ("Congress saw fit to provide only certain remedies for violations of § 6103."); *see also United States v. Michaelian*, 803 F.2d 1042, 1049-50 (9th Cir. 1986) (upholding district court's "refus[al] to fashion a dismissal or suppression remedy for a violation of § 6103," given other "legislatively

42

created remedies"). Additional equitable relief is, therefore, unavailable.

Indeed, when Congress wanted to afford taxpayers the ability to bring a preemptive suit to prevent the disclosure of their tax information, it did so expressly. Section 6110 provides that a taxpayer who has obtained a written determination concerning his tax situation may petition the Tax Court to prevent IRS from disclosing information contained therein. 26 U.S.C. § 6110(f)(3)(A). Congress's provision of such a remedy in this limited context confirms that its omission in other contexts should be respected.

In the face of a comprehensive statute, litigants are not permitted to "circumvent the [scheme's] requirements and limitations by resorting to the catchall APA," even when "the plaintiff cannot prevail in a claim" under the scheme. *Grosdidier v. Chairman*, 560 F.3d 495, 497 (D.C. Cir. 2009); *see also Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). Given the remedies available to individuals whose return information is disclosed in violation of § 6103—which is part of the complex statutory scheme Congress created in the Internal Revenue Code—a non-APA "special statutory review proceeding," 5 U.S.C. § 703,

exists and is adequate.  Therefore, plaintiffs are not entitled to injunctive relief through the APA.  *Cf. Agbanc Ltd. v. Berry*, 678 F. Supp. 804, 807 (D. Ariz. 1988) (concluding that § 7431 provides an adequate remedy at law that precludes equity jurisdiction).

### D.    Plaintiffs' APA claims fail on the merits

Even if plaintiffs' APA claims were justiciable, they would fail on the merits.  The district court held that (1) the MOU reflects an arbitrary and capricious change in IRS policy and (2) IRS's August 2025 disclosure of taxpayer addresses to ICE and ICE's subsequent handling of that information was contrary to law—specifically 26 U.S.C. 6103. The court erred on both fronts.

#### 1.    Arbitrary and capricious

The district court held that the MOU reflects an arbitrary and capricious change from previous IRS policy that purportedly did not permit the disclosure of taxpayer information for immigration enforcement and did not permit the disclosure of taxpayer addresses alone.  (A629-630.)  That ruling directly conflicts with the D.C. Circuit's decision in *Centro*, 167 F.4th at 1236-39, which rejected this exact argument.

44

IRS's policy under the MOU to disclose taxpayer addresses to ICE upon receipt of a compliant request cannot be arbitrary and capricious because such disclosure is mandatory, not discretionary, under 26 U.S.C. § 6103(i)(2). *Centro*, 167 F.4th at 1236-39. The statute gives IRS no discretion to deny a request under § 6103(i)(2) on the ground that it seeks only address information. "There is no such limitation in the statute," which is "crystal clear" on this point. *Id.* at 1230. The statute's plain language "allows agencies to submit a taxpayer's name and address and request the taxpayer's current mailing address in return." *Id.* at 1231. Nor does the statute make any exception that would single out ICE or immigration enforcement for differential treatment; as any other federal agency, ICE is entitled to obtain return information from IRS for use in its criminal investigations and prosecutions.[4]

In short, "§ 6103(i)(2) requires IRS to disclose address information in response to a valid request regardless of what happens to the MOU." *Id.* at 1239. Therefore, IRS's policy reflected in the MOU to disclose

---

[4] The term "Federal agency" used in § 6103(i)(2) means an agency within the meaning of 5 U.S.C. § 551(1), including ICE. 26 U.S.C. § 6103(b)(9).

45

taxpayer addresses to ICE in compliance with § 6103(i)(2)'s statutory mandate cannot be arbitrary and capricious.

### 2.    Section 6103

The district court further held that IRS's August 2025 disclosure of taxpayer addresses to ICE and ICE's subsequent handling of that information was likely in violation of 26 U.S.C. 6103.  (A630-636.) Again, the court erred.

To begin, IRS's August 2025 disclosure and ICE's handling of the information should not have been the focus of the APA contrary-to-law issue in the first place because the district court never determined that those actions were "final agency actions" reviewable under the APA. *See supra* pp. 39-40.  Absent such determination, the August 2025 disclosure and ICE's handling plainly cannot serve as the basis for the court's preliminary injunction founded upon alleged violations of the APA.  Yet the court focused exclusively on unique aspects of the August 2025 disclosure to find a likely violation of the APA—namely, that ICE's request that precipitated the August 2025 disclosure purportedly did not include a "specific reason" for the disclosure and identified only "one person as the recipient."  (A630-632.)  But those features are specific to

46

the August 2025 disclosure and are nowhere reflected in the MOU or the Implementing Agreement that the court held were final agency action.  (*See* A626-627.)  The district court abused its discretion by basing its contrary-to-law ruling on agency actions that it never determined were final agency actions reviewable under the APA.

The MOU—which should have been the focus of the court's contrary-to-law analysis—is fully "consistent with what is plainly contemplated by § 6103(i)(2)."  *Centro*, 167 F.4th at 1236.  "[I]n fact, [the MOU's requirements] are taken almost word-for-word from § 6103(i)(2)."  *Id.*  Because the MOU is the asserted final agency action at issue and because it does not violate § 6103, plaintiffs cannot show they are likely to succeed on the merits of their contrary-to-law claim under the APA.  And the court could not properly enjoin the implementation or enforcement of the MOU or its Implementing Agreement based upon finding problems with the August 2025 disclosure.

Moreover, and in any event, IRS's August 2025 disclosure and ICE's subsequent handling of the disclosed information were likewise in compliance with § 6103(i)(2).  ICE's request was made by ICE's Acting

47

Director, who was "the head of [the] Federal agency"; was "in writing";
and set forth the information specified in § 6103(i)(2)(B) for all but a
small percentage (less than 5%) of the 47,289 individuals whose
addresses were disclosed.[5]  (A418-419 (letter), A403-408 (redacted
excerpt of ICE data file).  The district court erred in concluding
otherwise.

### a.  The "specific reason" why disclosure "is, or may be, relevant"

A request meets the requirements of § 6103(i)(2) if it sets forth,
among other information, "the statutory authority under which the
[nontax criminal] proceeding or investigation … is being conducted" and
"the specific reason or reasons why such disclosure is, or may be,
relevant to such proceeding or investigation."  26 U.S.C.
§ 6103(i)(2)(B)(iv).  The district court concluded (A631-632) that ICE's
request did not provide a "specific reason" for the disclosure.  That is
incorrect.

---

[5] As noted *supra* p. 13 n.1, IRS has acknowledged an error in
processing the August 2025 disclosure to the extent that ICE's request
may have provided incomplete or insufficient address information for a
small percentage of the 47,289 individuals whose addresses were
disclosed, and IRS is working with ICE to remediate that error.  (A657-
662.)

ICE's request sought the "last known address" (A418)—*i.e.*, the most *current* address in IRS records, 26 C.F.R. § 301.6212-2(a)—of the individuals identified in its request, all of whom were subject to a final order of removal (*see* A341, A451).[6]  ICE's request also designated 8 U.S.C. § 1253(a)(1) as the statutory authority under which it was conducting a criminal investigation.  (A418.)  Section 1253(a)(1) makes it a felony for an alien to willfully fail or refuse to depart from the United States within a period of 90 days from the date of a final order of removal; to fail to make timely, good-faith application for travel documents necessary for departure; to take action designed to prevent departure; or to fail to appear for removal at the time and place required by the Attorney General pursuant to such order.  ICE's request explained that the current address of the individuals identified in its request "is, or may be, relevant" to its criminal investigation under § 1253(a)(1) because "address information … is potentially at issue [in]

---

[6] ICE's request identified "January 2022 *to present*" as the "taxable periods" to which the requested return information relates for each individual (A406-408).  *See* 26 U.S.C. § 6103(i)(2)(B)(ii).  That is a logical and permissible way for an agency to obtain an individual's *current* address from the IRS, as the statute allows.  *Centro*, 167 F.4th at 1231.

49

proving a violation under 8 U.S.C. § 1253(a)(1)" (A418) and can be used "to verify [the individual's] presence within the United States of America" (A403-405).

Contrary to the district court's ruling, these reasons provided by ICE were "specific" enough under the statute to demonstrate that the disclosure "is, or may be, relevant" to ICE's investigation under § 1253(a)(1), which is all the statute requires.  26 U.S.C. § 6103(i)(2)(B)(iv).  If an alien's current address on file with IRS is in the United States, that would be probative of the alien's continued presence in the United States, which is highly relevant to investigating or proving a violation under § 1253(a)(1) by an alien who is subject to a final removal order.  Indeed, such alien's presence in the United States is an element of the offense for each of the several felonies specified in § 1253(a)(1).[7]  ICE's request easily satisfied § 6103(i)(2)(B)(iv)'s "specific reason" requirement.

---

[7] The district court mistakenly believed an alien could violate 8 U.S.C. § 1253(a)(1) only by overstaying a final removal order by more than 90 days, so it wrongly faulted ICE for including in its request individuals whose removal order was less than 90 days old.  (A615.) But ICE reasonably included such individuals in its request who were under investigation; the court simply overlooked the other felonies

*Continued on next page.*

### b.   "Personally and directly engaged"

The district court further concluded (A630-631) that IRS's August 2025 disclosure violated § 6103(i)(2)'s requirement that disclosures be made only "to officers and employees of [the requesting] agency who are personally and directly engaged in" the criminal investigation or prosecution.  26 U.S.C. § 6103(i)(2)(A).  ICE identified Jesse Williams, whose position was Assistant Director of ICE Enforcement and Removal Operations, Enforcement Division, as an officer "personally and directly engaged in" the criminal investigation.  (A418, A406-408, A459.)  The court found it implausible "that one individual could be 'personally and directly' involved with the investigation and prosecution of 1.3 million people."  (A630.)  But that conclusion rests on unsupported notions about how the district court thinks ICE must conduct a criminal investigation under 8 U.S.C. § 1253(a)(1).

Before addressing that issue, we pause to clarify a significant aspect of the statute—namely, the "personally and directly engaged" requirement in § 6103(i)(2)(A) is not about *whether* disclosure is

---

specified in § 1253(a)(1).  In any event, this incorrect reasoning would not support the court's broad injunction.

required; rather, it governs only *to whom* disclosure—which at this point is *mandatory*—must be made.  In other words, § 6103(i)(2) mandates disclosure of return information upon receipt of a compliant request, and the "personally and directly engaged" requirement merely tells IRS to whom the required disclosure must be made.  So the district court's focus on this requirement boils down to whether IRS made the required disclosure to the right person or persons at ICE.  Ironically, under the court's flawed rationale, IRS should have disclosed the material to many thousands of ICE officers and employees instead of just one.

That aside, the district court fundamentally misconceived how ICE may conduct a criminal investigation under 8 U.S.C. § 1253(a)(1).  ICE's criminal investigation began with a large-scale effort "being run out of ICE Headquarters in [Washington] D.C."  (A307.)  ICE's request thus sought the last known address of approximately 1.3 million individuals with final removal orders.  (A418, A341.)  In carrying out its criminal enforcement obligations under § 1253(a)(1) with respect to these individuals, ICE has discretion to initiate a *single*, broad-scale investigation that *begins* with a high-level review of address

52

information that is directly relevant to determining, at the outset of the investigation, whether and how many of these 1.3 million individuals are still present in the United States in potential violation of the criminal statute.  ICE sought these individuals' current addresses from IRS for that very purpose:  "To verify presence within the United States of America."  (A403-405.)  With the assistance of computers and modern technology, that is the sort of task that is certainly suitable for a high-level ICE officer charged with enforcing § 1253(a)(1), and it is one he can readily perform with help, as needed, from his information technology support staff or others.  *See* 26 C.F.R. § 301.6103(i)-1(b) (permitting officers and employees to whom disclosure is authorized under the statute to further disclose return information to clerical or other personnel with specialized knowledge or technical skills needed for the criminal investigation or prosecution); 26 U.S.C. § 6103(q) (authorizing the Secretary to prescribe regulations necessary to carry out the statute's provisions).  Following that initial high-level review, after gaining a better understanding of the scope of potential violations based on the results of that initial review of the data, ICE would have discretion whether to assign additional staff and initiate separate

53

investigations that focus on specific individuals, and § 6103 would permit ICE to further disclose the pertinent return information it received from IRS to these additional staff who might later be assigned to particular criminal matters. 26 C.F.R. § 301.6103(i)-1(b).

Properly viewed this way, ICE's designation of the Assistant Director as an "officer" who was "personally and directly engaged" in ICE's initial, broad-scale criminal investigation, 26 U.S.C. § 6103(i)(2)(A), is perfectly compatible with the statute and satisfies even the district court's view of that statutory phrase—that is, as referring to "someone working on the substance of the relevant criminal matter who will be able to apply to the criminal matter the information obtained through the IRS's disclosure." (A631.)

The district court's decision, by contrast, improperly constrains ICE's discretion how to enforce and carry out investigations under 8 U.S.C. § 1253(a)(1). Under the district court's faulty view, ICE was required to initiate and fully staff 1.3 million *separate* investigations—one for each individual—*before* it could receive any return information from IRS. Obviously, that may not be the best use of ICE resources, and it is implausible that Congress would have limited the ability to

54

investigate and enforce federal criminal law in this manner.  Instead, the statute broadly requires IRS to disclose return information for use in "*any* investigation."  26 U.S.C. § 6103(i)(2)(A)(ii) (emphasis added).  Neither the district court nor IRS should be in the business of dictating how ICE must conduct its criminal investigations, or else lose access to relevant return information that Congress made disclosable for its use under § 6103(i)(2).  But that is the absurd effect of the district court's decision.

IRS's August 2025 disclosure to the Assistant Director as an officer "personally and directly engaged in" ICE's criminal investigation under § 1253(a)(1) complied with § 6103(i)(2).

### c.    "Solely" for use in "criminal" investigations or prosecutions

Return information disclosed under § 6103(i)(2) is "solely" for use in an investigation or prosecution "pertaining to the enforcement of a specifically designated Federal criminal statute."  26 U.S.C. § 6103(i)(2)(A) (incorporating § 6103(i)(1)(A)(i)).  The district court concluded (A632) that the record lacks sufficient information to demonstrate that ICE is truly seeking address information for *criminal* law enforcement, as the statute requires, as opposed to *civil*

enforcement. That is the same implausible assertion rejected by the court in *Centro de Trabajadores Unidos v. Bessent*, No. 25-cv-0677, 2025 WL 1380420, at \*4 (D.D.C. May 12, 2025), *aff'd*, 167 F.4th 1218 (D.C. Cir. 2026). The district court's contrary conclusion here not only is belied by the record in this case but also fundamentally misunderstands IRS's limited role in responding to § 6103(i)(2) requests.

To start, the record includes repeated representations made by DHS and ICE officials at the highest levels that the requested address information would be used by the agency solely for criminal investigation or prosecution. In the MOU, signed by the Secretary of DHS, the Secretary represented that information provided under § 6103(i)(2) will "only be used by officers and employees of ICE *solely*" for proceedings and investigations "pertaining to the enforcement of 8 U.S.C. § 1253(a)(1), or other specifically designated Federal criminal statutes, or any subsequent criminal proceedings." (A343 (emphasis added).) The Secretary further specified in the MOU that "ICE will use and redisclose the address information only as specifically authorized by IRC § 6103(i)(2) as implemented in 26 C.F.R. § 301.6103(i)-1." (A343.) Additionally, in ICE's June 2025 request for information, ICE's

56

Acting Director reiterated and attested that ICE would abide by these restrictions on the use of the taxpayer information. (A418-419.) And during this litigation, in direct response to the district court's questions on this issue, ICE submitted a declaration further attesting that all IRS data will be "properly tagged and identified as IRS data, marked restricted, and designated for use in criminal investigations" and that "ICE will adhere to the appropriate laws and regulations and will follow the terms of the MOU and the implementation agreement." (A508, A498-499.) All of that is ample evidence supporting ICE's intended use of the address information solely for criminal enforcement.

Neither plaintiffs nor the district court pointed to any evidence that ICE *has in fact* used the information it obtained for unlawful purposes, and courts must presume that public officers will properly discharge their official duties "in the absence of clear evidence to the contrary." *Tota v. Gonzales*, 457 F.3d 161, 168 (1st Cir. 2006). That presumption applies forcefully here because plaintiffs' theory that ICE will use the information for civil enforcement requires an implausible assumption that government officials would open themselves up to potential disciplinary proceedings, dismissal, and criminal penalties by

57

violating § 6103, as well as subject the government to potential civil damages.  26 U.S.C. §§ 7213, 7213A, 7431.

In addition, and more fundamentally, § 6103(i)(2)'s structure demonstrates that IRS has a very limited role in responding to requests under that provision.  The statute mandates IRS to disclose return information "*upon receipt*" of a request that is (1) "from the head of [a] Federal agency" (or other similar specified position); (2) "in writing"; and (3) "sets forth" the information specified in paragraph (B).  26 U.S.C. § 6103(i)(2) (emphasis added).  In other words, the statute gives IRS no discretion to conduct its own internal investigation into the accuracy of the representations made by the head of the requesting agency; IRS "shall disclose" return information "upon receipt" of such a request.  *Id.*  While IRS's role is expressly limited, the statute is not without a gatekeeping function; but that function is served not by IRS but by the statute's requirements that any request must be in writing and must come from the head of a federal agency who, in turn, is accountable to Congress and the public.  *See id.* § 6103(p)(3) (requiring the Secretary to maintain a permanent system of records of all requests for disclosure under § 6103(i)(2), to make them available for

58

examination by the Joint Committee on Taxation, and to submit periodic reports to the Joint Committee and the public). Under this statutory structure, IRS was not at liberty to investigate or second-guess the accuracy of the representations made by ICE's Acting Director that the address information was being sought for use in, and would be used solely for, a nontax criminal investigation—a subject matter that lies well beyond any IRS agency expertise, and one in which Congress plainly did not intend for IRS to substitute its judgment for that of the head of the requesting agency.

Egregiously, the district court not only enjoined ICE from impermissibly using the information for civil enforcement, where there was no evidence to suggest it might do so, but also from permissibly using the information for criminal enforcement. (A641-642.) That facially overbroad injunction cannot stand.

### d.    ICE's handling of the address information

Last, the district court concluded that ICE's handling, use, and storage of the information it received from IRS was in violation of § 6103. (A632-636.) As provided in the MOU's Implementing Agreement (A359), IRS's August 2025 disclosure was in the form of a

59

large data file that it shared with ICE via Kiteworks, a secure file

sharing and transfer platform.  The data transfer was coordinated and

retrieved on Assistant Director Williams' behalf by personnel in the ICE

Homeland Security Investigations Cyber and Operational Technology

Division and then provided to the Assistant Director's Enforcement and

Removal Operations, Law Enforcement Systems and Analysis, team.

(A506-508, A646-647.)  The district court said that the use of these

"intermediaries" violated the statute.  (A633-634.)  But the court

ignored regulations promulgated under § 6103 that permit officers and

employees to whom disclosure is authorized to further disclose return

information to other officers and employees of the agency, including

clerical or other personnel, with "specialized knowledge or technical

skills" needed for the criminal investigation or prosecution.  26 C.F.R.

§ 301.6103(i)-1(b); *see also* 26 U.S.C. § 6103(q).  Here, it is entirely

reasonable that Assistant Director Williams (who was himself

personally and directly engaged in ICE's criminal investigation) would

require support from individuals with specialized knowledge or

technical skills in information technology to retrieve and safeguard the

IRS data and to assist with the computerized data analysis required to

60

effectively interpret and use the information.  (*See* A506-508, A646-647.)  The regulations logically provide for that kind of operational business reality, allowing further disclosure to other officers and employees of the agency to the extent needed for the criminal investigation or prosecution, which the district court failed to acknowledge or appreciate.  Therefore, the district court had no basis to conclude that those ICE officers and employees with access to the address information were unauthorized under the statute and regulations.  As noted, the DHS Secretary represented in the MOU that "ICE will use *and redisclose* the address information only as specifically authorized by IRC § 6103(i)(2) *as implemented in 26 C.F.R. § 301.6103(i)-1*" (A374), which is all that happened here.

Even further afield is the district court's conclusion (A634) that ICE is not even "organizationally capable" of segregating IRS information for use in criminal investigations.  That conclusion is beyond the pale and was arrived at by the court based entirely on a generic description of how ICE has in the past conducted certain criminal investigations that do not involve a statutory obligation to segregate information, as here.  It contravenes the repeated

61

representations by the DHS Secretary and ICE's Acting Director that the information would be used solely for criminal enforcement (A343, A418-419), as well as ICE's declarations submitted in the district court that the information would be "properly tagged and identified as IRS data, marked restricted, and designated for use in criminal investigations" (A508).  It is doubtful the district court understands ICE's "organizational capabilities" better than the agency itself.

Moreover, the precise manner and method selected by ICE to segregate the information for use solely in criminal investigations is the very sort of "day-to-day operations" of a federal agency that courts may not superintend under the APA, *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 899 (1990), and the district court had no business doing so here.

ICE's handling, use, and storage of the address information did not violate § 6103.

## II.   Plaintiffs failed to establish the remaining preliminary injunction factors

The remaining preliminary injunction factors—irreparable harm, the balance of equities, and the public interest—likewise favor the government and cannot justify the district court's injunction.

62

## A.    Irreparable harm

"Irreparable injury" in the preliminary injunction context "means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).  Here, plaintiffs cannot establish a cognizable injury for Article III standing purposes, let alone the kind of irreparable harm necessary to support a preliminary injunction.

While this Court affords "considerable deference" to a district court's evaluation of irreparable harm, *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009), plaintiffs cannot show irreparable harm here because Congress has already crafted a statutory scheme specifically outlining the nature and scope of the remedy—*i.e.*, monetary damages—for any violation of 26 U.S.C. § 6103.  *See supra* pp. 41-44; 26 U.S.C. § 7431.  The availability of monetary relief, which Congress already determined was the appropriate remedy, belies any claim to irreparable harm.

63

The district court nevertheless determined that plaintiffs' members would suffer irreparable harm absent an injunction because they have been "chilled from filing taxes" and thus "deprived of necessary tax credits." (A637.) That alleged harm, however, is fully compensable by later-issued money damages. The district court also said that not filing taxes would "complicate their immigration statuses." (A637.) But that is "a tenuous or overly speculative forecast of anticipated harm," *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996), given that the agencies' address sharing under the MOU pertains only to aliens who are already subject to a final order of removal. (A341.) Plaintiffs made no showing relating to the impact on members who are subject to final removal orders and who have refused to leave the United States in violation of federal criminal law. And whether such individuals file taxes is unlikely to "complicate"—or even to affect at all—their immigration status. Furthermore, any harm resulting from their failure to file taxes would be self-inflicted in any event, and self-inflicted harm does not qualify as irreparable. *San Francisco Real Est. Invs. v. Real Est. Inv. Tr. of Am.*, 692 F.2d 814, 818 (1st Cir. 1982); *Salt Lake Trib. Pub. Co., LLC v. AT &*

64

*T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995); 11A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice & Procedure* § 2948.1 pp. 152-53 (1995).

The district court also concluded that plaintiffs are harmed due to an "erosion of trust between the organizations and their members" because the organizations previously assured their members that their tax information was confidential.  (A637.)  But, again, that alleged harm is self-inflicted.  Plaintiffs have only themselves to blame if they failed to inform their members of the numerous statutory exceptions to the general rule of confidentiality that authorize, and sometimes require, IRS to disclose taxpayer information, 26 U.S.C. § 6103(c)–(o), including § 6103(i)(2) that mandates IRS to disclose return information to other federal agencies for their use in criminal investigations and prosecutions.  The agencies' address-sharing under the MOU is consistent with § 6103(i)(2) and plainly lawful, and plaintiffs' failure to accurately advise their members of the law is not a basis for finding irreparable harm.

65

The district court articulated no other basis for finding irreparable harm; and the reasons it gave do not suffice to show a likelihood of irreparable injury, which by itself precludes a preliminary injunction. *See Winter*, 555 U.S. at 20, 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.").

## B.    Balance of equities and public interest

As for the remaining factors, allowing the injunction to stand threatens irreparable injuries to the government and the public, whose interests "merge" in this context. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The district court's order is far-reaching and extreme. Based on the court's misinterpretation of § 6103(i)(2)'s requirements, the order obstructs federal law enforcement by precluding ICE from obtaining and using information that it is statutorily entitled to receive from IRS and that is relevant to its criminal investigation of aliens who may have committed a felony under 8 U.S.C. § 1253(a)(1). (A641-642.) "Any time [the government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in

chambers). Moreover, the address-sharing policy under the MOU applies only to aliens who are subject to a final removal order (A341), and there is no public interest in helping aliens who have overstayed a final removal order to evade criminal law enforcement.

In balancing the equities and the public interest, the district court relied primarily on the unfounded "potential [for] misidentification … that could lead to wrongful arrests, detention and even removal" of plaintiffs' members who have no removal order. (A639.) As we demonstrated *supra* pp. 30-34, the assertion that IRS and ICE will commit legal or administrative errors in carrying out their official responsibilities is pure speculation and contravenes the presumption of regularity. "Injunctions against administrative officers" are not appropriate "on the mere apprehension that they will not do their duty or will not follow the law." *Waite v. Macy*, 246 U.S. 606, 609 (1918). And it of course does not justify enjoining policies that are consistent with the law. The harms to the government and the public far outweigh any asserted injury to plaintiffs or their members.

## III. The district court improperly granted relief to nonparties

Even if it were not otherwise an abuse of discretion, the district court's order improperly stays the implementation and enforcement of the address-sharing policy under the MOU for *everyone*, instead of granting party-specific relief as *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), requires. *CASA* makes clear that Congress "has granted federal courts no" power to issue "universal injunction[s]." *Id.* at 841. Consistent with the longstanding limits on equitable power that cabin the authority provided to federal courts in the Judiciary Act of 1789, federal courts sitting in equity may provide—at most—"complete relief between the parties." *Id.* at 851. That principle required the district court to limit relief to plaintiffs in this case.

5 U.S.C. § 705 provides no avenue around the equitable limitations on non-party relief identified in *CASA*. That provision permits a court to stay agency action only "to the extent necessary to prevent irreparable injury," which incorporates constitutional and equitable limitations on non-party relief. Congress intended that § 705 relief would be "equitable" and used only "to prevent irreparable injury." H.R. Rep. No. 79-1980, at 43 (1946). Consistent with equitable

principles, Congress understood that "[s]uch relief would normally, if not always, be limited to the parties complainant." *Id.* More generally, the APA is explicit that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground." 5 U.S.C. § 702(1). Thus, consistent with the equitable principles articulated in CASA, the APA requires courts to decline to enter universal relief, however styled, where other remedies would fully redress the plaintiffs' injuries.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's February 5, 2026 order.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

AUGUST FLENTJE

 */s/ Jacob Christensen*
JACOB CHRISTENSEN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 4629*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 307-0878*
  *jacob.christensen@usdoj.gov*

June 2026

70

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains <u>12,950</u> words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Jacob Christensen*
Jacob Christensen

# ADDENDUM

**TABLE OF CONTENTS**

<u>**Page**</u>

District Court's Memorandum and Order (Dkt. 75) ................................. 1

Memorandum of Understanding (Dkt. 39-1) ........................................... 43

Implementing Agreement (Dkt. 39-1) ................................................... 58

8 U.S.C. § 1253 ................................................................................. 62

26 U.S.C. § 6103 .............................................................................. 62

26 C.F.R. § 301.6103(i)-1 .................................................................. 69

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

COMMUNITY ECONOMIC       *
DEVELOPMENT CENTER OF      *
SOUTHEASTERN MASSACHUSETTS;   *
NATIONAL PARENTS UNION;     *
NATIONAL KOREAN AMERICAN    *
SERVICE AND EDUCATION      *
CONSORTIUM; UNDOCUBLACK     *
NETWORK, INC.,          *
              *
   Plaintiffs,         *
              *
     v.           *
              *
SCOTT BESSENT, Acting Commissioner of   *
the Internal Revenue Service and Secretary   *    Civil Action No. 1:25-cv-12822-IT
of the Treasury; INTERNAL REVENUE   *
SERVICE; FRANK BISIGNANO,     *
Commissioner of the Social Security    *
Administration; SOCIAL SECURITY    *
ADMINISTRATION; TODD M. LYONS,   *
Acting Director of U.S. Immigration and   *
Customs Enforcement; U.S.      *
IMMIGRATION AND CUSTOMS    *
ENFORCEMENT; KRISTI L. NOEM,    *
Secretary of Homeland Security;     *
DEPARTMENT OF HOMELAND    *
SECURITY,          *
              *
   Defendants.        *

MEMORANDUM & ORDER

February 5, 2026

TALWANI, D.J.

This litigation concerns the sharing of taxpayer addresses by Defendants Internal

Revenue Service ("IRS") and Social Security Administration ("SSA") with Immigration and

Customs Enforcement ("ICE") within the Department of Homeland Security ("DHS"). Plaintiffs,

four community organizations with members based in Massachusetts and across the country,

1

Add. 1

contend that Defendants have entered and implemented data sharing agreements that violate the privacy protections of the Tax Reform Act of 1976, specifically 26 U.S.C. § 6103, and that this agency action, *inter alia*, is contrary to law and arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706, et seq. Am. Compl. ¶¶ 182–198 [Doc. No. 73].

Plaintiffs' Motion for Relief under 5 U.S.C. §§ 705, 706 or, in the alternative, for Preliminary Injunction [Doc. No. 27] seeks a stay or, in the alternative, a preliminary injunction, as to all Defendants. On January 27, 2026, the court denied the motion without prejudice as to Defendants IRS, Department of Treasury, and Treasury Secretary Bessent (the "IRS Defendants"), where a preliminary injunction limiting the IRS Defendants' implementation of data sharing agreements is in place through other litigation. Elec. Order [Doc. No. 72]; Ctr. for Taxpayer Rights v. Internal Revenue Serv., 2025 WL 3257096, at *1 (D.D.C. Nov. 21, 2025); see also Ctr. for Taxpayer Rights v. Internal Revenue Serv., 2025 WL 3251044, at *43 (D.D.C. Nov. 21, 2025).[1] The court also denied the motion without prejudice as to Defendants SSA and SSA Commissioner Frank Bisignano, where the record before the court was not sufficient to make a finding that sharing of tax information between SSA and ICE has or is likely to occur. Elec. Order [Doc. No. 72].

The court now turns to Plaintiffs' motion as to Defendants ICE, DHS, Secretary of DHS Kristi Noem, and Acting Director of ICE Todd M. Lyons (the "ICE Defendants") and, in

---

[1] Pursuant to the D.C. district court's Order, the IRS Defendants are now preliminarily enjoined "from disclosing any return information, including taxpayer return information, to [DHS] or any of its component agencies pursuant to [26 U.S.C.] Section 6103(i)(2), except in strict compliance with the requirements of that Section, including that the recipients of the information be "officers and employees of [the receiving] agency who are personally and directly engaged in" a relevant nontax criminal investigation or proceeding and that the recipients will use the information "solely for" that criminal investigation or proceeding. Ctr. for Taxpayer Rights, 2025 WL 3257096, at *1 (alteration in original).

Add. 2

particular, to Plaintiffs' request for an order not only staying information sharing between the agencies, but also enjoining the ICE Defendants and their agents "from inspecting, viewing, using, copying, distributing, relying on or otherwise acting upon any return information" obtained from the IRS, including "relying on such information in any way for the purposes of identifying, locating, arresting, detaining, or deporting any person." See Proposed Order 1–2 [Doc. No. 35-1]. For the reasons that follow, as to the ICE Defendants, Plaintiffs' Motion [Doc. No. 27] is GRANTED.

## I.    Background

All U.S. income-earners must report and pay taxes on their income, regardless of citizenship status. 26 U.S.C. §§ 1, 2(d), 871. The Internal Revenue Code, 26 U.S.C. §§ 1, et seq., sets forth the tax-filing process.

### A.   Section 6103

#### 1.   Overview

The Internal Revenue Code provides strong privacy protections for information submitted by taxpayers and/or obtained by the IRS. See 26 U.S.C. § 6103. In response to prior uses of taxpayer information for improper purposes, Congress amended Section 6103 through the Tax Reform Act of 1976, "to protect the privacy of tax return information and to regulate in minute detail the disclosure of this material." Lake v. Rubin, 162 F.3d 113, 115 (D.C. Cir. 1998); see Ctr. for Taxpayer Rights, 2025 WL 3251044, at *3 (describing the history of the Tax Reform Act, "passed in the wake of Watergate[.]") (quoting Tax Analysts v. I.R.S., 117 F.3d 607, 611 (D.C. Cir. 1997)); see also Church of Scientology of California v. I.R.S., 484 U.S. 9, 16 (1987) ("One of the major purposes in revising § 6103 was to tighten the restrictions on the use of return information by entities other than [the IRS].").

3

Add. 3

As a general rule, "[r]eturn and return information shall be confidential[.]" 26 U.S.C. § 6103(a). As the accompanying Senate Report noted, "returns and return information should generally be treated as confidential and not subject to disclosure except in those limited situations delineated in the newly amended section 6103." S. REP. NO. 94–938, at 318 (1976), as reprinted in 1976 U.S.C.C.A.N. 2897, 3747.

Congress defined "return" and "return information" subject to the confidentiality restrictions very broadly. A "return" is "any tax or information return, declaration of estimated tax, or claim for refund . . . filed with the [IRS] by, or on behalf of, or with respect to any person[.]" 26 U.S.C. § 6103(b)(1). The statute defines "return information" as "a taxpayer's identity, the nature, source, or amount of [] income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments," and "any other data, received by, recorded by, prepared by, furnished to, or collected by the [IRS]" with respect to a return or the determination of a tax, penalty or fine; as well as any written determinations, background documents, and agreements with the taxpayer. Id. § 6103(b)(2). "Taxpayer identity" is defined, in turn, as "the name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number (as described in [S]ection 6109), or a combination thereof." Id. § 6103(b)(6). The "taxpayer identifying number" is the taxpayer's Social Security Number ("SSN"), id. § 6109(a), or for taxpayers without an SSN, the Individual Tax Identification Number ("ITIN") assigned by the IRS, id. §§ 6109(d), (i).

Congress carefully delineated certain exceptions to Section 6103's general rule of confidentiality. Exceptions set forth in Section 6103(i) providing for limited disclosure by the IRS in connection with non-tax criminal matters are at issue here. Also at issue are restrictions on the use by the recipients of the disclosed information found in Sections 6103(i) and (p).

4

Add. 4

2. <u>Section 6103(i) – IRS Disclosure of Records in Non-Tax Criminal Matters</u>

Section 6103(i) allows for limited disclosure of confidential tax information in connection with federal non-tax criminal matters. 26 U.S.C. § 6103(i). Reflecting Congress' policy objective of confidentiality, Section 6103(i) provides for disclosure of returns and return information in connection with non-tax criminal matters only when constrained by significant procedural safeguards. As explained in the IRS' Internal Revenue Manual, in enacting Section 6103(i), "Congress decided that federal law enforcement officials should not have easier access to information about a taxpayer maintained by the IRS than they would have if they sought to compel the production of that information from the taxpayer themselves." IRM § 11.3.28.1.1(1) (Apr. 17, 2025).

The different subsections of Section 6103(i) provide different schemes, with varying procedures required for disclosure, depending on the type and source of information sought, the purpose for which federal employees and officers intend to use the information, and the stage of the criminal proceeding.

Three subsections of Section 6103(i) are relevant here. The first two subsections address obtaining information in connection with "criminal investigations." 26 U.S.C. §§ 6103(i)(1), (2). Under both subsections (i)(1) and (i)(2), if other requirements are met, the IRS may disclose certain information to federal officers and employees "personally and directly engaged in" (1) preparing for a judicial or administrative criminal, but non-tax related, proceeding; (2) an investigation that may result in such a proceeding; or (3) a grand jury proceeding regarding a criminal, but non-tax, violation. 26 U.S.C. §§ 6103(i)(1)(A), (2)(A). Under both subsections, the information sought must be "solely for the use of such officers and employees in such preparation, investigation, or grand jury proceeding." <u>Id.</u> §§ 6103(i)(1)(A), (2)(A). These two

5

Add. 5

subsections differ significantly based on the source of the return information: more stringent protections apply to information that includes "taxpayer return information[,]" that is, "return information" filed by or on behalf of the taxpayer to whom the return information relates, 26 U.S.C. § 6103(b)(3), than to return information created by the IRS[2] or sourced from a third-party.[3] See IRM § 11.3.28.1.1(3) ("IRC [§] 6103(i) is the only code section where it may be necessary to distinguish between taxpayer return information and return information (other than taxpayer return information).").

Under the first subsection, if the information sought by the federal officers and employees personally involved in the criminal investigation includes taxpayer return information, a court order is required to permit the IRS to disclose the information. 26 U.S.C. § 6103(i)(1)(A); see IRM § 11.3.28.1.1(1) (in general, "a federal agency enforcing a non-tax criminal law must obtain court approval to obtain a return or return information submitted by the taxpayer or their representative."). The court may only authorize the IRS' disclosure of taxpayer return information if: (1) "there is reasonable cause to believe, based upon information believed to be reliable, that a specific criminal act has been committed," (2) "there is reasonable cause to believe that the return or return information is or may be relevant to a matter relating to the commission" of the criminal act, and (3) "the return or return information is sought exclusively for use in a criminal investigation or proceeding . . . and the information sought to be disclosed cannot reasonably be obtained . . . from another source." 26 U.S.C. § 6103(i)(1)(B)(i)–(iii) (emphasis added).

---

[2] E.g., an agreement to finalize taxpayer liability. See 26 U.S.C. § 6103(b)(2)(D).

[3] E.g., financial documents seized from a taxpayer during a raid and sent by the police to the IRS. IRM § 11.3.28.1.5.2(3) (Apr. 17, 2025).

6

Add. 6

Under the second subsection, the IRS may "disclose return information (other than taxpayer return information)" to the federal officers and employees personally involved in the criminal investigation without a court order. Id. § 6103(i)(2). For the IRS to disclose return information under this provision, either the head or inspector general of an agency (or certain other enumerated officers) must submit a written request to the IRS for "return information other than taxpayer return information." Id. § 6103(i)(2)(A) (parentheses omitted). The request must meet specific requirements. Id.

First, the written request must identify the agency employee who is "personally and directly engaged in" the criminal investigation described in subsection 6103(i)(1)(A). Id.

Second, the written request must include:

(i) the name and address of the taxpayer with respect to whom the requested information relates;

(ii) the taxable period or periods to which return information relates;

(iii) the statutory authority under which the proceeding or investigation . . . is being conducted; and

(iv) the specific reason or reasons why such disclosure is, or may be, relevant to such proceeding or investigation.

26 U.S.C. § 6103(i)(2)(B).

Subsection 6103(i)(2) provides that "[f]or purposes of this paragraph, a taxpayer's identity shall not be treated as taxpayer return information." Id. § 6103(i)(2)(C). The "taxpayer's identity," including the taxpayer's address, is still protected, however, as "return information." Id. § 6103(b)(2).

The third relevant subsection of Section 6103(i) allows for disclosure following a criminal investigation resulting in an arrest warrant where the return or return information is sought to "locate fugitives from justice." Id. § 6103(i)(5). Under this subsection, an application must be made to the court, to allow disclosure to federal officers and employees "exclusively for

7

Add. 7

use in locating such individuals," id. § 6103(i)(5)(A). The court may grant the application if the

applicant can show that:

(i) a Federal arrest warrant relating to the commission of a Federal felony offense has been issued for an individual who is a fugitive from justice,

(ii) the return of such individual or return information with respect to such individual is sought exclusively for use in locating such individual, and

(iii) there is reasonable cause to believe that such return or return information may be relevant in determining the location of such individual.

Id. § 6103(i)(5)(B).

### 3. Section 6103 – Use and Protection of Tax Information Disclosed by the IRS

Section 6103 provides that "no officer or employee of the United States" may disclose

"return or return information obtained by him" except as authorized under the Internal Revenue

Code. Id. § 6103(a)(1). The statute does not merely apply to IRS employees, instead, it forbids

any officers and employees of the United States who obtain this information from making an

impermissible disclosure. Id. § 6109(a)(1). As noted above, under both subsections 6103(i)(1)

and (2), the information sought for preparing for a judicial or administrative criminal proceeding;

an investigation that may result in a criminal proceeding; or a grand jury proceeding regarding a

non-tax criminal violation, must be "solely for the use of such officers and employees in such

preparation, investigation, or grand jury proceeding." Id. §§ 6103(i)(1)(A), (2)(A). Subsection

6103(i)(5), which provides for disclosure for the purpose of locating an individual, is similarly

limited to federal officers and employees' use for that specified purpose.[4]

---

[4] None of the three subsections discussed permits further disclosure to State and local law enforcement agencies. In contrast, subsection 6103(i)(3)(B)(i), which deals with emergency circumstances involving an imminent danger of death or physical injury; subsection 6103(i)(1)(C), which deals with missing children; and subsection 6103(i)(7), which deals with terrorist activities, include provisions for disclosure to state or local enforcement officers and employees personally and directly engaged in the investigation as part of a team with federal law enforcement. Subsections 6103(a)(2) and (3) provide further that officers and employees of any state or local law enforcement agency who have access to returns or return information under

8

Add. 8

Section 6103(p), in turn, provides that any federal agency obtaining records under these three (and other provisions) must, to the satisfaction of the Secretary, (1) maintain a permanent system of standardized records, including any disclosures of return or return information made by the agency; (2) establish a secure area or place in which such returns or return information is stored; (3) "restrict . . . access to the returns or return information only to persons whose duties or responsibilities require access and to whom disclosure may be made under the provisions of this title[;]" (4) provide other safeguards as necessary to protect the confidentiality of the returns or return information; and (5) and upon completion of the use of the returns or return information, return them (and all copies) to the Secretary or otherwise make the records undisclosable. 26 U.S.C. § 6103(p)(4).

**B.   IRS Policy Regarding Disclosure of Addresses Prior to the Events at Issue here**

Prior to the events at issue here, the IRS's stated policy was to reject address-only requests for confidential tax information pursuant to Section 6103(i)(2). IRM § 11.3.28 ("Material Changes") (2025), https://www.irs.gov/irm/part11/irm_11-003-028 (last visited Feb. 4, 2026) (Prior to April 17, 2025, the Manual stated "requests for addresses only cannot be honored because IRC § 6103(i)(2) requires that the requester provide an address.").

The IRS's construction was consistent with the White House Office of General Counsel's statement at the time of the 1982 amendment, which had added the provision "[f]or purposes of this paragraph, a taxpayer's identity shall not be treated as taxpayer return information" to subsection 6103(i)(2). 26 U.S.C. § 6103(i)(2)(C). In explaining this amendment, the White House Office of General Counsel noted that Congress had:

---

specific subsections of Section 6103 are also prohibited from disclosing such information. See id. §§ 6103(i)(3)(B)(i), 6103(i)(1)(C)(i), 6103(i)(7)(A)(ii).

Add. 9

recognized that if [the IRS] was to respond to a written request for information which was not furnished by or on behalf of the taxpayer, it could not as a practical matter transmit the information without providing the name and address of the requested individual. Since the ultimate source of the name and address would have been the taxpayer's return, a technical argument existed that [the IRS] could not provide the information without an *ex parte* court order. This would, of course, have completely negated the purpose and operation of the written request provision. As a result, section 6103(i)(2) was amended so that if [the IRS] received a proper written request, it could disclose name and address information under the same circumstances that it could disclose <u>other information which was not received from or on behalf of the taxpayer</u>.

See Mem. from Fred F. Fielding, Couns. to the President, for Craig L. Fuller, White House Cabinet Sec'y (Aug. 6, 1982), at 1 (emphasis added). In other words, the purpose of the language, as stated by then-White House Counsel, was to ensure that, if an agency submitted a proper request for information not furnished by or on behalf of the taxpayer under Section 6103(i)(2), the information that was not furnished by or on behalf of the taxpayer could be disclosed even though it contained the taxpayer's name and address. By this reading, an address-only request falls outside the ambit of subsection 6103(i)(2) because it does not seek information obtained from a non-taxpayer source that might also contain the taxpayer's name and address.

The IRS's stated policy that addresses alone would not be provided under Section 6103(i)(2) was also consistent with another subsection, which sets forth the requirement of a court order for law enforcement agencies to obtain addresses when seeking to locate fugitives. See 26 U.S.C. § 6103(i)(5)(B).

10

Add. 10

### C. IRS Data-Sharing with ICE as Set Forth in the Administrative Record[5]

#### 1. ICE's Initial Request to Locate Noncitizen Taxpayers

As a component of President Trump's immigration policy agenda,[6] on February 18, 2025, ICE requested that the IRS "assist[] in an ICE led effort to locate approximately 700,000 individuals who are all under Final Orders of Removal." Defs.' Opp'n, Ex. A, at TD_0000001 ("Admin. Record") [Doc. 39-1]. As noted, at the time, the IRS's stated policy was to reject address-only requests under Section 6103(i)(2). See supra Section I.B.

#### 2. IRS April 7, 2025 Memorandum of Understanding

Following negotiation between the agencies (and the departure of some IRS employees), see Ctr. for Taxpayer Rights, 2025 WL 3251044, at *3–6 (describing interactions between officials at the IRS and ICE during Spring 2025), on April 7, 2025, the IRS and ICE entered into a Memorandum of Understanding (the "IRS-ICE MOU") regarding the sharing of tax information across agencies to implement President Trump's direction that DHS "take immediate steps to identify, exclude, or remove aliens illegally present in the United States." Am. Compl., Ex. A, at ECF 3 ("IRS-ICE MOU") [Doc. No. 73-1]. The IRS-ICE MOU explained that DHS "has identified numerous aliens illegally present in the United States . . . under final orders to remove them from the United States[.]" Id.

Further, DHS asserted that "each of the above-referenced individuals is under criminal investigation for violations of one or more" federal criminal statutes, "including 8 U.S.C.

---

[5] Defendants state that "Plaintiffs import limited portions of the Administrative Record ["AR"] in Center for Taxpayer Rights v. IRS, No. 1:25-cv-00457-CKK (D.D.C. 2025), into this case[,]" and that "[f]or completeness, Defendants [have] provide[d] more of that AR (i.e., all but the 'authorities' portion thereof) as Exhibit A [Doc. No. 39-1]." See Defs.' Opp'n 3 n.1 [Doc. 39]. The court cites to the AR, as submitted by the Defendants.

[6] See Exec. Order No. 14,161, Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats, 90 Fed. Reg. 8451 (Jan. 20, 2025).

Add. 11

§ 1253(a)(1)[.]" Id. The cited immigration statute subjects a noncitizen who "willfully fails or refuses to depart from the United States within a period of 90 days from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court" to criminal penalties. 8 U.S.C. § 1253(a)(1) (emphasis added). The MOU described its purpose "to establish the procedures and requirements for ICE's submission of valid IRC § 6103(i)(2) requests for addresses of persons subject to criminal investigation under 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statutes." IRS-ICE MOU, at ECF 4 [Doc. No. 73-1] (emphasis added).

The IRS-ICE MOU provided an overview for the "duties and responsibilities" of both the IRS and ICE. Id. at ECF 4–5. Under the MOU, ICE stated its intent to "[s]end requests[7] for address information for specifically identified individuals . . . consistent with IRC [26 U.S.C. §] 6103(i)(2)(A)." Id. at ECF 5. As specified by the MOU, the requests must include:

1. The name and address of the taxpayer.

2. The taxable period or periods as to which the return information (address) they are seeking relates.

3. The specifically designated nontax Federal criminal statute (i.e., 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statute) under which an investigation or proceeding regarding the individual is being conducted.

4. The date of the final order of removal and the related case number assigned to each such order.

5. The specific reason or reasons why disclosure is, or may be, relevant to the nontax criminal investigation or proceeding. Any other information ICE can provide to help the IRS identify each individual, such as SSNs, ITINs, etc.

6. Identity information for the ICE officers and employees personally and directly engaged in the nontax criminal investigation that may result in criminal charges

---

[7] ICE committed in the MOU to sending as part of ICE's request the following identification information: "CVID [e.g., SSN or ITIN]; [Alien Registration] Number; First, Middle and Last Name; Address Information; Date of Birth; Country of Citizenship; FBI Numbers; and Fingerprint Identification Number[.]" IRS-ICE MOU, at ECF 7 [Doc. No. 73-1].

Add. 12

against the individual under the specifically designated Federal criminal statute ICE has identified.

Id. The IRS-ICE MOU specified that the request must attest that "the requested address information will only be used by officers and employees of ICE solely for the preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings, pertaining to the enforcement of 8 U.S.C. § 1253(a)(1), other specifically designated Federal criminal statute, or any subsequent criminal proceedings[,]" and that "[r]eturn information disclosed . . . shall be open to inspection by or disclosure to ICE officers and employees personally and directly engaged in, and for their necessary use in, proceedings and investigations that may result in such proceedings, pertaining to the enforcement of a specifically designated nontax Federal criminal statute." Id.

Under the IRS-ICE MOU, the IRS agreed to screen ICE's request for "completeness and validity[,] and return to ICE any requests" not compliant with subsection 6103(i)(2). Id. at ECF 4. Should the IRS find a request to be legally sufficient, the IRS committed to "[s]earch for the last known address for each individual in each request." Id. Further, for "each individual the IRS is able to identify from the information provided by ICE, [the IRS agreed to] provide the IRS last known address for that individual [to ICE]." Id. If the IRS is unable to identify an individual based on the information ICE provided in its legally sufficient request, the IRS agreed to communicate to ICE that the IRS was unable to "identify [a taxpayer] from the information provided by ICE." Id.

On April 17, 2025, the IRS removed from its Manual its former policy to reject address-only requests for confidential tax information pursuant to § 6103(i)(2). IRM § 11.3.28 (2025) ("Material Changes"), https://www.irs.gov/irm/part11/irm_11-003-028 (last visited Feb. 4, 2026).

13

Add. 13

### 3. ICE and IRS Implementing Agreement

On April 18, 2025, the IRS and ICE entered into an Implementing Agreement for the IRS-ICE MOU. See Am. Compl. Ex. B ("ICE-IRS Implementing Agreement") [Doc. No. 73-2]. Pursuant to the Agreement, the IRS agreed to disclose information requested from six Systems of Records to ICE: Treasury/IRS 22.060 Automated Non-Master File, 80 FR 54064 (Sept. 8, 2015); Treasury/IRS 34.037 IRS Audit Trail and Security Records System, 80 FR 54064 (Sept. 8, 2015); Treasury/IRS 24.030 Customer Account Data Engine Individual Master File, 80 FR 54064 (Sept. 8, 2015); Treasury/IRS 24.046 Customer Account Data Engine Business Master File, 80 FR 54064 (Sept. 8, 2015); Treasury/IRS 22.061 Individual Return Master File, 80 FR 54064 (Sept. 8, 2015); and Treasury/IRS 42.008 Audit Information Management System, 80 FR 54064 (Sept. 8, 2015). ICE-IRS Implementing Agreement, at ECF 3 [Doc. No. 73-2].

The Implementing Agreement states further that the information provided by the IRS would be maintained by ICE in the following Systems of Records: Alien File, Index, and National File Tracking, 82 F.R. 43556, (Sep. 18, 2017); External Investigations, 85 F.R. 74362 (Nov. 20, 2020); and Criminal Arrest Records and Immigration Enforcement Records (CARIER), 89 F.R. 55638 (Jul. 5, 2024). ICE-IRS Implementing Agreement, at ECF 4 [Doc. No. 73-2].

### 4. ICE and IRS Implementation of the IRS-ICE MOU

On June 5, 2025, ICE sent a request to the IRS for address information for "the full alien population" of 7,615,279 individuals. See Admin. Record, at TD_0000086 [Doc. No. 39-1]. ICE explained that a name was associated with each request "but there may not always be an address available[.]" Id. at TD-0000084. ICE stated that it did not indicate a taxable period because ICE did "not specifically know the tax filing status of any of these individuals." Id. ICE further

14

Add. 14

explained that "[t]he request is to enrich the data with relevant address data so the most recent address that IRS can identify associated with any of the individuals would be the primary goal." Id. As to the nontax criminal statute relevant to an active investigation or proceeding, ICE wrote "8 USC [§] 1325 – Improper entry by alien[.]" This request was rejected by the IRS on June 7, 2025. Id. at TD_0000083.

On June 24, 2025, ICE sent a second request for approximately 7.3 million records. Id. at TD–0000093. This request was also found "deficient" by IRS personnel, where it excluded four significant components, namely: "[a] written request from the head of Federal agency"; "[t]he specific reason or reasons why disclosure is, or may be, relevant to the nontax criminal investigation or proceeding"; "[i]dentity information for the ICE officers and employees personally and directly engaged in the nontax criminal investigation that may result in criminal charges against the individual under the specifically designated Federal criminal statute ICE has identified"; and "[a]ttestation for each request - stating the requested address information will only be used by officers and employees of ICE solely for the preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings." Id. IRS personnel explained that the requirements set forth in the IRS-ICE MOU were "derived from [S]ection 6103(i)(2)[]." Id.

On June 27, 2025, ICE sent a third request for approximately 1.2 million individuals to the IRS. Id. at TD_0000107–108, 112. This second submission was reviewed by the IRS and determined to substantially comply with the requirements laid out in 26 U.S.C. § 6103(i)(2), id. at TD_0000108, despite various deficiencies discussed below. After screening out those taxpayers who had not overstayed a Final Order of Removal by over ninety days, and, therefore, could not have violated 8 U.S.C. § 1253(a)(1), the IRS identified "match[ing]" records for

15

Add. 15

roughly 47,000 noncitizen taxpayers and disclosed those individuals' address information to ICE on August 7, 2025. Id. at TD_0000143–146.

### D. Litigation in the D.C. District Court

Following the implementation of the IRS-ICE MOU, a different group of plaintiffs moved for injunctive relief against the IRS, Department of Treasury, and Secretary Bessent in the United States District Court for the District of Columbia. See Ctr. for Taxpayer Rights, 2025 WL 3251044.

In a detailed opinion, the Ctr. for Taxpayer Rights court found that the implementation of the IRS-ICE MOU, i.e. IRS' disclosure of 47,000 taxpayer addresses to ICE, constituted arbitrary and capricious final agency action. Id. at *29. The D.C. district court found that the IRS violated the Internal Revenue Code's requirement that confidential taxpayer information be disclosed only to Federal agency officers and employees "personally and directly engaged in" in a criminal investigation. Id. at *22, 29 (citing 26 U.S.C. § 6103(i)(2)(A)). The court found a further violation in IRS' disclosure of taxpayer addresses to ICE "[w]ithout first confirming that an address provided by ICE matched an address the IRS had in its system." Id. at *26 (citing 26 U.S.C. § 6103(i)(2)(B)(i)). The court also found that IRS' implementation of the IRS-ICE MOU failed to comport with Congress' purpose in enacting Section 6103(i)(2), i.e. to permit federal employees, engaged in the non-tax criminal investigations or proceedings, to have access to "return information other than taxpayer return information" for the limited purpose of assisting in those criminal investigations or proceedings. Id. at *28–29. The court pointed out that ICE's third amended request to the IRS on June 27, 2025, failed to adequately set forth the "specific, individualized reason" for which the taxpayer address information was relevant. Id. at *28 (citing 26 U.S.C. § 6103(i)(2)(B)(iv)). Finally, the court determined that ICE's June 27, 2025 request

16

failed to include "the taxable period or periods" to which the requested taxpayer information related. Id. at *29 (citing 26 U.S.C. § 6103(i)(2)(B)(ii)). The court found that the IRS' disclosure, despite these enumerated violations of Section 6103(i)(2), violated the Administrative Procedure Act, 5 U.S.C. § 706. Ctr. for Taxpayer Rights, 2025 WL 3251044 at *29. Additionally, the court determined that the IRS' disclosure of taxpayer addresses to ICE was a significant policy change, for which the agency failed to provide a reasoned explanation, and was therefore arbitrary and capricious. Id. at *30–31.

The Ctr. for Taxpayer Rights court granted Plaintiffs' request for preliminary relief and (1) stayed IRS' policy to disclose address information pursuant to the terms of the IRS-ICE MOU; and (2) preliminarily enjoined the IRS from disclosing "any return information, including taxpayer information" to DHS and ICE, "except in strict compliance" with Section 6103(i)(2). See Ctr. for Taxpayer Rights, 2025 WL 3257096, at *1. The court ordered further that

> on or before November 24, 2025, Defendant Bessent, in his official capacity as Secretary of the Treasury, or his designee, shall notify Secretary Kristi Noem, in her official capacity as Secretary of Homeland Security, and Todd M. Lyons, in his official capacity as Senior Official Performing the Duties of the Director of ICE, that, consistent with Section 6103(p)(4) of the Internal Revenue Code, Defendant Bessent or his designee, in furtherance of his responsibilities under the Internal Revenue Code, shall require that ICE will:

>> 1. "restrict . . . access to the returns or return information" disclosed on August 7, 2025, "only to persons whose duties and responsibilities require access and to whom disclosure may be made" consistent with the requirements of Section 6103(i)(2), including the requirement that such persons be "personally and directly engaged" in a relevant nontax criminal investigation or proceeding and that the information be used "solely for" such investigation or proceeding, see 26 U.S.C. § 6103(p)(4)(C); (i)(2)(A); and

>> 2. "upon completion of use of" the confidential return information received from the IRS on August 7, 2025, cause that information to be "return[ed] to the Secretary" or his designee or otherwise made "undisclosable," see id. § 6103(p)(4)(F).

Id. at *2.

Add. 17

On January 5, 2026, the government appealed the D.C. district court's order to the United States Court of Appeals for the D.C. Circuit. See Ctr. for Taxpayer Rights v. Internal Revenue Serv., No. 26-05006 (D.C. Cir. Jan. 13, 2026). The D.C. district court subsequently stayed proceedings, but the injunction remains in effect pending the outcome of the D.C. Circuit's decision. See Ctr. for Taxpayer Rights, No. 1:25-cv-00457-CKK, ECF No. 65 (Jan. 21, 2026).

**E. Further Information as to ICE's Use of Return Information**

In addition to the Administrative Record produced in the Ctr. for Taxpayer Rights litigation, Defendants here have provided two declarations from ICE regarding ICE's operations generally and its use of the return information. First, Brian McShane, the Acting Assistant Director of the Enforcement Division within ICE's Enforcement and Removal Operations ("ERO") component, describes various functions performed by units within ERO to "identif[y], investigate[], and arrest[] aliens subject to removal from the United States." Opp'n, Ex. C ¶ 2 ("McShane Decl.") [Doc. No. 39-3]. According to the McShane Declaration, within ERO, "[t]he Criminal Alien Program focuses on strategic planning and policy development to enhance ICE's ability to apprehend and remove criminal aliens and supports ERO field offices in enforcing violations of the United States Criminal Code against criminal offenders, in conjunction with the United States Attorney's Office." Id.

The Declaration states that "ERO's focus on criminal prosecutions . . . is typically performed by a specialized unit called ERO Criminal Prosecution (ECP) team," and asserts that "[t]hese teams initiate prosecution of crimes under Title 8 and Title 18 of the United States Code and execute criminal arrest warrants." Id. The Declaration describes further how the "Targeting Operations" component consists of three centers that "leverage technical capabilities, analytical tools, and law enforcement expertise to produce intelligence-driven leads on aliens subject to

18

Add. 18

removal." Id. The Declaration also describes how individual investigating officers collect information for 8 U.S.C. § 1253 (willful overstay of a final order of removal) investigations and that the officers will only present the case to a United States Attorney's Office for a determination of whether the case would be accepted or declined for prosecution after establishing that sufficient evidence exists to establish the elements of the criminal offence being charged. Id. ¶¶ 7–8. If insufficient for a criminal prosecution, the officers will bring civil enforcement actions, e.g. detention and removal. Id. ¶ 8.

In a second declaration,[8] Richard Fitzgerald, the Assistant Director for Cyber and Operational Technology for Homeland Security Investigations in DHS, states that the information received from the IRS was compared against "the list of 1.2 million individuals with final removal orders[.]" Defs.' Notice, Ex. B ¶ 5 ("Fitzgerald Decl.") [Doc. No. 51-2]. According to the Fitzgerald Declaration, ICE "identified approximately 33,000 updated addresses" and on August 7, 2025, "made the data available to the Enforcement Removal Operations, Law Enforcement Systems and Analysis Team." Id.[9] The Declaration states further that the IRS data "has not been populated into any database covered by the Systems of Records" identified in the Implementation Agreement. Id. ¶ 6; see supra Section I.C.3. Instead, "[t]he IRS data is currently residing on the [Homeland Security Investigations] lead architect's government-issued

---

[8] In response to concerns raised by the court during the hearing on Plaintiffs' Motion for a Preliminary Injunction, Defendants submitted the Fitzgerald Declaration and a declaration on behalf of SSA regarding the sourcing, storage, use, and access of confidential taxpayer information by ICE and SSA, respectively. See Defs.' Notice [Doc. No. 51].

[9] Defendants have not explained how the Enforcement Removal Operations, Law Enforcement Systems and Analysis Team fits within the units and support centers detailed in the first declaration. See McShane Decl. ¶ 2 [Doc. No. 39-3]. However, no ERO component described by the McShane Declaration as conducting a criminal investigation is titled the "Law Enforcement Systems and Analysis Team." Id.

19

Add. 19

computer." Fitzgerald Decl. ¶ 6 [Doc. No. 51-2]. The Declaration states that "[a]t this juncture, only the lead architect[10] has access to the IRS data." Id.

The Declaration provides further that "[t]he lead architect is responsible for transferring data between the operators and other stakeholders[,] and that "when the IRS data is to be integrated into databases covered by the Systems of Records, ICE will collaborate closely with the developers to ensure that the IRS data is properly tagged and identified as IRS data, marked restricted, and designated for use in criminal investigations." Id. ¶¶ 6–7.

### F. The Plaintiffs

Plaintiffs are four community organizations that "advocate for immigrants' rights and support members with tax, legal, and community-based services." Pls.' Mem. ISO Mot. for Prelim Inj. 4 ("Pls.' Mem.") [Doc No. 35]. Community Economic Development Corp. ("CEDC") is a community-development organization based in New Bedford, Massachusetts, that works with residents and businesses to develop and improve the local economy. Decl. of Corinn Williams Executive Director, CEDC ¶¶ 2–3 ("CEDC Decl.") [Doc. No. 31]. CEDC also provides general community support to immigrant communities in New Bedford. Id. ¶¶ 10–18. Since 2004, CEDC has served as a Volunteer Income Tax Assistance site under the IRS's Volunteer Income Tax Assistance program, assisting its low- and moderate-income members, both citizens and noncitizens, with tax filing. Id. ¶¶ 19-21. CEDC has assisted its noncitizen members with filing their taxes in association with an ITIN. Id. ¶¶ 26–31.

The National Parents Union ("NPU") is a nationwide organization advocating "to improve K-12 education" and for the "equitable treatment of all families," including advocating

---

[10] The Fitzgerald Declaration [Doc. No. 51-2] does not provide the name or title of the "lead architect" on whose computer the data resides and does not specify whether the lead architect is an employee or officer of DHS or an outside contractor.

for expanding the Child Tax Credit to immigrant families. Pls.' Notice, Ex. 1 ¶¶ 4, 11 ("NPU Decl.") [Doc. No. 37]. NPU has multiple members who file their taxes, with assistance from NPU, in association with an ITIN. Id. ¶¶ 14–18. The National Korean American Service and Education Consortium ("NAKASEC") is a national organization that advocates for Korean and Asian Americans and immigrants. Decl. of Rebecca Belcore Co-Executive Director, National Korean American Service & Education Consortium ¶ 1 ("NAKASEC Decl.") [Doc. No. 33]. The UndocuBlack Network ("UBN") advances the rights and well-being of Black immigrant communities. Decl. of Patrice Lawrence Executive Director, UndocuBlack Network ¶¶ 1-3 ("UBN Decl.") [Doc. No. 34].

Plaintiffs assert that interagency sharing of tax information harms their immigrant members, many of whom file their taxes because of or through the guidance of Plaintiffs. See CEDC Decl. ¶¶ 26–31 [Doc. 31]; NAKASEC Decl. ¶ 9 [Doc. No. 33] (To assist its members with complying with tax-filing obligations, NAKASEC "created a bilingual English-[Korean] guide" regarding ITINs, available on its website until the organization removed it recently); UBN Decl. ¶ 9 [Doc. No. 34]. One Plaintiff describes many of its members living in households with family members of "mixed-[immigration] status." NPU Decl. ¶ 6 [Doc. No. 37]. Further, Plaintiffs explain that some members have SSNs as a component of their "deferred action" status, under programs like Deferred Action for Childhood Arrivals ("DACA"). NAKASEC Decl. ¶¶ 7–8 [Doc. No. 33]; UBN Decl. ¶ 7 [Doc. No. 34]. When a noncitizen has "deferred action status," DHS may have issued an administratively final order of removal, however, that removal is "deferred" indefinitely and the noncitizen is eligible for an employment authorization document or work permit and social security card, through which they can file income taxes. See

21

Decl. of Bill Ong Hing ¶¶ 9, 33, 46 ("Ong Hing Decl.") [Doc. No. 29]; 8 C.F.R. §§ 236.21–36.25 (implementing the DACA policy).

Finally, Plaintiffs explain that for many immigrant communities, including their members, specific surnames are common. See NAKASEC Decl. ¶ 16 [Doc. 33] (nearly half the Korean American population shares one of three surnames and almost one quarter of Korean Americans share surname "Kim"). Additionally, family and community members often share home addresses and/or post office boxes or live in the same apartment complexes. See Pls.' Mem. 11 n.8 [Doc. 35]; NAKASEC Decl. ¶¶ 16–17 [Doc. No. 33].

## II. <u>Standing</u>

Defendants contend that Plaintiffs lack Article III standing. Defs.' Opp'n 5–6. [Doc. No. 39]. Defendants argue that Plaintiff CEDC lacks organizational standing because CEDC's injury is causally disconnected from the agency action at issue and that all four Plaintiffs' alleged injuries are either too generalized or too remote to provide Plaintiffs with standing. Id.

To satisfy Article III's standing requirements, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (quoting Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 149 (2010)). "At the preliminary injunction stage . . . the plaintiff must make a clear showing that she is likely to establish each element of standing." Murthy v. Missouri, 603 U.S. 43, 58 (2024) (quotations omitted). To establish injury in fact, a plaintiff must demonstrate "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (quotations omitted). "The particularization element of the injury-in-fact inquiry reflects the commonsense notion that the party asserting standing must not

22

Add. 22

only allege injurious conduct attributable to the defendant but also must allege that he, himself, is among the persons injured by that conduct." Hochendoner v. Genzyme Corp., 823 F.3d 724, 731–32 (1st Cir. 2016).

Regarding CEDC, Defendants first contend that "nothing about inter-agency data-sharing remotely interferes with CEDC's ability to conduct its operations, build trust, or associate with its members." Defs.' Opp'n 5 [Doc. No. 39]. However, CEDC has alleged that the IRS' abrupt change in policy directly impacts CEDC's ability to appropriately counsel its members regarding their tax filing obligations. Am. Compl. ¶¶ 149–58 [Doc. No. 73]. Previously, CEDC could assure its citizen and noncitizen members that the confidentiality of their filings was protected by law and policy. The IRS's change in policy directly undermines CEDC's credibility and activities. CEDC not only cannot advise its members not to file tax returns (which would be unlawful, contrary to CEDC's purposes of providing tax filing assistance, and may undermine noncitizen members' opportunity to secure their immigration status) but also cannot encourage the filing of tax returns that may result in ICE arresting and detaining them or their household members. Id. ¶¶ 151–52. CEDC also has reported a decrease in membership and attendance based on the chilling effect caused by IRS' policy change. Id. ¶ 158. Finally, CEDC's decreased revenue, attributable to reduced tax return filings, comprises sufficient pecuniary injury, caused by agency action to share taxpayer identity information with ICE, and potentially redressable by this court's order to cease such sharing. Id. ¶ 161.Regarding the four Plaintiffs' associational standing based on their members' injuries, Defendants characterize these injuries as "hesitancy to comply with the law [i.e. file a tax return]." Defs.' Opp'n 6 [Doc. No. 39]. But the injuries complained of differ significantly from the mere "[f]ulfill[ment] of a legal obligation." Id. Plaintiffs' members—citizens and noncitizens—allege that they are at risk of arrest and detention

23

Add. 23

due to administrative errors tied to similarities between names, Am. Compl. ¶¶ 162 [Doc. No. 73], and noncitizen members are at risk of arrest, detention, and even deportation, due to legal error where ICE treats noncitizens as subject to criminal prosecution based on an administratively final order of removal that is either still pending judicial review or subject to deferred action, see Ong Hing Decl. ¶¶ 9, 46 [Doc. 29]; id. Ex. 1 [Doc. No. 29-1] (case involving removal due to administrative error).

Further, given the breadth of ICE's requests for taxpayer information, the likelihood that noncitizen members' information will be shared is high and the concomitant injury of that disclosure is "particularized" to those members. Lyman v. Baker, 954 F.3d 351, 361 (1st Cir. 2020) (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 344 (2006)); see CEDC Decl. ¶¶ 48–50 [Doc. No. 31]; NPU Decl. ¶¶ 14–17 [Doc. No. 37]; NAKASEC Decl. ¶¶ 12–15 [Doc. No. 33]; UBN Decl. ¶¶ 18–22 [Doc. No. 34]. Further, the IRS has already disclosed taxpayer information to ICE and has committed to disclosing more information on a monthly or regular basis. See Admin. Record, at TD_0000143 [Doc No. 39-1]. Significantly, ICE has already used the information to identify "updated addresses" and intends to integrate the IRS data into its various databases, albeit with a limiting designation. Fitzgerald Decl. ¶ 5 [Doc. No. 51-2]. The court finds the Plaintiffs' injury is either likely to have already occurred or about to occur "imminent[ly.]" See Lyman, 954 F.3d at 360 (quotations omitted); IRS-ICE MOU [Doc. No. 73-1]; ICE-IRS Implementing Agreement [Doc. No. 73-2]. Therefore, CEDC has established organizational standing, and all Plaintiffs have established associational standing, sufficient for Article III and justiciability purposes. Accord Ctr. for Taxpayer Rights, 2025 WL 3251044, at *8–17 (finding both organizational and associational standing satisfied for plaintiffs with similar missions and services).

Add. 24

### III.   Preliminary Injunction

The issuance of a preliminary injunction before a trial on the merits can be held is an "extraordinary remedy" that shall enter only if a plaintiff makes a clear showing of entitlement to such relief. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). The purpose of a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held." Starbucks Corp. v. McKinney, 602 U.S. 339, 346 (2024) (quoting Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981)). In evaluating a motion for a preliminary injunction, the court considers four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movants] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 17–18 (1st Cir. 2006) (quoting Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004)). The balancing of hardships and the analysis of the public interest merge when, as here, the government is the opposing party. Does 1–6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021) (citing Nken v. Holder, 556 U.S. 418, 435 (2009)). The court addresses each of the factors in turn.

#### A.  Likelihood of Success on the Merits

The first factor is the most important: if the moving party cannot demonstrate a likelihood of success on the merits, "the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002) (citing Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993)). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." Sindicato Puertorriqueño de Trabajadores

25

v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (quoting Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)).

### 1. Final Agency Action

The parties dispute whether the interagency data-sharing constitutes final agency action ripe for judicial review. See Pls.' Mem. 7 [Doc. No. 35]; Defs.' Opp'n 7–8 [Doc. No. 39]. The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court[.]" 5 U.S.C. § 704. An agency action is "final" if: (1) it marks the "'consummation' of the agency's decision-making process," and (2) the action has determined rights or obligations or will create legal consequences. Harper v. Werfel, 118 F.4th 100, 116 (1st Cir. 2024) (citing Bennett v. Spear, 520 U.S. 154, 177 (1997)).

First, the administrative record submitted by Defendants demonstrates that the IRS-ICE MOU and ICE-IRS Implementation Agreement have already resulted in substantial data-sharing between the two agencies. See Admin. Record, at TD_0000143–146 [Doc. No. 39-1] (IRS employees noting that they had shared roughly 47,000 addresses of noncitizens with ICE). The court finds that the IRS-ICE MOU, Implementation Agreement, and the data-sharing already effectuated are the "consummation" of the IRS and ICE decision-making processes. Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 91 (1st Cir. 2020). Neither the agreements nor the agencies' operationalization was in any way "tentative or interlocutory[.]" Bennett, 520 U.S. at 178.

Further, the IRS-ICE Memo and the ICE-IRS Implementing Agreement clearly spell out the agencies' respective "rights or obligations" under the terms of the agreements. Id. Both agreements require the IRS to provide ICE with noncitizens' address information, something the IRS had not done prior or, minimally, had never done at the scale and breadth requested by ICE.

26

Add. 26

See IRS-ICE MOU [Doc. No. 73-1]; ICE-IRS Implementing Agreement, [Doc. No. 73-2]. If the interagency data-sharing was merely a recitation or affirmation of the agencies "obligations," no official memorandum or letter would be necessary. See Defs.' Opp'n 8 [Doc. No. 39]. Accordingly, the inter-agency data-sharing between the IRS and ICE is final agency action and ripe for judicial review. Accord Ctr. for Taxpayer Rights, 2025 WL 3251044, at *18–19 ("[T]he IRS has made a final decision to adopt and implement a policy of disclosing the confidential address information of tens of thousands of taxpayers to ICE[.]").

### 2. Alternative Remedy

Defendants also assert that Plaintiffs claims are not reviewable by this court because "Congress has created a different, comprehensive remedial scheme for violations of" 26 U.S.C. § 6103. Defs.' Opp'n 8 [Doc. No. 39]. Plaintiffs contend that a suit under the APA is appropriate, given Plaintiffs' need for forward looking injunctive relief. Pls.' Reply 15–16 [Doc. No. 43]. The court finds Congress' civil damages and criminal penalties provisions, see 26 U.S.C. §§ 7213, 7431, to provide inadequate remedial mechanisms for the scope and breadth of ongoing identity and location disclosures involved in this case. See IRS-ICE MOU [Doc. No. 73-1]. While the court agrees that Congress recognized the severity of an impermissible disclosure of confidential tax information and accordingly created a responsive retrospective penalty, neither provision referenced by Defendants encompasses the prospective relief required to enjoin IRS and SSA's disclosures. Abbott Laboratories v. Gardner, 387 U.S. 136, 151 (1967) (explaining strong presumption of judicial review of agency action); accord Ctr. for Taxpayer Rights, 2025 WL 3251044, at *20 ("*ex post* penalties are [not] an adequate alternative to *ex ante* prohibitions."). Therefore, judicial review is available for Plaintiffs' claims, given that "no other adequate remedy" is available for the interagency data-sharing across IRS, SSA, and ICE. 5

27

Add. 27

U.S.C. § 704; see Abbott Laboratories, 387 U.S. at 140, abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977).

### 3. APA Claims

Plaintiffs allege that the inter-agency data sharing of confidential tax information between the IRS and ICE violates Section 6103 and is therefore agency action both contrary to law and arbitrary and capricious, in violation of 5 U.S.C. § 706. Am. Compl. ¶¶ 182–198 [Doc. No. 73].

As previously discussed, Section 6103 represents Congress' efforts to balance important privacy considerations of taxpayers against other governmental priorities.[11] In the example of subsection 6103(i)(2), Congress weighed privacy against assisting law enforcement with criminal investigations and added substantial procedural protections in working out the balance. The parties do not dispute that ICE now possesses tax return data, and that Section 6103 governs the agencies' treatment of that data. See Pls.' Mem. 10 (Doc. No. 35); Defs.' Opp'n 12–13 [Doc. No. 39]; Pls.' Reply 9 [Doc. No. 43]. The court considers Plaintiffs' claims with respect to the IRS and ICE, separately.

---

[11] In amending the Tax Reform Act of 1976 to rework some of the exceptions to the general rule of confidentiality, the Conference Committee explained:

> The purpose of these modifications to the disclosure law is to facilitate the disclosure of tax information for legitimate law enforcement needs while, at the same time, preserving the basic principle that a taxpayer's return should generally be treated as confidential and should be disclosed, in only a limited number of circumstances, where those law enforcement needs outweigh the needs to preserve taxpayer confidentiality. In agreeing to these provisions, the conferees have fulfilled a commitment made by the conferees on the Economic Recovery Tax Act of 1981 to take appropriate legislative action in this area.

H.R. REP. No. 97-760, at 677 (1982) (Conf. Rep.).

a) <u>IRS</u>

As previously discussed, a D.C. district court has enjoined the IRS from sharing taxpayer addresses with ICE, in violation of 26 U.S.C. § 6103(i)(2). See <u>Ctr. for Taxpayer Rights</u>, 2025 WL 3257096, at *1–3. That court found that IRS' implementation of the IRS-ICE MOU constituted a significant change in IRS policy, for which the agency was unable to provide a reasonable explanation. See <u>Ctr. for Taxpayer Rights</u>, 2025 WL 3251044, at *30–31. Further, that court found that this unexplained policy change, set against the substantial reliance interests at stake, was arbitrary and capricious. <u>Id.</u> This court agrees. See <u>FCC v. Prometheus Radio Project</u>, 592 U.S. 414, 423 (2021); <u>FCC v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 515 (2009). Taxpayers have long been counseled that their data is confidential and will not be shared or used for immigration enforcement. <u>See, e.g.</u>, 60 Fed. Reg. 30,211, 30,213 (June 8, 1995) (in Notice of Proposed Rulemaking relating to ITINs, the IRS stated ITINs "are intended for tax use only. For example, the numbers will create no inference regarding the immigration status of a foreign person or the right of that person to be legally employed in the United States. The [ITIN] and the information obtained by the IRS as a result of issuing numbers constitute confidential taxpayer information. Section 6103 strictly prohibits the disclosure of this information to other government agencies, private entities, or citizens."). Millions of noncitizen taxpayers file under an ITIN or SSN in reliance on this assurance and thereby generate tens of billions of dollars for federal tax revenue. See Lam Decl., Ex. 2, at 3 ("Tax Payments by Undocumented Immigrants News Article") [Doc. 28-2]. Further, the record is replete with evidence that the IRS' policy did not permit usage of subsection 6103(i)(2)'s process to permit disclosure of taxpayer's address information alone. See IRM § 11.3.28 (2025) ("Material Changes"), https://www.irs.gov/irm/part11/irm_11-003-028 (last visited February 4, 2026).

29

Add. 29

Therefore, given the federal government's prior protective policy and the "serious reliance interests" of taxpayers, it was incumbent upon the IRS to carry out a reasoned decision-making process before changing its policy to provide for and enable disclosure of previously considered confidential information. See Fox Television Stations, Inc., 556 U.S. at 515. The IRS' lack of explanation for such a substantial change in policy falls outside any "zone of reasonableness" and reflects arbitrary and capricious agency action. Prometheus Radio Project, 592 U.S. at 423; see 5 U.S.C. § 706(2)(A).

Additionally, like the Ctr. for Taxpayer Rights court, this court finds that the IRS' disclosure to ICE violated Section 6103 in multiple ways even if the requested addresses are treated only as "return information" under subsection 6103(i)(2), with its less onerous requirements, rather than "taxpayer return information," for which a court order would have been required under subsection 6103(i)(1). See 2025 WL 3251044, at *22–29.

First, when ICE requested address information for 1.2 million individuals from the IRS in June 2025, the request included one person as the recipient of such information: the Assistant Director of the ICE ERO, Enforcement Division. See Admin. Record, at TD_0000077, TD_0000084, TD_0000088 [Doc. 39-1]. However, the statutory provision requires that the request identify the officers and employees "personally and directly" with the criminal investigation and proceedings, and that the information be provided only to them. The assertion that one individual could be "personally and directly" involved with the investigation and prosecution of 1.3 million people ignores the plain meaning of those words, which convey direct involvement in those criminal proceedings. See Fleischaker Decl. ¶¶ 28–31 [Doc. No. 30] (describing that, in her experience as a long-time career employee and political appointee at DHS

30

Add. 30

and ICE, the ERO Assistant Director "generally would not make decisions about individual cases.").

Defendants contend that the Assistant Director of the ICE ERO, Enforcement Division is "personally engaged in overseeing and managing the enforcement initiatives related to, and components involved in, carrying out" by ERO officers. McShane Decl. ¶ 8[Doc. No. 39-3]. Neither "overseeing" nor "managing" others would fall within the narrow strictures of the statutory language. Accord Ctr. for Taxpayer Rights, 2025 WL 3251044, at *24 ("[A]n officer or employee 'personally and directly engaged' in a criminal matter under Section 6103(i)(2) is someone working on the substance of the relevant criminal matter who will be able to apply to the criminal matter the information obtained through the IRS's disclosure.").

Assistant Director McShane describes the investigatory process of the ERO Officers he oversees. McShane Decl. ¶¶ 5–8 [Doc. No. 39-3] (describing evidence-gathering in DHS databases, establishing identity and location information, and reviewing court information). But those ERO Officers were not identified in the June 2025 request. See Admin. Record, at TD_0000107–108 [Doc. No. 39-1]. Assistant Director McShane, the substituted-recipient designated on ICE's request, as a practical matter is unable to do more than "oversee[] and manage[]" a criminal investigation by sheer limitation of volume, and is therefore an impermissible recipient of confidential tax return information for purposes of a criminal investigation. McShane Decl. ¶ 8 [Doc. No. 39-3].

In addition to the "personally and directly engaged" recipient violation, the Ctr. for Taxpayer Rights court found that the contents of ICE's request further violated subsection 6103(i)(2). 2025 WL 3251044, at *25–29. The subsection requires that the request include "a 'specific reason' that justifies the agency's entitlement to taxpayer information." Id. at *28

31

Add. 31

(citing 26 U.S.C. § 6103(i)(2)(B)(iv)). This court makes a similar and slightly broader finding. Not only did ICE's June 2025 address request exclude a "specific reason" for the disclosure, but the record lacks sufficient information to demonstrate that ICE is seeking the addresses to assist with criminal investigations or proceedings under 8 U.S.C. § 1253(a)(1).

To the extent that ICE seeks addresses not as part of a criminal investigation but to locate taxpayers so that they may be civilly arrested, that purpose would grossly misread the statute. Section 6103(i) does allow the IRS to disclose addresses to assist Federal officers and employees to "locate fugitives from justice[.]" 26 U.S.C. § 6103(i)(5) (capitalization omitted). But this subsection requires an application to a court and a court order to allow disclosure to federal officers and employees of return information (including taxpayer furnished information) "exclusively for use in locating such individuals." Id. § 6103(i)(5)(A). The court may only grant the application if (1) the applicant shows that a Federal arrest warrant relating to the commission of a Federal felony offense has been issued for an individual who is a fugitive from justice; (2) the return of such individual or return information with respect to such individual is sought exclusively for use in locating such individual; and (3) there is reasonable cause to believe that such return or return information may be relevant in determining the location of such individual. Id. § 6103(i)(5)(B). No such showing has been made here.

  b) <u>ICE</u>

Unlike the D.C. litigation, this case is also brought against the ICE Defendants. Because, as explained above, ICE's request failed to comply with even with the lesser requirements of subsection 6103(i)(2), the confidential taxpayer information should not have been disclosed to ICE.

32

Add. 32

Moreover, whether the request was sufficient or not, the court must now address the merits of Plaintiffs' claims with respect to ICE's use and protection of the confidential taxpayer information disclosed by IRS. Whether confidential information is disclosed pursuant to subsection 6103(i)(1) or (2), the information is still "return information," and remains subject to Section 6103's proscriptions on use and storage. 26 U.S.C. §§ 6103(i), (p).

At the outset, the court notes an irreconcilable issue with Section 6103's statutory framework and the implementation of the IRS-ICE MOU. Both subsection 6103(i)(1) and 6103(i)(2)'s strictly confined processes require that, at a bare minimum, federal officials or employees have commenced an investigation regarding specific non-tax criminal activity of a taxpayer. Id. §§ 6103(i)(1), (2). Pursuant to those processes, disclosure of return information (including taxpayer-furnished identity information) is limited to the agency officers and employees who are investigating the taxpayer.

However, in this circumstance, IRS did not provide its disclosure to the ICE officers personally and directly engaged in criminal investigations. See McShane Decl. ¶ 8 [Doc. No. 39-3]. First, the scope and breadth of ICE's request rendered it impossible for IRS, as a practical matter, to disclose the 47,000 taxpayer addresses to investigatory officers without an intermediary. Indeed, the Fitzgerald Declaration describes how, in August 2025, the IRS sent taxpayer information to the ICE Homeland Security Investigations ("HSI") Cyber and Operational Technology Division. Fitzgerald Decl. ¶ 5 [Doc. No. 51-2]. That ICE component not only viewed the confidential data but "use[d] the IRS data to compare it with the list of 1.2 million individuals with final removal orders and identified approximately 33,000 updated addresses." Id. The ICE component then sent the data to the ERO Law Enforcement Systems and Analysis team. Id. Neither the ICE HSI Cyber and Operational Technology Division nor the

33

ERO Law Enforcement Systems and Analysis team include the specific employees or officers directly participating in the 8 U.S.C. § 1253 investigations and prosecutions of the taxpayers' whose information was shared. McShane Decl. ¶ 8 [Doc. No. 39-3]; Fitzgerald Decl. ¶ 5 [Doc. No. 51-2]. Because the data transfer was so large (rather than being limited to specific investigations, as contemplated by the statutory scheme), the data transfer necessitated two intermediary ICE components not statutorily authorized to receive the information. McShane Decl. ¶ 8 [Doc. No. 39-3]; Fitzgerald Decl. ¶ 5 [Doc. No. 51-2].

Second, the ICE ERO Enforcement Division does not appear to be organizationally capable of segregating the taxpayer addresses (which may only be used in association with a criminal investigation) from use in potential civil enforcement matters. See McShane Decl. ¶¶ 2, 4 [Doc. No. 39-3]. The McShane Declaration explains that an investigating ERO officer "must evaluate the evidence at hand and determine if it is sufficient to establish the elements of the contemplated criminal charge." Id. ¶ 8. "Once an ERO officer establishes that sufficient evidence exists . . ., the ERO officer will present the case to the appropriate USAO[.]" Id. The United States Attorney's Office will then review the case worked up by the ERO officer and determine whether to prosecute. Id. Throughout the initial investigatory process, the ERO officer determines "whether administrative remedies can satisfactorily resolve a case, or whether . . . criminal prosecution should be pursued." Id. Accordingly, ERO officers use the initial investigatory process to determine whether to pursue civil enforcement or recommend criminal prosecution. Id. This process presents insurmountable challenges with respect to Section 6103. The court fails to understand how an ERO officer could segregate the data and only use taxpayer addresses for the latter.

34

Add. 34

Third, there is nothing before the court to suggest that ERO officers are engaged in any specific criminal investigations regarding 8 U.S.C. § 1253 violations. The McShane Declaration details numerous preliminary steps, typically taken by ERO officers before even determining that a crime has been committed. See id. ¶¶ 6, 8 (referencing "the initial investigation"); id. ¶ 6 (explaining that an "investigation" includes establishing a noncitizen's identity, "all known addresses," and immigration status); id. ¶ 7 (describing that, for 8 U.S.C. § 1253 investigations, "relevant database checks are . . . conducted to determine whether the alien has a final executable order of removal and whether the alien has departed or has been removed from the United States pursuant to the final order of removal" and appellate databases are reviewed to ensure that no ongoing appeals might stay the proceedings); id. ¶ 8 (detailing steps taken by the ERO officer before presenting the case to the appropriate United States Attorney's Office, where the case will be "accepted or declined for prosecution."). The McShane Declaration demonstrates that the decision to prosecute under 8 U.S.C. § 1253 is a deliberative one, arrived at some point "during the initial investigation." Id. ¶ 8. Therefore, ICE's desired use of the taxpayer information belies the purpose of Section 6103's statutory scheme. Instead of initiating a criminal investigation, determining that prosecution requires a taxpayer's return information, and requesting such information from the IRS, ICE requested taxpayer addresses and then attempted to ascertain which of those taxpayers may have potentially violated a criminal statute.

In addition to these structural issues preventing compliance with Section 6103, the Fitzgerald Declaration demonstrates that impermissible use of the addresses by ICE has already occurred. After receiving the data from the IRS, ICE HSI "identified approximately 33,000 updated addresses." Fitzgerald Decl. ¶ 5 [Doc. No. 51-2]. The court understands this statement as follows: ICE compared the IRS data to its own and noted that 33,000 out of the IRS-provided

Add. 35

47,000 addresses were different than the addresses for people with the same or similar names in its own records. Id. Even accepting that "nothing further was done with the data," ICE's cross-reference of its records against the taxpayer addresses constitutes an impermissible use of taxpayer addresses because it was conducted by employees not "personally and directly engaged" in a criminal investigation or proceeding. 26 U.S.C. §§ 6103(i)(1)(A). Further, the storage of the taxpayer addresses on the computer of the ICE HSI lead architect, an unnamed individual, constitutes impermissible storage, in contravention of subsection 6103(p). Id. § 6103(p)(4)(C) (requiring, inter alia, that the recipient federal agency "restrict . . . access to the returns or return information only to persons . . . to whom disclosure may be made under the provisions of" Section 6103).

In sum, Plaintiffs have established a high likelihood that ICE's handling, use, and storage of taxpayer addresses violated and continues to violate Section 6103, and therefore, the APA.

## B. Irreparable Harm to Plaintiffs

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005). "[T]he measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009). Further, "[d]istrict courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." Id. (internal quotations omitted). "[T]he issuance of a preliminary injunction requires a showing of irreparable harm to the movant rather than to one or more third parties." CMM Cable Rep., Inc.

36

v. Ocean Coast Props., Inc., 48 F.3d 618, 622 (1st Cir. 1995) (emphasis in original). Moreover, "plaintiffs seeking preliminary relief [are required] to demonstrate that irreparable injury is likely in the absence of an injunction." Winter, 555 U.S. at 22 (emphasis in original).

Plaintiffs have sufficiently demonstrated irreparable harm to their members as well as to CEDC as an organization. First, Plaintiffs describe members fearful of filing taxes due to the likely consequence of their addresses being provided to ICE. See, e.g., CEDC Decl. ¶ 48 [Doc. No. 31] (describing noncitizen member who consistently filed taxes with an ITIN or SSN from 2019–2024 who fears that IRS and SSA will share their information with ICE, deport them to their country of origin, and separate them from their children). Many of Plaintiffs' members are not subject to criminal prosecution because of their deferred action status. Nonetheless, these members too are fearful of filing taxes. See, e.g., UBN Decl. ¶¶ 21–22 [Doc. No. 34] (describing DACA recipient who has filed taxes since 2021 through an SSN but is fearful that continued filing will expose themself and their parents to arrest, detention, or removal). Because these members have been chilled from filing taxes, they are deprived of necessary tax credits and further complicate their immigration statuses. See NPU Decl. ¶ 25 [Doc. No. 37]; see also Ctr. for Taxpayer Rights, 2025 WL 3251044, at *38 ("Plaintiffs have shown that the imminent risk that their members' address information will be misused impedes [their members'] ability to safely participate in the tax system[.]") (internal citation omitted) (alteration in the original).

Second, Plaintiffs have been and will continue to be harmed by the data-sharing due to the erosion of trust between the organizations and their members. See UBN Decl. ¶ 17 [Doc. No. 34]. All four organizations previously advised their members to obtain an ITIN and file taxes, regardless of immigration status, because of the IRS' assurance and practice to keep tax information confidential. See, e.g., NAKASEC Decl. ¶¶ 9–10 [Doc. 33]. Similarly, Plaintiff

37

Add. 37

organizations encouraged its members to apply for programs like DACA and obtain SSNs, based on the reasonable assumption, consistent with the DACA program, that no adverse immigration consequences would flow from the application process. See, e.g., UBN Decl. ¶¶ 16–17 [Doc. No. 34]. Because of the interagency data-sharing, Plaintiffs' trustworthiness and reputations are being irreparably harmed as organizations, no matter how difficult that harm may be to measure. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18–19 (1st Cir. 1996) (Irreparable harm can occur when "the plaintiff suffers a substantial injury that cannot be accurately measured or adequately compensated by money damages" or other legal remedies.); see also Ctr. for Taxpayer Rights, 2025 WL 3251044, at *32 (As an organization, the D.C. plaintiff's "harm resulting from this loss of trust is irreparable because it is difficult to replace or measure and one the [plaintiff] should not be expected to suffer." (internal citations omitted)).

### C.  Balance of Hardships and Public Interest

The balance of hardships and public interest factors merge when the government is the opposing party. See Nken, 556 U.S. at 435 (stating factors merge in stay context); accord Massachusetts v. Nat'l Institutes of Health, 770 F. Supp. 3d 277, 295 (D. Mass. 2025) (holding factors merge in preliminary injunction context). Here, Plaintiffs argue that those factors favor preliminary injunctive relief because of the "public's strong 'interest in preventing [noncitizens] from being wrongfully removed[.]'" Pls.' Mem. 18 [Doc. No. 35] (citing A.B.-B. v. Morgan, 548 F. Supp. 3d 209, 222 (D.D.C. 2020)). Defendants contend that the government's ability to assist "law-enforcement officers to perform" the task of "enforcing federal law" outweighs "'the interests of individuals who are illegally in the country in avoiding . . . law enforcement.'" Defs.' Opp'n. 19 [Doc. No. 39] (citing Noem v. Vasquez Perdomo, __ U.S. __, 2025 WL 2585637, at *4 (Sept. 8, 2025) (Kavanaugh, J., concurring)).

38

In this instance, both the balance of the hardships and the public interest tilt heavily towards enjoining the implementation of the interagency data-sharing agreements. First, the federal tax system is built upon a foundation of the taxpayer's systemic trust and confidence. See IRS' Taxpayer Bill of Rights, https://www.irs.gov/taxpayer-bill-of-rights ("Taxpayers have the right to expect that any information they provide to the IRS will not be disclosed unless authorized by the taxpayer or by law. Taxpayers have the right to expect appropriate action will be taken against [those] who wrongfully use or disclose taxpayer return information.") (last visited February 4, 2026). The implementation of agreements contrary to law erodes that foundation and undermines the public interest in a functioning tax system. Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth., 791 F.2d 183, 184 (D.C. Cir. 1986) ("The assurance of privacy secured by § 6103 is fundamental to a tax system that relies upon self-reporting.").

Second, there is significant hardship in the potential misidentification of noncitizens and citizens alike that could lead to wrongful arrests, detention and even removal. See Nken, 556 U.S. at 435 ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."). Because the information sought was not for any specific criminal investigation, the data-sharing will necessarily include both the data of noncitizens subject to criminal prosecution and those who are not subject to criminal prosecution because of their deferred action status. See IRS-ICE MOU [Doc. No 73-1]; ICE-IRS Implementing Agreement [Doc. No. 73-2]. Further, Plaintiffs have demonstrated that a significant portion of immigrant communities not only share common last names, see NAKASEC Decl., at ¶ 16 [Doc. 33] (nearly half of the Korean-American population share one of three surnames), but also live in shared homes or in the same apartment complexes. See Pls.' Mem. 11 n.8 [Doc. 35]. These factual circumstances significantly raise the

39

Add. 39

risk of misidentification of taxpayers by IRS and ICE, and subsequent arrest by ICE. See, e.g., Maia Coleman, ICE Arrest of a Citizen, Barely Dressed, Sows Fear in Twin Cities, N.Y. TIMES (Jan. 20, 2026).

Misidentifications due to administrative error also present significant danger to citizens and noncitizens alike given the DHS General Counsel's opinion that "illegal aliens aren't entitled to the same Fourth Amendment protections as U.S. citizens." Jimmy Percival, How the Deep State Thwarted Ice Administrative Warrants, WALL STREET J. (Jan. 22, 2026). The DHS General Counsel described ICE's practice to use administrative warrants (i.e. warrants signed by an Immigration Judge rather than a federal magistrate or district judge) to enter noncitizens' homes and arrest them. Id. The DHS General Counsel claimed this practice is lawful because "[a]liens in this context are fugitives from justice[.]" Id. Given the high potential for misidentification, ICE's arrests and detention practices (including, as affirmed by DHS counsel, the misapprehension that homes of individuals suspected to be noncitizens may be searched without a judicial warrant), and the absence of procedural safeguards, the court finds that the public interest is not served by ICE's use of the confidential taxpayer information provided despite ICE's failure to satisfy the statutorily required procedures for obtaining such information.

Third and finally, the government has failed to show that the provision of taxpayer addresses is integral to law enforcement, let alone to the President's promise to start enforcement with the "worst of the worst."[12] As discussed above, Defendants failed to identify in their request to the IRS, and have offered no further demonstration here, how the use of taxpayer addresses

---

[12] See Department of Homeland Security, Arrested: Worst of the Worst, https://www.dhs.gov/wow, (last visited Feb. 4, 2026) ("Under Secretary Noem's leadership, the hardworking men and women of DHS and ICE are fulfilling President Trump's promise and carrying out mass deportations - starting with the worst of the worst[.]").

serves ICE in its efforts to prosecute specific criminal offenders under 8 U.S.C. § 1253. The court finds no basis to conclude that enjoining the data-sharing, until that sharing complies with the law and includes statutorily-mandated procedural protections, will interfere with ICE's ability to enforce the law. See Ala. Ass'n of Realtors v. Dep't of Health and Human Servs., 594 U.S. 758, 766 (2021) ("[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends."); see also Ctr. for Taxpayer Rights, 2025 WL 3251044, at *38 (describing the likelihood that plaintiffs' "members' address information will be impermissibly used for civil immigration enforcement" as an "imminent risk.").

## IV.    Conclusion

After carefully considering Plaintiffs' likelihood of success on the merits of their APA claims,[13] the threat of irreparable harm, and the balance of the equities and public interest, the court finds that relief is warranted to preliminarily enjoin ICE's use of taxpayer addresses provided by IRS pursuant to the IRS-ICE MOU during the pendency of this litigation.[14] Therefore, the court GRANTS Plaintiffs' Motion for a Preliminary Injunction as to the ICE Defendants as follows:

It is hereby ORDERED that:

---

[13] Given that the court finds that Plaintiffs' APA claims are likely to succeed on the merits, the court need not analyze Plaintiffs' remaining claims at this preliminary procedural juncture. See Am. Compl. ¶¶ 199–222 (Counts 3–5) [Doc. No. 73].

[14] Neither party addresses whether the court should impose bond on Plaintiffs pursuant to Federal Rule of Civil Procedure 65(c). Given this omission, the court exercises its discretion to waive the bond requirement. See Int'l Ass'n of Machinists & Aerospace Workers v. Eastern Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991) (explaining that "a district court retains substantial discretion to dictate the terms of an injunction bond."); Liu v. Noem, 780 F. Supp. 3d 386, 405 (D.N.H. 2025) (waiving bond requirement where defendants requested that plaintiff post bond but did not "request a specific amount," "explain any costs they will incur by complying with the preliminary injunction," or describe "any damages they will have sustained" if the preliminary injunction was later found to be erroneous).

41

1. The implementation and/or enforcement of the IRS-ICE MOU, the ICE-IRS Implementing Agreement, as well as related agreements, policies, practices, and procedures (together, the "information sharing arrangements") are stayed and preliminarily vacated, pursuant to the Administrative Procedure Act, 5 U.S.C. § 705, pending disposition of this litigation on the merits.

2. Defendants DHS, Secretary Noem, ICE, Acting Director Lyons, and their agents, are enjoined from inspecting, viewing, using, copying, distributing, relying on, or otherwise acting upon any return information that had been obtained from or disclosed by the IRS Defendants pursuant to the information sharing arrangements, including the information received August 7, 2025.

3. The ICE Defendants shall provide a copy of this Order to the individual whose government-issued computer holds the information received from the IRS on August 7, 2026, and shall file confirmation that a copy of this Order has been provided to that individual, no later than February 10, 2026. That individual, as a DHS agent, is bound by this Order.

IT IS SO ORDERED.

February 5, 2026                          /s/ Indira Talwani
                                          United States District Judge

42

Add. 42

Department of the Treasury

**IRS**

Internal Revenue Service

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# MEMORANDUM OF UNDERSTANDING

BETWEEN

THE U.S. DEPARTMENT OF THE TREASURY, INTERNAL REVENUE SERVICE

AND

THE U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

FOR THE EXCHANGE OF INFORMATION FOR NONTAX CRIMINAL ENFORCEMENT

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

Add. 43

## MEMORANDUM OF UNDERSTANDING
## BETWEEN
## U.S. TREASURY DEPARTMENT on behalf of the INTERNAL REVENUE SERVICE
## AND
## U.S. DEPARTMENT OF HOMELAND SECURITY on behalf of the U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,

## FOR THE EXCHANGE OF INFORMATION FOR NONTAX CRIMINAL ENFORCEMENT

1. **INTRODUCTION:**

   a. WHEREAS by Executive Order (EO) No. 14161, <u>Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats</u>, 90 Fed. Reg. 8451 (Jan. 20, 2025), the President directed the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to take immediate steps to identify, exclude, or remove aliens illegally present in the United States; and

   b. WHEREAS the Department of Homeland Security has identified numerous aliens illegally present in the United States whom they have represented are under final orders to remove them from the United States; and

   c. WHEREAS the Department of Homeland Security has represented that each of the above-referenced individuals is under criminal investigation for violations of one or more specifically designated Federal criminal statutes (not involving tax administration), including 8 U.S.C. § 1253(a)(1); and

   d. WHEREAS the parties wish to enter into an agreement setting forth the procedures, processes, and safeguards to be followed upon the receipt of a request for the disclosure of information subject to the confidentiality requirements of Internal Revenue Code (IRC) § 6103;

   e. NOW THEREFORE, this Memorandum of Understanding (MOU) between the U.S. Treasury Department / Internal Revenue Service (IRS), and the U.S. Department of Homeland Security / U.S. Immigration and Customs Enforcement (ICE), sets forth the agreement of the parties with respect to ICE's use of the authority in IRC § 6103(i)(2) for the submission of requests for addresses of persons subject to criminal investigation under 8 U.S.C. § 1253(a)(1) or another specifically designated Federal criminal statute.

2. **AUTHORITY:**

The IRS enters into this MOU pursuant to IRC § 7803(a)(2), delegating to the IRS the authority to administer the Internal Revenue Code, and IRC § 6103(i)(2), authorizing the disclosure of return information other than taxpayer return information for purposes of the enforcement of a specified

nontax Federal criminal statute.  ICE enters into this MOU pursuant to 8 U.S.C. § 1253(a)(1), 8 U.S.C. § 1103, and 6 U.S.C. § 112(b)(2).

**3.  PURPOSE:**

(U//LES) The purpose of this MOU is to establish the procedures and requirements for ICE's submission of valid IRC § 6103(i)(2) requests for addresses of persons subject to criminal investigation under 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statutes.  The specifications and details regarding the IRS's and ICE's procedural obligations and requirements concerning the information exchange will be included in a separate implementation agreement entered into between IRS and ICE.

**4.  CONTACTS:**

A.  Contacts for this MOU are the IRS designee(s) and the ICE designee(s). Refer to Exhibit A.

B.  Succession of Authority.  The IRS and ICE anticipate there may be changes to the titles and\or responsibilities of officers and employees designated within this MOU. In the event of such changes, any actions that may be taken under this MOU by said officers or employees, may be taken by any officer(s) or employee(s) the IRS and ICE determine to have succeeded to the relevant portions of said officers' or employees' authorities or responsibilities.  Each party shall be responsible for ensuring the points of contact are current by providing a revised Exhibit A to all parties within 30 days of any change.

**5.  DUTIES AND RESPONSIBILITIES OF THE IRS:**

The IRS will:

A.  Receive requests for address information from ICE.

B.  Review each request for completeness and validity and return to ICE any requests not meeting the requirements necessary for disclosure pursuant to IRC § 6103(i)(2). The IRS will provide explanations and/or reasons the request cannot be processed.

C.  (U//LES) Search for the last known address for each individual in each request.

D.  (U//LES) For each individual the IRS is able to identify from the information provided by ICE, provide the IRS last known address for that individual.  For each individual the IRS cannot identify from the information provided by ICE, indicate "no match" in the response.

E.  Send responses to ICE in the manner set forth herein.

F.  Account for disclosures made under this MOU as required pursuant to IRC § 6103(p)(3)(A).

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

G. (U//LES) Specifications and details regarding the IRS's procedural obligations and requirements concerning the information exchange will be included in a separate implementation agreement entered into between IRS and ICE.

## 6. DUTIES AND RESPONSIBILITIES OF ICE:

ICE will:

A. (U//LES) Send requests for address information for specifically identified individuals pursuant to the specifications contained in a separate implementation agreement between ICE and IRS.

B. Each request must be made consistent with IRC § 6103(i)(2)(A).

C. (U//LES) Each request will contain the following information with respect to each individual identified in the request:

   1. (U//LES) The name and address of the taxpayer.
   2. (U//LES) The taxable period or periods as to which the return information (address) they are seeking relates.
   3. (U//LES) The specifically designated nontax Federal criminal statute (i.e., 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statute) under which an investigation or proceeding regarding the individual is being conducted.
   4. (U//LES) The date of the final order of removal and the related case number assigned to each such order.
   5. (U//LES) The specific reason or reasons why disclosure is, or may be, relevant to the nontax criminal investigation or proceeding. Any other information ICE can provide to help the IRS identify each individual, such as SSNs, ITINs, etc.
   6. (U//LES) Identity information for the ICE officers and employees personally and directly engaged in the nontax criminal investigation that may result in criminal charges against the individual under the specifically designated Federal criminal statute ICE has identified.

D. (U//LES) Each request will attest that the requested address information will only be used by officers and employees of ICE solely for the preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings, pertaining to the enforcement of 8 U.S.C. § 1253(a)(1), other specifically designated Federal criminal statute, or any subsequent criminal proceedings.

E. ICE will use and redisclose the address information only as specifically authorized by IRC § 6103(i)(2) as implemented in 26 C.F.R § 301.6103(i)-1. Specifically, the regulations provide:
   1. (U//LES) Return information disclosed under IRC § 6103(i)(2) shall be open to inspection by or disclosure to ICE officers and employees personally and directly engaged in, and for their necessary use in, proceedings and investigations that may result in such proceedings, pertaining to the enforcement of a specifically designated nontax Federal criminal statute.

   2. (U//LES) Return information disclosed under IRC § 6103(i)(2) may be disclosed by such

3

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

Add. 46

ICE officers and employees to other persons only to the extent necessary to the enforcement of the specifically designated nontax Federal criminal statute, including:

    a.  (U//LES) To properly obtain the services of persons having special knowledge or technical skills (such as, but not limited to, handwriting analysis, photographic development, sound recording enhancement, or voice identification);

    b.  (U//LES) To properly interview, consult, depose, or interrogate or otherwise obtain relevant information from, the taxpayer to whom such return or return information relates (or such taxpayer's legal representative) or any witness who may be called to give evidence in the proceeding; or

    c.  (U//LES) To properly conduct negotiations concerning, or obtain authorization for, disposition of the proceeding, in whole or in part, or stipulations of fact in connection with the proceeding.

3.  (U//LES) Among those persons to whom returns and return information may be disclosed by officers and employees of ICE on a need-to-know basis as provided are:

    a.  (U//LES) Other ICE officers and employees such as clerical personnel (for example, secretaries, stenographers, docket and file room clerks, and mail room employees) and supervisory personnel;

    b.  (U//LES) Officers and employees of another Federal agency (as defined in section 6103(b)(9)) working under the direction and control of such ICE officers and employees; and

    c.  (U//LES) Court reporters.

F.  (U//LES) ICE will ensure the proper handling, transmission, safeguarding, and security of the address information as contained in Sections 8 and 9 of this MOU.

G.  Specifications and details regarding ICE's procedural obligations and requirements concerning the information exchange will be included in a separate implementation agreement entered into between IRS and ICE.

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

Add. 47

TD_0000038

## 7. DESCRIPTION OF THE RECORDS:

A. Systems of Records Notices

1. The IRS will
   a. (U//LES) disclose address information from the System(s) of Records described in a separate implementation agreement entered into between the IRS and ICE.

2. ICE will
   a. (U//LES) disclose the following subject identifier information: CVID; A Number; First, Middle and Last Name; Address Information; Date of Birth; Country of Citizenship; FBI Numbers; and Fingerprint Identification Number (FINS), from the System(s) of Records described in a separate implementation agreement entered into between the IRS and ICE; and

   b. (U//LES) maintain the address information provided by the IRS in the System(s) of Records described in a separate implementation agreement entered into between the IRS and ICE.

## 8. INFORMATION SECURITY:

The IRS and ICE will comply with the requirements of the Federal Information Security Management Act (FISMA), 44 U.S.C. Chapter 35, Subchapter II, as amended by the Federal Information Security Modernization Act of 2014 (Pub. L. No. 113-283); related Office of Management and Budget (OMB) circulars and memoranda, such as Circular A-130, Managing Information as a Strategic Resource (July 28, 2016), and Memorandum M-17-12, Preparing for and Responding to a Breach of Personally Identifiable Information (PII) (Jan. 3, 2017); National Institute of Standards and Technology (NIST) directives; and the Federal Acquisition Regulations, including amendments published after the effective date of this MOU. These laws, directives, and regulations include requirements for safeguarding Federal information systems and Personally Identifiable Information used in Federal agency business processes, as well as related reporting requirements. Both agencies recognize, and will implement, the laws, regulations, NIST standards, and OMB directives, including those published subsequent to the effective date of this MOU.

The FISMA requirements apply to all Federal contractors, organizations, or entities that possess or use Federal information, or that operate, use, or have access to Federal information systems on behalf of an agency. Both agencies are responsible for oversight and compliance of their contractors and agents.

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

Add. 48

TD_0000039

A. Incident Reporting

If the IRS or ICE experiences an incident involving the loss or breach of PII provided by IRS under the terms of this MOU, they will follow the incident reporting guidelines issued by OMB. In the event of a reportable incident under OMB guidance involving PII, the agency experiencing the incident is responsible for following its established procedures, including notification to proper organizations (i.e., Cybersecurity & Infrastructure Security Agency (CISA) and the agency's privacy office). Immediately upon discovery of a potential cybersecurity incident involving IRS-provided PII, ICE will contact the IRS Computer Security Incident Response Center (CSIRC) at 240-613-3606.

B. Breach Notification

The IRS and ICE will follow PII data breach notification policies and related procedures as required by OMB Memorandum M-17-12 (Jan. 3, 2017). If the agency that experienced the data breach, after conducting a risk assessment, determines notification to the potentially impacted individuals and an offer of an identity protection/identity monitoring service, and/or other remedies is required, that agency will carry out the remedies without cost to the other agency.

9. **DISCLOSURE, SAFEGUARDS, AND RECORD KEEPING REQUIREMENTS:**

A. ICE will maintain all Federal tax returns and return information sourced from the IRS in accordance with IRC § 6103(p)(4) and comply with the safeguards requirements set forth in Publication 1075, *Tax Information Security Guidelines for Federal, State and Local Agencies*. Publication 1075 is the IRS-published guidance for security guidelines and other safeguards for protecting returns and return information, pursuant to 26 C.F.R. § 301.6103(p)(4).

The IRS safeguarding requirements include:

1. ICE will establish a central point of control for all requests for and receipt of Federal tax returns and return information and maintain a log to account for all subsequent disclosures and products made with/from that information, and movement of the information until destroyed, in accordance with Publication 1075.

2. ICE will establish procedures for secure storage of Federal tax returns and return information consistently maintaining two barriers of protection to prevent unauthorized access to the information, including when in transit, in accordance with Publication 1075.

3. ICE will consistently label Federal tax returns and return information obtained under this MOU to make it clearly identifiable and to restrict access by unauthorized individuals. Any duplication or transcription of Federal tax returns and return information creates new records which must also be properly accounted for and safeguarded. Federal tax returns and return information should not be commingled with other ICE records unless the entire file is safeguarded in the same manner as required for Federal tax returns and return

6

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

Add. 49

information and the Federal tax information (FTI) within is clearly labeled in accordance with Publication 1075.

4. ICE will restrict access to Federal tax returns and return information solely to officers and employees of ICE as described in this MOU for the purposes of carrying out this MOU. Prior to access ICE must evaluate which employees require such access. Authorized individuals may only access Federal tax returns and return information to the extent necessary to perform services related to, and as authorized by, this MOU, in accordance with Publication 1075.

5. Prior to initial access to FTI and annually thereafter, ICE will ensure that employees and officers that will have access to Federal tax returns and return information receive awareness training regarding the confidentiality restrictions applicable to the Federal tax returns and return information and certify acknowledgement in writing that they are informed of the criminal penalties and civil liability provided by IRC §§ 7213, 7213A, and 7431 for any willful disclosure or inspection of Federal tax returns and return information that is not authorized by the IRC, in accordance with Publication 1075.

6. ICE will submit an annual Safeguard Security Report (SSR) to the Office of Safeguards by the submission deadline specified in Publication 1075 to provide an update on safeguarding activities during the reporting period.  The SSR will also provide Head of Agency certification that the SSR addresses all Outstanding Actions identified by the IRS Office of Safeguards from the agency's prior year SSR; accurately and completely reflects ICE's current environment for the receipt, storage, processing, and transmission of FTI; accurately reflects the security controls in place to protect the FTI in accordance with Publication 1075 and of ICE's commitment to assist the Office of Safeguards in the joint effort of protecting the confidentiality of FTI; support the Office of Safeguards on-site review to assess ICE's compliance with Publication 1075 requirements by means of manual and automated compliance and vulnerability assessment testing, including coordination with information technology (IT) divisions to secure pre-approval, if needed, for automated system scanning and to support timely mitigation of identified risk to FTI in ICE's Corrective Action Plan (CAP) for as long as ICE maintains Federal tax returns and return information.  Required reports will be transmitted in electronic format and on the template provided by IRS Office of Safeguards using an IRS-approved encryption method in accordance with Publication 1075.

7. ICE will timely report all data incidents involving FTI to the Office of Safeguards and cooperate with Office of Safeguards investigators, providing data and access as needed to determine the facts and circumstances of the incident.

8. When a data incident results in ICE taking adverse or disciplinary action against an employee based on an unauthorized inspection or disclosure of FTI in violation of ICE's procedures ICE must notify each impacted taxpayer in writing. The notification letter must include the date of the unauthorized inspection or disclosure and the rights of the taxpayer

7
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

Add. 50

under IRC § 7431. ICE must report to IRS Safeguards when taxpayer notification letters are issued, in accordance with Publication 1075.

9. ICE will ensure that Federal tax return and return information is properly destroyed or returned to the IRS when no longer needed based on established ICE record retention schedules in accordance with Publication 1075.

10. ICE will conduct periodic internal inspections of facilities where Federal tax returns and return information is maintained to ensure IRS safeguarding requirements are met and will permit the IRS access to such facilities as needed to review the extent to which ICE is complying with the IRC § 6103(p)(4) requirements of this section.

11. IRC § 6103(p)(9) requires ICE to conduct on-site assessments of each contractor's compliance with safeguarding requirements. ICE must submit findings of the most recent review as part of the annual SSR submission. ICE must certify to the IRS that each contractor is in compliance with safeguarding standards in accordance with Pub 1075. ICE must ensure that contracts with contractors and subcontractors performing work involving returns or return information contain specific language requiring compliance with IRC § 6103(p)(4) and Publication 1075 standards. Contract language must enforce ICE's right to access contractor and subcontractor facilities in order to comply with IRC § 6103(p)(9) to ensure IRS safeguarding requirements are met.

12. Usage of FTI for Artificial Intelligence (AI) purposes must be disclosed to the Office of Safeguards for assessment of compliance with safeguard requirements.

B. Generally, this MOU covers secure electronic transmission of Federal tax returns and return information to ICE, provided ICE computer systems are compliant with National Institute of Standards and Technology (NIST) Special Publication 800-53 standards and guidance for security of data at the moderate impact level. ICE's SSR must fully describe the computer system and security controls implemented for the receipt, processing, storage, and transmission of electronic Federal tax returns and return information. Required security controls for systems that receive, process, store, and transmit electronic Federal tax returns and return information are specified in Publication 1075.

C. Any creation or receipt of Federal tax returns and return information in paper format must also be fully disclosed in ICE's SSR. Required security controls associated with the receipt, processing, and storage of any Federal tax returns and return information received in paper format are specified in Publication 1075.

D. ICE must report suspected unauthorized inspection or disclosure of Federal tax returns and return information within 24 hours of discovery to the IRS Office of Safeguards in accordance with Publication 1075.

E. IRS will conduct periodic safeguard reviews of ICE to assess whether security and confidentiality of Federal tax returns and return information is maintained consistent with the

8
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

Add. 51

TD_0000042

safeguarding protocols described in Publication 1075, ICE's SSR, and in accordance with the terms of this MOU. Periodic safeguard reviews will involve the inspection of ICE's facilities where FTI is maintained; the testing of technical controls for computer systems storing, processing, or transmitting FTI; review of ICE's recordkeeping and policies; and interviews of ICE's employees to verify the use of FTI and to assess the adequacy of procedures established to protect FTI.

F.  ICE recognizes and will reflect in its actions and procedures that all Safeguards documents and related communications are IRS official records; that they are property of the IRS; that IRS records are subject to disclosure restrictions under Federal law and IRS rules and regulations and may not be released publicly under state Sunshine or Information Sharing/Open Records provisions and that any requestor seeking access to IRS records should be referred to the Federal Freedom of Information Act (FOIA) statute. If ICE determines that it is appropriate to share Safeguards documents and related communications with another governmental function/branch for the purposes of operational accountability or to further facilitate protection of FTI, the recipient governmental function/branch must be made aware, in unambiguous terms, that Safeguards documents and related communications are property of the IRS; that they constitute IRS official records; that any request for the release of IRS records is subject to disclosure restrictions under Federal law and IRS rules and regulations and that any requestor seeking access to IRS records should be referred to the Federal Freedom of Information Act (FOIA) statute. Federal agencies in receipt of FOIA requests for Safeguards documents must forward them to IRS for reply.

G.  All information received from ICE under this MOU becomes return information as defined in IRC § 6103(b)(2) and will not be further disclosed or disseminated except as authorized by IRC § 6103.

## 10.  TRANSMITTAL PROCEDURES:

Transmittal procedures and transmittal security requirements will be included in a separate implementation agreement entered into between IRS and ICE.

9
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

Add. 52

TD_0000043

## 11. LIABILITY:

A.  Each party to this MOU shall be liable for the acts and omissions of its own employees.

B.  The IRS shall not be liable for any injury to another party's personnel or damage to another party's property unless such injury or damage is compensable under the Federal Tort Claims Act (28 U.S.C. § 1346(b)), or pursuant to other Federal statutory authority. Similarly, ICE shall not be liable for any injury to another party's personnel or damage to another party's property unless such injury or damage is compensable under applicable Federal Tort Claims Act (28 U.S.C. § 1346(b)), or pursuant to other Federal statutory authority.

C.  This MOU is not an obligation or commitment of funds, nor a basis for transfer of funds, but rather is a basic statement of the understanding between the parties. Unless otherwise agreed in writing, each party shall bear its own costs in relation to this MOU. Expenditures by each party will be subject to its budgetary processes and to the availability of funds and resources pursuant to applicable laws, regulations, and policies.

## 12. THIRD PARTY RIGHTS:

This MOU does not confer any rights or benefits on any third party.

## 13. PRIVACY:

The IRS and ICE will ensure the integrity and accuracy of personal and financial data. The IRS and ICE will perform their duties in a manner that recognizes and enhances individuals' right of privacy and will ensure their activities are consistent with laws, regulations, and good administrative practices.

## 14. EFFECTIVE DATE:

The effective date of this MOU is the date it has been signed by all parties to the Agreement. The information exchange contained in this agreement will not commence until a separate implementation agreement between the IRS and ICE has been signed and implemented.

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

Add. 53

TD_0000044

## 15.  AMENDMENT OF MOU:

This MOU may be amended by deletion or modification of any provisions, provided that such amendment is in writing and is signed by all parties to the MOU.

## 16. TERMINATION OF MOU:

(U//LES) This MOU will remain in effect as necessary for the IRS to provide address information in response to ICE requests satisfying the requirements contained in this MOU.  This MOU may be terminated upon ninety  (90) days written notice by either the IRS or ICE, which shall describe the rationale for the termination and be publicly posted on the respective party's website 90 days prior to termination.

## 17. LIMITATIONS:

Any provision of this MOU which conflicts with Federal law will be null and void. The provisions of paragraph 11, *Liability*, will continue until all potential liabilities have lapsed.

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

Add. 54

TD_0000045

**APPROVALS:**

U.S. DEPARTMENT OF TREASURY on behalf of the
INTERNAL REVENUE SERVICE

*[signature]*
Secretary Scott Bessent

Date: April 07, 2025

U.S. DEPARTMENT OF HOMELAND SECURITY on behalf of the
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

Secretary Kristi Noem

Date: April ___, 2025

12
UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

Add. 55

TD_0000046

**APPROVALS**:

U.S. DEPARTMENT OF TREASURY on behalf of the
INTERNAL REVENUE SERVICE

_____

Secretary Scott Bessent

Date: April ___, 2025

U.S. DEPARTMENT OF HOMELAND SECURITY on behalf of the
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

_____

Secretary Kristi Noem

Date: April 7, 2025

12
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

Add. 56

## EXHIBIT A – POINTS OF CONTACT

### INTERNAL REVENUE SERVICE:

Name: ███████████████
Title: ████████████████████
Phone: ████████████
Email: ████████████

Name: ███████████████████
Title: ████████████████████
Phone: ████████████
Email: ███████████

### U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT:

Name:
Title:
Phone:
Email:

Name:
Title:
Phone:
Email:

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

Add. 57

TD_0000048

UNCLASSIFIED//FOR
OFFICIAL USE ONLY

# Implementing Agreement

# for the

# Memorandum of Understanding for the

# Exchange of Information for Nontax Criminal

# Enforcement

# between

# the U.S Department of Homeland Security,

# U.S. Immigration and Customs Enforcement

# and

# the U.S Department of the Treasury,

# Internal Revenue Service

UNCLASSIFIED//FOR OFFICIAL USE ONLY

Add. 58

I.   Purpose

This Agreement provides implementing procedures for the Memorandum of Understanding between the U.S. Department of the Treasury, Internal Revenue Service (IRS) and the U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement (ICE) for the Exchange of Information for Nontax Criminal Enforcement. (MOU), dated April 7, 2025.  ICE will send, and IRS will receive, requests for information for specifically identified individuals via transmittal procedures contained in Section II of this Agreement.

II.   Procedures

01.   Disclosures by ICE to the IRS will be in accordance with IRC § 6103(i)(2) and all other applicable law, regulation, and policy.  Information may be securely transmitted via Kiteworks or as otherwise agreed upon.

02.   IRS will search the Integrated Data Retrieval System (IDRS) for the information requested.

03.   Disclosures by the IRS to ICE: Information may be securely transmitted via Kiteworks or as otherwise agreed upon.

III.   Description of the Records

01.   The IRS will

a.   disclose requested information from the following System(s) of Records:

1.   Treasury/IRS 22.060 Automated Non-Master File, 80 FR 54064 (Sept. 8, 2015)
2.   Treasury/IRS 34.037 IRS Audit Trail and Security Records System, 80 FR 54064 (Sept. 8, 2015)
3.   Treasury/IRS 24.030 Customer Account Data Engine Individual Master File, 80 FR 54064 (Sept. 8, 2015)
4.   Treasury/IRS 24.046 Customer Account Data Engine Business Master File, 80 FR 54064 (Sept. 8, 2015)
5.   Treasury/IRS 22.061 Individual Return Master File, 80 FR 54064 (Sept. 8, 2015)
6.   Treasury/IRS 42.008 Audit Information Management System, 80 FR 54064 (Sept. 8, 2015)

b.   treat the incoming data from ICE as transient data and destroy the data when no longer needed for business use, in accordance with General Record Schedule 5.2, item 010.

02.   ICE will

a.   disclose the following subject identifier information: CVID; A Number; First, Middle and Last Name; Date of Birth; Address Information; Country of Citizenship; FBI

2 UNCLASSIFIED//FOR OFFICIAL USE ONLY

Add. 59

Numbers; and Fingerprint Identification Number (FINS), from the following System(s) of Records:

1. Alien File, Index, and National File Tracking, 82 F.R. 43556 (Sep. 18, 2017).
2. External Investigations, 85 F.R. 74362 (Nov. 20, 2020).
3. Criminal Arrest Records and Immigration Enforcement Records (CARIER), 89 F.R. 55638 (Jul. 5, 2024).

b. maintain the information provided by IRS in the following Systems of Records:

1. Alien File, Index, and National File Tracking, 82 F.R. 43556, (Sep. 18, 2017).
2. External Investigations, 85 F.R. 74362 (Nov. 20, 2020).
3. Criminal Arrest Records and Immigration Enforcement Records (CARIER), 89 F.R. 55638 (Jul. 5, 2024)

c. ICE will ensure that Federal tax return and return information is properly destroyed or returned to the IRS when no longer needed based on established ICE record retention schedules in accordance with IRS Publication 1075, *Tax Information Security Guidelines for Federal, State and Local Agencies.*

The information in these systems of records notices may be updated during the effective period of this MOU as required by the Privacy Act.

## IV. Reproduction Costs

It is mutually agreed that the parties signing this Agreement will not charge one another for costs incurred in production or reproduction of information provided under this Agreement.

Nothing in this MOU is intended or shall be construed to require the obligation, appropriation, or expenditure of funds from the U.S. Treasury in violation of the Anti-Deficiency Act, 31 U.S.C. §§ 1341-1519.

## V. Approval Signatures

TODD M LYONS
Digitally signed by TODD M LYONS
DN: cn=TODD M LYONS, o=U.S. Government, ou=People,
email=Todd.M.Lyons@ice.dhs.gov, c=US
Date: 2025-04-18T16:50:24-0400

_____        _____
Signature                                                                Date

Todd Lyons
Director (Acting)
Immigration and Customs Enforcement
500 12th St SW
Washington, DC 20536

Add. 60

TD_0000054

Dottie A.
Romo

Digitally signed by
Dottie A. Romo
Date: 2025.04.18
13:52:42 -04'00'

_____          _____
Signature                                Date

Dottie Romo
Chief Operating Officer (Acting)
Internal Revenue Service
1111 Constitution Ave NW
Washington DC 20224

4

Add. 61

**8 U.S.C. § 1253.  Penalties related to removal**

(a) Penalty for failure to depart

(1) In general

Any alien against whom a final order of removal is outstanding by reason of being a member of any of the classes described in section 1227(a) of this title, who—

(A) willfully fails or refuses to depart from the United States within a period of 90 days from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court,

(B) willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure,

(C) connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure pursuant to such, or

(D) willfully fails or refuses to present himself or herself for removal at the time and place required by the Attorney General pursuant to such order,

shall be fined under Title 18, or imprisoned not more than four years (or 10 years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), or (4) of section 1227(a) of this title), or both.

\*   \*   \*   \*   \*

**26 U.S.C. § 6103.  Confidentiality and disclosure of returns and return information**

(a) General rule

Returns and return information shall be confidential, and except as authorized by this title—

(1) no officer or employee of the United States,

(2) no officer or employee of any State, any local law enforcement agency receiving information under subsection (i)(1)(C) or (7)(A), any

Add. 62

tribal or local child support enforcement agency, or any local agency administering a program listed in subsection (l)(7)(D) who has or had access to returns or return information under this section or section 6104(c), and

(3) no other person (or officer or employee thereof) who has or had access to returns or return information under subsection (c), subsection (e)(1)(D)(iii), paragraph (10), (13), (14), or (15) of subsection (k), paragraph (6), (8), (10), (12), (13) (other than subparagraphs (D)(v) and (D)(vi) thereof), (16), (19), (20), or (21) of subsection (l), paragraph (2) or (4)(B) of subsection (m), or subsection (n),

shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section. For purposes of this subsection, the term "officer or employee" includes a former officer or employee.

(b) Definitions

For purposes of this section—

(1) Return

The term "return" means any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed.

(2) Return information

The term "return information" means—

(A) a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data,

Add. 63

received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense,

\* \* \* \* \*

(3) Taxpayer return information

The term "taxpayer return information" means return information as defined in paragraph (2) which is filed with, or furnished to, the Secretary by or on behalf of the taxpayer to whom such return information relates.

\* \* \* \* \*

(6) Taxpayer identity

The term "taxpayer identity" means the name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number (as described in section 6109), or a combination thereof.

\* \* \* \* \*

(i) Disclosure to Federal officers or employees for administration of Federal laws not relating to tax administration

(1) Disclosure of returns and return information for use in criminal investigations

(A) In general

Except as provided in paragraph (6), any return or return information with respect to any specified taxable period or periods shall, pursuant to and upon the grant of an ex parte order by a Federal district court judge or magistrate judge under subparagraph (B), be open (but only to the extent necessary as provided in such order) to inspection by, or disclosure to, officers and employees of any Federal agency who are personally and directly engaged in--

Add. 64

(i) preparation for any judicial or administrative proceeding pertaining to the enforcement of a specifically designated Federal criminal statute (not involving tax administration) to which the United States or such agency is or may be a party, or pertaining to the case of a missing or exploited child,

(ii) any investigation which may result in such a proceeding, or

(iii) any Federal grand jury proceeding pertaining to enforcement of such a criminal statute to which the United States or such agency is or may be a party, or to such a case of a missing or exploited child,

solely for the use of such officers and employees in such preparation, investigation, or grand jury proceeding.

\* \* \* \* \*

(2) Disclosure of return information other than taxpayer return information for use in criminal investigations

(A) In general

Except as provided in paragraph (6), upon receipt by the Secretary of a request which meets the requirements of subparagraph (B) from the head of any Federal agency or the Inspector General thereof, or, in the case of the Department of Justice, the Attorney General, the Deputy Attorney General, the Associate Attorney General, any Assistant Attorney General, the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, any United States attorney, any special prosecutor appointed under section 593 of title 28, United States Code, or any attorney in charge of a criminal division organized crime strike force established pursuant to section 510 of title 28, United States Code, the Secretary shall disclose return information (other than taxpayer return information) to officers and employees of such agency who are personally and directly engaged in--

(i) preparation for any judicial or administrative proceeding described in paragraph (1)(A)(i),

Add. 65

(ii) any investigation which may result in such a proceeding, or

(iii) any grand jury proceeding described in paragraph (1)(A)(iii),

solely for the use of such officers and employees in such preparation, investigation, or grand jury proceeding.

(B) Requirements.--A request meets the requirements of this subparagraph if the request is in writing and sets forth--

(i) the name and address of the taxpayer with respect to whom the requested return information relates;

(ii) the taxable period or periods to which such return information relates;

(iii) the statutory authority under which the proceeding or investigation described in subparagraph (A) is being conducted; and

(iv) the specific reason or reasons why such disclosure is, or may be, relevant to such proceeding or investigation.

(C) Taxpayer identity.--For purposes of this paragraph, a taxpayer's identity shall not be treated as taxpayer return information.

\* \* \* \* \*

(p) Procedure and recordkeeping

\* \* \* \* \*

(4) Safeguards

Any Federal agency described in subsection (h)(2), (h)(5), (i)(1), (2), (3), (5), or (7), (j)(1), (2), or (5), (k)(8), (10), (11), or (15), (l)(1), (2), (3), (5), (10), (11), (13)(A), (13)(B), (13)(C), (13)(D)(i), (14), (17), or (22), (o)(1)(A), or (o)(3), the Government Accountability Office, the Congressional Budget Office, or any agency, body, or commission described in subsection (d), (i)(1)(C), (3)(B)(i), or (7)(A)(ii), or (k)(10), (l)(6), (7), (8), (9), (12), (15), or (16), any appropriate State officer (as defined in section 6104(c)), or any

Add. 66

other person described in subsection (k)(10) or (15), subsection (l)(6), (8), (10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20), or any Indian tribe or tribal organization receiving a grant under section 455(f) of the Social Security Act, or any entity described in subsection (l)(21), shall, as a condition for receiving returns or return information—

(A) establish and maintain, to the satisfaction of the Secretary, a permanent system of standardized records with respect to any request, the reason for such request, and the date of such request made by or of it and any disclosure of return or return information made by or to it;

(B) establish and maintain, to the satisfaction of the Secretary, a secure area or place in which such returns or return information shall be stored;

(C) restrict, to the satisfaction of the Secretary, access to the returns or return information only to persons whose duties or responsibilities require access and to whom disclosure may be made under the provisions of this title;

(D) provide such other safeguards which the Secretary determines (and which he prescribes in regulations) to be necessary or appropriate to protect the confidentiality of the returns or return information;

(E) furnish a report to the Secretary, at such time and containing such information as the Secretary may prescribe, which describes the procedures established and utilized by such agency, body, or commission, the Government Accountability Office, or the Congressional Budget Office for ensuring the confidentiality of returns and return information required by this paragraph; and

(F) upon completion of use of such returns or return information

(i) in the case of an agency, body, or commission described in subsection (d), (i)(3)(B)(i), (k)(10), or (l)(6), (7), (8), (9), or (16), any appropriate State officer (as defined in section 6104(c)), or any other person described in subsection (k)(10) or (15) or subsection

Add. 67

(l)(6), (8), (10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20) return to the Secretary such returns or return information (along with any copies made therefrom) or make such returns or return information undisclosable in any manner and furnish a written report to the Secretary describing such manner,

(ii) in the case of an agency described in subsection (h)(2), (h)(5), (i)(1), (2), (3), (5) or (7), (j)(1), (2), or (5), (k)(8), (10), (11), or (15), (l)(1), (2), (3), (5), (10), (11), (12), (13)(A), (13)(B), (13)(C), (13)(D)(i), (14), (15), (17), or (22),,3 (o)(1)(A), or (o)(3) or any entity described in subsection (l)(21), the Government Accountability Office, or the Congressional Budget Office, either--

(I) return to the Secretary such returns or return information (along with any copies made therefrom),

(II) otherwise make such returns or return information undisclosable, or

(III) to the extent not so returned or made undisclosable, ensure that the conditions of subparagraphs (A), (B), (C), (D), and (E) of this paragraph continue to be met with respect to such returns or return information, and

*   *   *   *   *

(q) Regulations

The Secretary is authorized to prescribe such other regulations as are necessary to carry out the provisions of this section.

Add. 68

**26 C.F.R. § 301.6103(i)-1.  Disclosure of returns and return information (including taxpayer return information) to and by officers and employees of the Department of Justice or another Federal agency for use in Federal grand jury proceeding, or preparation for proceeding or investigation, involving enforcement of Federal criminal statute not involving tax administration**

(a) Disclosure of returns and return information (including taxpayer return information) to officers and employees of the Department of Justice or another Federal agency

Returns and return information (including taxpayer return information), as defined in section 6103(b)(1), (2), and (3) of the Internal Revenue Code, shall, to the extent provided by section 6103(i)(1), (2), and (3) and subject to the requirements of section 6103(i)(1) and (2), be open to inspection by or disclosure to officers and employees of the Department of Justice (including United States attorneys) or of another Federal agency (as defined in section 6103(b)(9)) personally and directly engaged in, and for their necessary use in, any Federal grand jury proceeding, or preparation for any administration or judicial proceeding (or their necessary use in an investigation which may result in such a proceeding), pertaining to enforcement of a specifically designated Federal criminal statute not involving or related to tax administration to which the United States or such agency is or may be a party.

(b) Disclosure of returns and return information (including taxpayer return information) by officers and employees of the Department of Justice or another Federal agency

(1) Returns and return information (including taxpayer return information), as defined in section 6103(b)(1), (2), and (3) of the Code, disclosed to officers and employees of the Department of Justice or other Federal agency (as defined in section 6103(b)(9)) as provided by paragraph (a) of this section may be disclosed by such officers and employees to other persons, including, but not limited to, persons described in subparagraph (2) of this paragraph, but only to the extent necessary in connection with a Federal grand jury proceeding, or the proper preparation for a

Add. 69

proceeding (or in connection with an investigation which may result in such a proceeding), described in paragraph (a). Such disclosures may include, but are not limited to, disclosures where necessary—

(i) To properly obtain the services of persons having special knowledge or technical skills (such as, but not limited to, handwriting analysis, photographic development, sound recording enhancement, or voice identification);

(ii) To properly interview, consult, depose, or interrogate or otherwise obtain relevant information from, the taxpayer to whom such return or return information relates (or such taxpayer's legal representative) or any witness who may be called to give evidence in the proceeding; or

(iii) To properly conduct negotiations concerning, or obtain authorization for, disposition of the proceeding, in whole or in part, or stipulations of fact in connection with the proceeding.

Disclosure of a return or return information to a person other than the taxpayer to whom such return or return information relates or such taxpayer's legal representative to properly accomplish any purpose or activity described in this subparagraph should be made, however, only if such purpose or activity cannot otherwise properly be accomplished without making such disclosures.

(2) Among those persons to whom returns and return information may be disclosed by officers and employees of the Department of Justice or other Federal agency as provided by subparagraph (1) of this paragraph are—

(i) Other officers and employees of the Department of Justice (including an office, board, division, or bureau of such department, such as the Federal Bureau of Investigation or the Drug Enforcement Administration) or other Federal agency described in subparagraph (1), such as clerical personnel (for example, secretaries, stenographers, docket and file room clerks, and mail room employees) and supervisory personnel (for example, in the case of the

Add. 70

Department of Justice, Section Chiefs, Deputy Assistant Attorneys General, Assistant Attorneys General, the Deputy Attorney General, the Attorney General, and supervisory personnel of the Federal Bureau of Investigation or the Drug Enforcement Administration);

(ii) Officers and employees of another Federal agency (as defined in section 6103(b)(9)) working under the direction and control of such officers and employees of the Department of Justice or other Federal agency described in subparagraph (1); and

(iii) Court reporters.