No. 26-1329

# In the United States Court of Appeals for the First Circuit

_____

COMMUNITY ECONOMIC DEVELOPMENT CENTER OF
SOUTHEASTERN MASSACHUSETTS; NATIONAL PARENTS
UNION; NATIONAL KOREAN AMERICAN SERVICE AND
EDUCATION CONSORTIUM; UNDOCUBLACK NETWORK, INC.,

*Plaintiffs-Appellees,*

v.

SCOTT BESSENT, Acting Commissioner of the Internal Revenue
Service and Secretary of the Treasury; INTERNAL REVENUE
SERVICE; FRANK BISIGNANO, Commissioner of the Social Security
Administration; SOCIAL SECURITY ADMINISTRATION; DAVID J.
VENTURELLA, Acting Director of U.S. Immigration and Customs
Enforcement; U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT; MARKWAYNE MULLIN, Secretary of Homeland
Security; DEPARTMENT OF HOMELAND SECURITY,

*Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the District of Massachusetts
Case No. 1:25-cv-12822-IT
Hon. Indira Talwani

_____

## APPELLEES' RESPONSE BRIEF

_____

| | |
|---|---|
| KEKER, VAN NEST & | ASIAN LAW CAUCUS |
| PETERS LLP | JOSHUA ROSENTHAL |
| LEO L. LAM | DOROTHY CHANG |
| LAURIE CARR MIMS | 55 Columbus Ave. |
| SARAH SALOMON | San Francisco, CA 94111 |
| CHARLOTTE KAMAI | Telephone: 415 896 1701 |
| KELLY M. HERNANDEZ | Facsimile: 415 896 1702 |

633 Battery Street
San Francisco, California 94111
Telephone: 415 391 5400
Facsimile:  415 397 7188

GREATER BOSTON LEGAL
SERVICES
GARY KLEIN
197 Friend Street
Boston, MA 02114
Telephone: 617 320 8397
Facsimile: 617 371 1222

Counsel for Plaintiffs-Appellees

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, each plaintiff-appellee that is a nongovernmental corporation hereby identifies any parent corporation and any publicly held corporation that owns 10% or more of its stock or states there is no such corporation.

1.    Community Economic Development Center of Southeastern Massachusetts has no parent corporation and has no stock or stockholders, so no publicly held corporation owns 10% or more of its stock.

2.    National Parents Union has no parent corporation and has no stock or stockholders, so no publicly held corporation owns 10% or more of its stock.

3.    National Korean American Service and Education Consortium has no parent corporation and has no stock or stockholders, so no publicly held corporation owns 10% or more of its stock.

4.    UndocuBlack Network, Inc., has no parent corporation and has no stock or stockholders, so no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ................. 1

INTRODUCTION ........................................................................ 2

STATEMENT OF JURISDICTION............................................ 4

STATEMENT OF THE ISSUES................................................ 4

STATEMENT OF THE CASE .................................................. 5

I. Statutory Background ........................................................ 5

II. Factual Background .......................................................... 10

A. Agency Action ...................................................................... 10

B. Response from the Organizations ....................................... 13

C. The District Court Order ..................................................... 17

SUMMARY OF ARGUMENT .................................................. 18

RESTATEMENT OF STANDARD OF REVIEW ...................... 21

ARGUMENT ............................................................................ 23

I. The Organizations have standing. ........................................ 23

A.   All Organizations have associational standing to challenge the data-sharing arrangements based on injuries to their members. ...... 23

B.   CEDC has organizational standing to challenge the data-sharing arrangements. ................................................................. 28

II.   The Organizations are likely to succeed on the merits of their APA claims. ................................................................................. 33

A.   The data-sharing arrangements constitute reviewable final agency action. ............................................................................ 34

B.   The data-sharing arrangements are contrary to § 6103. ............. 39

i.   ICE's requests for data are pretextual. .................................... 39

ii.   ICE's requests fail to comply with the requirements of § 6103. ... ........................................................................................ 43

iii.  ICE's storage and handling of the data are unlawful under § 6103. ............................................................................... 47

C.   The data-sharing arrangements are arbitrary and capricious.... 49

III.   Injunctive relief under the APA is justified, as there is no other adequate remedy for the Organizations' injuries. .................................. 55

ii

IV.    The Organizations established the remaining preliminary relief

factors. ...................................................................................................58

   A.    If the injunction is vacated, the Organizations would endure

irreparable harm. ...............................................................................58

   B.    The balance of equities and public interest strongly favor relief.63

V.    The district court's order was lawful and appropriately limited in

scope.......................................................................................................66

CONCLUSION..............................................................................................69

CERTIFICATE OF COMPLIANCE .......................................................72

CERTIFICATE OF SERVICE ...............................................................73

# TABLE OF AUTHORITIES

**Federal Cases**

**Page(s)**

*A.B.-B. v. Morgan,*
548 F. Supp. 3d 209 (D.D.C. 2020) ....................................................... 64

*Abbott Lab'ys v. Gardner,*
387 U.S. 136 (1967) ............................................................................. 56

*AFSCME v. SSA,*
No. 25-CV-00596 (D. Md. Jan. 16, 2026) ............................................ 13

*Airbnb, Inc. v. City of New York,*
373 F. Supp. 3d 467 (S.D.N.Y. 2019) ................................................... 62

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
594 U.S. 758 (2021) ............................................................................. 66

*All. for Retired Ams. v. Bessent,*
770 F. Supp. 3d 79 (D.D.C. 2025) ....................................................... 25

*Am. Ass'n of Univ. Professors v. Rubio,*
780 F. Supp. 3d 350 (D. Mass. 2025) .................................................. 63

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.,*
187 F. Supp. 3d 217 (D. Mass. 2016) ............................................. 31, 63

*Aronson v. I.R.S.,*
973 F.2d 962 (1st Cir. 1992) ............................................................... 65

*Bennett v. Spear,*
520 U.S. 154 (1997) ....................................................................... 34, 35

*Biden v. Nebraska,*
600 U.S. 477 (2023) ............................................................................. 23

*Bost v. Ill. Bd. of Elections,*
607 U.S. 71 (2026) ......................................................................... 23, 33

iv

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ..............................................................55, 56, 57, 58

*Cablevision of Bos., Inc. v. Pub. Improvement Comm'n of City
  of Bos.*,
  184 F.3d 88 (1st Cir. 1999) ................................................................. 46

*Center for Taxpayer Rights v. IRS*,
  815 F. Supp. 3d 1 (D.D.C. 2025)................................................17, 25, 55

*Centro de Trabajadores Unidos v. Bessent*,
  167 F.4th 1218 (D.C. Cir. 2026) ................................................... *passim*

*Cohen v. United States*,
  650 F.3d 717 (D.C. Cir. 2011) ............................................................. 57

*Comcast of Me./N.H., Inc. v. Mills*,
  988 F.3d 607 (1st Cir. 2021) ......................................................... 22, 23

*Conservation L. Found., Inc. v. Acad. Express, LLC*,
  129 F.4th 78 (1st Cir. 2025)........................................................... 23, 24

*Conservation L. Found., Inc. v. Busey*,
  79 F.3d 1250 (1st Cir. 1996) ......................................................... 56, 58

*Corp. Techs., Inc. v. Harnett*,
  943 F. Supp. 2d 233 (D. Mass.), *aff'd*, 731 F.3d 6 (1st Cir.
  2013)..................................................................................................... 62

*Czyewski v. Jevic Holding Corp.*,
  580 U.S. 451 (2017) ............................................................................. 28

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019) ............................................................................. 33

*Diamond Alternative Energy, LLC v. EPA*,
  606 U.S. 100 (2025) ............................................................................. 33

*Doe v. Trump*,
  157 F.4th 36 (1st Cir. 2025)........................................................... 68, 69

*DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*,
  76 F.3d 1212 (D.C. Cir. 1996) ................................................................ 36

*EEOC v. Astra USA, Inc.*,
  94 F.3d 738 (1st Cir. 1996) ..................................................................... 60

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ................................................................................. 50

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................................. 54

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ................................................................................. 53

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ........................................................... 29, 30, 32, 33

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
  608 U.S. --, 146 S. Ct. 1114 (2026) ...................................................... 68

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,
  604 U.S. 542 (2025) ................................................................................. 50

*Francisco Sanchez v. Esso Standard Oil Co.*,
  572 F.3d 1 (1st Cir. 2009) ....................................................................... 22

*Grosdidier v. Chairman*,
  560 F.3d 495 (D.C. Cir. 2009) ................................................................ 59

*Hardaway v. D.C. Hous. Auth.*,
  843 F.3d 973 (D.C. Cir. 2016) ................................................................ 26

*Harper v. Werfel*,
  118 F.4th 100 (1st Cir. 2024) ........................................................... 34, 35

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ........................................................................... 30, 32

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) .................................................................. 61

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .................................................................. 23

*INS v. Lopez-Mendoza*,
468 U.S. 1032 (1984) ............................................................... 58

*Jeffries v. Volume Servs. Am., Inc.*,
928 F.3d 1059 (D.C. Cir. 2019) .............................................. 25

*Jennings v. Stephens*,
574 U.S. 271 (2015) ................................................................ 22

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .................................................... 66

*Lujan v. National Wildlife Federation*,
497 U.S. 871 (1990) ........................................................ 37, 38

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) ................................................................ 64

*Massachusetts v. U.S. Dep't of HHS*,
923 F.3d 209 (1st Cir. 2019) .................................................. 29

*Me. Ass'n of Interdependent Neighborhoods v. Petit*,
647 F. Supp. 1312 (D. Me. 1986) ........................................... 26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.
Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................ 52, 54

*N.H. Indon. Cmty. Support v. Trump*,
157 F.4th 29 (1st Cir. 2025) ............................................. 22, 29

*NAACP v. Alabama*,
357 U.S. 449 (1958) ................................................................ 68

*NAACP v. Button*,
371 U.S. 415 (1963) ................................................................ 31

*NAACP v. Sec'y of Hous. & Urb. Dev.,*
817 F.2d 149 (1st Cir. 1987) ...................................................... 38

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.,*
779 F. Supp. 3d 149 (D.N.H. 2025) ........................................... 63

*Nat'l TPS All. v. Noem,*
150 F.4th 1000 (9th Cir. 2025) ................................................. 22

*Nat'l Treasury Emps. Union v. U.S. Dep't of Treasury,*
838 F. Supp. 631 (D.D.C. 1993) ................................................ 62

*New York v. Trump,*
133 F.4th 51 (1st Cir. 2025) ..................................................... 38

*New York v. Trump,*
171 F.4th 1 (1st Cir. 2026) ....................................................... 22

*Noem v. Abrego Garcia,*
604 U.S. --, 145 S. Ct. 1017 (2025) ...................................... 27, 52

*Nowicki v. Comm'r of Internal Revenue,*
262 F.3d 1162 (11th Cir. 2001) ................................................. 57

*O'Connell v. Shalala,*
79 F.3d 170 (1st Cir. 1996) ....................................................... 47

*Perez-Cruz v. Barr,*
926 F.3d 1128 (9th Cir. 2019) ................................................... 58

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan,*
397 F.3d 56 (1st Cir. 2005) ....................................................... 59

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
102 F.3d 12 (1st Cir. 1996) ....................................................... 60

*Sindicato Puertorriqueno de Trabajadores v. Fortuno,*
699 F.3d 1 (1st Cir. 2012) ......................................................... 31

*Somerville Public Schools v. McMahon,*
139 F.4th 63 (1st Cir. 2025) ..................................................... 66

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) .................................................................. 24

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) .................................................................. 25

*Tota v. Gonzales,*
  457 F.3d 161 (1st Cir. 2006) ................................................... 43

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ............................................................ 25, 31

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) ...................................................... 21, 67, 68

*U.S. Army Corps of Engr's v. Hawkes Co.,*
  578 U.S. 590 (2016) .................................................................. 34

*United States v. Armstrong,*
  517 U.S. 456 (1996) .................................................................. 43

*United States v. Fausto,*
  484 U.S. 439 (1988) .................................................................. 59

*United States v. Michaelian,*
  803 F.2d 1042 (9th Cir. 1986) ................................................ 57

*United States v. Orlando,*
  281 F.3d 586 (6th Cir. 2002) ................................................. 57

*Venetian Casino Resort, LLC v. EEOC,*
  530 F.3d 925 (D.C. Cir. 2008) ................................................ 37

*Waldron v. George Weston Bakeries Inc.,*
  570 F.3d 5 (1st Cir. 2009) ....................................................... 22

*Webb v. Injured Workers Pharmacy, LLC,*
  72 F.4th 365 (1st Cir. 2023) ................................................... 25

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ...................................................................... 22

## Federal Statutes

5 U.S.C. § 555 ................................................................... 53

8 U.S.C. § 1253 ............................................................. *passim*

26 U.S.C. § 6103 ........................................................... *passim*

26 U.S.C. § 6110 .................................................................. 58

26 U.S.C. § 7213 .................................................................. 57

26 U.S.C. § 7431 .................................................................. 57

28 U.S.C. § 1292 ................................................................... 4

28 U.S.C. § 1331 ................................................................... 4

Administrative Procedure Act, 5 U.S.C. §§ 704-706 ...................... *passim*

Pub. L. 95-600 § 701(b)(3), 92 Stat. 2763, 2922 (1979) ............................ 9

## Regulations

26 C.F.R. § 301.6103(i)–1(b)(1) ........................................................ *passim*

Exec. Order 14161, *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, 90 Fed. Reg. 8451 (Jan. 20, 2025) ................... 10

## Other Authorities

*Chief Counsel Att'y Memo*, IRS AM 2017-004, 2017 WL 3713172 (July 8, 2016) ........................................................ 8

*Gen. Explanation of the Revenue Act of 1978* 396 (JCS-7-79, Comm. Print 1979) ................................................................. 8

IRS Pub. 1075 (Rev. 11-2021), *Tax Information Sec'y Guidelines* ........................................................................ 50

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Appellees believe oral argument is warranted in this case. The interpretation of 26 U.S.C. § 6103's criminal-investigation exception is now before multiple circuit Courts of Appeals. This appeal uniquely addresses ICE's obligations as a requestor, recipient, and user of taxpayer information. The data-sharing arrangements here have progressed substantially since the MOU at issue in *Centro de Trabajadores Unidos v. Bessent* ("*Centro*"), 167 F.4th 1218 (D.C. Cir. 2026). Moreover, federal agencies' treatment of confidential taxpayer information is a matter of significant public importance. In light of the impact and importance of the issues presented, and to best aid the Court in reaching a decision, Appellees respectfully request oral argument.

## INTRODUCTION

Congress enshrined decades-long protections of taxpayer data, including immigrants' information, in 26 U.S.C. § 6103. Since the statute was enacted in 1976, the sharing and use of taxpayer data has been strictly prohibited except in narrow, specifically enumerated circumstances—none of which includes civil immigration enforcement. These protections promote tax filing, regardless of immigration status.

In April 2025, abruptly reversing longstanding law and policy, the Internal Revenue Service ("IRS") executed a Memorandum of Understanding ("MOU") with the Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE"). Per the MOU and a follow-on Implementation Agreement, these agencies proceeded to unlawfully exchange taxpayer data for civil immigration enforcement. ICE requested home address data for over seven million taxpayers for civil immigration use. When IRS initially declined ICE's wholesale request, ICE made another improper request for data of all immigrants with final orders of removal. This request and receipt of data did not consider the devastating consequences on taxpayers, their families, and the U.S. tax system, let alone the statutory requirements

2

of § 6103. IRS later admitted that ICE's request was facially unlawful, and that sharing certain data had been a mistake.

The four Plaintiffs-Appellees are Organizations that educate and assist immigrants and their families to be full participants and responsible contributors in the U.S. economy and society as legal taxpayers. Together they sued ICE, IRS, and DHS for illegally sharing immigrant taxpayer data in violation of § 6103. The district court correctly granted the Organizations' request for preliminary relief. The court's order recognized that IRS's sharing of additional data had been separately enjoined in a parallel proceeding in the District of Columbia and therefore limited its order to prohibiting ICE from unlawfully using or further sharing § 6103-protected data it had already received from IRS. That order currently prevents further irreparable harm to Organizations and their members by prohibiting ICE from using the illegally obtained home-address taxpayer data to pursue arrests, detention, and deportation as part of ICE's civil immigration mandate.

Injunctive relief is critical to halting ICE's persistent and facially unlawful data requests. Indeed, ICE admitted in another matter that it unlawfully stored immigrant data in the cloud, shared data with

3

DOGE, and does not know how to track that data. Because ICE has shown consistent willingness to flout the law, the district court's order in this case is necessary to prevent ICE's continuing unlawful actions, and it should be affirmed.

## STATEMENT OF JURISDICTION

On November 3, 2025, the Organizations moved for a preliminary injunction, or alternatively a stay under 5 U.S.C. §§ 705, 706, in the District of Massachusetts against IRS, ICE, and DHS, and their respective officials. The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and granted the Organizations' motion for preliminary relief as to ICE on February 5, 2026. ICE filed a notice of appeal on March 30, 2026. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1) to review the district court's decision granting a preliminary injunction.

## STATEMENT OF THE ISSUES

The issues presented on appeal are:

1. Whether the district court properly found the Organizations made a sufficient showing of Article III standing.

4

2. Whether the court properly found the APA provides judicial review of the IRS-ICE data-sharing arrangements.

3. Whether the district court properly found the Organizations are likely to succeed in showing that the data-sharing arrangements are contrary to law, arbitrary and capricious, or both.

4. Whether the court properly exercised its discretion in finding the Organizations are likely to succeed on their APA claims and face irreparable injury absent an injunction, and the balance of equities and public interest favor the preliminary relief.

<div align="center">

**STATEMENT OF THE CASE**

</div>

## I.  Statutory Background

In the aftermath of Watergate, Congress rewrote § 6103 of the Internal Revenue Code ("IRC") to establish the "General Rule" that tax-related information "shall be confidential" and no "officer or employee of the United States [in IRS or otherwise] . . . shall disclose any return or return information" except as specifically provided in the IRC. 26 U.S.C. § 6103(a)(1). These protections apply to "return information," which is defined broadly to include nearly any information that IRS acquires

<div align="center">

5

</div>

with regard to a person's tax obligations, including "the name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number . . . or a combination thereof." *Id.* § 6103(b)(2), (b)(6).

Because the statute's "General Rule" is strict, its limited exceptions are laid out with specificity. As relevant, section (i) of the statute excepts the sharing of information with criminal law enforcement agencies for non-tax purposes in narrow circumstances. The statute first provides mechanisms for an agency to obtain return information for "the investigation" or "preparation for any judicial or administrative proceeding pertaining to the enforcement of a specifically designated Federal criminal statute," including a grand jury proceeding. *Id.* § 6103(i)(1)(A), (i)(2)(A). Investigation and preparation under those provisions do not include the location and apprehension of a suspect. Rather, the statute separately and explicitly provides for the use of data to locate fugitives, with a court order and where there is a pending felony arrest warrant for the person. *Id.* § 6103(i)(5).

Generally, a law enforcement agency must obtain a judicial order for IRS to share return information. To obtain such an order, the agency

6

must establish "reasonable cause to believe, based upon information believed to be reliable, that a specific criminal act has been committed . . . that the return or return information is or may be relevant to a matter relating to the commission of such act, and the return or return information is sought exclusively for use in a Federal criminal investigation or proceeding concerning such act." *Id.* § 6103(i)(1)(B). On such a showing, the court may order IRS to disclose specifically identified information to "officers and employees of any Federal agency who are personally and directly engaged in preparation for any judicial or administrative proceeding pertaining to the enforcement of a specifically designated Federal criminal statute," or an investigation or grand jury proceeding related to that crime. *Id.* § 6103(i)(1)(A).

In rare circumstances, an agency may obtain return information without a judicial order. *Id.* § 6103(i)(2)(A). However, if an agency does not seek a court order, it can receive only a narrow subset of the return information: it may not receive "information . . . which is filed with, or furnished to, [IRS] by or on behalf of the taxpayer." *Id.* § 6103(b)(3), (i)(2)(A). For example, while a criminal law-enforcement agency may receive a whistleblower report or documents seized in a search without

7

court order, a judicial order is necessary for information from a Form 1040, W-2, or 1099. *See Chief Counsel Att'y Memo*, IRS AM 2017-004, 2017 WL 3713172 (July 8, 2016) ("A Form W-2 is entirely taxpayer return information" which may not be disclosed without a court order.).

The original version of § 6103(i)(2) created a practical problem, however:

> [F]or the IRS to transmit this information to the Justice Department or other Federal agency, it is necessary, of course, to provide the name and address of the taxpayer. Because the taxpayer furnishes his name and address on his return, it is arguable that the IRS would not be able to provide this information to the Justice Department or other Federal agency, thus completely negating the purpose and operation of these provisions.

Staff of the Joint Cmm. on Tax'n, 95th Cong., *Gen. Explanation of the Revenue Act of 1978* 396 (JCS-7-79, Comm. Print 1979). Accordingly, Congress later added an exception to this subsection's limitation, allowing the disclosure of taxpayer's name and address when included on a document to which the government is entitled under § 6103(i)(2)(A). This is now subsection (i)(2)(C), providing an exception for "taxpayer identity" information. Pub. L. 95-600 § 701(b)(3), 92 Stat. 2763, 2922 (1979). Even though that

8

information may have originally been provided by the taxpayer, it is not necessary for IRS to withhold or redact it under this narrow exception to the exception.

To seek the limited information accessible without a court order under § 6103(i)(2), the requesting agency head must send a written request to IRS. Notably, the information will not go to the requesting individual. Rather, the request must identify the "officers and employees of such agency who are personally and directly engaged in" the investigation or preparation for a proceeding to enforce federal criminal law. 26 U.S.C. § 6103(i)(2)(A). Those individuals may receive the information. In full, the request must contain:

> (i) the name and address of the taxpayer with respect to whom the requested return information relates;
> (ii) the taxable period or periods to which such return information relates;
> (iii) the statutory authority under which the proceeding or investigation described in subparagraph (A) is being conducted; and
> (iv) the specific reason or reasons why such disclosure is, or may be, relevant to such proceeding or investigation.

*Id.* § 6103(i)(2)(B).

Whether obtained by court order or direct request, the information is disclosed "solely for the use of such officers and employees in such

9

preparation, investigation, or grand jury proceeding." *Id.* § 6103(i)(1)(A); (i)(2)(A). The statute prohibits disclosure by any "officer or employee of the United States," including recipient law-enforcement officers. *Id.* § 6103(a)(2).

## II. Factual Background

### A. Agency Action

***The MOU and Implementation Agreement.***  President Trump's Executive Order 14161 directed the Attorney General, Secretary of Homeland Security, and Director of National Intelligence to "take immediate steps to exclude or remove [any] alien" when "information is identified that would support [their] exclusion or removal." Exec. Order 14161, *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, 90 Fed. Reg. 8451 (Jan. 20, 2025).

ICE soon demanded data on 700,000 taxpayers from IRS, entirely ignoring § 6103, but was appropriately rebuffed by IRS. A307–08. Days later, ICE attempted its request again, this time reframing it as a "DOGE ICE Information Request." A315–16.

10

On April 7, 2025, ICE and IRS entered into a MOU, under which IRS agreed to share and ICE agreed to receive taxpayer information "to aid in the identification and location of certain aliens." A323. The MOU cites Executive Order 14161's directive that the Secretary of Homeland Security "identify, exclude, or remove aliens illegally present" in the U.S. A327. The MOU purports to rely on 26 U.S.C. § 6103(i)(2) to advance ICE's broad civil immigration enforcement objectives, even though that provision permits disclosure of taxpayer information only for criminal enforcement. A341–42.

On April 18, 2025, the same agencies entered into an Implementation Agreement by which to carry out the data-sharing arrangements under the MOU. A591–94. Though ICE typically maintains classified data in a restricted or separate file, this agreement provides for incorporating data received from IRS directly into three general, non-segregated Systems of Records—indeed, one is maintained by an entirely separate agency. *See* A593; *see also* A175–77 (describing the Systems of Records).

***Data Requests and Disclosures.*** On June 5, 2025, ICE sent a request to IRS for address information for "the full alien population" of

11

7.6 million individuals, but IRS again rejected this request. A392. On June 24, 2025, ICE issued another data request to IRS seeking taxpayer information for 7.3 million immigrants—the vast majority of immigrants in the U.S. A399; A406–08. ICE's request specified the relevant taxable periods as January 2022 to present, referenced 8 U.S.C. § 1253(a)(1) as the relevant criminal statute, and listed a single official as the employee personally and directly involved in all 7.3 million criminal investigations. A406–08. IRS denied that request for facially violating § 6103. A399 (listing deficiencies under § 6103 and noting "IRS is again unable to process this data file in accordance with the MOU.").

Three days later, on June 27, 2025, ICE issued another request for the protected data of 1.2 million taxpayers, A413—essentially all immigrants with final orders of removal. IRS later admitted this request too violated § 6103 because the address fields for thousands of taxpayers were "incomplete or insufficiently populated." A660. For example, rather than providing an actual address, ICE often populated the field with merely "parts of a common address," "Failed to Provide," "Unknown Address," or simply, "NA NA." A661. IRS, however, accepted

and processed the request, sharing data with ICE for 47,289 taxpaying immigrants on August 7, 2025.[1] A451, A660.[2]

### B.    Response from the Organizations

The Organizations—the Community Economic Development Center of Southeastern Massachusetts ("CEDC"), National Parents Union ("NPU"), National Korean American Service and Education Consortium ("NAKASEC"), and UndocuBlack Network ("UBN"), and collectively, the "Organizations"—are four membership-based organizations that advocate for immigrants' rights and support members with tax, legal, and community-based services. A171–270. Each Organization's members have a wide range of immigration statuses, ranging from naturalized and U.S. born citizens to members with final removal orders. A213–14; A219–20; A263–64.

---

[1] Despite IRS's admission that this data was improperly shared, *see, e.g.*, A661, ICE has not represented that it would take any steps to purge this data from its records.

[2] Subsequently, in another case, SSA admitted it had sent DHS and ICE protected information using an unsecure cloud-based database and did not know where the data ended up. *AFSCME v. SSA*, No. 25-CV-00596 (D. Md. Jan. 16, 2026), ECF No. 197; A543.

CEDC is a community-development organization that promotes economic justice for its many immigrant members and assists with immigration and tax issues to enable them to participate in the U.S. economy and society. A181–87 ¶¶ 10–34. CEDC is federally registered as a Volunteer Income Tax Assistance ("VITA") site, receiving funding to directly assist taxpayers, including immigrants, with annual filings and with obtaining Individual Taxpayer Identification Numbers ("ITINs").  A185–87 ¶¶ 25, 30, 32–33. NPU and its members promote the rights and welfare of parents and families, including by advocating to expand the Child Tax Credit to immigrant families. A265 ¶ 11. NAKASEC, UBN, and their members similarly promote immigrants' rights, share knowledge and resources, and advance social and economic justice. A211–17; A218–226.

The agencies' data-sharing arrangements, and in particular ICE's actions, have sown confusion and disruption in the lives of the Organizations' members. Their members have long complied with tax laws, assisted by the advice and service of the Organizations, in reliance on ICE's and IRS's longstanding policies and practices to refrain from using taxpayer data to facilitate deportations. A186–87 ¶¶ 32–33; A213

14

¶¶ 9–10; A220 ¶ 9. But the unlawful data-sharing arrangements have stoked fear that filing tax returns would prompt ICE to locate or deport immigrant members and their families. A189 ¶ 44; A214 ¶ 14. Immigrant members fear consulting the Organizations, engaging with other members, and participating in organizational activities. A188–89 ¶¶ 38, 40–41, 43; A267 ¶ 19. Some members have lost hope of adjusting their immigration statuses, for which they must show tax compliance to establish good moral character. A138 ¶ 43. Others have forsaken Child Tax Credits and other benefits for which they are lawfully eligible. A189 ¶ 45; A265–68 ¶¶ 11, 24.

Members with final removal orders are reasonably certain that ICE requested their information, and IRS may well have shared it. A38–40; A50; A221–22, 225 ¶¶ 19–20, 32; A191 ¶ 50. Members who have common names in immigrant communities fear they will be confused with others and mistakenly targeted by ICE. A214–15 ¶¶ 16–17 & nn. 1–2. Other members fear that they will be targeted as a result of typos or data issues, like other immigrants who have already been misidentified by government error. *Id.* And other members fear that their families and friends with fragile immigration statuses will be

impacted by ICE's actions if they file tax returns sharing their home addresses. A223 ¶¶ 23–25. The data-sharing arrangements force the Organizations' members to make an impossible decision: continue longstanding compliance with tax laws by providing ICE with data that risks their and their families' deportation, or forgo filing taxes, risking civil penalties, and undermining their chances of qualifying for future immigration relief.

CEDC itself has also been harmed by the data-sharing arrangements and ICE's indiscriminate requests for and use of immigrant taxpayer data. CEDC, whose funding depends on the volume of its tax filings, has seen a steep decline in its ITIN applications and tax filings since the data-sharing arrangements commenced. A188 ¶¶ 38–39. As a VITA site, CEDC cannot counsel its members to disregard tax laws, but as a mission-based organization, it also cannot encourage activity that puts members at risk of unlawful detention and deportation. A187 ¶¶ 36–37. ICE's actions have caused CEDC reputational harm because ICE's reversal contradicts CEDC's prior assurances that their information was protected, destroying years of

16

trust-building with its immigrant members and forcing staff to divert resources to repair the damage. *Id.* ¶¶ 33–37.

### C.    The District Court Order

On September 30, 2025, the Organizations brought suit and shortly thereafter on November 3, 2025, filed a motion for preliminary injunction to stop the agencies' unlawful data-sharing arrangements to protect the rights and interests of their members and themselves. On February 5, 2026, the district court correctly held that preliminary relief is warranted under the APA because the data-sharing arrangements are final agency action that is contrary to § 6103 and arbitrary and capricious; Organizations have suffered irreparable harm; and the balance of equities and public interest favored preliminary relief. Though the district court declined to enjoin IRS, because it was already temporarily enjoined, *see Center for Taxpayer Rights v. IRS*, 815 F. Supp. 3d 1 (D.D.C. 2025), the court prohibited ICE from using the taxpayer data it already had received. On February 11, 2026, the government admitted that ICE's request for 1.28 million addresses, and IRS's subsequent release of 47,289 addresses, violated § 6103 because

17

ICE failed to include the complete address information required by law. A660–61 ¶¶11–16.

## SUMMARY OF ARGUMENT

The district court correctly granted the Organizations preliminary relief.

First, the Organizations have standing to challenge the data-sharing arrangements, both on behalf of their members and on CEDC's own behalf. The Organizations identified members with final orders of removal whose data was requested by ICE and was at "substantial risk" of having been disclosed by IRS. IRS conceded that some of its disclosures were facially improper, and the record establishes an imminent threat that the data would be used by ICE unlawfully for arrest or deportation. Disclosure of members' confidential information, especially to an entity that will use it to the members' detriment, constitutes quintessential Article III injury.

The district court correctly noted that a substantial risk of misidentification exposed even more members to potential injury. Members have also been chilled from filing their taxes, lost access to government benefits to which they are legally entitled, and endured

18

First Amendment injuries. And CEDC has suffered financial and reputational injury as well as harm to its core organizational activities. Each harm is sufficient for standing.

Second, the Organizations demonstrated a substantial likelihood that the data-sharing arrangements constitute final agency action that is contrary to the procedural and substantive mandates of § 6103 and is arbitrary and capricious. IRS's actual breach of confidentiality for more than 40,000 taxpayers had "legal consequences," as did the agencies' specific commitments for such disclosures.

The data-sharing arrangements are contrary to law in several respects. ICE requested addresses for the improper purpose of locating taxpayers, rather than for a statutorily permitted "investigation." Worse, the purported criminal prosecutions identified by ICE are pretext for civil immigration enforcement, an impermissible purpose. And ICE's requests failed to meet the requirements of the statute, including by identifying an improper recipient and failing to offer specificity regarding the relevance of the sought-after addresses to any investigation or prosecution. The government further admitted that IRS disclosed data, even where the request violated § 6103 by omitting valid

19

address information. Further, ICE's treatment of the data following receipt violated the continuing obligations under § 6103 to strictly limit access and use of that information.

Beyond these statutory violations, the data-sharing arrangements are arbitrary and capricious. For decades, address-only requests have been rejected by IRS, and immigrants filed their taxes based on assurances that their filings would not be used for immigration enforcement. Yet, the agencies ignored these taxpayers' longstanding reliance interests. As they ignored the historic restrictions on disclosure, they failed to acknowledge the change or offer any explanation for the new practices. Further, the agencies neglected to consider a slew of critical issues, such as the extraordinary risk of error inherent in their data systems.

Third, the district court properly determined that the remaining factors justify preliminary relief. The data-sharing arrangements threaten to cause several irreparable harms: breach of confidentiality itself; threatened immigration arrest, detention, and deportation; chilling of tax filing and First Amendment activities; and reputational harms to CEDC. By contrast, the government failed to show any

20

detriment to its law enforcement objectives, particularly given ICE's enforcement of immigration law for decades without resorting to using protected taxpayer information. Moreover, the public interest favors preliminary relief, given the significant public interests in, amongst other things, preserving the integrity of the American tax system and preventing citizens and noncitizens from being wrongfully deported.

The order properly requires ICE to follow the law, is narrowly tailored to maintain the status quo for the pendency of the action and is well within the court's discretion and power under the APA and adheres to the limitations found in *Trump v. CASA*. Even if a broad stay under 5 U.S.C. § 705 were not available, narrower relief for only the Organizations' members would be impractical—requiring the very exposure that this lawsuit seeks to prevent.

This Court should affirm the district court's grant of preliminary relief.

## RESTATEMENT OF STANDARD OF REVIEW

A preliminary injunction is warranted where the movant shows "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance

21

of equities tips in [its] favor, and that an injunction is in the public interest." *New York v. Trump,* 171 F.4th 1, 15 (1st Cir. 2026) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1016 (9th Cir. 2025) (applying standard to a § 705 stay).

This Court reviews a district court's grant of preliminary relief for abuse of discretion. *N.H. Indon. Cmty. Support v. Trump*, 157 F.4th 29, 34 (1st Cir. 2025). Courts "afford considerable deference to the trial court's balancing" of the four preliminary injunction factors, *Waldron v. George Weston Bakeries Inc.*, 570 F.3d 5, 8-9 (1st Cir. 2009) (citation omitted), because "trial courts have wide discretion in making judgments regarding the appropriateness of such relief," *Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

This Court can "affirm the entry of the preliminary injunction on any ground supported by the record." *Comcast of Me./N.H., Inc. v. Mills*, 988 F.3d 607, 612 (1st Cir. 2021) (citing *Jennings v. Stephens*, 574 U.S. 271, 276 (2015)).

22

# ARGUMENT

## I.    The Organizations have standing.

As the district court correctly concluded, the record shows that the Organizations have standing: each has associational standing to sue on behalf of its members, and CEDC has standing to sue based on its own injuries. This Court may affirm the district court's finding of standing based on any ground supported by the record. *See Comcast*, 988 F.3d at 612. And importantly, "only one plaintiff needs standing for a suit to proceed." *Bost v. Ill. Bd. of Elections*, 607 U.S. 71, 76 n.3 (2026) (citing *Biden v. Nebraska*, 600 U.S. 477, 489 (2023)).

### A.    All Organizations have associational standing to challenge the data-sharing arrangements based on injuries to their members.

Each Organization has associational standing because (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Conservation L. Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 86 (1st Cir. 2025) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432

23

U.S. 333, 343 (1977)). Because the government "does not contest—and the record demonstrates—that [each Organization] meets the second and third elements of this test," this Court may focus its analysis on the first factor. *Id.*

The Organizations have identified members with standing to sue because they have endured traceable, redressable Article III injuries in fact.[3] *See id.* (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). The government ignores the bulk of the injuries in the record.

First, the government ignores, and so has waived, any argument regarding the Organizations' members who have a final removal order. A221–22, 225 ¶¶ 19–20, 32; A191 ¶ 50. ICE requested the home addresses of nearly all immigrants with final removal orders. A38–40; A50. IRS broadly disclosed thousands of taxpayers' data to ICE, including where ICE had provided inadequate address information. A660-61. These facts establish the specific, "substantial risk" that the members are among the thousands of taxpayers whose protected data

---

[3] Except for the injuries stemming from confusion of common immigrant names, as addressed below, the government does not dispute that the Organizations' injuries suffice to establish associational standing **at all**, let alone that they are traceable or redressable. *See* OB 30–34.

IRS disclosed to ICE. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (holding that injury is sufficiently "actual or imminent" where "there is a 'substantial risk' that the harm will occur"). Given the amount of data already shared, and what was sought, members reasonably fear that their data will or has been shared and will imminently be used.

Further, the government does not, and could not, dispute that "disclosure of private information[] and intrusion upon seclusion" are sufficient injuries to confer standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021); *see also Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 372 (1st Cir. 2023) ("disclosure of private information[] and intrusion upon seclusion" are Article III injuries); *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019) (data disclosure akin to "common law breach of confidence"). Several courts have found standing for similar disclosures by IRS and other agencies, including for this very disclosure. *See Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 31–39 (D.D.C. 2025) (finding standing based on this disclosure); *see also All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 101–05 (D.D.C. 2025) (finding standing for "internal[]" disclosures within the

25

government). ICE's plans to use the data for arrests, deportation, and detention only heighten the threatened injury.

Second, the Organizations' members are chilled from filing their tax returns. Members have regularly filed and wish to continue compliance but reasonably fear that the data-sharing arrangements will cause their unlawful arrest, deportation, or detention; that fear chills their filings. A189–90 ¶¶ 45–50; A214–17 ¶¶ 14, 17–24; A221–26 ¶¶ 15–35. This chilling both deprives members of lawful tax credits and refunds and undermines their eligibility for future immigration relief. A138–39 ¶ 43; A189 ¶ 45; A268–69 ¶ 25. The loss of government benefits is an Article III injury, *see Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 978 (D.C. Cir. 2016), as is the wrongful denial of government benefits, *see Me. Ass'n of Interdependent Neighborhoods v. Petit*, 647 F. Supp. 1312, 1315 (D. Me. 1986).

Third, the record establishes that members are enduring First Amendment injuries, which are sufficient to establish standing and which the government ignores. Members' First Amendment rights to association, petition, and speech are being chilled because of their reasonable fear that the government will use their data to detain or

26

deport them. *See, e.g.*, A188–91 ¶¶ 38, 40–41, 43–44, 48–50. That fear is caused directly by the data-sharing arrangements, particularly given this Administration's stated goals of deporting all immigrants. A183, 187 ¶¶ 18, 36.

Each of these injuries is sufficient to establish associational standing; the government's brief does not address them. Yet the government faults the district court for failing to apply the "presumption of regularity" to government action, in the court's finding that members with common names were additionally at risk due to administrative errors, alongside those with final removal orders. *See* OB 31–32. But clear evidence in the record overcomes that presumption, for example, ICE has wrongfully deported misidentified individuals, A98–99,[4] including American citizens, A107–26; IRS has violated § 6103 and failed to properly match names and addresses, A657–62 ¶¶ 11–17; ICE and DHS have flouted legal requirements when requesting data from IRS, A392 (ICE asking for data on all 7.6 million

---

[4] *See also Noem v. Abrego Garcia*, 604 U.S. --, 145 S. Ct. 1017, 1018 (2025) (noting governmental admission that Abrego Garcia was deported to El Salvador due to "administrative error").

immigrants in the U.S. without any indication of statutory compliance; A307–10 (same, for 700,000 addresses); and ICE and IRS lack the technical capabilities to protect § 6103 data, *see, e.g.*, A456 ¶ 4 (ICE does not yet have technical ability), A658–61 ¶¶ 6–16 (IRS's technical capabilities insufficient to prevent error).

The district court correctly found that the Organizations' members face multiple Article III injuries from the government's conduct, establishing standing here.

### B. CEDC has organizational standing to challenge the data-sharing arrangements.

The district court also correctly concluded that CEDC is likely to establish Article III standing. The record establishes that CEDC has suffered four distinct injuries, each independently sufficient to confer Article III standing.

First, CEDC's decreased revenue, attributable to reduced tax filings by its members, is sufficient to establish injury. A623; *see Czyewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("[A] loss of even a small amount of money" caused by a defendant's actions constitutes an Article III injury.). CEDC's VITA funding is directly tied to the number of returns it files, and in 2025, the number of returns it

28

filed dropped by 14 percent because of the data-sharing arrangements. A188–89 ¶¶ 38, 44. The government asserts that the record is insufficiently detailed but fails to cite any caselaw or contrary evidence to support its position. Pure speculation about the district court's findings cannot demonstrate clear error. *See N.H. Indon. Cmty. Support*, 157 F.4th at 34 (factual findings are reviewed for "clear error"); *see also Massachusetts v. U.S. Dep't of HHS*, 923 F.3d 209, 223–25 (1st Cir. 2019) ("substantial risk" of imminent injury sufficient for standing).

Second, the data-sharing arrangements cause Article III injury because they "directly affect[] and interfere[] with [CEDC's] core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) ("*AHM*"). These core activities include providing tax filing assistance and tax advice to its members—citizens and noncitizens alike—through its VITA Program. A183–84 ¶¶ 19–23.

The data-sharing arrangements make it nearly impossible to provide that assistance effectively for multiple reasons. They place CEDC in a catch-22: CEDC cannot, given its organizational mission, encourage its members to file tax returns that ICE may then use to

arrest, detain, or deport them, but it also cannot, as a government-funded VITA site, advise its members not to file taxes. A187 ¶ 36. CEDC also must expend additional resources to advise members on the implications of filing taxes under the challenged policy. A187–88 ¶¶ 36–37. These harms directly parallel the "concrete and demonstrable injury to the organization's activities" found in *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982), where the defendant's unlawful racial steering practices "directly affected and interfered with" the organization's ability to effectively counsel its clients, requiring it to drain organizational resources to mitigate such harm. *AHM*, 602 U.S. at 395.

The government's data-sharing arrangements also directly interfere with CEDC's activities by chilling member participation. CEDC cannot provide tax advice and filing assistance when members are too afraid to show up, A188 ¶¶ 38, 40–41, and, as a result, has suffered a drastic decline in the number of ITIN applications and tax returns filed by noncitizens, A188 ¶ 38. The organization also has been forced to cancel events due to low expected turnout, caused by fear of the data-sharing arrangements. A188–89 ¶¶ 40–41.

Third, CEDC's reputational harm, which the government's brief entirely ignores, constitutes Article III injury. *See TransUnion*, 594 U.S. at 425 (reputational injury sufficient for standing); *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 187 F. Supp. 3d 217, 223 (D. Mass. 2016) (standing for harm to goodwill and reputation). As the district court concluded, the government's data-sharing arrangements "directly undermine[] CEDC's credibility." A623. And CEDC has had to expend resources to reinforce its reputation. A187–88 ¶¶ 33–37.

Fourth, CEDC has suffered First Amendment injury, which the government likewise ignores. The record shows that the data-sharing arrangements infringed on CEDC's First Amendment associational rights by interfering with its ability to engage in protected expressive association and provide legal and tax advice. A188–89 ¶¶ 38, 40–41, 43; *see, e.g.*, *NAACP v. Button*, 371 U.S. 415, 429 (1963) (providing legal assistance is protected expressive association). Constitutional injury is cognizable Article III injury. *See, e.g.*, *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012).

The government mistakenly argues that CEDC's injuries are insufficient under the *AHM* standard. OB 25. But in *AHM*, 602 U.S. at

31

394–95, the Supreme Court distinguished interference "with [the organization's] core business activities" from interference with the organization's advocacy interests, explaining that an organization cannot manufacture standing simply by expending resources to oppose actions contrary to its advocacy interests. The record shows that the data-sharing arrangements interfere with CEDC's core activities because they directly cause financial harm, decrease member participation, impair its ability to provide effective tax assistance, and force CEDC to spend additional resources educating about the risks of the arrangements and repairing its reputational harm to the detriment of its other core services. These are not expenditures to "gather information and advocate against the [government's] action," *id.* at 394; they are concrete and particularized harms under both *Havens* and *AHM*.

And those harms are directly traceable to the unlawful data-sharing arrangements, notwithstanding the government's argument to the contrary. OB 28–29. IRS and ICE's actions caused noncitizens with a final removal order (and even citizens and others who live with someone subject to a final removal order) to reasonably fear that filing

taxes would endanger themselves and their loved ones. That fear leads members and potential members to decline to file tax returns or participate in CEDC's events, impairing its core activities and decreasing its revenue.  That causal sequence is neither speculative nor attenuated; it follows directly from "a predictable chain of events" traceable to the government's conduct. *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025) (quoting *AHM*, 602 U.S. at 385); *see Dep't of Commerce v. New York*, 588 U.S. 752, 767–68 (2019) (finding causation because noncitizens "will likely react in predictable ways" to challenged action, "even if they do so unlawfully").

The district court found—and the Organizations have established—several independent bases for each Organization's Article III standing. This Court need only conclude that one plaintiff has standing to affirm. *See Bost*, 607 U.S. at 76 n.3.

## II.    The Organizations are likely to succeed on the merits of their APA claims.

The IRS-ICE data-sharing arrangements under the MOU and Implementation Agreement constitute "final agency action."

33

### A. The data-sharing arrangements constitute reviewable final agency action.

Under the APA, judicial review is available for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Agency action is "final" if: (1) it marks the "consummation" of the agency's decisionmaking process; and (2) is one "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024). Applying this "pragmatic" approach, the district court correctly concluded that the challenged actions satisfy both *Bennett* prongs. *U.S. Army Corps of Engr's v. Hawkes Co.*, 578 U.S. 590, 598–99 (2016).

The MOU and the Implementation Agreement require IRS to furnish ICE with noncitizens' address information upon a conforming request—something it had never done before, let alone on this scale or breadth. The agreements prescribe the technical specifications and procedures for the actual transfer and retrieval of that information. These are not aspirational statements of intent: the agencies signed the agreements and carried them out. Nothing about the MOU, the

34

Implementation Agreement, or the August 7, 2025, data sharing under the same is tentative or interlocutory.

The legal consequences are equally plain. For at least fifty years, IRS declined to honor address-only requests under § 6103(i)(2). As of February 21, 2025, IRS expressly confirmed that such disclosures were prohibited. A310–11. In an about-face, IRS and ICE signed the MOU, ICE requested confidential taxpayer information for millions of immigrants, and IRS disclosed a subset of that information, the same type of disclosure IRS had previously deemed unlawful. This is a radical departure from decades of settled practice and a new interpretation and application of § 6103(i)(2). *See Harper*, 118 F.4th at 116 (action producing "legal consequences" satisfies second *Bennett* prong).

The government's rejoinder—that the agency action is not final because any legal consequence is "wholly contingent on future administrative action" after ICE's investigations under 8 U.S.C. § 1253(a)(1)—misidentifies when the legal consequence first attaches. OB 38, 40 (citing *DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212 (D.C. Cir. 1996)). The moment ICE requested and IRS transmitted the protected tax return information, the government

35

breached the confidentiality that § 6103 guarantees, which is an immediate legal consequence. Each additional disclosure within ICE is a further breach.

This Court should reject the government's insistence that § 6103 always required IRS to disclose addresses upon request. Indeed, IRS declined to do so for half a century. OB 36–37. Moreover, that federal law independently requires (some) noncitizens to report address changes to DHS is beside the point: that obligation does not authorize ICE to request and IRS to disclose protected tax data. *Id.* at 38. Here, the agencies' decision to reverse settled practice and enact a new policy of disclosing taxpayer addresses to ICE was formalized in written agreements and carried out through mass disclosure. And the government does not challenge the finality of the data disclosure, in effect conceding it is subject to APA review. OB 36–39; A707–708.[5]

---

[5] Finality is found not only in documents governing agency conduct, but also in practices related to the conduct itself; an agency's adoption of a policy, rather than particular documents reflecting that policy, can constitute final agency action. *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008).

36

The government's reliance on *Lujan v. National Wildlife Federation* fares no better. OB 34–36 (citing 497 U.S. 871, 890–94 (1990)). This Court should reject the government's effort to recast this case as a "generic challenge" barred by that case. The Organizations challenge discrete agency decisions: the agencies' executions of the MOU and Implementation Agreement, A358–361; ICE's requests; and the August 7, 2025 disclosure of approximately 47,000 taxpayers' addresses, A615. This specificity contrasts with the "land withdrawal review program" in *Lujan*—an ongoing, evolving program that did "not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations," but instead represented "continuing (and thus constantly changing) . . . operations." 497 U.S. at 890. *Lujan* itself recognized that agency actions with such defined parameters, specific dates, documented terms, and effects, are final agency action. *Id.* at 885-86.

Moreover, *Lujan* does not prohibit challenging multiple agency actions in a single suit. 497 U.S. at 890. Consistent with this Court's recent observation, the government cites no "supporting authority for the proposition that the APA bars a plaintiff from challenging a number

of discrete final agency actions all at once." *New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025). Even if the Organizations' challenge were construed, as the government argues, as targeting the practice of interagency data sharing, OB 34–36, that would not place it beyond judicial review. As this Court has recognized, an interpretation of § 706(2)(A) that excludes an agency's "practice" from the statute's reference to "action, findings, and conclusions" "would prevent a court from setting aside those unlawful acts and practices that emerge from a 'pattern.'" *NAACP v. Sec'y of Hous. & Urb. Dev.*, 817 F.2d 149, 160 (1st Cir. 1987). The Organizations do not challenge interagency cooperation broadly and instead challenge the agencies' execution and implementation of specific agreements resulting in unlawful disclosure of thousands of taxpayer addresses. The district court was correct to treat the agencies' "commitment to and implementation of disclosing taxpayer information" as final agency action. A564–565; A626–627.

Nor is the government correct that this Court "would create a circuit split" with *Centro*. OB 34, 39 (citing 167 F.4th at 1235–36). The *Centro* court considered the MOU before the August 2025 disclosure occurred, whereas the record here includes the Implementation

38

Agreement, completed transfer of approximately 47,000 addresses and the documented IRM policy change. These facts confirm what the *Centro* court could not yet see: the MOU and Implementation Agreement are the binding instruments through which a radical new disclosure policy has been operationalized.

The government has entered into signed, operative interagency agreements, reversed decades of settled policy, and disclosed protected taxpayer information. Yet, it seeks to evade any judicial review of those actions. That is precisely what the APA serves to prevent.

### B. The data-sharing arrangements are contrary to § 6103.

The data-sharing arrangements contravene the requirements of § 6103 in several respects. Because the APA requires that a court "set aside" an agency action that is "not in accordance with law," 5 U.S.C. § 706(2)(A), each of these defects was sufficient to justify the preliminary injunction.

### i. ICE's requests for data are pretextual.

The record shows that ICE planned to use the data not to prepare for specific criminal prosecutions, as permitted by § 6103(i), but rather

to locate people and expedite civil deportations as ordered by the EO.[6] Such disclosure and use runs afoul of the explicit statutory requirement that ICE officials maintain the addresses "solely for the use . . . in [the] preparation, investigation, or grand jury proceeding" related to the criminal prosecution for which it was requested and be disclosed only to "officers and employees . . . personally and directly" involved. 26 U.S.C. § 6103(i)(1)(A).

From the outset, the MOU made clear that ICE sought IRS data to locate immigrants for deportation, not to investigate criminal offenses. The MOU's very first recital emphasizes the Executive Order's directive for DHS "to take immediate steps to identify, exclude, or remove aliens illegally present in the United States." A327. This priority was likewise reflected in the correspondence leading to the MOU, in which ICE repeatedly sought as much location information as possible from IRS. *See, e.g.*, A315–16 (requesting information on 700,000 individuals without reference to any criminal prosecution);

---

[6] ICE's argument that there is no direct evidence that it has yet *used* the information for civil immigration enforcement or any other purpose, *see* OB 57, is irrelevant, because the injunction has prevented such use.

A399 (describing a request for data on 7.3 million people). Even as Treasury maintained the pretext of criminal enforcement, it recognized the purpose of the exchange to "aid in the identification and location of certain aliens." A323.

ICE's unprecedented and sweeping use of § 6103 to make mass requests further belies the government's purported reliance on IRS data for criminal prosecutions. ICE official Peter McShane acknowledged that ICE pursues criminal prosecution only in special circumstances. Before seeking prosecution, ICE first "determin[es] whether administrative remedies can satisfactorily resolve a case;" only then does ICE evaluate "a serious negative impact on our society, members of the public, and agency operations such that criminal prosecution should be pursued." A462–63. For this reason, ICE has historically pursued extremely few criminal prosecutions under 8 U.S.C. § 1253. A538 (citing Bureau of Justice Statistics prosecution data). Here, ICE's mass data requests bely that carefully delineated investigatory process and instead suggest a broad data-gathering effort untethered to individualized criminal prosecution.

Further, ICE's own actions show its preparations to use and disclose the data beyond criminal investigations. In its request for data, ICE provided a list of individuals with removal orders—including people whose removal orders were not yet 90 days old, A451, and therefore could not have violated 8 U.S.C. § 1253(a)(1)(A)'s prohibition on willful failure or refusal to depart by that time. The government feebly attempts to explain away this overreach by asserting that ICE could have sought the addresses to investigate other violations of § 1253(a)(1). OB 50–51 n.7. This explanation makes no sense. A person's address has no bearing on the additional prohibitions in § 1253(a)(1), including on whether they applied for travel documents, *id.* § 1253(a)(1)(B), or presented themself for removal at a designated time, *id.* § 1253(a)(1)(D). The only rational explanation of ICE's overbroad request is simple: the agency was trying to locate people by unlawful means.

In response, the government insists that ICE's bald, boilerplate recitations of compliance should be credited, OB 61–62, notwithstanding the other evidence in the record. The government invokes the "presumption of regularity" to bolster its position. OB 31.

42

Yet as even the government acknowledges, the presumption of regularity—and flat assertions of lawfulness—cannot overcome "clear evidence to the contrary." *Tota v. Gonzales*, 457 F.3d 161, 168 (1st Cir. 2006) (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).[7] That presumption is rebutted here by the ample and clear evidence that ICE attempted to use § 6103(i)(2) as a subterfuge for its civil immigration priorities.

### ii.  ICE's requests fail to comply with the requirements of § 6103.

Even apart from ICE's improper goals, the information-sharing arrangements failed to meet the requirements of § 6103 in multiple respects:

First, the data request named a lone high-ranking official as "personally and directly engaged in" the investigation of each individual criminal proceeding. A390. It is implausible that this lone high-ranking official was "directly" engaged in each such investigation, A177, and the

---

[7] *See also* Ryan Goodman, et al., *The 'Presumption of Regularity' in Trump Administration Litigation*, Just Security (March 19, 2026), https://www.justsecurity.org/120547/presumption-regularity-trump-administration-litigation/, (collecting over 200 cases between January 20, 2025, and March 19, 2026).

government essentially conceded that he was not, A463 (acknowledging an oversight and managerial, rather than direct role). As the district court correctly recognized, subsection (i)(2) expressly separates the high-level requester of information from a directly involved recipient. While some redisclosure to supervisors and managers may be necessary, as recognized in 26 C.F.R. § 301.6103(i)–1(b)(2)(i), it is appropriate "only if such purpose or activity cannot otherwise properly be accomplished without making such disclosures." *Id*. § 301.6103(i) – 1(b)(1). The government's approach collapses that distinction, transforming subsection (i)(2)'s direct-involvement requirement into a managerial-oversight standard.

Second, ICE's requests to IRS did not meet the requirements of § 6103(i)(2)(B) because they failed to provide complete name and address information. A659–62. IRS admitted as much, explaining that it improperly provided address information for thousands of individuals where ICE had not provided a sufficient request. *See id*. The haphazard nature of ICE's requests and IRS's disclosure exemplifies the rushed process by which the agencies reached the information-sharing

44

arrangements and exposes the true purpose of ICE's requests: mass civil detention and removal.

Finally, and fundamentally, ICE's request for IRS to conduct a dragnet search of its records to find evidence of a criminal violation defeats the purpose of the statute. The government admits, as it must, that ICE provided a bulk data file to IRS, without indication that any specific individual on the list had violated § 1253. OB 52–55. That approach flouts § 6103(i)'s express requirement, for nearly any piece of information held by IRS, that there be a judicial determination of a "specific" criminal act, that the requested information is relevant, and that there is no other source of the information. 26 U.S.C. § 6103(i)(1)(B).

Further, ICE admittedly seeks information provided by or on behalf of taxpayers themselves—the very category of information Congress afforded heightened protection under the statute. The statute generally provides "that federal law enforcement officials should not have easier access to information about a taxpayer maintained by the IRS than they would have if they sought to compel the production of that information from the taxpayer themselves." IRM § 11.3.28.1.1(1)

45

(Apr. 17, 2025). Disclosure of such taxpayer return information is subject to judicial oversight, whether for the purpose of investigation, § 6103(i)(1), or for location of fugitives, § 6103(i)(5).

While subsection (i)(2) allows for certain investigatory and other material to be disclosed without court order, the government seeks to use an exception to an exception to smuggle in a special rule for obtaining addresses. But § 6103(i)(2) should not be read in a vacuum. *See Cablevision of Bos., Inc. v. Pub. Improvement Comm'n of City of Bos.*, 184 F.3d 88, 101 (1st Cir. 1999) ("[S]tatutory interpretation involves more than the application of syntactic and semantic rules to isolated sentences."); *O'Connell v. Shalala*, 79 F.3d 170, 176 (1st Cir. 1996) ("[S]tatutory interpretation [requires] examin[ing] the statute as a whole, giving due weight to design, structure, and purpose as well as to aggregate language."). Here, when read as a whole, subsection (i) clearly supports the longstanding and shared understanding that address-only requests are ***not*** proper under the statute.[8]

---

[8] To the extent that the D.C. Circuit reached a different result in *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026), it was wrongly decided.

46

### iii. ICE's storage and handling of the data are unlawful under § 6103.

After receiving data pursuant to the MOU, ICE failed to safeguard that taxpayer data as required under § 6103. *See* 26 U.S.C. §§ 6103(i),(p).

First, once ICE received the requested data, improper disclosures continued. On October 7, the (unnamed) ICE employee or employees who held the data "made the data available to the Enforcement Removal Operations, Law Enforcement Systems and Analysis team." A507. As the district court noted, this team was nowhere identified as involved in criminal investigations. A619 n.9 (citing A459–63). Accordingly, making the data available to them was contrary to § 6103 and illustrated ICE's cavalier disregard for its statutory responsibilities with respect to the data.

The government suggests that any apparent improprieties in further disclosure were justified by IRS regulations implementing subsection (i)(2). OB 60–61. That suggestion is unavailing. IRS regulations allow a law-enforcement agency to share information internally, beyond the initial recipients—but "only to the extent necessary" to further the investigation and "only if such purpose or

47

activity cannot otherwise properly be accomplished without making such disclosures." 26 C.F.R. §301.6103(i)–1(b)(1). Here, ICE granted access to additional staff without any indication it considered necessity to a criminal investigation—and it was preparing to make the data even more available. As such, the regulation cannot salvage ICE's unlawful actions.

In addition to these improper disclosures, the district court concluded that ICE does not appear to be "organizationally capable" of segregating the data to prevent its improper use. A634. In conducting its investigations, ICE considers whether to pursue civil enforcement or criminal charges; it strains credulity that ICE would sequester the data for one purpose and not the other. A634; A462–63.

The IRS-ICE implementation agreement provides that ICE will "maintain" the IRS-provided information in three systems of record: the Alien File, Index, and National File Tracking (or A-File); External Investigations; and Criminal Arrest Records and Immigration Enforcement Records (CARIER). A360. As longtime ICE official Deborah Fleischaker explained, these systems have not historically provided for the inclusion of confidential or sensitive information.

48

A175–77. In fact, the A-File is maintained by an entirely separate DHS agency, suggesting further disclosure beyond ICE, and a strong likelihood that the data would be used for purposes other than criminal law enforcement.

And as it stands, the government's current safeguards are wholly deficient. ICE official Sean Fitzgerald acknowledged that the data would be "integrated" into these databases, with the sole precautions that the addresses would be "tagged and identified as IRS data, marked restricted, and designated for use in criminal investigations." A508. But to comply with § 6103, ICE would have to go further—protecting any servers containing the data as return information and blocking access to the IRS-source information to anyone who is not investigating or preparing for criminal investigation and prosecution. IRS Pub. 1075 (Rev. 11-2021), *Tax Information Sec'y Guidelines*, at 55; *see also* A332–33 (incorporation of this requirement into MOU). The agency has made no efforts to do so.

### C.    The data-sharing arrangements are arbitrary and capricious.

A court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

§ 706(2)(A). Where, as here, an agency reverses a longstanding policy, the agency must consider "serious reliance interests," or provide "good reasons" for the new policy. *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568, 570 (2025) (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)). The district court committed no error in applying these standards.

For decades, the government construed § 6103(i)(2) to prohibit disclosure of taxpayer addresses in response to address-only requests. Immigrant taxpayers, employers, organizations, and state and local governments relied on the government's repeated assurances that § 6103 prohibits sharing taxpayer information for immigration enforcement. As noted, *supra* Part II.B.1., ICE rarely pursues criminal remedies under 8 U.S.C. § 1253(a)(1). Here, ICE's mass data requests are inconsistent with that carefully delineated investigatory process and instead suggest a broad data-gathering effort untethered to individualized criminal prosecution.

ICE's successive data requests to IRS each reveal the agency's haste and disregard for statutory requirements. ICE's request for approximately 7.3 million records was found "deficient" because it

50

excluded components required by the MOU and §6103(i)(2)—including the identity information for personally-and-directly-engaged officers. A399. Then ICE requested data for approximately 1.2 million individuals, which IRS deemed in substantial compliance—yet even that request contained deficiencies. A420–21; A449–51. ICE repeatedly made these single sweeping data requests with one designated recipient and no individualized criminal predicate, simply ignoring § 6103. This pattern of repeated, deficient demands—the breakneck speed of which drew pushback from IRS's own legal counsel—is the very definition of arbitrary. A399.

ICE also "entirely failed to consider" several "important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). ICE requested data for nearly every immigrant with a final order of removal, A145, but it ignored that even immigrants with final orders may reside lawfully in the country. A137–38. Additionally, ICE overlooked the extraordinary risk of errors inherent in their data systems. A431–32. Under the data-sharing arrangements, a database error could incorrectly flag law-abiding individuals for immigration enforcement and trigger cascading

consequences for them. *See, e.g., Abrego Garcia*, 145 S. Ct. at 1018

(noting governmental admission that Abrego Garcia was deported to El

Salvador due to "administrative error"). Yet ICE offered no reasoned

explanation for its dramatic shift to request taxpayer information *en

masse*, let alone any acknowledgment of the reliance interests its

reversal would upend—such as members' reliance on the Tax Code

privacy provisions in light of their immigration statuses, given their

desires to comply with tax law. That alone renders the policy change

arbitrary and capricious. A630 (citing *FCC v. Prometheus Radio Project*,

592 U.S. 414, 423 (2021)).

The government argues circularly that IRS had no choice but to

disclose the data to ICE, OB 58–59, contending that § 6103(i)(2)

compels disclosure upon receipt of a valid request, so its policy "cannot

be arbitrary and capricious because such disclosure is mandatory." OB

45. But even if true (and it is not), that heightens ICE's obligation to

comply with the statute in making the request and the need for judicial

review to ensure that the statute is respected. *See* 5 U.S.C. § 555(c) (An

"investigative act or demand may not be issued, made, or enforced

except as authorized by law."); 26 U.S.C. § 6103(a)(1) (applying

restrictions to any "officer or employee of the United States"). The statute imposes specific predicate requirements on the requesting agency—the request must be for criminal investigative purposes, identify officers "personally and directly engaged in" the criminal investigation, specify the "specific reason or reasons" why disclosure is relevant, and designate the proper taxable periods. § 6103(i)(2)(A), (B). The government's framing that IRS must disclose the information "upon receipt" of a compliant request, OB 45, only underscores the point: ICE must first submit a request that is compliant. And as demonstrated, *supra* Part II.B, ICE's requests have repeatedly failed to satisfy those requirements.

The government asks this Court to examine only one side of an inter-agency transaction. The APA requires a court to assess the "whole record" and § 6103 applies to both the agency requesting the data and the agency furnishing the data. The government cannot shield those choices from review by pointing to the final step of turning over the data; the APA reaches the reasoning that led to the action, not merely its endpoint. *State Farm*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its

53

action."). IRS offered no explanation for reversing its decades-long policy and ICE failed to acknowledge the reliance interests it engendered. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). The government cannot shield either agency from the Court's obligation to assess both agencies' conduct.

The government relies heavily on *Centro* for the proposition that § 6103(i)(2) is "crystal clear" and leaves IRS no discretion. But *Centro* is not persuasive on the question presented. First, the *Centro* court's arbitrary-and-capricious analysis rested on specific circumstances absent here. There, the court relied on its holding that the MOU ***alone*** was not reviewable agency action and the plaintiffs' concession that a remand would have been a "useless formality." 167 F.4th at 1224. Second, affirming the preliminary injunction would not create an untenable circuit split. It would reflect a reasoned evaluation of a distinct legal question based on different underlying facts. On a more complete record, the district court in *Center for Taxpayer Rights v. IRS*, held the data-sharing arrangements were arbitrary and capricious, 815 F. Supp. 3d 1, 56–57 (D.D.C. 2025), *appeal filed* (Jan. 13, 2026). This Court should reach the same conclusion.

54

The district court did not abuse its discretion in finding a substantial likelihood of success on the merits.

### III. Injunctive relief under the APA is justified, as there is no other adequate remedy for the Organizations' injuries.

The APA provides review of agency action when there is no other adequate remedy. 5 U.S.C. § 704; *Bowen v. Massachusetts*, 487 U.S. 879, 903–04 (1988). While review under the APA should not be redundant, it was intended to provide a "broad spectrum" of review; its "generous review provisions" must be given a "hospitable interpretation." *Id.* at 904 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140–41 (1967)); *see also Conservation L. Found., Inc. v. Busey*, 79 F.3d 1250, 1261 (1st Cir. 1996) (APA review available absent "clear and convincing" contrary legislative intent). To that end, denying relief under the APA based on the availability of monetary relief has been rejected as "restrictive." *Bowen*, 487 U.S. at 904. Courts are unwilling to assume "that a naked money judgment . . . will always be an adequate substitute for prospective relief[.]" *Id.* at 905.

The Organizations have experienced serious harm with no adequate remedy but injunctive relief. Their members have been placed

at substantial risk of unlawful detention and deportation, sometimes due to misidentification; had their private, protected information disclosed; foregone tax benefits; and been chilled from filing tax returns due to fear that they or a family member will be deported. *See, e.g.,* A189–91, A214–15, A221–23, A265–66. Individualized, retrospective monetary damages cannot remedy these harms. Nor can criminal penalties, which are not within the Organizations' discretion to pursue. *See Bowen*, 487 U.S. at 904–05; *see also Cohen v. United States*, 650 F.3d 717, 732–33 (D.C. Cir. 2011). Contrary to ICE's assertions, the statutorily provided civil damages and criminal penalties for violations of § 6103 do not constitute "adequate" remedies for the unlawful data-sharing arrangements. *See Cohen*, 650 F.3d at 733. They do not, for instance, restore the Organizations' privacy or end the risk of unlawful detention. Instead, the Organizations' harms require prospective relief: agency restrictions on additional unlawful data sharing and the use of unlawfully obtained data. *See Bowen*, 487 U.S. at 904–05.

ICE's insistence that 26 U.S.C. §§ 7213, 7213A, and 7431 are the exclusive remedial scheme for the Organizations' harms is wholly unsupported. First, ICE relies on irrelevant, out-of-circuit cases, which

56

hold that suppression of evidence in a criminal proceeding is not an appropriate remedy for the government's violation of § 6103. *See United States v. Orlando*, 281 F.3d 586, 595–96 (6th Cir. 2002); *Nowicki v. Comm'r of Internal Revenue*, 262 F.3d 1162, 1163–64 (11th Cir. 2001); *United States v. Michaelian*, 803 F.2d 1042, 1048–50 (9th Cir. 1986). These criminal cases and the exclusionary rule are immaterial to whether the Organizations have an adequate remedy. Not only are removal proceedings civil, with more limited application of the exclusionary rule, but ICE is targeting individuals who already have a final removal order and would not have further proceedings for evidence to be excluded from. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984); *see also Perez-Cruz v. Barr*, 926 F.3d 1128, 1137 (9th Cir. 2019).

Second, Congress' creation of a remedial lawsuit in § 6110 is irrelevant. There is no "exclusive" remedial scheme to consider, and whether Congress created a particular remedy for public inspections of IRS determinations under § 6110 does not address whether there is an adequate remedy for violations of § 6103. The difference between these two statutes shows there is no "clear and convincing evidence of

57

legislative intent to preclude [APA] review." *Conservation L. Found.*, 79 F.3d at 1261.

The APA is not merely a convenient workaround or fallback; it is the exact remedial path Congress made available when no adequate remedy exists. *See Bowen*, 487 U.S. at 903–04. ICE uses cases examining the Civil Service Reform Act ("CSRA") to assert that the APA is not a catchall. But the limitation on APA review in those cases turns on the CSRA's stated purpose: to "replace the haphazard arrangements for administrative and judicial review of personnel action." *See Grosdidier v. Chairman,* 560 F.3d 495, 497 (D.C. Cir. 2009) (quoting *United States v. Fausto*, 484 U.S. 439, 444 (1988)). No such explicit limitation applies here. Given the need for forward-looking relief, the Organizations have no adequate remedy other than the APA.

## IV. The Organizations established the remaining preliminary relief factors.

### A. If the injunction is vacated, the Organizations would endure irreparable harm.

The district court's order enjoining ICE from using data shared by IRS unlawfully, combined with the D.C. district court's order enjoining IRS from sharing additional data unlawfully, currently prevent

additional irreparable injury to the Organizations and their members. But should either order be vacated, the Organizations will immediately endure irreparable harm.

"Irreparable injury in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005); *see also EEOC v. Astra USA, Inc.*, 94 F.3d 738, 743 (1st Cir. 1996) (irreparable harm showing need not be strong where "likelihood of success on the merits is great"). As the government concedes, this Court affords "considerable deference" to the district court's thorough analysis of irreparable harm. OB 63.

The Organizations will suffer irreparable harm if either injunction is vacated. First, as discussed, *supra* Part I.A, the data-sharing arrangements create a substantial risk of unlawful civil detention and deportation, with concomitant consequences to families, communities, and employers. These injuries are irreparable because they are "substantial" and cannot be "accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick, Inc. v.*

59

*Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996); *infra* Part III. At least one sister circuit has found that "anyone subject to immigration detention" is subject to "irreparable harms . . . [including] subpar medical and psychiatric care in ICE detention facilities, the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained." *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017). The Organizations' members face those harms here.

Second, misidentification is built into the data-sharing arrangements. As explained, ICE has ***already received*** protected immigrant taxpayer information unlawfully, without attempting to meet the statute's requirement of providing a complete address. A657–62 ¶¶ 11–17. There is high risk that the systems will continue to misidentify individuals with common names who were not the intended targets, which is only heightened by the record evidence that ICE regularly wrongfully detains and deports individuals, including citizens, A107–26, endangering members and families of wrongful identification, detention, or deportation. A214–15 ¶ 16.

60

Third, members would again be irreparably chilled from lawfully filing their tax returns, depriving them of tax credits and future immigration relief. *See, e.g.*, A138–39 ¶43; A186 ¶ 31; A216 ¶¶ 21–22. The government argues these harms are tenuous because the data-sharing arrangements apply only to immigrants with final orders of removal, OB 64, but many immigrants with final orders are still entitled to immigration relief, *see, e.g.*, A135–37 ¶¶ 28–34; A224–25 ¶¶ 31–32. And the government omits that it previously sought the data of immigrants whose orders were ***not*** subject to prosecution, A451 (ICE requested records where orders were less than 90 days old), and ignores the evidence showing the impact of the data-sharing arrangements on immigrants who have common surnames and on individuals who share home addresses with individuals with final orders of removal. *See, e.g.*, A214–15 ¶¶ 16–17.

Fourth, "the disclosure of private, confidential information 'is [a] quintessential type of irreparable harm[.]'" *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019); *see also Corp. Techs., Inc. v. Harnett*, 943 F. Supp. 2d 233, 242–43 (D. Mass.), *aff'd*, 731 F.3d 6 (1st Cir. 2013). "[O]nce this type of highly personal information is

61

disclosed to the government, the revelation cannot be undone." *Nat'l Treasury Emps. Union v. U.S. Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993). The privacy of members cannot be fully restored, and the improper use of that data cannot be fully remedied, even if ICE ultimately deletes the data it already has. Additional sharing or use of this data would further exacerbate this irreparable injury.

CEDC would also endure additional irreparable injury if the district court order were lifted. The data-sharing arrangements would again disable CEDC's mission to promote economic opportunity and build community by providing tax-filing assistance, because again members would forgo filing taxes and ITINs, forcing CEDC to cancel yet more organizational events. A180–81, 187–89 ¶¶ 4–7, 35–41. This would irreparably harm CEDC's "organization[al] core missions" and impair its "core activities" by decreasing the funding it relies on to provide its services, *see Am. Ass'n of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350, 386 (D. Mass. 2025), and, by reducing resources and participation, ultimately "threaten[ing] [CEDC's] very existence," *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 200 (D.N.H. 2025). Further, the injuries to CEDC's reputation, including to its

goodwill among members and the local community, are irreparable "because they . . . cannot be easily measured or fully compensable in damages." *Arborjet*, 187 F. Supp. 3d at 223; *see* A187–88 ¶¶ 35–38.

Finally, it is well-established that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (collecting cases).

Contrary to the government's assertions, these harms would not be self-inflicted, and they could not be alleviated through money damages. *See* OB 63–66; *supra* Part III. The data-sharing arrangements forced members into the impossible predicament of complying with tax laws—which they have been and want to continue doing, *see, e.g.*, A190–91 ¶¶ 48–49, A214 ¶¶ 13–15, A221–22 ¶¶ 19–22, A266 ¶ 17—and risking harm to themselves and their families. And, critically, the government never contests that the harms specific to CEDC as an organization are reparable by money damages.

### B. The balance of equities and public interest strongly favor relief.

The equities and public interest support the district court's injunction. As the district court explained, noncitizens face significant

hardship when the government obtains or uses confidential taxpayer information in ways that violate § 6103's safeguards. A638–39. And the public has a strong "interest in preventing [noncitizens] from being wrongfully removed." *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 222 (D.D.C. 2020). Here, the government's system for obtaining address information creates a serious risk that non-citizens and citizens alike will be misidentified, which could lead to wrongful arrests, detention, or even removal. That risk is especially acute for immigrant households whose members may share similar surnames, live with extended family, or share the same address. A214–15 ¶ 16.

There is also a profound public interest in protecting the integrity and security of our federal tax system. A system built on voluntary self-reporting by citizens and noncitizens alike requires taxpayers' trust and confidence. For immigrants, that trust is especially critical as they must weigh the obligation to comply with the law against the immense fear that their personal data may be disclosed unlawfully for immigration enforcement. A186–87 ¶¶ 31–33. The district court correctly concluded that the government's data-sharing arrangements erode that trust and undermine the public interest in a functioning tax system. *See* A639;

64

*Aronson v. I.R.S.,* 973 F.2d 962, 966 (1st Cir. 1992) ("[W]ithout clear taxpayer understanding that the government takes the strongest precautions to keep tax information confidential, taxpayers' confidence in the federal tax system might erode, with harmful consequences for a tax system that depends heavily on voluntary compliance.").

Set against these weighty interests, the government has not shown that the challenged use of taxpayer addresses is necessary to law enforcement or that the injunction prevents the government from enforcing the law. Indeed, ICE has enforced immigration law ***for decades*** without resorting to unlawful use of taxpayer information. The district court's order does not prevent ICE from obtaining information in compliance with the law. Barring ICE from acting unlawfully does not harm the government. *See Somerville Public Schools v. McMahon*, 139 F.4th 63, 75 (1st Cir. 2025) ("[T]here is generally no public interest in the perpetuation of unlawful agency action.") (quoting *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). That is true even where the government invokes an important interest in enforcing civil immigration or criminal law because the government may not "act unlawfully even in the pursuit of desirable ends." *Ala.*

65

*Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 766 (2021).

The district court therefore did not abuse its discretion in concluding that the balance of the hardships and the public interest "tilt heavily towards enjoining the implementation of the interagency data-sharing agreements." A639–41.

### V.   The district court's order was lawful and appropriately limited in scope.

The district court properly exercised its authority and discretion in ordering preliminary relief.

First, the district court had the power to preliminarily stay and vacate agency actions, like the data-sharing arrangements, in full under the APA. *See* 5 U.S.C. §§ 705, 706; *Trump v. CASA, Inc.*, 606 U.S. 831, 869 (2025) (Kavanaugh, J., concurring); *see also id.*, 606 U.S. at 847 n.10.

Second, the scope of the order was necessary to provide complete relief. *See CASA*, 606 U.S. at 851. ICE's request for IRS data was a dragnet. Wholly sequestering the data was necessary to ensure that no member's data is further unlawfully disclosed or used, and to prevent further chill on tax filing and expressive activities.

66

That the order's scope provides relief to both parties and non-parties is of no consequence here. In fashioning complete relief for parties, benefits may flow to non-parties as long as they are purely incidental. *See id.* at 851–52; *Doe v. Trump*, 157 F.4th 36, 80–82 (1st Cir. 2025) (affirming "universal" injunction as necessary to provide plaintiffs complete relief).

A narrower order would not provide complete relief and would be unworkable. ICE makes no effort at this stage to propose a narrower approach, and its proposal to the district court would be ineffectual. There, ICE suggested that the Organizations submit their membership lists for *in camera* review to secure their members' protection. A297. Yet this would require disclosing the Organizations' members' information: the precise harm the Organizations seek to prevent.[9] *See id.* And a narrower order would not address all of the Organizations' harms.

---

[9] ICE's proposal is also arguably unconstitutional. *See NAACP v. Alabama*, 357 U.S. 449, 460–62 (1958) (compelled disclosure of membership lists infringes freedom of association rights); *cf. First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. --, 146 S. Ct. 1114, 1124 (2026). The Organizations would be disclosing their membership to IRS but also—presumably—to ICE, who could deduce members if IRS withholds information.

67

Threat of disclosure would continue to chill CEDC's ability to engage new and prospective members through its VITA services, and importantly, the risk of misidentification would remain for the Organizations' members.

Finally, ICE's proposal would be unduly burdensome. *See Doe*, 157 F.4th at 81–82. ICE's scheme places ongoing administrative and micromanagement burdens on both the Organizations and the district court. The starting place for any narrower relief would require quarantining the information that IRS has already transferred to ICE so that it cannot be used, which the order already requires. Then, the Organizations would have to submit information for every new member, and any time IRS receives an information request from ICE, the district court would have to engage in a person-by-person determination under § 6103. This constant oversight—even if possible—is so burdensome that it is unworkable.

Taken together, the district court's order provided the Organizations with proper, complete relief. ICE has proposed one unworkable approach and has failed to offer any others—simply,

68

because it cannot. The district court's order is the only plausible solution.

## CONCLUSION

For these reasons, this Court should affirm the district court's order in full.

Dated: July 27, 2026

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

By*: /s/ Leo L. Lam*
    Leo L. Lam
    Laurie Carr Mims
    Sarah Salomon
    Charlotte Kamai
    Kelly M. Hernandez
    633 Battery Street
    San Francisco, CA 94111-1809
    Telephone: 415 391 5400
    Facsimile: 415 397 7188

    ASIAN LAW CAUCUS
    Joshua Rosenthal
    Dorothy Chang
    55 Columbus Ave.
    San Francisco, CA 94111
    Telephone: 415 896 1701
    Facsimile: 415 896 1702

    GREATER BOSTON LEGAL
    SERVICES
    Gary Klein (BBO 560769)
    197 Friend Street
    Boston, MA 02114
    Telephone: 617 320 8397
    Facsimile: 617 371 1222

    Attorneys for Plaintiffs-Appellees,
    COMMUNITY ECONOMIC
    DEVELOPMENT CENTER OF
    SOUTHEASTERN
    MASSACHUSETTS; NATIONAL
    PARENTS UNION; NATIONAL
    KOREAN AMERICAN SERVICE

70

AND EDUCATION
CONSORTIUM; UNDOCUBLACK
NETWORK, INC.

# CERTIFICATE OF COMPLIANCE

This brief contains 12,689 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f). The brief's type size and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6). I certify that this brief complies with the word limit of Circuit Rule 32-1.

*/s/Leo L. Lam*
Leo L. Lam

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate ACMS system.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

*/s/ Leo L. Lam*
Leo L. Lam

73