# No. 26-1329

## UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

**COMMUNITY ECONOMIC DEVELOPMENT CENTER OF SOUTHEASTERN MASSACHUSETTS; NATIONAL PARENTS UNION; NATIONAL KOREAN AMERICAN SERVICE & EDUCATION CONSORTIUM; UNDOCUBLACK NETWORK INC.,**

*Plaintiffs-Appellees,*

v.

**SCOTT BESSENT, Acting Commissioner of the Internal Revenue Service and Secretary of the Treasury; SOCIAL SECURITY ADMINISTRATION; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MARKWAYNE MULLIN, Secretary of Homeland Security; INTERNAL REVENUE SERVICE; DAVID J. VENTURELLA, Acting Director of U.S. Immigration and Customs Enforcement; FRANK J. BISIGNANO, Commissioner of the Social Security Administration; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. DEPARTMENT OF THE TREASURY,**

*Defendants-Appellants.*

On Appeal from the United States District Court for
the District of Massachusetts
No. 1:25-cv-12822-IT, Hon. Indira Talwani

## BRIEF OF 85 MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE

Laura MacCleery
UNIDOSUS
1126 16th Street NW #600
Washington, D.C. 20036
Phone: (202) 489-7147
lmaccleery@unidosus.org

Andrew Weiner
*Counsel of Record*
Robert McLeod
KOSTELANETZ LLP
601 New Jersey Avenue, NW
Suite 260
Washington, D.C. 20001
Phone: (202) 790-6999
aweiner@kostelanetz.com

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

INTERESTS OF *AMICI CURIAE*................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT....................................3

ARGUMENT.......................................................................................7

I.    Through Section 6103, Congress Sought to Protect Confidentiality
      and Promote Voluntary Compliance for All Taxpayers ...............................7

II.   The Disclosure of Return Information to ICE
      Defied the Plain Language of I.R.C. § 6103(i)(2) ........................................ 19

III.  ICE Further Violated I.R.C. § 6103(p)(4)'s
      Conditions on Receipt and Maintenance
      of Confidential Return Information............................................................25

CONCLUSION....................................................................................30

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**CASES**

*Addison v. Holly Hill Fruit Prods.*,
   322 U.S. 607 (1944) ................................................................................ 19

*Allstate Ins. Co. v. Fougere*,
   581 F. Supp. 3d 307 (D. Mass. 2022) ..................................................... 25

*Center for Taxpayer Rights v. IRS*,
   815 F. Supp. 3d 1 (D.D.C. 2025) ..................................................... 20, 23

*Centro de Trabajadores Unidos v. Bessent*,
   167 F.4th 1218 (D.C. Cir. 2026) ....................................................... 7, 24

*Commissioner v. Clark*,
   489 U.S. 726 (1989) ................................................................................ 19

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020). ................................................................................... 29

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ................................................................................ 28

*Hibbs v. Winn*,
   542 U.S. 88 (2004) .................................................................................. 23

*Judulang v. Holder*,
   565 U.S. 42 (2011) .................................................................................. 29

*Lake v. Rubin*,
   162 F.3d 113 (D.C. Cir. 1998) ................................................................. 8

*Maracich v. Spears*,
   570 U.S. 48 (2013) .................................................................................. 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .................................................................................. 27

*Nat'l Treasury Emps. Union v. FLRA*,
   791 F.2d 183 (D.C. Cir. 1986) .................................................................. 7

*New York v. Kennedy*,

  155 F.4th 67 (1st Cir. 2025) ................................................................. 25

*Tax Analysts v. IRS*,

  117 F.3d 607 (D.C. Cir. 1997) ............................................................... 8

**STATUTES**

5 U.S.C. § 706(2)(A). ............................................................................ 27

8 U.S.C. § 1253(a)(1)(A) ....................................................................... 22

Internal Revenue Code (26 U.S.C.):

  § 1 ........................................................................................................ 12

  § 6103 ...........................................................1, 3, 5-9, 13, 14, 18, 23, 28

  § 6103(a) .............................................................................................. 9

  § 6103(i)(2) .........................................................3, 5, 10, 18, 19, 26

  § 6103(i)(2)(A) ................................................................................ 10, 20

  § 6103(i)(2)(B) ........................................................................ 10, 16, 20, 22

  § 6103(i)(2)(B)(i) ............................................................................... 24

  § 6103(i)(2)(B)(iv) ............................................................................ 23

  § 6103(i)(5) ........................................................................................ 23

  § 6103(k)(12) ..................................................................................... 23

  § 6103(l) .............................................................................................. 11

  § 6103(l)(13) ...................................................................................... 18

  § 6103(l)(21) ...................................................................................... 18

  § 6103(p)(4) ................................................................................ 4, 5, 9, 25

  § 6103(p)(4)(A)–(F) .......................................................................... 26

  § 6109(a)(1) ....................................................................................... 12

  § 7526(a) ............................................................................................ 15

  § 7526(b)(1)(A)(ii)(II) ....................................................................... 15

  § 7526(e)(2)(4) .................................................................................. 15

  § 7526A(a) ........................................................................................ 15

  § 7701(b) ............................................................................................ 12

  § 871 .................................................................................................... 12

Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. Q, § 203, 129 Stat. 2242 (2015) ...................................................................... 15

Revenue Act of 1978, Pub. L. No. 95-600, § 701, 92 Stat. 2763 (1978) ..................... 9

Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 356, 96 Stat. 324 (1982) .......................................................................... 10

Tax Reform Act of 1976, Pub. L. No. 94-455, § 1202, 90 Stat. 1520 (1976)................................................................................................... 7, 9

OTHER AUTHORITIES

26 C.F.R. § 301.6103(b)(1)(i)............................................................................ 27

26 C.F.R. § 301.6103(i)-1(a) ............................................................................ 27

122 Cong. Rec. 23277 (1976)............................................................................. 8

127 Cong. Rec. 16002 (1981)........................................................................... 17

152 Cong. Rec. 9083 (2006)............................................................................. 11

152 Cong. Rec. 4810 (2006)............................................................................. 11

152 Cong. Rec. 9122 (2006)............................................................................. 11

*Federal Tax Return Privacy: Hearings Before the Subcomm. on Admin. of the Internal Revenue Code of the Comm. on Finance*, 94th Cong. (1975)................................................................................................ 8

H. Amdt. 110 to H.R. 3519, 97th Cong. (1981-1982)................................................ 17

I.R.M. § 11.3.28.4(5) (Apr. 17, 2025) ................................................................. 14

IRS, *Disclosure and Privacy Law Reference Guide*, Pub. 4639 (rev. Oct. 2012) ...................................................................................................... 14

IRS, *Topic No. 857—Individual Taxpayer Identification Number ("ITIN")*, https://www.irs.gov/taxtopics/tc857 (last updated Apr. 2, 2026) .................................................................................................. 13

Kevin G. Andrade, *Many immigrants have stopped filing taxes out of fear,* THE NEW BEDFORD LIGHT (Feb. 24, 2026), https://newbedfordlight.org/many-immigrants-have-stopped-filing-taxes-out-of-fear/. ...................................................................................... 16

Maria Sacchetti*, Undocumented and Paying Taxes, They Seek a Foothold in the American Dream*, WASH. POST (Mar. 11, 2017) ........................... 28

Memorandum from Edwin Meese III, Counsellor to the President, to Richard S. Schweiker, Sec'y of Health & Human Servs. (June 3, 1982) ....................................................................................................... 16

Memorandum from Joel Gerber, Deputy Chief Counsel, IRS, to Roscoe L. Egger Jr., Comm'r (Apr. 2, 1982)..................................................................... 17

Memorandum from Peter J. Wallison, General Counsel of the Treasury, to Secretary Regan, Deputy Secretary McNamar (May 17, 1982) ........................ 17

Nat'l Taxpayer Advocate, *IRS Processing of Individual Taxpayer Identification Numbers*, *in Annual Report to Congress 2024, TAS Research Reports* 224 (2025) .................................................................................... 14

S. 2611, 109th Cong. § 301 (2006)................................................................... 10

S. Rep. No. 94-938 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 3438................. 7, 8, 9

*Social Security Number and Individual Taxpayer Identification Number Mismatches and Misuse: Hearing Before the Subcomm. on Oversight & the Subcomm. on Soc. Sec. of the H. Comm. on Ways & Means*, 108th Cong. (2004)........................................................................................ 16

Staff of the Joint Comm. on Tax'n, JCX-32-06, Present Law and Background Relating to Tax Issues Associated With Immigration Reform (2006). ......................................................................................... 12

T.D. 10013, 89 Fed. Reg. 93172 (Nov. 26, 2024)................................................ 13, 28

T.D. 8671, 61 Fed. Reg. 26788 (May 29, 1996) ................................................. 12, 13

*The Potential Impact of IRS-ICE Data Sharing on Tax Compliance*, The Budget Lab at Yale (2025) ...................................................................... 14

TIGTA, IRS Memorandum No. 94505 (1999)............................................... 28

U.S. Census Bureau, *What's in a Name* (Dec. 15, 2016)......................... 24

U.S. Dep't of the Treasury, Off. of Tax Pol'y, *Report to the Congress on Scope and Use of Taxpayer Confidentiality and Disclosure Provisions, vol. I* (2000) ...................................................................................... 18

U.S. Gov't Accountability Off., GAO-03-821, *Taxpayer Information: Increased Sharing and Verifying of Information Could Improve Education's Award Decisions* (2003) ........................................................ 18

## INTERESTS OF *AMICI CURIAE*

*Amici* are 85 Members of Congress identified below. *Amici* submit this brief because Congress has an acute interest in ensuring that section 6103 of the Internal Revenue Code (26 U.S.C.) ("I.R.C."),[1] which protects the privacy of taxpayers, is followed.[2] We are alarmed that this Administration seeks to alter a longstanding interpretation of section 6103 and to disregard its requirements.

The data sharing at issue in this case by the Internal Revenue Service ("IRS") and Immigration and Customs Enforcement ("ICE") violates the express terms of the statute and ignores its history. Congress previously rejected legislative proposals to alter section 6103 and allow the use of return information for immigration enforcement purposes. Instead, Congress and the IRS for decades have done the opposite: promoting voluntary compliance by immigrant taxpayers by protecting their information to ensure tax revenues keep pace with economic activity.

---

[1] Unless otherwise stated, all "section" references are to the Internal Revenue Code of 1986, as amended, in effect at the relevant time. "App." references are to Appellants' Appendix. "Dist. Ct. Dkt." references are to documents entered in the district court docket in this case.

[2] Counsel for *Amici* certify pursuant to Fed. R. App. P. 29(a)(4)(E) that (i) no party's counsel authored this brief in whole or in part, (ii) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and (iii) no other person besides *Amici* and their counsel contributed money that was intended to fund preparing or submitting the brief. All parties consent to *Amici's* participation.

1

*Amici* submit this brief to make clear how the Administration's actions and change in policy encroach upon powers reserved by the Constitution for Congress and contravene Congress's longstanding prerogative to prioritize collection of federal tax revenues by preserving the confidentiality of return information. The IRS adhered to and promoted this policy of confidentiality to millions of taxpayers for decades.

The data sharing here was illegal and threatens federal revenue, adversely affecting all taxpayers. It would also compromise taxpayer privacy and raise the possibility of grave consequences for individuals misidentified by ICE, chill participation in the tax system, impact our constituents, and destroy public trust.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Every year, millions of Americans entrust their most sensitive personal and financial information to the IRS by filing tax returns that Congress requires by law. Congress enacted section 6103 to assure taxpayers that their information will not be disclosed except for narrowly defined and specific exemptions authorized by Congress. This statutory scheme reflects Congress's careful judgment, maintained and refined over fifty years, in support of a tax system built on voluntary compliance.

The confidentiality protections of section 6103 are foundational to a legal architecture created and refined over decades by Congress and the IRS to promote voluntary compliance with our tax laws and assure federal revenue. The specific exception at issue, section 6103(i)(2), illustrates the care with which Congress has approached this subject. Section 6103(i)(2) permits the disclosure of certain return information for an investigation of a nontax criminal matter. When Congress first authorized nontax criminal disclosures in 1976, it required judicial approval through an *ex parte* order to obtain return information furnished by the taxpayer including address information. Congress subsequently amended section 6103(i)(2) to permit disclosure of taxpayer address and other identifying information in response to written agency requests satisfying four requirements: that the head of a requesting agency or other designated officials must identify the taxpayer by name

3

and address, specify the taxable period, identify the criminal statute under which the investigation is proceeding, and state the specific reason why disclosure is relevant. Further, return information may be disclosed only to officials who are "personally and directly engaged" in the investigation and used "solely for" the criminal investigation.

Congress also imposed specific safeguards to ensure taxpayer information remains secure when legally provided by the IRS to another agency. Section 6103(p)(4) requires any agency receiving tax return information to maintain standardized records of requests and disclosures, store the information securely, restrict access to persons whose duties require access and to whom disclosure may lawfully be made, and return the information (or make it undisclosable) once the allowable use of the information ends.

Here, the district court entered a preliminary injunction against the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement, and the heads of both agencies that prohibits inspecting, using, copying, distributing, relying on, or otherwise acting upon return information they obtained from the IRS based on the April 7, 2025 Memorandum of Understanding between the IRS and ICE. Dist. Ct. Dkt. 1-1 [hereinafter MOU]. The preliminary injunction should be affirmed for any of three independent reasons.

First, ICE was never authorized to receive the information. Section

4

6103(i)(2) permits disclosure only to officers and employees who are personally and directly engaged in a nontax criminal investigation or proceeding tied to an identified taxpayer and supported by a specific reason. The disclosures here met none of these requirements. The district court therefore properly enjoined ICE from using information that was unlawfully disclosed to it.

Second, ICE violated the requirements of section 6103(p)(4) to restrict access to the disclosed return information.

Third, the IRS's data-sharing policy is arbitrary and capricious. By sharing address information with ICE, the IRS departed from decades of assurances that taxpayer information would not be used for immigration enforcement absent narrow exceptions authorized by Congress. The IRS failed to acknowledge that reversal and consider reliance interests it had induced, foreseeable consequences for voluntary compliance and federal revenue, and the limits of its statutory authorization requiring that it request an amendment by Congress, as it had in the past. These failures resulted in ICE receiving return information unlawfully that it should not retain.

Section 6103 embodies Congress's repeated and bipartisan judgment, expressed in the statute and its many amendments, that taxpayer confidentiality is essential to voluntary compliance and collection of federal revenue. ICE suffers no cognizable hardship from being barred from using information it never should have

5

received and cannot lawfully keep, and the injunction leaves it free to enforce immigration and criminal laws through lawful means, including through requests that comply with section 6103. In contrast, the disclosure to ICE imperils effective tax administration, the reliance of millions of taxpayers, and Congress's clear prerogative to decide when and how sensitive tax information may be used for nontax purposes.

*Amici* respectfully request that this Court affirm the district court's preliminary injunction.

6

## ARGUMENT

### I.    Through Section 6103, Congress Sought to Protect Confidentiality and Promote Voluntary Compliance for All Taxpayers

Nearly fifty years ago, Congress mandated that "[r]eturns and return information shall be confidential" except as expressly authorized for a specific, compelling purpose and consistent with longstanding privacy principles. Tax Reform Act of 1976, Pub. L. No. 94-455, § 1202, 90 Stat. 1520, 1667 (1976) (codified as amended at I.R.C. § 6103(a)); *see* S. Rep. No. 94-938, at 328 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 3438, 3757 (anchoring section 6103 in the principle that "the information that the American citizen is compelled by our tax laws to disclose . . . was entitled to essentially the same degree of privacy as those private papers maintained in his home."); *id.* at 318 ("[R]eturns and return information should generally be treated as confidential and not subject to disclosure except in those limited situations delineated in the newly amended section 6103."). Section 6103 reflects a considered judgment that "the assurance of privacy . . . is fundamental to a tax system that relies upon self-reporting." *Nat'l Treasury Emps. Union v. FLRA*, 791 F.2d 183, 184 (D.C. Cir. 1986); *see also Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1230–31 (D.C. Cir. 2026) (stating that "§ 6103(i)(2) does not contemplate or authorize freewheeling disclosure of sensitive information" and instead "imposes specific requirements for requesting information from IRS, strictly delineating who can

7

make a request, how, and why"); *Lake v. Rubin*, 162 F.3d 113, 115 (D.C. Cir. 1998) (stating that section 6103 was enacted "to protect the privacy of tax return information and to regulate in minute detail the disclosure of this material").

Before 1976, the IRS operated, according to one Senator, as a "lending library" for the rest of the federal government, 122 Cong. Rec. 23277, 24013 (1976) (statement of Sen. Lowell Weicker), sharing roughly 80 million transcripts per year with other agencies. *Federal Tax Return Privacy: Hearings Before the Subcomm. on Admin. of the Internal Revenue Code of the Comm. on Finance*, 94th Cong. 23 (1975) (statement of Donald C. Alexander, Comm'r of Internal Revenue Service). As Congress recognized, "the IRS probably has more information about more people than any other agency in this country," and "[c]onsequently, almost every other agency that has a need for information about U.S. citizens, therefore, logically seeks it from the IRS." S. Rep. No. 94-938, at 316–17 (1976). Watergate laid bare the dangers of that arrangement: the information that taxpayers disclosed in good faith was being weaponized by the Executive branch. *See Tax Analysts v. IRS*, 117 F.3d 607, 611 (D.C. Cir. 1997) (noting that section 6103 was enacted "in the wake of Watergate and White House efforts to harass those on its 'enemies list'").

In response, Congress imposed a statutory scheme that denies the Executive discretion over disclosures of return information—even to other federal agencies—

creating a general rule of confidentiality absent a specific statutory provision. Exceptions to the general rule of confidentiality (subsections (c) through (o)) reflect Congress's painstaking, ongoing effort "to balance the particular office or agency's need for the information involved with the citizen's right to privacy and the related impact of the disclosure upon the continuation of compliance with our country's voluntary assessment system." S. Rep. No. 94-938, at 318.

Congress also designed safeguards for taxpayer information following a disclosure. Section 6103(a) creates obligations for every federal officer or employee receiving return information, and section 6103(p)(4) imposes explicit conditions on receipt.

As originally enacted, section 6103(i) required an *ex parte* court order for every disclosure of return information furnished by the taxpayer, including address information, for nontax criminal purposes. Tax Reform Act, Pub. L. No. 94-455, § 1202, 90 Stat. 1520, 1675–76 (codified as amended at I.R.C. § 6103(i)(1)); *see also id.* § 1202, 90 Stat. at 1668 (codified as amended at I.R.C. § 6103(b)(3)). Recognizing this requirement was too cumbersome, Congress amended the statute in 1978 to allow disclosure of a taxpayer's name and address upon written request of an agency engaged in a nontax criminal investigation or proceeding. Revenue Act of 1978, Pub. L. No. 95-600, § 701, 92 Stat. 2763, 2922–23 (1978) (codified as amended at I.R.C. § 6103(i)(2)(C)). In the Tax Equity and Fiscal Responsibility

Act of 1982 ("TEFRA"), Pub. L. No. 97-248, § 356, 96 Stat. 324, 641–45 (1982)

(codified as amended at I.R.C. § 6103(i)), Congress adopted section 6103(i)(2) in

substantially its current form, providing that a written request must come from the

head of a federal agency or a high-ranking criminal-justice official and include:

> (i) the name and address of the taxpayer with respect to whom the requested return information relates;
>
> (ii) the taxable period or periods to which such return information relates;
>
> (iii) the statutory authority under which the proceeding or investigation described in subparagraph (A) is being conducted; and
>
> (iv) the specific reason or reasons why such disclosure is, or may be, relevant to such proceeding or investigation.

I.R.C. § 6103(i)(2)(B). Section 6103(i)(2) further limits disclosure of return

information to "officers and employees" who are "personally and directly engaged

in" the criminal proceeding or investigation, and provides that such return

information may be used "solely for" the criminal proceeding or investigation.

I.R.C. § 6103(i)(2)(A).

Congress repeatedly and deliberately has chosen not to allow the IRS to

share information related to immigration enforcement. In 2006, Congress

considered amendments to the Comprehensive Immigration Reform Act of 2006,

S. 2611, 109th Cong. § 301 (2006), which proposed allowing limited disclosure of

return information to DHS to facilitate implementation of the Electronic Employment Verification System ("E-Verify"). Senator Chuck Grassley proposed amending section 6103(l) to allow DHS to obtain taxpayer information of certain employers whose employee tax data raised a red flag for immigration purposes. 152 Cong. Rec. 9122, 9169-70 (2006). In remarks on the Senate floor, Senator Grassley explained:

> The protection of taxpayer information is a cornerstone of our voluntary tax system . . . . We identified the specific information that would be needed to identify potentially illegal workers and crafted an amendment to 6103 that permits such use while maintaining all of the privacy protections afforded by 6103.

152 Cong. Rec. 9083, 9101 (2006) (statement of Sen. Chuck Grassley). Additionally, Senator Ben Nelson proposed broadly amending section 6103(i) to authorize disclosure of return information to DHS for use in "any judicial or administrative civil or criminal enforcement proceeding against an alien under the Immigration and Nationality Act," or "any investigation which may result in [such] proceedings." 152 Cong. Rec. 4810, 4828 (2006).

Congress considered these proposed amendments because it was clear that section 6103 did not already authorize disclosure or use of return information for immigration enforcement and taking that step required Congress to evaluate "whether the potential benefits to Department of Homeland Security workplace enforcement outweigh the adverse effects on taxpayer compliance and privacy that

11

would result from the disclosures of return information." Staff of the Joint Comm. on Tax'n, JCX-32-06, Present Law and Background Relating to Tax Issues Associated With Immigration Reform, 1 (2006). Both proposed amendments failed to pass.

Congress consistently has prioritized revenue collection over a competing goal of using taxpayer information for immigration enforcement—both by safeguarding the confidentiality of return information and encouraging voluntary compliance on the part of *all* taxpayers, including those who may lack authorization to work in the United States. Immigration status has no relevance in our tax system, which instead applies a substantial presence test and imposes tax on anyone qualifying as a "resident alien." *See* I.R.C. §7701(b); *see also* I.R.C. §§ 1, 871.

For decades, for millions of individuals obligated to pay federal taxes, their ineligibility to obtain a Social Security Number ("SSN") presented a significant problem for properly reporting income and filing returns. The IRS, in turn, lacked any reliable means to track immigrant taxpayers' information from one year to the next. Congress and the IRS addressed these problems by creating the Individual Taxpayer Identification Number ("ITIN") program. T.D. 8671, 61 Fed. Reg. 26788 (May 29, 1996); *see* I.R.C. § 6109(a)(1) (authorizing the Secretary to require for tax purposes an "identifying number as may be prescribed for securing proper

identification of such person").

The history of the ITIN program is instructive. The IRS worked with the Immigration and Naturalization Service ("INS") (a predecessor agency to ICE) to design a system that would track tax payments from an individual over time. Over a period of years, the agencies considered the parameters and workability of a new identification system in full view of competing interests related to immigration enforcement. 61 Fed. Reg. at 26788–89.

Consistent with section 6103 and Congressional intent, the agencies prioritized tax privacy to facilitate voluntary compliance. In its rule giving rise to the ITIN program, the IRS emphasized that the ITIN is "intended for tax use only" and that the use of an ITIN "creates no inference" about an individual's immigration status or right to work. 61 Fed. Reg. at 26789.

The IRS consistently and publicly has reinforced that understanding. *See, e.g.,* T.D. 10013, 89 Fed. Reg. 93172, 93174 (Nov. 26, 2024) ("There is no provision in the United States Code that authorizes the disclosure or redisclosure of returns or return information for enforcement of immigration laws."); IRS, *Topic No. 857—Individual Taxpayer Identification Number ("ITIN")*, https://www.irs.gov/taxtopics/tc857 (last updated Apr. 2, 2026) ("An ITIN is issued for federal tax purposes only and . . . creates no inference concerning your immigration status or your right to work in the United States."); *see also* I.R.M.

13

§ 11.3.28.4(5) (Apr. 17, 2025) ("Requests for addresses only are invalid because IRC 6103(i)(2) requires that the requester provide an address."); IRS, *Disclosure and Privacy Law Reference Guide*, Pub. 4639, at 5-4 (rev. Oct. 2012) ("Requests under section 6103(i)(2) seeking only taxpayers' addresses do not comply with the section. The section contemplates requests for return information in addition to taxpayers' addresses.").

Millions of taxpayers, including many economic contributors residing and working in *Amici's* districts and states, took the IRS at its word and applied for an ITIN, resulting in billions of dollars in payroll-tax contributions from workers who are unlikely ever to claim Social Security benefits, and yet whose contributions help to maintain the solvency of the Social Security Trust Fund. *See* Nat'l Taxpayer Advocate, *IRS Processing of Individual Taxpayer Identification Numbers*, *in Annual Report to Congress 2024, TAS Research Reports* 224, 230 fig. 5.3.3 (2025) (reporting that approximately 3.8 million returns were filed with ITINs in tax year 2022, generating $17.3 billion in total tax paid); *The Potential Impact of IRS-ICE Data Sharing on Tax Compliance*, The Budget Lab at Yale, 1(2025) (estimating that undermining Section 6103 confidentiality protections could reduce federal revenue by $313 billion over a decade as ITIN filers exit the tax system). The program has also been an essential facilitator of billions of dollars in tax payments to states, as ITIN holders use that identifier to meet obligations

14

under state tax laws. In short, *Amici's* constituents benefit significantly from the substantial tax payments of individuals who are ineligible for an SSN.

Congress also repeatedly authorized and invested in return preparation and taxpayer assistance grants that support underserved and limited English proficiency communities, including immigrant taxpayers, to ensure that everyone with an obligation to pay federal taxes has the information and assurances necessary to do so. I.R.C. § 7526(a), (b)(1)(A)(ii)(II); I.R.C. § 7526A(a), (e)(2)(4). In addition, Congress enacted ITIN expiration and renewal rules in 2015, further codifying ITINs as a fixture of our tax system. *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. Q, § 203, 129 Stat. 2242, 3078 (2015).

The high rates of voluntary compliance for millions of diverse taxpayers is an achievement of Congressional and IRS efforts to maintain tax revenues consistent with economic activity. Commissioner of Internal Revenue Mark W. Everson, who also served as Deputy Commissioner of INS, testified in 2004 that "any sharing of confidential taxpayer information, directly or indirectly, with immigration authorities would have a chilling effect on efforts to bring ITIN holders, and potential ITIN holders, into the U.S. tax system" and "deprive the Federal Government of tax revenue[.]" *Social Security Number and Individual Taxpayer Identification Number Mismatches and Misuse: Hearing Before the Subcomm. on Oversight & the Subcomm. on Soc. Sec. of the H. Comm. on Ways &*

*Means*, 108th Cong. 12 (2004) (statement of Mark W. Everson, Commissioner of Internal Revenue). In the same hearing, the Government Accountability Office confirmed that "Section 6103 does not currently authorize data sharing between IRS and DHS specifically for immigration enforcement." *Id.* at 48 n.20. The IRS's current data-sharing policy contradicts these longstanding assurances without any assessment of its foreseeable harm to voluntary compliance, the public fisc, or trust in the tax system. *See, e.g.,* Kevin G. Andrade, *Many immigrants have stopped filing taxes out of fear,* THE NEW BEDFORD LIGHT (Feb. 24, 2026), https://newbedfordlight.org/many-immigrants-have-stopped-filing-taxes-out-of-fear/.

The IRS's current data-sharing policy is also contrary to law because longstanding interpretations of the statute make clear that section 6103(i)(2)(B) is incompatible with bulk data sharing. In 1982, the Reagan Administration sought to identify men who failed to register for the Selective Service, requesting that the Social Security Administration and IRS provide address information for roughly 500,000 individuals. *See* Memorandum from Edwin Meese III, Counsellor to the President, to Richard S. Schweiker, Sec'y of Health & Human Servs. (June 3, 1982) (requesting that the Secretary furnish to the Selective Service System the names, dates of birth, social security numbers, and addresses of individuals required to register under the Military Selective Service Act).

16

Critically, months earlier, Congress considered and rejected a provision that would have authorized exactly this kind of address sharing. Specifically, House Amendment 110 to H.R. 3519, 97th Cong. (1981-1982), proposed amending the Military Selective Service Act to empower the President to require the Secretary of the Treasury to disclose addresses of any individual listed in the Selective Service System. The House struck that provision on the floor. 127 Cong. Rec. 16002, 16011-12 (1981).

In response to the White House's subsequent request of 500,000 individuals' address information, the Treasury General Counsel concluded that disclosing such information under section 6103(i)(2) "would likely be viewed as a challenge to Congressional prerogatives" and observed that "[t]here would appear to be no reason to seek such an amendment if Justice could, under current law (section 6103(i)(2)), simply write to the IRS and request the current addresses[.]" Memorandum from Peter J. Wallison, General Counsel of the Treasury, to Secretary Regan, Deputy Secretary McNamar (May 17, 1982); *see* Memorandum from Joel Gerber, Deputy Chief Counsel, IRS, to Roscoe L. Egger Jr., Comm'r (Apr. 2, 1982) (stating, based on "an overall reading of section 6103 and its legislative history," that the "more defensible legal position is that the disclosures cannot be made").

Exceptions in section 6103 that authorize disclosure of bulk return

information stand in marked contrast to the circumscribed requirements of section 6103(i)(2). For example, section 6103(l)(21) permits disclosure to the Department of Health and Human Services to determine eligibility for health insurance, and section 6103(l)(13) permits disclosure to the Department of Education for student financial aid. These exceptions contain minimal requirements.

Notably, as to the latter example, when the Department of Education initially sought data to assist parents in applying for student aid based on tax records, the Treasury Department responded that it would need Congressional authorization, leading Congress to amend the statute and add subsection (l)(13). *See* U.S. Dep't of the Treasury, Off. of Tax Pol'y, *Report to The Congress on Scope and Use of Taxpayer Confidentiality and Disclosure Provisions, vol. I*, 90–92 (2000); *see also* U.S. Gov't Accountability Off., GAO-03-821, *Taxpayer Information: Increased Sharing and Verifying of Information Could Improve Education's Award Decisions* 13–16 (2003).

The history of section 6103 makes clear that, in this instance, ICE acquired return information it was never entitled to receive under section 6103(i)(2). These violations justify the preliminary injunction against the ICE Defendants.

There is also no merit to Appellants' argument that Congress provided civil and criminal penalties as the exclusive remedies for violations of section 6103. The statute and history belie any suggestion that the Executive branch may violate

18

taxpayer confidentiality whenever a competing policy is deemed to be worth the cost. The reality is that there would be *no* cost in this case given that the taxpayers whose privacy has been violated have no way of knowing and the Executive branch has every incentive not to pursue the matter. Section 6103 is not toothless.

## II.    The Disclosure of Return Information to ICE Defied the Plain Language of I.R.C. § 6103(i)(2)

The requirements of section 6103(i)(2) are the principal means by which Congress sought to ensure that limited disclosures for a nontax criminal investigation or proceeding without an *ex parte* order would remain individualized, targeted, and bounded. Where "a general statement of policy is qualified by an exception," courts generally "read the exception narrowly in order to preserve the primary operation of the provision." *Comm'r v. Clark*, 489 U.S. 726, 739 (1989). The "detail and . . . particularity" of the exceptions in section 6103 "preclude their enlargement by implication." *Addison v. Holly Hill Fruit Prods.*, 322 U.S. 607, 617 (1944); *see also Maracich v. Spears*, 570 U.S. 48, 60 (2013) (stating that exceptions "ought not operate to the farthest reach of their linguistic possibilities if that result would contravene the statutory design").

Section 6103(i)(2) authorizes disclosure of return information (1) to officers and employees of a requesting agency who are "personally and directly engaged in" a nontax criminal investigation or proceeding, (2) "solely for the use of such officers and employees" in the investigation or proceeding, and (3) in response to a

19

written request that, among other requirements, sets forth "the name and address of the taxpayer" and "the specific reason or reasons why such disclosure is, or may be, relevant." I.R.C. § 6103(i)(2)(A), (i)(2)(B) . As the district court recognized, the disclosures of address information to ICE did not satisfy any of these statutory requirements.

First, the IRS did not disclose the return information only to officers and employees who were "personally and directly engaged in" criminal investigations of 1.3 million individuals. Instead, the IRS disclosed information for approximately 47,000 individuals to one official, Assistant Director of ICE Enforcement and Removal Operations ("ERO"), Enforcement Division. Echoing the court's conclusion in *Center for Taxpayer Rights v. IRS*, 815 F. Supp. 3d 1, 24 (D.D.C. 2025), the district court in this case rightly stated, "[t]he assertion that one individual could be 'personally and directly' involved with the investigation and prosecution of 1.3 million people ignores the plain meaning of those words," and that "the scope and breadth of ICE's request rendered it impossible for IRS, as a practical matter, to disclose the 47,000 taxpayer addresses to investigatory officers without an intermediary." App. A630, A633. Appellants would reduce the statutory safeguards to a nullity in contravention of Congressional design.

Second, ICE conceded that it did not request the address information "solely" for use by officers and employees engaged in criminal investigations or

20

proceedings. The Acting Assistant Director of ICE ERO, Enforcement Division, explained that initial investigations by ERO officers involve gathering all known addresses of an individual and other evidence to "determine[e] whether administrative remedies can satisfactorily resolve a case, or whether the violations have a serious negative impact on our society, members of the public, and agency operations such that criminal prosecution should be pursued." App. A462–63. In other words, ICE's request for return information preceded the opening of criminal investigations and, at best, had the twin purpose of serving either civil or criminal immigration enforcement. As stated by the district court, "ICE's desired use of the taxpayer information belies the purpose of Section 6103's statutory scheme," which limits the use of information "solely" for criminal investigations or proceedings. App. A635.

Moreover, the record in this case demonstrates that the IRS knew ICE's requests for return information were not "solely" for use in criminal investigations or proceedings. The Memorandum of Understanding cites, as its primary purpose, Executive Order No. 14161 "to identify, exclude, or remove aliens illegally present in the United States," which is a civil matter. MOU at 1. In this vein, ICE initially sought address information for "the full alien population" of more than 7.6 million individuals, explaining that "the most recent address that IRS can identify" was "the primary goal" and that the request would "enrich the data" in ICE's files. App.

21

A614–15 (quoting Dist. Ct. Dkt. 39-1 at TD_0000086). While the IRS initially rejected ICE's request, it then disclosed return information in response to a pared-down request that omitted individuals who had not overstayed a final order of removal. App. A615-16. That change, however, failed to address the violation of section 6103(i)(2) that requested information be used "solely" for criminal investigations.

Appellants argue that a taxpayer's last known address "would be probative of . . . continued presence" following a final order of removal. Appellants' Br. 50; Admin. R., *Ctr. for Taxpayer Rights v. IRS*, No. 1:25-cv-00457-CKK, Dkt. 48-3 at TD_0000097–99 [hereinafter Admin R.]. Yet ICE requested and IRS reviewed 1.3 million individuals' records for tax years from "January 2022 to present," regardless of when a removal order became final. Appellants' Br. 49 n.6 (citing App. A406–408) (emphasis omitted); Admin. R., Dkt. 48-3 at TD_0000100–02. Because criminal penalties require willful failure to depart within 90 days after a removal order, 8 U.S.C. § 1253(a)(1)(A), only a tax record created *after* that period closes could demonstrate the continued presence relevant to a criminal investigation.

Further, section 6103(i)(2)(B) does not permit disclosure of return information to target an individual for immigration enforcement. Congress allowed using return information only to locate an individual when so ordered by a judge.

22

I.R.C. § 6103(i)(5).

Third, ICE's written request for return information was deficient in multiple respects, including by failing to provide "the specific reason or reasons why such disclosure is, or may be, relevant to such [criminal] proceeding or investigation." I.R.C. § 6103(i)(2)(B)(iv). Every word here serves a function: "the" demands a particularized showing; the modifier "specific" requires more than a generic assertion; and the requirement that the reason or reasons relate to "such proceeding or investigation" links each disclosure to an identified and active criminal matter.

If Congress thought that broad or categorical reasons for a request would suffice, it would have omitted the term "specific"—as it did elsewhere in section 6103. *See Ctr. For Taxpayer Rights*, 815 F. Supp. 3d 1, 53 (contrasting section 6103(i)(2)(B)(iv) with provisions like section 6103(k)(12), which uses "reason" without the modifier "specific"); *see also Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("'A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'") (quoting 2A N. Singer, *Statutes and Statutory Construction* § 46.06, pp.181–186 (rev. 6th ed. 2000)).

ICE stated that "the requested information may contain address information which is potentially at issue with respect to investigating or proving a violation under 8 U.S.C. § 1253(a)(1)." Dist. Ct. Dkt. 39-1 at TD_0000112. This reason

23

lacks all specificity as demonstrated by the fact that ICE offered this singular reason for requesting address information of all 1.3 million individuals. Moreover, as noted above, ICE also appears to have made its request before deciding in each case whether to proceed with administrative removal or open a criminal investigation, meaning that the request was unlawfully premature. App. A632.

Fourth, ICE's written request also fails to supply "the name and address of the taxpayer with respect to whom the requested information relates." I.R.C. § 6103(i)(2)(B)(i). Congress requires both the name and address for obvious reasons: to confirm the identity of the taxpayer whose return information is requested and to ensure that the disclosure is properly authorized. Accuracy is particularly important where, as here, the requested information may be used to locate individuals for immigration enforcement and the risk of misidentification is substantial. Among Hispanic populations, for example, 26 surnames cover a quarter of the population, and similar concentration exists for Asian Americans. U.S. Census Bureau, *What's in a Name* (Dec. 15, 2016). The statutory requirement to provide "*the* name and address of the taxpayer" suggests that the address information must match the IRS's last known address for the taxpayer. I.R.C. § 6103(i)(2)(B)(i) (emphasis added); *but see Centro de Trabajadores*, 167 F.4th at 1231. Regardless, ICE did not provide any address information for many individuals, and even when it did the IRS did not verify the address information

24

90.3% of the time. Dist. Ct. Dkt. . 79-1, Romo Decl. ¶¶ 8(a), 10, 13–14.

Because the IRS improperly disclosed return information in response to an unlawful request from ICE, ICE should be enjoined from using that information unlawfully obtained. *See Allstate Ins. Co. v. Fougere*, 581 F. Supp. 3d 307, 320 (D. Mass. 2022) (enjoining defendants from continued use of misappropriated information imposed no hardship); *cf. New York v. Kennedy*, 155 F.4th 67, 77 (1st Cir. 2025) (recognizing that "there is generally no public interest in the perpetuation of unlawful agency action") (quoting *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63 (1st Cir. 2025)). Such relief merely requires that ICE comply with existing law.

III.    **ICE Further Violated I.R.C. § 6103(p)(4)'s Conditions on Receipt and Maintenance of Confidential Return Information**

Section 6103(i)(2) governs disclosure of return information by the IRS, and section 6103(p)(4) governs an agency's use and storage of such information following receipt. Section 6103(p)(4) provides stringent safeguards for handling of tax return information following disclosure. As pointed out by the district court, return information disclosed under section 6103(i)(2) "is still 'return information,' and remains subject to Section 6103's proscriptions on use and storage." App. A633.

Section 6103(p)(4) commands that any agency "shall, as a condition for receiving returns or return information" under section 6103(i)(2): (A) establish and

25

maintain a permanent system of standardized records of each request and disclosure; (B) establish and maintain secure storage of the return information; (C) restrict access to return information "only to persons whose duties or responsibilities require access and to whom disclosure may be made under the provisions of this title"; and (F) return or render undisclosable return information upon completion of use. I.R.C. § 6103(p)(4)(A)–(F). ICE has not—and cannot—satisfy these statutory safeguards.

First, ICE received return information without identifying any officers or employees "personally and directly engaged in" criminal investigations, as required by the plain language of section 6103(i)(2), and therefore it cannot be said that ICE has restricted access "to whom disclosure may be made under the provisions of this title." As the district court observed, ICE's request for address information of 1.3 million individuals made the use of intermediaries a practical necessity. App. A633. The return information went from ICE Homeland Security Investigations, Cyber Operations Technology Division, to ICE ERO, Law Enforcement Systems and Analysis, and finally to the "lead architect" of ICE Homeland Security Investigations, none of whom directly conduct criminal investigations. App. A633-34, A636. Moreover, absent criminal investigations, the Cyber Operations Technology Division compared the disclosed data against a list of roughly 1.2 million individuals with removal orders and "identified

26

approximately 33,000 updated addresses." App. A633 (quoting Dist. Ct. Dkt. 51-2, Fitzgerald Decl. ¶ 5).

Appellants claim that ICE disclosed return information "[t]o properly obtain the services of persons having special knowledge or technical skills (such as, but not limited to, handwriting analysis, photographic development, sound recording enhancement, or voice identification)." 26 C.F.R. § 301.6103(i)-1(a), (b)(1)(i); *see* Appellants' Br. 60. That assumes a bona fide ongoing criminal investigation of each individual and officers and employees who are personally and directly engaged in such investigations, neither of which is accurate. Nor is there any suggestion that multiple divisions of ICE accessed the return information to provide technical or other support for criminal investigations.

## IV.     The IRS's Change in Data-Sharing Policy Is Arbitrary and Capricious and Violates the Administrative Procedure Act

The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). An agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When an agency changes course, it must at least "display awareness that it is changing position," show "good reasons for the new policy," and address serious reliance interests generated by the prior policy. *Encino*

*Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–23 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). In addition to the statutory violations described above, the IRS data-sharing policy is also arbitrary and capricious because the IRS changed a longstanding policy of confidentiality without acknowledging this change or explaining its reversal, and without considering the reliance interests and federal revenue consequences Congress's confidentiality regime was designed to protect.

For decades, the IRS maintained that "[t]here is no provision in the United States Code that authorizes the disclosure or redisclosure of returns or return information for enforcement of immigration laws." 89 Fed. Reg. 93172, 93174 (Nov. 26, 2024); *see* TIGTA, IRS Memorandum No. 94505, 5 (1999) (stating that "the IRS intentionally will not provide information to" immigration enforcement authorities and that, before doing so, "the IRS requires that IRC Section 6103 be changed"); Maria Sacchetti*, Undocumented and Paying Taxes, They Seek a Foothold in the American Dream*, WASH. POST (Mar. 11, 2017) (including the IRS statement that it has "strong processes in place to protect the confidentiality of taxpayer information," including information related to returns filed using ITINs). The IRS repudiates these longstanding positions by disclosing return information to ICE without any reasoned public explanation consistent with section 6103, its history, or its revenue-protection purpose.

28

The IRS also failed to consider the profound reliance interests at stake. When the government reverses a policy that induced widespread reliance, it must confront both the reliance itself and the consequences of upsetting it. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22–26 (2020). The IRS spent nearly three decades assuring taxpayers that ITINs were for tax purposes only and working with Congress to promote voluntary compliance among immigrant taxpayers. Those assurances drew millions of taxpayers into the federal tax system, generating billions of dollars in revenue. The IRS reversed course without assessing the foreseeable harms to voluntary compliance, the public fisc, and trust in the tax system. That omission is especially serious because voluntary compliance and confidentiality are central to the statutory scheme Congress directed the IRS to administer. *See Judulang v. Holder*, 565 U.S. 42, 55–56, 64 (2011).

The IRS's address sharing policy therefore violates the statute, improperly displaces Congress's legislative judgments, undermines the confidentiality of taxpayer information and taxpayer reliance, and threatens the national fisc. The district court's preliminary injunction preserves Congress's unambiguous command that taxpayer information remain confidential unless and until an agency lawfully satisfies the conditions set forth by Congress and longstanding IRS policy. *Amici* urge that the preliminary injunction be upheld.

## CONCLUSION

For the foregoing reasons, the Court should affirm the stay order and preliminary injunction entered by the district court.

Respectfully submitted,

/s/ Andrew Weiner
Andrew Weiner
Robert McLeod
KOSTELANETZ LLP
601 New Jersey Avenue
NW Suite 260
Washington, DC 20001
Phone: 202-790-6999
Fax: 212-808-8108
aweiner@kostelanetz.com

Laura MacCleery
UNIDOSUS
1126 16th Street NW #600
Washington, DC 20036
Phone: 202-489-7147
lmaccleery@unidosus.org

*Counsel for Amici Curiae*

## ADDENDUM: AMICI CURIAE

### LEADING AMICI (5)

**Adriano Espaillat**
Representative of New York

**Catherine Cortez Masto**
Senator from Nevada

**Linda T. Sánchez**
Representative of California

**Alex Padilla**
Senator from California

**Jimmy Gomez**
Representative of California

### MEMBERS OF THE U.S. SENATE (8)

**Angela Alsobrooks**
Senator from Maryland

**Maria Cantwell**
Senator from Washington

**Tammy Duckworth**
Senator from Illinois

**Martin Heinrich**
Senator from New Mexico

**Amy Klobuchar**
Senator from Minnesota

**Jacky Rosen**
Senator from Nevada

**Chris Van Hollen**
Senator from Maryland

**Ron Wyden**
Senator from Oregon

### MEMBERS OF THE HOUSE OF REPRESENTATIVES (72)

**Gabe Amo**
Representative of Rhode Island

**Jake Auchincloss**
Representative of Massachusetts

**Becca Balint**
Representative of Vermont

**Nanette Barragán**
Representative of California

**Wesley Bell**
Representative of Missouri

**Suzanne Bonamici**
Representative of Oregon

**Shontel M. Brown**
Representative of Ohio

**Julia Brownley**
Representative of California

**André Carson**
Representative of Indiana

**Judy Chu**
Representative of California

**J. Luis Correa**
Representative of California

**Joe Courtney**
Representative of Connecticut

**Madeleine Dean**
Representative of Pennsylvania

**Suzan DelBene**
Representative of Washington

**Maxine Dexter**
Representative of Oregon

**Veronica Escobar**
Representative of Texas

**Maxwell Alejandro Frost**
Representative of Florida

**Robert Garcia**
Representative of California

**Adelita Grijalva**
Representative of Arizona

**Steven A. Horsford**
Representative of Nevada

**Pramila Jayapal**
Representative of Washington

**Sean Casten**
Representative of Illinois

**Yvette D. Clarke**
Representative of New York

**Jim Costa**
Representative of California

**Danny K. Davis**
Representative of Illinois

**Diana DeGette**
Representative of Colorado

**Mark DeSaulnier**
Representative of California

**Lloyd Doggett**
Representative of Texas

**Bill Foster**
Representative of Illinois

**Jesús G. "Chuy" García**
Representative of Illinois

**Sylvia R. Garcia**
Representative of Texas

**Jahana Hayes**
Representative of Connecticut

**Glenn Ivey**
Representative of Maryland

**Henry C. "Hank" Johnson, Jr.**
Representative of Georgia

**Ro Khanna**
Representative of California

**Summer Lee**
Representative of Pennsylvania

**Zoe Lofgren**
Representative of California

**April McClain Delaney**
Representative of Maryland

**Betty McCollum**
Representative of Minnesota

**Rob Menendez**
Representative of New Jersey

**Gwen Moore**
Representative of Wisconsin

**Jerrold Nadler**
Representative of New York

**Alexandria Ocasio-Cortez**
Representative of New York

**Delia C. Ramirez**
Representative of Illinois

**Andrea Salinas**
Representative of Oregon

**Jan Schakowsky**
Representative of Illinois

**Brad Sherman**
Representative of California

**George Latimer**
Representative of New York

**Sam Liccardo**
Representative of California

**Stephen F. Lynch**
Representative of Massachusetts

**Jennifer L. McClellan**
Representative of Virginia

**Analilia Mejia**
Representative of New Jersey

**Dave Min**
Representative of California

**Seth Moulton**
Representative of Massachusetts

**Eleanor Holmes Norton**
Representative of the District of
Columbia

**Mike Quigley**
Representative of Illinois

**Luz M. Rivas**
Representative of California

**Mary Gay Scanlon**
Representative of Pennsylvania

**Terri Sewell**
Representative of Alabama

**Lateefah Simon**
Representative of California

**Greg Stanton**
Representative of Arizona

**Haley Stevens**
Representative of Michigan

**Mark Takano**
Representative of California

**Mike Thompson**
Representative of California

**Dina Titus**
Representative of Nevada

**Rashida Tlaib**
Representative of Michigan

**Juan Vargas**
Representative of California

**Nydia M. Velázquez**
Representative of New York

**Debbie Wasserman Schultz**
Representative of Florida

**Maxine Waters**
Representative of California

**Bonnie Watson Coleman**
Representative of New Jersey

**Frederica S. Wilson**
Representative of Florida

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limit of Fed. R. App. P. 29(a)(5), because, excluding the parts of the brief listed in Fed. R. App. P. 32(f), this brief contains 6,293 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in size 14, Times New Roman font.

July 30, 2026                                                  /s/ Andrew Weiner
                                                               *Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

This is to certify that on this 30th day of July 2026 the foregoing brief was electronically filed with the Clerk of the Court using the Court's CM/ECF system and was served on the parties by CM/ECF.

/s/ Andrew Weiner