**No. 26-1329**

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

COMMUNITY ECONOMIC DEVELOPMENT CENTER OF
SOUTHEASTERN MASSACHUSETTS; NATIONAL PARENTS UNION;
NATIONAL KOREAN AMERICAN SERVICE & EDUCATIONAL
CONSORTIUM; UNDOCUBLACK NETWORK INC.,
*Plaintiffs-Appellees*,

v.

SCOTT BESSENT, Acting Commissioner of the Internal Revenue Service
and Secretary of the Treasury; SOCIAL SECURITY ADMINISTRATION;
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MARKWAYNE
MULLIN, Secretary of Homeland Security; INTERNAL REVENUE
SERVICE; TODD M. LYONS, Acting Director of U.S. Immigration and Customs
Enforcement; FRANK J. BISIGNANO, Commissioner of the Social Security
Administration; U.S. DEPARTMENT OF HOMELAND SECURITY;
U.S. DEPARTMENT OF THE TREASURY,
*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Massachusetts

**BRIEF OF TAX CLINICS AND LEGAL SERVICES
ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-
APPELLEES AND AFFIRMANCE**

ANDREW M. TROOP
*Counsel of Record*
  Pillsbury Winthrop Shaw Pittman LLP
  10 Post Office Square, Floor 8
  Boston, MA 02109
  (857) 323-5400

HON. FRANK J. BAILEY (RET.)
GABRIELA FORERO
PAUL JOHNSON
  Pioneer New England Legal Foundation
  185 Devonshire Street, 11th Floor
  Boston, MA 02110
  (617) 819-1010

COUNSEL FOR AMICI CURIAE
(*ADDITIONAL COUNSEL ON INSIDE COVER*)

LAWRENCE A. SANNICANDRO
DARIANNE DE LEON
  Pillsbury Winthrop Shaw Pittman LLP
  31 West 52nd Street, Floor 28
  New York, NY 10019
  (212) 858-1377

REED C. TRECHTER
  Pillsbury Winthrop Shaw Pittman LLP
  609 Main Street, Suite 2000
  Houston, TX 77002
  (713) 276-7628

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), *Amici Curiae* Empire Justice Center, Legal Services NYC, Public Law Center, and Rutgers Federal Tax Law Clinic state that no *Amicus* has a parent corporation and no publicly held corporation owns 10 percent or more of any *Amicus*.

**TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ................................................................................. ii

TABLE OF AUTHORITIES.............................................................................. iv

INTERESTS OF AMICI CURIAE ...................................................................... 1

PRELIMINARY STATEMENT.......................................................................... 4

ARGUMENT .............................................................................................. 7

    I.    Congress Enacted Section 6103 to Protect Taxpayer Confidentiality and Preserve Voluntary Compliance .......................................... 7

        A.    Confidentiality Is Essential to the Federal Tax System ................... 7

        B.    Congress Specifically Created Section 6103 to Prevent Political Misuse ........................................................................ 10

    II.    The Government's Position Cannot Be Reconciled with Congress's Statutory Design .................................................................. 12

        A.    The Government's Reading of the Statute Would Turn a Targeted Criminal-Investigation Exception into a Bulk Locator Tool................................................................................ 12

        B.    Section 6103(i)(2) Is Not a Bulk Locator Provision ..................... 13

        C.    Section 6103(i)(5) Requires Judicial Approval............................. 16

        D.    The Government's Position Is Undermining Taxpayer Confidence and Voluntary Compliance ....................................... 19

    III.    The Government's Position Creates Harmful Consequences for the *Amici* and the Low-Income Taxpayers They Serve.................................. 20

        A.    The Government's Reading Adversely Impacts *Amici's* Compliance Counseling Duties and Increases the Likelihood that Vulnerable Taxpayers Will Not Receive Critical Services ..... 21

        B.    Actual Disclosures Confirm That the Risk of Harm Is Not Theoretical.......................................................................... 24

        C.    The Government's Position, if Accepted, Would Not Be Limited to ICE or Immigration Enforcement, but Rather Would Open the

Door to Widespread Disclosure of Sensitive Information, Contrary to Congress's Mandate ....................................................26

IV.    Prospective Relief Is Necessary Because Damages Under Section 7431 Cannot Restore Confidentiality or Repair the Harm from Disclosure and Use ...........................................................................................27

CONCLUSION .......................................................................................................30

CERTIFICATE OF COMPLIANCE ....................................................................32

CERTIFICATE OF SERVICE ..............................................................................33

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*California v. Trump*,
    Nos. 26-1774, 26-1779 (1st Cir. July 25, 2026) ................................................24

*Carpenter v. United States*,
    585 U.S. 296 (2018) ...........................................................................................17

*Centro de Trabajadores Unidos v. Bessent*,
    167 F.4th 1218 (D.C. Cir. 2026) .................................................................18, 19

*Corley v. United States*,
    556 U.S. 303 (2009) ...........................................................................................17

*Ctr. for Taxpayer Rts. v. Internal Revenue Service*,
    No. 25-cv-457 (D.D.C. Feb. 11, 2026) ......................................................*passim*

*Lake v. Rubin*,
    162 F.3d 113 (D.C. Cir. 1998) .............................................................................8

*Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*,
    791 F.2d 183 (D.C. Cir. 1986) .............................................................................8

*Republic of Sudan v. Harrison*,
    587 U.S. 1 (2019) ...............................................................................................13

*Russello v. United States*,
    464 U.S. 16 (1983) .............................................................................................17

*United States v. Jones*,
    565 U.S. 400 (2012) ...........................................................................................17

*Webb v. Injured Workers Pharmacy, LLC*,
    72 F.4th 365 (1st Cir. 2023) ...............................................................................28

iv

Statutes and Codes

United States Code
  Title 26, Section 6103 ...............................................................*passim*
  Title 26, Section 6103(a) ...................................................9, 12, 22
  Title 26, Section 6103(b)(2)...........................................................9
  Title 26, Section 6103(i) .............................................................17
  Title 26, Section 6103(i)(2) .................................................*passim*
  Title 26, Section 6103(i)(5) .................................................*passim*
  Title 26, Section 6103(p)(4)...................................................19, 28
  Title 26, Section 7213 ...................................................................8
  Title 26, Section 7213A .................................................................8
  Title 26, Section 7217 .................................................................11
  Title 26, Section 7217(a) .............................................................11
  Title 26, Section 7217(e)(1)..........................................................11
  Title 26, Section 7431 ...........................................................*passim*
  Title 26, Section 7526 ...................................................................1
  Title 26, Section 7803(a)(3)..........................................................22

Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248,
  Section 356(a), 96 Stat. 324 (1982) ...............................................17

Tax Reform Act of 1976, Pub. L. No. 94-455, Section 1202, 90 Stat. 1520,
  1667–84 (1976)...................................................................8, 9, 10

Rules and Regulations

Federal Rules of Appellate Procedure
  Rule 29(a)(4)(E).............................................................................4

Taxpayer Identifying Numbers (TIN)
  60 Fed. Reg. 30211 (proposed June 8, 1995) (to be codified at 26 C.F.R.
  pt. 301) ........................................................................................23

Other Authorities

The Budget Lab at Yale, *The Potential Impact of IRS-ICE Data Sharing on
  Tax Compliance* (Apr. 8, 2025), https://budgetlab.yale.edu/node/470/pdf........20

H.R. Rep. No. 94-658 (1975)...............................................................10

Internal Revenue Manual 11.3.28.4(5) (Apr. 17, 2025) ........................................14

IRS, *Publication 596 (2025), Earned Income Credit (EIC) Table*, https://www.irs.gov/publications/p596#d0e5346 ..................................................2

Kris Cox, *IRS-ICE Agreement Weakening Privacy Protections Poses Risks for All Taxpayers*, Ctr. on Budget & Policy Priorities (Apr. 21, 2025), https://www.cbpp.org/blog/irs-ice-agreement-weakening-privacy-protections-poses-risks-for-all-taxpayers ...........................................20

Lauren Loricchio, *Funding Freeze Creates Uncertainty for Taxpayer Clinics*, 186 TAX NOTES Fed. 1325 (2025).........................................20

Margot L. Crandall-Hollick, Gene Falk, and James A. Carter, Cong. Rsch. Serv., R45971, *The Impact of the Federal Income Tax Code on Poverty* (2020)..................................................................................................2

Miriam Jordan & Andrew Duehren, *Immigrants Are Scared to File Taxes. It Could Cost the U.S. Billions*, N.Y. TIMES (Apr. 14, 2026), https://www.nytimes.com/2026/04/14/us/undocumented-immigrants-ice-tax-returns-irs.html ...........................................................................20

Nat'l Taxpayer Advocate, *Low Income Taxpayer Clinics Program Report 2025* (2026).................................................................21, 22, 23

Sasha Snyder, *Pathways to Reduce Child Poverty: Impacts of Federal Tax Credits*, Brookings Inst. (Feb. 9, 2026), https://www.brookings.edu/articles/pathways-to-reduce-child-poverty-impacts-of-federal-tax-credits.................................................................2

S. Rep. No. 94-938 (1976) ......................................................................9, 10

Staff of the Joint Comm. on Taxation, 93d Cong., *Investigation into Certain Charges of the Use of the Internal Revenue Service for Political Purposes* (Comm. Print 1973) ........................................................11

Staff of the Joint Comm. on Taxation, 94th Cong., *General Explanation of the Tax Reform Act of 1976* (Comm. Print 1976)...........................9, 11

TIGTA, Report No. 2026-IE-R010, *The IRS Provided Addresses for Nearly 47,000 Persons to Immigration and Customs Enforcement* (2026) https://www.tigta.gov/sites/default/files/reports/2026-06/2026ier010fr.pdf .................................................................*passim*

vi

## INTERESTS OF AMICI CURIAE

*Amici curiae* ("*Amici*")—Empire Justice Center, Legal Services NYC, Public Law Center, and Rutgers Federal Tax Law Clinic—operate low-income taxpayer clinics ("LITCs") or provide legal services, including tax assistance and legal representation, to low-income taxpayers.[1]  Like all taxpayers, low-income taxpayers must comply with federal tax return filing requirements regardless of citizenship, immigration status, or occupation.  When assisting low-income taxpayers, *Amici* provide a broad range of compliance and administration services, including advising and representing taxpayers with respect to preparing and filing returns, obtaining and using individual taxpayer identification numbers ("ITINs"),[2] administrative appeals, disputes before the United States Tax Court ("Tax Court"), identity theft, and audit and collection disputes with the Internal Revenue Service ("IRS") ("Taxpayer Compliance Services").  *Amici*'s work often centers on eligibility for the earned income credit, child tax credit, and other refundable credits that are central to

---

[1] LITCs, including law school clinics, are organizations recognized under section 7526 of the Internal Revenue Code of 1986, as amended (the "Code" or "26 U.S.C.") that provide representation, education, and advocacy for low-income taxpayers in controversies with the IRS.  Legal services organizations provide civil legal assistance, including tax representation, to eligible low-income clients.  All section references are to the Code.

[2] ITINs are taxpayer identification numbers that allow individuals who are not eligible for Social Security numbers to comply with federal tax filing and reporting obligations.

the economic stability of low-income households.[3]  For 2025, the earned income credit alone could provide a married couple with three qualifying children as much as $8,046 in support.[4]

*Amici* have a direct institutional interest in this appeal because confidentiality under section 6103 is essential to their work.  *Amici's* success in counseling taxpayers to file accurate returns, provide complete information, and comply with the Code flows from the trust taxpayers place in them and the system.  That confidence is grounded in section 6103's mandate that returns and return information are confidential except as Congress specifically authorizes.

The issues in this appeal, therefore, have practical and severe consequences for *Amici*'s work and the taxpayers they serve.  If taxpayers fear that information supplied for tax compliance may be used by other federal agencies for broad nontax enforcement purposes, some taxpayers will delay filing, decline to update addresses,

---

[3] *See* Margot L. Crandall-Hollick, Gene Falk, and James A. Carter, Cong. Rsch. Serv., R45971, *The Impact of the Federal Income Tax Code on Poverty* 9–10, 15 (2020) (estimating that the federal income tax reduced the child-poverty rate from 18.2% to 12.6% and provided significant monetary benefits to many low-income families); *see also* Sasha Snyder, *Pathways to Reduce Child Poverty:  Impacts of Federal Tax Credits*, Brookings Inst. (Feb. 9, 2026), https://www.brookings.edu/articles/pathways-to-reduce-child-poverty-impacts-of-federal-tax-credits (reporting that the combined 2021 earned income and child tax credits lifted more than two million children out of poverty).

[4] *See* IRS, *Publication 596 (2025), Earned Income Credit (EIC) Table*, https://www.irs.gov/publications/p596#d0e5346.

ignore IRS notices, forgo refundable credits, or avoid free tax-preparation programs and trusted community organizations. Reduced use of those services would be especially detrimental to low-income taxpayers, who often rely on free tax-preparation programs, such as the Volunteer Income Tax Assistance ("VITA") program, to navigate the tax system. Additionally, reduced participation threatens the continued availability of those services by weakening *Amici's* ability to provide them.

*Amici* take no position on immigration policy or the targets of ICE's enforcement efforts because none is required to uphold the district court's injunction restricting information sharing under the April 2025 Memorandum of Understanding (the "MOU") between the U.S. Department of the Treasury ("Treasury"), on behalf of the IRS, and the U.S. Department of Homeland Security ("DHS"), on behalf of U.S. Immigration and Customs Enforcement ("ICE"), concerning disclosure of taxpayer address information for nontax criminal enforcement under section 6103(i)(2). Rather, *Amici* have an interest in protecting taxpayers, preserving voluntary compliance, and maintaining the statutory conditions that enable them to assist low-income taxpayers. This brief provides the perspective of organizations that counsel low-income taxpayers and explains why section 6103's statutory limits are critical both to individual taxpayer decision-making and to the entire voluntary-compliance system upon which federal tax administration depends.

All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici* state: no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting this brief; and no person other than *Amici* or their counsel contributed money intended to fund preparing or submitting this brief.[5]

## PRELIMINARY STATEMENT

Section 6103 reflects Congress's policy decision that tax returns and tax return information are confidential. That decision, which has been codified in its current form since 1976, has sound, practical force in the administration of our voluntary tax-compliance system. Taxpayers provide the IRS with sensitive financial, identifying, family, and address information because: (1) the Code requires accurate disclosure; and (2) the Code limits its use. This appeal concerns the Government's effort to repurpose confidential taxpayer information collected for tax administration into locator information for large-scale nontax enforcement, even though Congress authorized disclosure only in carefully defined circumstances that are not present here.

---

[5] Andrew M. Troop and the Hon. Frank J. Bailey (Ret.) serve on the board of directors of Greater Boston Legal Services, which represents Plaintiffs-Appellees in this appeal. They appear on this brief solely as counsel for *Amici*.

4

The Government argues that the IRS must disclose taxpayer address information to ICE whenever ICE submits a request that it considers compliant; that taxpayer addresses constitute "taxpayer identity" information subject to disclosure under section 6103(i)(2); that damages under section 7431 are an adequate remedy for unlawful disclosure; and that the injuries alleged by taxpayer-assistance organizations are speculative or self-inflicted. Gov't Br. at 1–2, 6–8, 41–44, 46–66. Informed by the perspective of organizations whose work depends on section 6103's confidentiality protections, *Amici* disagree.

*First*, Congress enacted section 6103 to preserve taxpayer confidence and the voluntary-compliance system upon which federal tax administration depends. If taxpayers, low income or not, perceive they may be exposed to unrelated nontax enforcement activity, the entire voluntary compliance system is at risk. Low-income taxpayers may avoid seeking Taxpayer Compliance Services, which may result in lost tax benefits, missed deadlines, and unnecessary assessments or collection activity, as well as lost tax revenue. But the consequences extend well beyond the taxpayers immediately affected by the challenged policy. Nothing in the Government's theory limits the challenged disclosures to immigration enforcement or to the taxpayers involved in this litigation. If accepted, the same rationale could be invoked whenever an administration identifies a different nontax enforcement priority and seeks access to IRS-held return information. That prospect threatens the

confidence Congress sought to foster through Section 6103 by replacing stable statutory limits with shifting executive priorities.

*Second*, section 6103(i)(2) does not authorize bulk access to IRS-held address information. Instead, Congress enacted section 6103(i)(5) which imposes additional safeguards such as judicial approval before the disclosure of locator information. The Government's attempt to end-run subsection (i)(5) through subsection (i)(2) would impermissibly render the former superfluous.

*Third*, the Government's interpretation fundamentally changes the advice LITCs must provide by requiring clinics to explain that information furnished to comply with the tax laws may later be used for nontax enforcement purposes. Taxpayers provide identifying, financial, family, and address information to the IRS because federal law requires them to do so. If information compelled for tax administration may be repurposed for unrelated nontax criminal enforcement, taxpayers and the organizations that advise them will need to consider legal questions that have no place in routine tax compliance counseling, including whether later government use of compelled identifying or locator information could implicate Fourth or Fifth Amendment protections.[6]

---

[6] *Amici* raise the constitutional issues not as independent grounds for decision, but to show why Congress made confidentiality the rule and the exceptions narrow.

6

*Fourth*, the injury is neither speculative nor hypothetical: both IRS Chief Risk and Control Officer Dottie A. Romo and a report from the Treasury Inspector General for Tax Administration ("TIGTA") report that the IRS has already shared last-known address information for approximately 47,000 individuals through a disclosure program with documented matching, data-quality, and safeguarding deficiencies.[7]

*Finally*, section 7431's after-the-fact damages cannot restore confidentiality, rebuild taxpayer confidence, or undo the continuing harm people will suffer once IRS-derived information has been disclosed, matched, retained, integrated into enforcement workflows, or used for operational purposes.

## ARGUMENT

I.    Congress Enacted Section 6103 to Protect Taxpayer Confidentiality and Preserve Voluntary Compliance

A.    Confidentiality Is Essential to the Federal Tax System

The federal income tax system depends upon millions of taxpayers voluntarily self-reporting sensitive personal and financial information to the IRS. Taxpayers must reveal their income, assets, liabilities, family relationships, business activities,

---

[7] *See Ctr. for Taxpayer Rts. v. Internal Revenue Service*, No. 25-cv-457 (D.D.C. Feb. 11, 2026), ECF No. 66-1 (Declaration of Dottie A. Romo, Chief Risk and Control Officer, Internal Revenue Service (the "Romo Decl.")); TIGTA, Report No. 2026-IE-R010, *The IRS Provided Addresses for Nearly 47,000 Persons to Immigration and Customs Enforcement* 2–9 (2026), https://www.tigta.gov/sites/default/files/reports/2026-06/2026ier010fr.pdf ("*TIGTA Report*").

and financial transactions—often under penalty of perjury and without any immediate means for the IRS to independently verify the accuracy of disclosure. Congress recognized that our voluntary system could only function effectively if information provided for tax administration would be used only for tax administration or disclosed only in the limited circumstances Congress expressly authorized. The continued success of our federal tax system, therefore, depends on public confidence that taxpayer information will, except as Congress specifically provides, remain confidential.

Courts have long recognized the central role section 6103's confidentiality protections play in supporting our tax system. Section 6103's "assurance of privacy" is "fundamental to a tax system that relies upon self-reporting." *Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 791 F.2d 183, 184 (D.C. Cir. 1986). Section 6103 accordingly regulates disclosure "in minute detail" and imposes civil, criminal, and disciplinary consequences for unauthorized inspection or disclosure. *Lake v. Rubin*, 162 F.3d 113, 115 (D.C. Cir. 1998); 26 U.S.C. §§ 7213, 7213A, 7431.

Congress's decision to enact this confidentiality regime did not arise in a vacuum. Before 1976, disclosure of taxpayer information for nontax purposes was governed by a patchwork of statutes, regulations, executive orders, and administrative practices that afforded the Executive Branch broad access to that information. *See* Tax Reform Act of 1976, Pub. L. No. 94-455, § 1202, 90 Stat.

8

1520, 1667–84 (1976) (codified as amended at 26 U.S.C. § 6103). As the IRS became the federal government's central repository of sensitive taxpayer information sought by other federal agencies, Congress grew concerned that unrestricted executive access threatened public confidence in the federal tax system. Staff of the Joint Comm. on Tax'n, 94th Cong., *General Explanation of the Tax Reform Act of 1976* 313–14 (Comm. Print 1976); S. Rep. No. 94-938 (1976), at 317 (recognizing disclosure for nontax purposes could "seriously impair the effectiveness of our country's very successful voluntary assessment system, which is the mainstay of the Federal tax system").

The Tax Reform Act of 1976, therefore, replaced the patchwork regime with a comprehensive statutory framework beginning with an unequivocal command: "Returns and return information shall be confidential." 26 U.S.C. § 6103(a). Congress defined "return information" to encompass tax returns, a taxpayer's identity, and virtually all information received, recorded, prepared, furnished, or collected by the IRS with respect to a taxpayer's liability under the Code. 26 U.S.C. § 6103(b)(2).

Congress made confidentiality the default rule not merely to protect taxpayer privacy, but to preserve the integrity of federal tax administration. Congress authorized disclosure only where it expressly determined that a competing governmental interest justified disclosure and only under carefully prescribed

9

statutory conditions. *See* S. Rep. No. 94-938, at 318–19. That balance remains the cornerstone for the voluntary compliance upon which our federal tax system depends.

B.      Congress Specifically Created Section 6103 to Prevent Political Misuse

Section 6103's confidentiality rule responded to a systemic concern: taxpayer information should not be available for political or other executive uses outside the limits Congress prescribed. Concerns regarding the political misuse of taxpayer information can be traced at least to the Roosevelt Administration during the 1930s. They came to a head in the Watergate era, when congressional investigations revealed that executive officials had sought to use taxpayer information and IRS enforcement authority against perceived political opponents for reasons unrelated to the administration of the internal revenue laws. *See id.* at 317–18; *see also* H.R. Rep. No. 94-658, at 307–09 (1975); Tax Reform Act of 1976 § 1202. Although Congress acted in response to those historical events, it drew a broader lesson. The risk of misuse was not confined to any one administration or political party but arose whenever executive officials possessed discretion to obtain or use confidential taxpayer information for nontax purposes. *See* S. Rep. No. 94-938, at 317–18.

After reviewing testimony, documentary evidence, and administrative practices, the Joint Committee on Taxation concluded that then-existing safeguards governing taxpayer information and IRS enforcement activity did not adequately

10

protect against actual or perceived political interference.  *See* Staff of the Joint Comm. on Tax'n, 94th Cong., *General Explanation of the Tax Reform Act of 1976* 1–4 (Comm. Print 1976); *see also* Staff of the Joint Comm. on Internal Revenue Tax'n, 93d Cong., *Investigation into Certain Charges of the Use of the Internal Revenue Service for Political Purposes* 1–4 (Comm. Print 1973) (describing congressional investigations into allegations that White House officials sought to use IRS audits and taxpayer information against perceived political opponents). Congress, thus, concluded it had to address a structural problem:  executive officials had discretionary access to taxpayer information without effective statutory limitations.  It enacted section 6103 to replace that problematic discretion with defined boundaries.

Congress addressed the same concern elsewhere in the Code.  Section 7217, for example, restricts certain executive officials from requesting that the IRS conduct or terminate an audit or investigation except in limited defined circumstances.  *See* 26 U.S.C. § 7217(a), (e)(1).  Although section 7217 does not apply here, it reinforces the same statutory prescription that taxpayer information and IRS enforcement decisions are governed by statutory limits, not open-ended executive discretion.

11

II.    The Government's Position Cannot Be Reconciled with Congress's Statutory Design

A.    The Government's Reading of the Statute Would Turn a Targeted Criminal-Investigation Exception into a Bulk Locator Tool

The Government asks this Court to read one of section 6103's narrow disclosure provisions so broadly that it is rendered both incompatible with congressional intent and contrary to the statute as a whole. The Government argues that section 6103(i)(2)'s "shall disclose" language requires the IRS to provide taxpayer identity information, including address information, whenever ICE submits an administrative request for use in a nontax criminal investigation. Gov't Br. at 45–46, 54–59. That framing treats the request as a run-of-the-mill criminal-investigation disclosure. But these requests are extraordinary. ICE wants address information to locate individuals. Congress addressed that use separately in section 6103(i)(5), which permits address disclosure to locate fugitives from justice but only with judicial pre-approval.

Section 6103 starts with confidentiality. 26 U.S.C. § 6103(a) ("Returns and return information shall be confidential."). Against that, Congress enacted limited exceptions for specific purposes. As relevant here, section 6103(i)(2) permits disclosure of certain return information—but not locator information—for use in nontax criminal investigations when the requesting agency satisfies Congress's prescribed conditions. In contrast, section 6103(i)(5) specifically addresses

12

disclosure of returns and return information for a locator purpose and requires a court order. 26 U.S.C. § 6103(i)(5).

The Government's position ignores these distinct exceptions. If section 6103(i)(2) permits administrative requests for IRS-held address information whenever an agency seeks to locate individuals in connection with a nontax criminal investigation, then the judicial process Congress requires in section 6103(i)(5) becomes avoidable merely by invoking section 6103(i)(2) instead. Section 6103 is not structured this way. Section 6103(i)(2) is a targeted criminal-investigation exception. Section 6103(i)(5) is the locator provision. The Government's reading would convert the former into the latter and render congressionally enacted language superfluous, contrary to basic rules of statutory interpretation. *See Republic of Sudan v. Harrison*, 587 U.S. 1, 12 (2019).

### B.    Section 6103(i)(2) Is Not a Bulk Locator Provision

Section 6103(i)(2) is narrow by design. Congress tied disclosure to a particular nontax criminal matter and to specific statutory showings. Disclosure is permitted only to officers and employees personally and directly engaged in the specified proceeding, investigation, or grand jury matter, and only for use in that matter. 26 U.S.C. § 6103(i)(2)(A). The written request must also set forth the taxpayer's name and address, the taxable periods to which the investigation relates, the statutory authority for the investigation or proceeding, and "the specific reason

or reasons why such disclosure is, or may be, relevant to such proceeding or investigation." 26 U.S.C. § 6103(i)(2)(B).

Those conditions make the confidentiality assurances *Amici* rely on when advising taxpayers meaningful. They also show why the Government's reliance on "shall disclose" is misplaced. Gov't Br. at 41–44. The duty to disclose arises only after the requesting agency satisfies the Code's prerequisites. Before the IRS may disclose return information under section 6103(i)(2), the requesting agency must submit a written request that sets forth, among other things, "the name and address of the taxpayer with respect to whom the requested return information relates." 26 U.S.C. § 6103(i)(2)(B)(i). Thus, a taxpayer's address is not the information the request is designed to obtain. Even the IRS's own guidance makes this point, providing that "[r]equests for addresses only are invalid because [section] 6103(i)(2) requires that the requester provide an address." Internal Revenue Manual 11.3.28.4(5) (Apr. 17, 2025). The statute simply does not authorize an agency to use section 6103(i)(2) to obtain IRS-held address information for a locator purpose.

Public materials concerning the August 2025 IRS-ICE disclosure illustrate why section 6103(i)(2)(B)(i)'s address requirement has limiting force. ICE's request included a datafile with an address field for each person for whom ICE sought IRS-held address information. Romo Decl. ¶¶ 4–6. The IRS treated that address field as sufficient if it was not blank and included a five-digit, nine-digit, or five-digit-plus-

14

four number used as a proxy for a ZIP Code. *Id.* ¶ 6. The IRS later determined that it had provided last-known addresses to ICE even where the ICE-provided address field was incomplete or insufficiently populated, including entries using terms such as "Failed to Provide," "Unknown Address," or "NA NA," and entries identifying jails, detention facilities, or prisons without street names or street numbers. *Id.* ¶¶ 13–16. TIGTA likewise found that not all invalid addresses were rejected and identified ICE-submitted address fields such as "NO ADDRESS PROVIDED," "NA NA," "CORRECTIONAL FACILITY," and "FAILED TO PROVIDE." *TIGTA Report* at 6. If entries like those can satisfy the statutory requirement for "the name and address of the taxpayer," then the address requirement ceases to operate as a prerequisite to disclosure.

Section 6103(i)(2) requires more than a showing that address information would be useful to an investigation. The written request must identify the statutory authority for the proceeding or investigation and provide "the specific reason or reasons why" the requested disclosure "is, or may be, relevant" to that proceeding or investigation. 26 U.S.C. § 6103(i)(2)(B)(iii)–(iv). Those requirements tie disclosure to the designated matter; they do not authorize general access to IRS-held addresses for locator use.

Section 6103(i)(2) further limits both the recipients and use of disclosed information. It does not permit disclosure to an agency as an institution. Rather, it

15

permits disclosure only to officers and employees personally and directly engaged in the identified proceeding, investigation, or grand jury matter, and solely for use in that matter. 26 U.S.C. § 6103(i)(2)(A). Those conditions are inconsistent with treating IRS-held address information as available for bulk transfer, matching, retention, or operational use any time the requesting agency invokes "shall disclose."

C.    Section 6103(i)(5) Requires Judicial Approval

Section 6103(i)(5) confirms that Congress was intentional when it restricted disclosure of locator information. That provision permits disclosure to locate "fugitives from justice," but only "pursuant to and upon the grant of an ex parte order" by a federal judge. 26 U.S.C. § 6103(i)(5)(A). To authorize disclosure, the court must find, among other things, that a federal arrest warrant has been issued for the individual, that the information is sought exclusively to locate that individual, and that there is reasonable cause to believe the information may be relevant to determining the individual's location. 26 U.S.C. § 6103(i)(5)(B).

The Government's construction of section 6103(i)(2) cannot be reconciled with that statutory framework. It would allow executive agencies to obtain IRS-held address information for locator purposes through an administrative request, even though, in section 6103(i)(5), Congress authorized locator disclosures only by court order based on specific predicates. And "where Congress includes particular language in one section of a statute but omits it in another section of the same Act,

16

it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). The inclusion of express locator disclosures in section 6103(i)(5) and its omission from section 6103(i)(2) must be given effect. Had Congress intended section 6103(i)(2) to authorize administrative requests for IRS-held address information to locate individuals in nontax enforcement efforts, it knew how to say so but it did not.[8]

The Government's reading likewise violates the settled principle that statutes should be construed so that every provision has independent meaning, and none is rendered superfluous. *See Corley v. United States*, 556 U.S. 303, 314 (2009). If section 6103(i)(2) authorizes agencies to obtain IRS-held address information through administrative requests for locator purposes, section 6103(i)(5)'s judicial protections and predicate findings would serve no purpose. Courts should avoid

---

[8] Section 6103(i)'s history confirms that Congress intended to treat locator disclosures differently from administrative requests. In 1982, Congress amended section 6103(i) to establish the present administrative-request framework under section 6103(i)(2), while requiring an *ex parte* court order for locator disclosures under section 6103(i)(5). Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 356(a), 96 Stat. 324, 641–45 (1982). Congress thus intentionally excluded locator disclosures from the administrative-request process. That distinction accords with Fourth Amendment decisions recognizing privacy concerns when the government tracks a person's location. *See Carpenter v. United States*, 585 U.S. 296, 309–10, 316 (2018); *United States v. Jones*, 565 U.S. 400, 412–13 (2012).

17

constructions that render one statutory safeguard superfluous by allowing another provision to accomplish the same result through less demanding procedures.

Reading sections 6103(i)(2) and 6103(i)(5) together gives independent effect to both provisions and preserves the comprehensive confidentiality framework Congress enacted. Section 6103(i)(2) governs limited disclosures in connection with specifically identified nontax criminal investigations and only after the requesting agency satisfies Congress's detailed procedural requirements. Section 6103(i)(5), by contrast, governs disclosures sought for locator purposes and requires prior judicial approval based on three statutory criteria before return information may be disclosed, confirming that Congress did not leave locator disclosure to executive discretion. That reading respects Congress's carefully crafted balance between legitimate law-enforcement interests and taxpayer confidentiality, gives effect to every subsection of section 6103, and preserves the statutory safeguards upon which taxpayer confidence and voluntary compliance depend.

The Government's reliance on *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026), to support its statutory argument is misplaced. *Centro* does not hold that every request under the MOU is valid merely because section 6103(i)(2) does not categorically prohibit disclosure of taxpayer address information when the requesting agency satisfies the statute's prerequisites. Nor did *Centro* decide the implementation and use questions presented here: whether ICE's request

18

satisfies section 6103(i)(2); whether the IRS's August 2025 disclosure complies with section 6103; and whether ICE's later handling, proposed integration, safeguarding, and use of IRS-derived return information complies with section 6103(i)(2) and (p)(4). Moreover, reading *Centro* to support the Government's position is contrary to the statute and its specific protections for locator information.

D.    <u>The Government's Position Is Undermining Taxpayer Confidence and Voluntary Compliance</u>

The institutional concerns that prompted Congress to enact section 6103 are no longer historical or hypothetical. The IRS has already disclosed last-known address information to ICE for approximately 47,000 individuals and public materials later identified matching, address-validation, and data-quality concerns with that disclosure. *See* Romo Decl. ¶¶ 11–19; *TIGTA Report* at 3–7. As a result, *Amici* must now advise taxpayers in a world where IRS-held address information has been disclosed to ICE and where the Government defends its authority to require similar disclosures under section 6103(i)(2).

Economic analysis also illustrates the broader consequences of diminished taxpayer confidence. The Yale Budget Lab estimates that concerns regarding disclosure of taxpayer information could reduce federal income and payroll tax revenue by $25 billion in 2026 and approximately $313 billion from 2026 through

2035.[9]    Those losses illustrate why Congress made confidentiality the rule. Diminished taxpayer confidence reduces voluntary compliance, increases administrative burdens, and weakens the federal tax system.[10]   The district court's injunction preserves the statutory balance Congress enacted by ensuring that taxpayer information may not be disclosed unless the Government satisfies the conditions prescribed by Congress.

III.    The Government's Position Creates Harmful Consequences for the *Amici* and the Low-Income Taxpayers They Serve

The Government argues that section 6103(i)(2) requires the IRS to disclose taxpayer addresses whenever a federal law-enforcement agency submits an administrative request that, in the Government's view, satisfies section 6103(i)(2). Gov't Br. at 41–59.  It treats IRS-held addresses as disclosable taxpayer identity information and places any remedy for unlawful disclosure in an after-the-fact damages action under section 7431.  Gov't Br. at 46–66.

---

[9] *See* The Budget Lab at Yale, *The Potential Impact of IRS-ICE Data Sharing on Tax Compliance* 1–3 (Apr. 8, 2025), https://budgetlab.yale.edu/node/470/pdf.

[10] *See* Lauren Loricchio, *Funding Freeze Creates Uncertainty for Taxpayer Clinics*, 186 TAX NOTES Fed. 1325, 1326 (2025); Miriam Jordan & Andrew Duehren, *Immigrants Are Scared to File Taxes.  It Could Cost the U.S. Billions*, N.Y. TIMES (Apr. 14, 2026), https://www.nytimes.com/2026/04/14/us/undocumented-immigrants-ice-tax-returns-irs.html; Kris Cox, *IRS-ICE Agreement Weakening Privacy Protections Poses Risks for All Taxpayers*, Ctr. on Budget & Pol'y Priorities (Apr. 21, 2025), https://www.cbpp.org/blog/irs-ice-agreement-weakening-privacy-protections-poses-risks-for-all-taxpayers.

20

That position turns ordinary tax compliance into a nontax enforcement-risk decision for all taxpayers.  That risk, however, falls most heavily on low-income taxpayers, who often depend upon community-based tax assistance to comply with their federal tax obligations and secure whatever refundable credits Congress has authorized to help lift them out of poverty.  That position also changes the advice LITCs and other community tax-assistance organizations must provide, requiring them to counsel taxpayers not only on how to comply with the Code, but also on the Government's asserted authority to use information furnished to the IRS for nontax enforcement purposes.  Clinics must address the practical consequence that some taxpayers, after learning of the Government's position, may delay filing current or delinquent returns, hesitate to update addresses, or avoid responding to IRS communications.

A.    The Government's Reading Adversely Impacts *Amici's* Compliance Counseling Duties and Increases the Likelihood that Vulnerable Taxpayers Will Not Receive Critical Services

*Amici* are part of the tax system's compliance infrastructure.  For example, the mission of the LITC program is to ensure the fairness and integrity of the tax system for low-income and English-as-a-second-language taxpayers by providing representation, education, and advocacy.  *See* Nat'l Taxpayer Advoc., *Low Income Taxpayer Clinics Program Report 2025* 1 (2026) ("*2025 LITC Program Report*"). In 2024, LITCs represented 21,180 taxpayers, advised 18,546 taxpayers, conducted

21

20,517 educational activities for 161,812 attendees, reduced or corrected more than $53 million in liabilities, and secured more than $10 million in refunds. *Id.* at 6.

LITC work depends on taxpayers' willingness to provide complete and current information to the IRS. People seeking assistance from LITCs and similar programs often face financial, language, and educational barriers in navigating the tax system. *Id.* at 7, 18. To comply with tax filing and payment obligations, those taxpayers often need reliable advice about IRS notices, refundable-credit eligibility, recordkeeping, collection options, Tax Court procedure, and available relief. *Id.* at 12–18. Clinics and similar programs meet that need by providing Taxpayer Compliance Services, which depend on the confidentiality rule Congress established in section 6103(a) and the "right to confidentiality" recognized in section 7803(a)(3)(H). *See* 26 U.S.C. §§ 6103(a), 7803(a)(3)(H).

The Government's position fundamentally changes that counseling. *Amici* will still advise taxpayers to comply with the tax laws, but they must now also explain that the Government claims authority to disclose IRS-held information to nontax enforcement agencies through section 6103(i)(2). That claimed authority must be addressed when *Amici* advise taxpayers about providing information to the IRS. What otherwise would be tax compliance counseling becomes counseling about both tax consequences and possible nontax enforcement consequences. That added counseling burden matters because section 6103 was designed to give

22

taxpayers and their advisors a stable confidentiality rule.  Taxpayers should be able to provide information without requiring their advisors to assess whether that same information may later be used for nontax enforcement.

Those risks are especially serious where family members share an address but have different filing, identification, or immigration circumstances (*e.g.*, where one household member files with a Social Security number, another uses an ITIN, and children are claimed for refundable credits).  IRS materials have long told taxpayers that ITINs are intended for tax use only and create no inference about immigration status or work authorization.  Taxpayer Identifying Numbers (TIN), 60 Fed. Reg. 30211, 30213 (proposed June 8, 1995) (to be codified at 26 C.F.R. pt. 301).  *Amici* rely on that tax-use-only premise when counseling their taxpayer clients.  The Government's position weakens that premise by treating IRS-held information supplied for tax compliance as readily available for nontax enforcement through section 6103(i)(2).

The consequences for low-income taxpayers are substantial.  Refunds and refundable credits often support rent, utilities, medical expenses, childcare, and other household necessities, and tax refunds are a critical source of income for many low-income households.  Earned income credit and child tax credit disputes likewise can have severe financial consequences for families.  *See 2025 LITC Program Report* at 14.  A rule that makes IRS-held information available for nontax enforcement can

23

affect whether taxpayers seek Taxpayer Compliance Services—the very assistance LITCs, VITA sites, and other community tax-assistance programs exist to provide.

Reduced taxpayer participation can also affect the stability of those programs, where funding often depends on projected and actual service levels. If taxpayers avoid filing assistance, ITIN counseling, or other Taxpayer Compliance Services because they fear disclosure of IRS-held information, those programs may serve fewer taxpayers than projected, undermining future grant applications and year-end reports, reducing available staffing, and leaving fewer resources for the low-income taxpayers who most need assistance.

B.    Actual Disclosures Confirm That the Risk of Harm Is Not Theoretical

The Government argues that plaintiffs' alleged harms are speculative and self-inflicted, including the asserted chilling effect and erosion of trust between plaintiffs and their members. Gov't Br. at 60–66.[11] But those arguments do not answer the harmful consequences for *Amici* that are evident from the Government's own publicly available materials.

---

[11] In an unpublished order in *California v. Trump*, this Court rejected a similar prematurity argument that injuries were speculative because implementation remained ongoing and the plaintiffs' responses were voluntary. Nos. 26-1774, 26-1779, Order at 7–14 (1st Cir. July 25, 2026). The same reasoning applies here: IRS address disclosures already occurred, the Government defends similar section 6103(i)(2) disclosures, and affected taxpayers and their advisors must account for that risk in tax-compliance decisions now.

24

After ICE requested last-known address information for approximately 1.28 million individuals, the IRS disclosed return information in the form of last-known addresses for 47,289 individuals, or 3.7% of the requests.  Romo Decl. ¶¶ 4, 10.  ICE then used IRS-derived information to identify updated addresses.  *Id.* ¶¶ 8–10; *TIGTA Report* at 2–3.  The IRS later determined that it had provided last-known addresses to ICE in instances in which ICE's address field was incomplete or insufficiently populated.  Romo Decl. ¶¶ 11–16.  TIGTA likewise found that the IRS's automated criteria were unable to identify and match ICE records accurately and consistently, that not all invalid addresses were rejected, and that inconsistent formatting in ICE data affected the matching process. *TIGTA Report* at 3–7.

Those disclosures now shape *Amici*'s counseling.  Filing a current or delinquent return, claiming a refundable credit, updating an address, or responding to an IRS notice may place current household address information in IRS systems.  If the Government's reading is accepted, clinics must counsel taxpayers that those same compliance steps may increase the risk that IRS-held address information will be disclosed and used outside the tax system.

Taxpayers therefore face the very dilemma Congress sought to avoid: withhold information and risk tax-enforcement consequences or provide information and risk nontax enforcement consequences as the result of an overbroad and flawed information-sharing system that respects neither the careful disclosure scheme

25

Congress enacted nor the importance of confidentiality to a tax system grounded in self-reporting.　Section 6103 addresses that dilemma by making taxpayer confidentiality the rule and disclosure the carefully circumscribed exception.　For *Amici*, that confidentiality rule is what allows clinics to advise taxpayers to file returns, update addresses, claim credits, and respond to IRS notices without turning each act of tax compliance into a separate assessment of nontax enforcement risk.

> C.　The Government's Position, if Accepted, Would Not Be Limited to ICE or Immigration Enforcement, but Rather Would Open the Door to Widespread Disclosure of Sensitive Information, Contrary to Congress's Mandate

*Amici* take no position on immigration policy because it is irrelevant to whether the district court's injunction should be upheld.　Their concern is that the statutory limits that allow *Amici* to counsel low-income taxpayers in a way that supports their clients' voluntary compliance are being weakened.　But this risk is not limited to low-income taxpayers.　Section 6103(i)(2) applies to nontax criminal investigations generally, and the Government's reading would expand access to IRS return information far beyond the circumstances Congress authorized.　If successful, the change the Government seeks would apply beyond ICE, beyond immigration enforcement, and beyond the specific disclosure program at issue here.　Other agencies could invoke the same broad right to access IRS information under other nontax criminal statutes for nontax enforcement priorities.

26

The tax system depends on stable, predictable statutory confidentiality protections that taxpayers can rely on when providing, for example, accurate address information. The district court's injunction preserves the balance Congress struck—and, with it, taxpayer confidence and voluntary compliance—by enforcing statutory limits on disclosure in the face of shifting nontax priorities and rejecting broader executive discretion that extends beyond the statute.

IV.    <u>Prospective Relief Is Necessary Because Damages Under Section 7431 Cannot Restore Confidentiality or Repair the Harm from Disclosure and Use</u>

The Government also argues that section 7431 provides the exclusive remedy for alleged violations of section 6103 and that the availability of damages weighs against prospective relief. Gov't Br. at 41–44, 63–66. That argument treats confidentiality as something that can be repaired after disclosure. Congress adopted section 6103 to prevent unauthorized disclosure in the first place. For taxpayers and *Amici*, a damages action after the fact is no substitute for preserving the statutory limits before IRS-held information is disclosed, retained, queried, or used. That distinction is especially important here because the district court's order addresses not only future IRS disclosures, but also ICE's use, retention, and reliance on IRS-derived return information already received.

Moreover, TIGTA reported that unresolved safeguard findings from a November 2023 review remained open when the data transfer occurred, that ICE had not filed semiannual corrective-action plans due in January 2024, July 2024, and

January 2025, and that ICE's July 2025 corrective-action plan did not provide implementation dates for completion. *TIGTA Report* at 8–9. Those findings matter because section 6103's protections do not end when return information leaves the IRS. *See* 26 U.S.C. § 6103(p)(4). Once return information has been disclosed, a damages action cannot ensure that the receiving agency restricts access, maintains safeguards, prevents redisclosure, or disposes of the information when the authorized use ends. Indeed, this Court has recognized in the privacy context that exposure of confidential information and the risk of future misuse can present injury. *See Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 375–78 (1st Cir. 2023). A post-disclosure damages action cannot retrieve confidential information, prevent reliance on it by the requesting agency, undo redisclosure, ensure remediation or disposal of affected data, or restore taxpayer confidence in the statutory limits Congress enacted.

Romo's declaration illustrates the point. After the IRS identified that it had supplied last-known addresses in response to incomplete or insufficient ICE-provided address information, Treasury notified DHS and requested remediation, including steps to prevent further disclosure or dissemination and to ensure appropriate disposal of affected data. Romo Decl. ¶ 18. Implicitly recognizing that prospective relief matters and monetary compensation is inadequate, DHS and ICE then confirmed that, pending the injunction, they would not inspect, view, use, copy,

28

distribute, rely on, or otherwise act on return information obtained from or disclosed by the IRS under the MOU. *Id.* ¶ 19. Injunctive relief prevents use, reliance, redistribution, and further operational consequences before confidentiality is irretrievably lost.

Moreover, for many taxpayers, an action under section 7431 is an unrealistic remedy. A taxpayer may not know that IRS-held information was disclosed or later relied upon. Even if the taxpayer learns of the disclosure, bringing a federal damages action requires time, resources, counsel or the ability to proceed without counsel, and the practical ability to litigate while addressing any tax or nontax consequences that may have followed the disclosure. Those burdens are especially significant for the taxpayers *Amici* serve. For a taxpayer facing detention, removal, family separation, loss of work, or other immediate nontax consequences, statutory or nominal damages do not prevent the harm caused by use of the disclosed information. For a taxpayer who has been removed from the United States, pursuing an action under section 7431 may be doubtful. Damages therefore cannot provide the same confidence in the tax system as enforcing section 6103's confidentiality rule before disclosure occurs. Nor is the harm necessarily confined to the taxpayer whose return information is disclosed. Address information can identify family members, dependents, roommates, and others who share the same household but did not make the filing decision.

29

Prospective relief is necessary to preserve the statutory confidentiality rule before protected information is disclosed or used. It does not expand section 6103. It enforces Congressional limits before IRS-derived information is retained, queried, redisclosed, relied upon, or used by the receiving agency outside those limits.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court. Doing so preserves the statutory framework, maintains public confidence indispensable to the voluntary-compliance system, and ensures that access to taxpayer information remains governed by the limits Congress enacted rather than open-ended executive discretion. At minimum, any modification of that order should preserve Congress's confidentiality protections and ensure that IRS-derived returns and return information cannot be retained, queried, used, redisclosed, relied upon, or otherwise acted upon absent strict compliance with section 6103.

*[Remainder of Page Intentionally Blank]*

Dated:  August 3, 2026

Respectfully submitted,

*/s/ Andrew M. Troop*

Andrew M. Troop (Bar No. 108508)
Pillsbury Winthrop Shaw Pittman LLP
10 Post Office Square, 8th Floor
Boston, MA 02109
Tel:  (857) 323-5400
andrew.troop@pillsburylaw.com

Lawrence A. Sannicandro (Bar No. 1225393)
Darianne De Leon (Bar No. 1225407)
Pillsbury  Winthrop  Shaw  Pittman  LLP
31 West 52nd Street, 28th Floor
New York, NY 10019
Tel: (212) 858-1377

Reed C. Trechter (Bar No. 1225399)
Pillsbury Winthrop Shaw Pittman LLP
609 Main Street, Suite 2000
Houston, TX 77002
Tel: (713) 276-7628

*/s/ Frank J. Bailey*

Hon. Frank J. Bailey (Ret.) (Bar No. 12716)
Gabriela Forero (Bar No. 1223159)
Paul Johnson (Bar No. 46931)
Pioneer New England Legal Foundation
185 Devonshire Street, 11th Floor
Boston, MA 02110
Tel: (617) 819-1010

*Counsel for Amici Curiae*

31

**CERTIFICATE OF COMPLIANCE**

It is hereby certified that:

1.      This brief complies with the type-volume limitation of FED. R. APP. P. 29(a)(5) because this brief contains 6,488 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

2.      This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using the Microsoft Word processing program in 14-point font size and Times New Roman style.

Dated:  August 3, 2026

      s/ Andrew M. Troop
Andrew M. Troop (Bar No. 108508)
*Counsel for Amici Curiae*
Pillsbury Winthrop Shaw Pittman LLP
10 Post Office Square, 8th Floor
Boston, MA 02109
Tel:  (857) 323-5400
andrew.troop@pillsburylaw.com

# CERTIFICATE OF SERVICE

It is hereby certified that on August 3, 2026, I electronically filed the foregoing

Brief of Tax Clinics and Legal Services Organizations as *Amici Curiae* in Support

of Plaintiffs-Appellees and Affirmance with the Clerk of the Court for the United

States Court of Appeals for the First Circuit using the CM/ECF system.  Counsel for

Appellants and Appellees are registered CM/ECF users and will be served by the

CM/ECF system.

Dated:  August 3, 2026

     s/ Andrew M. Troop
Andrew M. Troop (Bar No. 108508)
*Counsel for Amici Curiae*
Pillsbury Winthrop Shaw Pittman LLP
10 Post Office Square, 8th Floor
Boston, MA 02109
Tel:  (857) 323-5400
andrew.troop@pillsburylaw.com