No. 26-1329

# United States Court of Appeals
## for the First Circuit

COMMUNITY ECONOMIC DEVELOPMENT CENTER OF SOUTHEASTERN MASSACHUSETTS; NATIONAL PARENTS UNION; NATIONAL KOREAN AMERICAN SERVICE & EDUCATION CONSORTIUM; UNDOCUBLACK NETWORK INC.,

*Plaintiffs – Appellees,*

v.

SCOTT BESSENT, Acting Commissioner of the Internal Revenue Service and Secretary of the Treasury; SOCIAL SECURITY ADMINISTRATION; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MARKWAYNE MULLIN, Secretary of Homeland Security; INTERNAL REVENUE SERVICE; DAVID J. VENTURELLA, Acting Director of U.S. Immigration and Customs Enforcement; FRANK J. BISIGNANO, Commissioner of the Social Security Administration; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. DEPARTMENT OF THE TREASURY,

*Defendants – Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

**BRIEF SUPPORTING AFFIRMANCE FOR *AMICUS CURIAE* CAMBRIDGE CENTER FOR JUSTICE IN SUPPORT OF COMMUNITY ECONOMIC DEVELOPMENT CENTER OF SOUTHEASTERN MASSACHUSETTS, ET AL.**

Andrés Correa
Lynn Pinker Hurst & Schwegmann
2100 Ross Ave. Suite 2700
Dallas, Texas 75201
214-292-3630
acorrea@lynnllp.com
*Counsel for Amicus Curiae*

## DISCLOSURE STATEMENT

No. 26-1329, *Cmty. Econ. Dev. Ctr. for Se. Mass. v. Bessent*

Pursuant to Federal Rules of Appellate Procedure 29(a)(4)(A) and 26.1, *amicus curiae* Cambridge Center for Justice certifies that it is a non-profit, non-stock corporation that has no parent corporation, and that no publicly traded corporation has an ownership interest in it of any kind.

*/s/ Andrés Correa*
ANDRÉS CORREA
Counsel for *Amicus Curiae*
Cambridge Center for Justice

AUGUST 3, 2026

## TABLE OF CONTENTS


Disclosure Statement ........ ii

Table of Authorities ........ iv

Interest of *Amicus Curiae* ........ vii

Summary of Argument ........ 1

Argument ........ 4

I. The Government's Reading Of § 6103(i)(2) Would Fashion Compelled Tax Filings Into Evidence Against Filers, Forcing A Question The Supreme Court Has Repeatedly Reserved ........ 4

A. For the Targeted Class, Filing a Tax Return Is a Compelled, Testimonial Communication, so the Privilege Hinges On Hazard of Incrimination. ........ 4

B. The Government's Construction of § 6103 Makes the Targeted Class's Hazard of Incrimination Real and Appreciable. ........ 7

C. The Compelled-Reporting Cases Expressly Reserve the Question Forced by the Government's Reading. ........ 16

II. This Court Should Not Open That Question When The Statute's Own Words Close It ........ 23

A. The Avoidance Canon Requires the District Court's Reading of the Statute. ........ 24

B. The Government's Construction Condemns Itself, While the District Court's Reading Leaves Legitimate Enforcement Whole. ........ 25

Conclusion ........ 28

Certificate of Compliance ........ 30

Certificate of Service ........ 31

## TABLE OF AUTHORITIES

### Cases

*Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70 (1965) .......... 17, 19, 20, 21

*Baltimore City Department of Social Services v. Bouknight* 493 U.S. 549 (1990) .......... 18

*Brown v. Walker*, 161 U.S. 591 (1896) .......... 1

*California v. Byers*, 402 U.S. 424 (1971) .......... 8, 9, 10, 21

*Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026) .......... 14, 25

*Chavez v. Martinez*, 538 U.S. 760 (2003) .......... 15

*Church of Scientology of Cal. v. IRS*, 484 U.S. 9 (1987) .......... 11

*Clark v. Martinez*, 543 U.S. 371 (2005) .......... 23, 24

*Doe v. United States*, 487 U.S. 201 (1988) .......... 6

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988) .......... 24

*Garner v. United States*, 424 U.S. 648 (1976) .......... passim

*Grosso v. United States*, 390 U.S. 62 (1968) .......... 7, 17

*Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cnty.*, 542 U.S. 177 (2004) .......... 5, 18, 19

*Hoffman v. United States*, 341 U.S. 479 (1951) .......... 7, 12

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) .......... 24

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991) .......... 25

*Maffie v. United States*, 209 F.2d 225 (1st Cir. 1954) .......... 4

*Malloy v. Hogan*, 378 U.S. 1 (1964) .......... 12

*Marchetti v. United States*, 390 U.S. 39 (1968) .......... passim

*Miranda v. Arizona*, 384 U.S. 436 (1966) .......... 1

*Murphy v. Waterfront Comm'n*, 378 U.S. 52 (1964) .......... 1

*Pennsylvania v. Muniz*, 496 U.S. 582 (1990) .......... 26

*Plyler v. Doe*, 457 U.S. 202 (1982) .......... 4

*Ullmann v. United States*, 350 U.S. 422 (1956) .......... 1, 4

*United States v. Balsys*, 524 U.S. 666 (1998) .......... 4

*United States v. Hubbell*, 530 U.S. 27 (2000) .......... 7

*United States v. Sahadi*, 555 F.2d 23 (2d Cir. 1977) .......... 11

*United States v. Sullivan*, 274 U.S. 259 (1927) .......... passim

*Zadvydas v. Davis*, 533 U.S. 678 (2001) .......... 24

**Other Authorities**

26 C.F.R. § 301.6109-1(d)(3) .......... 6

26 C.F.R. § 301.6212-2(a) .......... 14

26 U.S.C. § 4424(c) .......... 10

26 U.S.C. § 6012(a)(1) .......... 5

26 U.S.C. § 6103 .......... 23, 28

26 U.S.C. § 6103(b)(2) .......... 8

26 U.S.C. § 6103(b)(3) .......... 8

26 U.S.C. § 6103(b)(6) .......... 8

26 U.S.C. § 6103(i)(2) .......... passim

26 U.S.C. § 6103(i)(2)(A) ........ 8, 10

26 U.S.C. § 6103(i)(2)(A), (B)(iv) ........ 25

26 U.S.C. § 6103(i)(2)(C) ........ 8

26 U.S.C. § 6103(i)(3)(A)(i) ........ 8

26 U.S.C. § 6103(i)(7)(A)(i) ........ 8

26 U.S.C. § 7203 ........ 2, 5, 26

26 U.S.C. § 7206(1) ........ 2, 26

424 U.S. at 660 ........ 18

424 U.S. at 665 ........ 17

542 U.S. at 189 ........ 18

8 U.S.C. § 1253(a)(1) ........ 11, 20

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus* Cambridge Center for Justice is a Massachusetts incorporated 501(c)(3) nonprofit organization whose mission is to advance constitutional justice by defending civil liberties, opposing abusive government policies, protecting immigrants, and promoting expanded access to education.

Because this case concerns the rights of immigrants—and in particular, their rights under the Fifth Amendment—it involves the heart of *amicus*'s work. Further, *amicus*'s argument in this brief supplies a constitutional consideration bearing directly on the statutory question presented, which offers this Court a path to resolution should the parties' textual arguments leave room for ambiguity.

[1] This brief was not authored in whole or part by counsel for a party, and no one other than *amicus curiae* or their counsel made a monetary contribution to the preparation or submission of the brief. Counsel for respondents and counsel for the government consent to its filing.

## SUMMARY OF ARGUMENT

In the English Court of Star Chamber, defendants could be forced to swear an oath binding them to answer truthfully to the court's questions about their alleged offenses. *See Miranda v. Arizona*, 384 U.S. 436, 458–59 (1966) (recounting the Star Chamber Oath trial of John Lilburn); *Brown v. Walker*, 161 U.S. 591, 596–97 (1896). The framers' antipathy for this "cruel trilemma of self-accusation, perjury or contempt," *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 55 (1964), led them to enshrine the privilege against self-incrimination in our Bill of Rights. *See Ullmann v. United States*, 350 U.S. 422, 428 (1956) (the privilege "was aimed at a more far-reaching evil—a recurrence of the Inquisition and the Star Chamber").

Apprehension is thus warranted today, when the government's interpretation of 26 U.S.C. § 6103(i)(2), in conjunction with the IRS-ICE criminal investigation partnership, threatens to subject an entire class of filers—undocumented immigrants under final orders of removal—to a version of that same trilemma. By the government's reading, these filers, whose names the government has specifically listed for criminal investigation, would face an untenable choice each Tax Day: A truthful

tax return hands ICE incriminating evidence of the filer's unlawful presence; a materially false one is a crime, 26 U.S.C. § 7206(1); and willful silence invites prosecution for the failure to file itself, *id.* § 7203.

Accordingly, *amicus* writes to warn that the government's interpretation opens the door to a serious Fifth Amendment question that the Supreme Court has repeatedly reserved without answering. *Amicus* explains that the Supreme Court has held a tax return to be compelled and testimonial, so whether the privilege against self-incrimination attaches turns on the filer's hazard of incrimination. Section 6103(i)(2)'s letter-request pathway—the statutory footing for the IRS-ICE scheme at issue today—normally works in three ways to keep most filers' hazard of incrimination low: *First*, the pathway withholds information the taxpayer was compelled to submit, with the exception of only her ordinarily innocuous name and address; *second*, the privilege may be claimed on the return itself, line by line, so disclosures with no claim of privilege are volunteered ones; and *third*, requests must be particularized and predicated, increasing the burden to criminal investigators.

For undocumented immigrants under final orders of removal, the first two conditions fall at the outset: Their names and addresses are the incriminating facts, which also makes rendering a line-item privilege claim impracticable. The third condition, then, carries outsized constitutional weight for these filers. But the government's construction of § 6103 topples it by converting the letter-request path into a wholesale conveyance running from the nation's tax collector to the agency investigating the filers on its list. Whether the Fifth Amendment can tolerate the collapse of *all three* conditions is a question the Supreme Court has left open at every turn, making it one this Court should avoid.

The avoidance canon thus requires this Court to interpret "personally and directly engaged in," "solely for," and "the specific reason or reasons" in § 6103 as the district court read them. That reading accords with those terms' ordinary meaning; preserves every genuinely individualized criminal request Congress authorized; ensures undocumented immigrants under final orders of removal can file required tax returns with all required disclosures; and avoids compelled incriminating testimony that the Fifth Amendment forbids.

## ARGUMENT

### I. The Government's Reading Of § 6103(i)(2) Would Fashion Compelled Tax Filings Into Evidence Against Filers, Forcing A Question The Supreme Court Has Repeatedly Reserved

#### A. For the Targeted Class, Filing a Tax Return Is a Compelled, Testimonial Communication, so the Privilege Hinges On Hazard of Incrimination.

The Fifth Amendment requires that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. As Chief Judge Magruder wrote for this Court, in words the Supreme Court later adopted, the framers' inclusion of the privilege reflected a judgment they "expressed . . . in our fundamental law, that it were better for an occasional crime to go unpunished than that the prosecution should be free to build up a criminal case, in whole or in part, with the assistance of enforced disclosures by the accused." *Maffie v. United States*, 209 F.2d 225, 227 (1st Cir. 1954) (Magruder, C.J.), *quoted in Ullmann v. United States*, 350 U.S. 422, 427 (1956). This protection belongs to every "person"—citizens, noncitizens, and those unlawfully present alike. *Plyler v. Doe*, 457 U.S. 202, 210 (1982); *United States v. Balsys*, 524 U.S. 666, 671 (1998). And the doctrine adjudging valid exercises of the privilege is compact: To qualify, an individual's

communication must be "testimonial, incriminating, and compelled." *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cnty.*, 542 U.S. 177, 189 (2004).

The communications at issue here are of a specific kind: tax returns filed by undocumented immigrants under final orders of removal whose names the government has submitted to the IRS as subjects of criminal investigation (the "targeted class"). Because such returns are compelled and testimonial, the operative question is the magnitude of these filers' hazard of incrimination when filing. *See Marchetti v. United States*, 390 U.S. 39, 53 (1968) ("The central standard for the privilege's application has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination.").

1. The compulsion element for tax returns is statutory. With limited exceptions, every person who receives income must file a tax return, 26 U.S.C. § 6012(a)(1), and willful failure constitutes a crime, *id.* § 7203. Indeed, "[I]t cannot fairly be said that taxpayers are 'volunteers' when they file their tax returns. The Government *compels* the filing of a return . . . ." *Garner v. United States*, 424 U.S. 648, 652 (1976) (footnote omitted and emphasis added). Those not lawfully present maintain the same

burden: The ITIN regime exists so that those ineligible for Social Security numbers can comply with the duty to file. 26 C.F.R. § 301.6109-1(d)(3).

2. The testimonial element is met for two reasons. First, "The information revealed in the preparation and filing of an income tax return is, for purposes of Fifth Amendment analysis, the testimony of a witness . . . ." *Garner*, 424 U.S. at 656 (internal quotation marks omitted). That flows from the definition—a communication is testimonial whenever it, "explicitly or implicitly, relate[s] a factual assertion or disclose[s] information," *Doe v. United States*, 487 U.S. 201, 210 (1988) (*Doe II*)—and communicating facts is precisely the return's function. It contains the taxpayer's statements, made under penalty of perjury, of her identity, address, employer, income, withholding, and state entries, among others. But—second—even setting the *contents* of a tax return aside, the mere act of filing a return ordinarily communicates, at minimum, the fact of the filer's presence within the country during a certain period of time. The gambling-tax cases are illustrative: Simply submitting a wagering form was itself an admission—the filer "necessarily identif[ied] himself as a gambler." *Garner*, 424 U.S. at 660 n.13. Doubtless, an ITIN return is not itself conclusive proof that a filer

was present throughout a given year, but conclusive proof is unnecessary at every step. A communication is testimonial once it discloses information, and the privilege reaches testimony that "may 'lead to incriminating evidence' . . . even if the information itself is not inculpatory," *United States v. Hubbell*, 530 U.S. 27, 38 (2000). Indeed, the privilege "embraces those [answers] which would furnish a link in the chain of evidence needed to prosecute," *Hoffman v. United States*, 341 U.S. 479, 486 (1951).

### B. The Government's Construction of § 6103 Makes the Targeted Class's Hazard of Incrimination Real and Appreciable.

Because the compulsion and testimony elements are met for the targeted class, everything then turns on incrimination, which is measured by the hazard a claimant faces. Valid claims of the privilege are available when the hazard an individual confronts is "'real and appreciable,' and not merely 'imaginary and unsubstantial.'" *Marchetti*, 390 U.S. at 48; *Grosso v. United States*, 390 U.S. 62, 66–67 (1968).

***i.*** While any compelled disclosure regime may introduce *some* chance of incrimination, "the mere possibility of incrimination is insufficient to defeat the strong policies in favor of a disclosure."

*California v. Byers*, 402 U.S. 424, 428 (1971) (plurality opinion). Three conditions have, to date, held the letter-request pathway's contribution to most filers' hazard at exactly that level—one *Marchetti* would call "trifling or imaginary." 390 U.S. at 53.

*First*, the pathway withholds the taxpayer's own compelled testimony. Section 6103(i)(2) reaches only "return information (other than taxpayer return information)," so what the filer herself was compelled to say ordinarily cannot travel through it at all.[2] The statute does admit a lone carve-out—the "taxpayer's identity," though otherwise an element of *taxpayer* return information, § 6103(b)(6), may be disclosed through the letter-request path. § 6103(i)(2)(C). That allowance accords with the case law's treatment of a person's identity as ordinarily

[2] While "return information" encompasses a plethora of information about the taxpayer, *see* § 6103(b)(2), "taxpayer return information"—the subset of return information "filed with, or furnished to, the Secretary *by or on behalf of* the taxpayer," § 6103(b)(3) (emphasis added)—receives elevated protection throughout the statute's non-tax criminal-enforcement provisions. *See, e.g.*, § 6103(i)(2)(A) (letter-request channel reaches only "return information (other than taxpayer return information)"); § 6103(i)(3)(A)(i) (same for reports of possible federal crimes); § 6103(i)(7)(A)(i), (B)(i) (same even for terrorism-related requests).

harmless: "Disclosure of name and address is an essentially neutral act," one that "identifies but does not by itself implicate anyone in criminal conduct." *Byers*, 402 U.S. at 432, 434 (plurality opinion). For nearly every filer, that observation is exactly right. As explained below, *infra* p. 15, for the targeted class, it is not.

*Second*, a taxpayer demurring to the possibility of incrimination possesses a remedy on the return itself: She may claim the privilege there, line by line, in lieu of the answer. *United States v. Sullivan*, 274 U.S. 259, 263 (1927). And where that choice is freely available, disclosures made instead of claiming it "were not compelled incriminations" at all. *Garner*, 424 U.S. at 665. Between the two rules, the letter-request pathway ordinarily has nothing privileged to carry: Disclosures withheld on the basis of privilege never reach the Secretary, and disclosures without a privilege claim are understood to have been volunteered.

*Third*, the statute contemplates requests that are particular and highly predicated. The IRS may disclose return information only to officers and employees "personally and directly engaged in" the pertinent investigation, "solely" for use in that matter, and only upon a written

request identifying the taxpayer by "name and address," the "taxable period," the statutory authority for the investigation, and "the specific reason or reasons why such disclosure is, or may be, relevant." § 6103(i)(2)(A), (B). These requirements carry constitutional weight because the hazard inquiry is made ex ante, when the return is due. A filer facing an April deadline under the statute as written confronts a "mere possibility" that her return will ever figure in a predicated criminal investigation of her. *See Byers*, 402 U.S. at 428.

This design tracks the lessons Congress learned from *Marchetti*, which found the wagering-tax scheme's hazard "real and appreciable" largely because "the [Internal Revenue] Service 'makes available' to law enforcement agencies the names and addresses of those who have paid the wagering taxes" and stood in "full cooperation" with the Attorney General's campaign against organized gambling. 390 U.S. at 48. Congress has since legislated on both sides of that line. After *Marchetti* it walled the wagering-tax filings off from prosecutors, barring criminal use even of "any information come at by the exploitation of any such document," 26 U.S.C. § 4424(c), and the Second Circuit then sustained the very scheme *Marchetti* had excused, on the ground that the 1974

revisions "eliminated the 'real and appreciable' hazards of self-incrimination that existed under the prior law." *United States v. Sahadi*, 555 F.2d 23, 27 (2d Cir. 1977). Section 6103's overhaul followed two years later, "to tighten the restrictions on the use of return information by entities other than [the IRS]." *Church of Scientology of Cal. v. IRS*, 484 U.S. 9, 16 (1987). The principle undergirding these moves is simple: Burdening the pathway from compelled disclosure to prosecutor diminishes the hazard of incrimination.

***ii.*** For the targeted class, the first two conditions cannot reliably keep the hazard imaginary. Begin with identity. The letter-request pathway's exception for taxpayer identity rests on the premise that *who* a person is, alongside *where* she lives, implicates nothing. For undocumented immigrants under final orders of removal, that premise gives way. The relevant criminal offense here, 8 U.S.C. § 1253(a)(1), is committed when a person under a final order of removal "willfully fails or refuses to depart from the United States within a period of 90 days." A core element of the offense's actus reus, then, is *remaining*. A current United States address, stated on a compelled annual filing signed under penalty of perjury, is direct documentary evidence of that element, and

the filings renew: Each new truthful return from one who remains hands the government fresh support for the inference that she is still here. At the very least, her address "would furnish a link in the chain of evidence needed to prosecute." *Hoffman*, 341 U.S. at 486.[3] In short, for this class, disclosure of name and address supplies the state's evidence, which conflicts with the privilege's oldest principle: The state "may not by coercion prove a charge against an accused out of his own mouth." *Malloy v. Hogan*, 378 U.S. 1, 8 (1964).

The second condition fares no better, and for related reasons: Those in the targeted class cannot invoke the Fifth Amendment as the ordinary taxpayer can. A claim of privilege entered on the address line, by a member of the targeted class identified by ICE, arrives associated with the filer's name and taxpayer identification number. The claim itself thus admits that her whereabouts would incriminate her. Any claim truly adequate to eliminate the hazard would be one that swallows the return

[3] Doubtless, an address does not prove the whole offense. Willfulness and the statute's other predicates remain the government's burden. But the privilege has never demanded that compelled words make out a complete case; it asks whether they create a "real and appreciable" hazard, *Marchetti*, 390 U.S. at 48, and testimony evidencing the very conduct under investigation does exactly that.

whole, which is the "conjurer's circle" *Sullivan* forbids. 274 U.S. at 264. The gambling-tax cases confronted exactly this bind: Because "making a claim of privilege when the disclosures were requested . . . would have identified the claimant as a gambler," the Court "forgave the usual requirement that the claim of privilege be presented for evaluation in favor of a 'claim' by silence." *Garner*, 424 U.S. at 658–59 n.11. For the targeted class, the line-item remedy on which *Sullivan* and *Garner* rest is simply a restatement of the incrimination.

What exactly follows from these two collapsed conditions is worth clarifying. Whether they alone would sustain a valid claim of privilege against the prospect of an isolated, predicated letter request is a question this case does not present, and *amicus* takes no position on it. But here, the government seeks to topple even the third condition by creating an aggressive, class-targeting data-sharing pipeline. The IRS-ICE scheme demolishes the particularized and predicated nature of the letter-request pathway that attenuates the hazard of incrimination. Whatever might be said of the first two failures standing alone, the loss of all three surely opens a serious question, and the government's reading is the only reading that produces it.

The record shows what the letter-request pathway becomes on that reading. ICE requested addresses for "the full alien population" of 7,615,279 individuals, A392; obtained roughly 47,000 in a single delivery, A615–16; secured a commitment to "monthly or regular" transfers thereafter, A624; and routed every transfer to a single designated recipient, on the theory that one official can be "personally and directly" engaged in the investigation of over a million people. *See* A630. The deliveries do real work. ICE "identified approximately 33,000 updated addresses" among the roughly 47,000 disclosed, A619 (quoting Fitzgerald Decl. ¶ 5); *see* A635–36, meaning two of every three were news to the government. Each of those addresses, moreover, was the filer's own sworn statement. The "last known address" the IRS committed to deliver, A613, is the address appearing on the taxpayer's "most recently filed and properly processed" return, 26 C.F.R. § 301.6212-2(a). A compelled annual filing that tells the investigating agency where its subject now lives, and that she remains, "could be useful in giving the requestor new information," as the D.C. Circuit put it. *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1231 (D.C. Cir. 2026). In short, the government's idea of § 6103 builds a pipeline aimed at the very filers the

state has designated for investigation, and for the filers on that list, the hazard resulting from their last, and next, truthful filing is nothing if not real and appreciable.

To be clear, *amicus* does not contend that transmission alone completes a Fifth Amendment violation. Ordinarily the Self-Incrimination Clause is violated when compelled testimony is used against its author in a criminal case. *See Chavez v. Martinez*, 538 U.S. 760, 767 (2003) (plurality opinion). The doubt here concerns what the government's construction would let it keep: an unrestricted right to use compelled testimonial information, and whatever that information yields, after deliberately routing it to the declarants' criminal investigators.[4] The Supreme Court has never approved such an arrangement, instead leaving the question conspicuously open.

[4] Later use restrictions would not answer the doubt. The targeted class will have lost its ability to claim the privilege, and their compelled disclosure will have been used by the government at the very least to investigate, if not outright prosecute. Further, a claim of privilege lodged on the return would itself incriminate, *supra* pp. 11–12, so the filer's dilemma arrives at filing. The information goes to work at once: The program's originating request sought the IRS's help in "an ICE led effort to locate approximately 700,000 individuals," A611, and the component receiving the addresses exists to "identif[y], investigate[], and arrest[]" the persons to whom they belong, A618 (quoting McShane

**C. The Compelled-Reporting Cases Expressly Reserve the Question Forced by the Government's Reading.**

***i.*** No holding of the Supreme Court settles the privilege claim the government's construction would generate. A century of compelled-reporting cases instead yields three propositions; this case fits neatly into the third.

1. *Sullivan* and *Garner* instruct that, where the taxpayer remains free to claim the privilege as to particular answers, compelled filing presents no constitutional infirmity. A taxpayer "could not draw a conjurer's circle around the whole matter," *Sullivan*, 274 U.S. at 264, because a narrower course lay open to him: If the return "called for answers that the defendant was privileged from making," Justice Holmes explained, "he could have raised the objection in the return." *Id.* at 263. *Garner* complemented this understanding. A taxpayer who "made disclosures instead of claiming the privilege on his tax returns" suffered

---

Decl. ¶ 2). Whether the Constitution would impose use limitations after the fact is exactly what the Supreme Court has reserved, *infra* pp. 17-18, and a statute should not be read to erect a reporting system whose constitutionality depends on judicially devised use immunities that Congress nowhere provided.

no compulsion at all, for "his disclosures were not compelled incriminations." 424 U.S. at 665.

2. Where compelled reporting builds a direct and substantial path from the citizen's answers to her prosecutors, the privilege prevails. *Albertson*, *Marchetti*, and *Grosso* each excused compliance outright: registration orders demanding admissions of Communist Party membership, *see Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70, 77–79 (1965), and wagering-tax forms whose yield the IRS supplied to law enforcement as standing practice, *Marchetti*, 390 U.S. at 48. *Marchetti* added a point of particular consequence here. The privilege guards against compelled evidence of ongoing and future conduct as fully as past conduct, for "it is not mere time to which the law must look, but the substantiality of the risks of incrimination." *Id.* at 53–54.

3. And where the ordinary claim is unavailable, or identity itself incriminates, the Court has declined to say what follows. *Garner* reserved the first situation, declining "to consider whether there may be circumstances that would deprive a gambler of the free choice to claim the privilege by failing to file such returns, and therefore allow him to exclude a completed gambling tax return by claiming the privilege at

trial." 424 U.S. at 660 n.14. *Baltimore City Department of Social Services v. Bouknight* compelled a mother to produce her child as part of a noncriminal regulatory regime, *see* 493 U.S. 549, 555–56 (1990), while preserving the question this case could force: "We are not called upon to define the precise limitations that may exist upon the State's ability to use the testimonial aspects of Bouknight's act of production in subsequent criminal proceedings. But we note that imposition of such limitations is not foreclosed." *Id.* at 561. And *Hiibel*, the Court's most recent word on compelled self-identification, upheld a demand for a suspect's name on the stated ground that "in this case disclosure of his name presented no reasonable danger of incrimination," 542 U.S. at 189, while holding the door open to a case "where there is a substantial allegation that furnishing identity [would incriminate]." *Id.* at 191. In such a case, the Court would "then consider whether the privilege applies, and, if the Fifth Amendment has been violated, what remedy must follow. We need not resolve those questions here." *Id.*

Should the government's statutory construction prevail, the targeted class members face the particular circumstances the Supreme Court identified as absent in *Garner*, *Bouknight*, and *Hiibel*. Their

identity incriminates, their claims are trapped, and the government's construction would deliver their compelled answers to their investigators as a matter of routine. *Hiibel* reserved judgment on isolated, face-to-face demands for a name. The demand here is annual and class-wide and compels information that directly evidences a crime—information piped directly to the agency investigating that offense. That no holding has yet measured individualized hazard in a facially neutral scheme whose yield is routed to investigators only adds to the constitutional doubt. The construction under review would place more than a million filers squarely within it.

***ii.*** The government may rely on *Sullivan's* characterization of income tax filings (and comparable regulatory schemes) as neutral and directed to the public at large, but any such parallels are misdrawn. True, the Supreme Court has sorted compelled self-reporting regimes into two types. On one side stands the income tax return *generally*: In *Sullivan*, "the questions in the income tax return were neutral on their face and directed at the public at large." *Albertson*, 382 U.S. at 79. On the other stand the schemes the Court struck down, whose demands were "directed at a highly selective group inherently suspect of criminal activities." *Id.*

The tax system, the government will say, sits safely in the first pattern. But this argument fails twice over.

*First*, the two types of compelled self-reporting schemes—facially neutral and directed to the public, versus targeting a specific and suspected class—are measuring sticks that only exist to measure the hazard of incrimination and criminal prosecution. Breadth of reporting is at best *some* indication of the hazard of criminal prosecution, but never the end in itself. *Sullivan* was unconcerned with tax returns because, under ordinary circumstances, the breadth of filers protects any one filer from an appreciable risk of prosecution. The IRS-ICE scheme has fundamentally changed that calculus, by targeting the sort of "highly selective group inherently suspect of criminal activities" *Albertson* describes. The disclosures the compelled filings feed are sought *only* for a class defined by the elements of a criminal statute: individuals who, in the MOU's own words, are "under criminal investigation" for one or more designated crimes, § 1253(a)(1) foremost. A576. A scheme whose yield is exclusively demanded for a roster of individually named criminal-investigation subjects strips any functional meaning from "directed at the public at large." Put simply, while the demand may run to all, the

disclosure runs to the list.[5] Nor is the enterprise "essentially regulatory," *id*. at 430 (plurality opinion). It is, in the MOU's own title, an exchange of information "For Nontax Criminal Enforcement," A576, and its disclosures travel to the investigating agency itself, the feature that separated *Albertson* and *Marchetti* from *Sullivan* and *Byers*.

*Second*, the Supreme Court itself has treated breadth as nothing more than evidence. A treatment of breadth as dispositive failed to command a majority in *Byers* precisely because of its insensitivity to genuine risk: Five Justices, in three opinions, warned in varying degrees that "directed at the public at large" reasoning could pronounce hazards unreal when they are anything but. Justice Harlan, the fifth vote, insisted that the hazard be measured by "the particular individual's claim, in all the circumstances of his particular case," cautioning against "artificial, if not disingenuous judgments that the risks of incrimination are not there when they really are there." 402 U.S. at 442 (Harlan, J., concurring in the judgment); *see id*. at 458–59 (sustaining the scheme due

[5] Indeed, while the *Byers* plurality found "[n]o empirical data" correlating drivers with prosecution, 402 U.S. at 431 (plurality opinion), here the correlation is definitional, because on the government's own theory the class *is* the suspect pool.

to its noncriminal ends). Justice Black, joined by Justices Douglas and Brennan, trained the analysis on "*this particular respondent*," who "would have run a serious risk of self-incrimination by complying with the disclosure statute." *Id.* at 461 (Black, J., dissenting) (emphasis added). Justice Brennan, joined by Justices Douglas and Marshall, put the criticism most directly, faulting the plurality for supposing "that membership in such a suspect group is somehow an indispensable foundation for any Fifth Amendment claim." *Id.* at 469 (Brennan, J., dissenting). Harlan and all four dissenters thus declined, for differing reasons, to let the nominal breadth of a reporting class decide the hazard inquiry. Their misgiving was well placed, considering how readily the binary can be gamed. Could Congress have rescued the wagering-tax scheme by requiring *every* American to declare that she is or is not a gambler? Certainly not—while such a demand would run to everyone, the gambler's compelled self-identification would incriminate her exactly as before. Put simply, a hazard created by compelled testimony cannot be *cured* by compelling the same testimony from everyone else too.

In all events, whether the targeted class's hazard is real and appreciable is at least a substantial question, which is all that matters here. *See supra* pp. 7–14.

## II. This Court Should Not Open That Question When The Statute's Own Words Close It

As the argument above explains, the government's construction of § 6103 swings open a door that would all but force the resolution of a difficult constitutional question the Supreme Court has taken care not to answer. This Court should keep it shut. Indeed, "[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice." *Clark v. Martinez*, 543 U.S. 371, 380–81 (2005). Here, consequences decide the choice twice over. That the government's interpretation raises constitutional doubt is reason enough, under the avoidance canon, to prefer the district court's reading. But its perverse consequences add a further layer—the government's view, if accepted, would imperil the very filing obligation it depends upon, while the district court's reading leaves legitimate enforcement whole. Either ground independently requires affirmance.

### A. The Avoidance Canon Requires the District Court's Reading of the Statute.

This Court must avoid answering constitutional questions when possible: "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). "[S]erious doubt," not established invalidity, is the trigger. *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001). And the doubt need not even "pertain to the particular litigant before the Court." *Clark*, 543 U.S. at 380–81. The government's construction meets that threshold comfortably, for the questions it would force are ones the Supreme Court has repeatedly left open.

To be sure, the avoidance canon "comes into play only when . . . the statute is found to be susceptible of more than one construction," *id.* at 385, and a court applying it "still must interpret the statute, not rewrite it," *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). If this Court reads "personally and directly engaged," "solely for," and "specific reason" as the district court read them, *see* A630–33, the case ends on the text, and

avoidance is unnecessary. The canon applies only if the Court instead finds the government's rival construction textually available. In that event, avoidance—by affirming the district court's reading—would be appropriate: The statute would not be rewritten on either path, *see* § 6103(i)(2)(A), (B)(iv), and no court of appeals has construed these specific phrases before. The D.C. Circuit decided only a facial challenge to the MOU's text without construing the phrases "personally and directly engaged," "solely for," or "specific reason," and in fact referenced those terms while emphasizing that "§ 6103(i)(2) does not contemplate or authorize freewheeling disclosure of sensitive information." *Centro*, 167 F.4th at 1230. Nor is an avoidance ruling unavailable in this case given the parties' failure to brief this issue. A court construing a statute "is not limited to the particular legal theories advanced by the parties," *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991), and *amicus* offers only a canon bearing on the exact construction under review.

### B. The Government's Construction Condemns Itself, While the District Court's Reading Leaves Legitimate Enforcement Whole.

Avoidance aside, the government's construction, in imperiling the very filing obligation it depends on, condemns itself by its consequences.

Taking the government's criminal-use theory seriously, every truthful annual filing by a targeted class member who remains unlawfully becomes evidence toward a federal crime, confronting filers with "the 'trilemma' of truth, falsity, or silence." *Pennsylvania v. Muniz*, 496 U.S. 582, 597 (1990). Truth supplies investigators fresh evidence of presence; material falsity exposes the filer to felony prosecution, 26 U.S.C. § 7206(1); and willful silence exposes her to prosecution for non-filing, *id.* § 7203, with no fourth path such as a line-item claim. *See supra* pp. 12–13. In schemes that complete that trilemma, those who properly assert the privilege "may not be criminally punished for failure to comply with their requirements." *Marchetti*, 390 U.S. at 61. The government's construction would accordingly invite claims of wholesale excusal from filing, or at the least demands for sweeping direct- and derivative-use restrictions, across a class the government has numbered at approximately 1.2 million, A615, in service of a charge its own declarant describes as reserved for cases of "serious negative impact." McShane Decl. ¶ 8 (A463).[6] Whichever remedy a court might ultimately select, no

[6] Importantly, rarity of prosecution does not shrink the hazard. Prosecutorial appetite is not dispositive. *See Marchetti*, 390 U.S. at 48. Even if it were, the letter underlying every request represents that each

correct reading of the statute forces the selection, least of all a reading that buys the government nothing a particularized, predicated investigation could not obtain.

The government cannot escape the consequence by recharacterizing what the pipeline is for. The MOU's legality hinges on it being an instrument of criminal investigation, A576, A578, putting the government in a bind it must face head-on: Each disclosure either genuinely serves a criminal investigation of a designated crime, which raises the serious self-incrimination question, or serves civil location and removal, which would plainly contravene the statute. A632 ("To the extent that ICE seeks addresses not as part of a criminal investigation but to locate taxpayers so that they may be civilly arrested, that purpose would grossly misread the statute.").

The district court's reading, for its part, costs legitimate enforcement nothing. Every channel keeps its work, with (i)(1) for returns upon a judge's order, (i)(2) for isolated requests in genuine, predicated investigations—taxpayer identity included—and (i)(5) for

subject is under criminal investigation and states why disclosure is, or may be, relevant to that investigation. A576, A578.

Case: 26-1329 Document: 00118438152 Page: 35 Date Filed: 03/06/2026 Entry ID: 6813289

locating a warranted fugitive. All the reading forecloses is the bulk transfer program the statute never contemplated.

## CONCLUSION

The path to judgment is not difficult. If the Court reads the contested statutory phrases to mean what they say, this case ends on the text, and the judgment can be affirmed on that ground alone. If the Court instead finds that the government's rival construction is textually available, the avoidance canon demands only one outcome, so the judgment should be affirmed to keep a grave constitutional question closed. Either way, the district court read the statute right. The Fifth Amendment sits within the Bill of Rights so that the government could never again put a person to the choice among self-accusation, perjury, and punished silence. Congress wrote § 6103 in a way that keeps the tax system from presenting that choice for the targeted class, and this Court should reject the one reading of the statute that would beget it.

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

/s/ Andrés Correa
Andres Correa

LYNN PINKER HURST & SCHWEGMANN

*Counsel for Amicus Curiae Cambridge Center for Justice*[7]

[7] *Amicus* acknowledges Benjamin Who of the Cambridge Center for Justice for his role in drafting this brief.

**CERTIFICATE OF COMPLIANCE**

1. This document complies with Federal Rule of Appellate Procedure 32(a)(7)(B), because, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), it contains 5752 words.

2. This document complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6), because this document has been prepared in a proportionally spaced typeface in 14-point Century Schoolbook font using Microsoft Word.

/s/ *Andrés Correa*
Andrés Correa

LYNN PINKER HURST & SCHWEGMANN

*Counsel for Amicus Curiae Cambridge Center for Justice*

AUGUST 3, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on August 3, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Andrés Correa*
Andrés Correa

LYNN PINKER HURST & SCHWEGMANN

*Counsel for Amicus Curiae Cambridge Center for Justice*

AUGUST 3, 2026