No. 26-1329

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

---

COMMUNITY ECONOMIC DEVELOPMENT CENTER OF SOUTHEASTERN MASSACHUSETTS; NATIONAL PARENTS UNION; NATIONAL KOREAN AMERICAN SERVICE & EDUCATION CONSORTIUM; UNDOCUBLACK NETWORK INC.,

Plaintiffs-Appellees,

v.

SCOTT BESSENT, Acting Commissioner of the Internal Revenue Service and Secretary of the Treasury; SOCIAL SECURITY ADMINISTRATION; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MARKWAYNE MULLIN, Secretary of Homeland Security; INTERNAL REVENUE SERVICE; DAVID J. VENTURELLA, Acting Director of U.S. Immigration and Customs Enforcement; FRANK J. BISIGNANO, Commissioner of the Social Security Administration; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. DEPARTMENT OF THE TREASURY,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of Massachusetts

---

# REPLY BRIEF FOR APPELLANTS

---

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

AUGUST FLENTJE
JACOB CHRISTENSEN
*Attorneys, Appellate Staff*
*Civil Division, Room 4629*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 307-0878*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

ARGUMENT ........ 1

I. Plaintiffs have no likelihood of success on the merits ........ 1

A. Plaintiffs lack Article III standing ........ 1

1. CEDC lacks organizational standing ........ 1

2. Plaintiffs lack associational standing ........ 5

B. Plaintiffs do not challenge a final agency action reviewable under the APA ........ 9

C. Plaintiffs' APA claims are foreclosed by the Internal Revenue Code's exclusive remedy for § 6103 violations ........ 13

D. Plaintiffs' APA claims fail on the merits ........ 14

1. Arbitrary and capricious ........ 14

2. Section 6103 ........ 18

II. Plaintiffs failed to establish the remaining preliminary injunction factors ........ 29

A. Irreparable harm ........ 29

B. Balance of equities and public interest ........ 32

III. The preliminary injunction is overbroad ........ 33

CONCLUSION ........ 35

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Aetna Health, Inc. v. Davila*,
542 U.S. 200 (2004) .......... 14

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 10, 17

*Bradley v. Village of Univ. Park*,
59 F.4th 887 (7th Cir. 2023) .......... 16

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026) .......... 10, 11, 12, 13, 14-15, 15, 18, 20, 21, 32

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 9

*DRG Funding Corp. v. Secretary of Hous. & Urb. Dev.*,
76 F.3d 1212 (D.C. Cir. 1996) .......... 17

*FERC v. Electric Power Supply Ass'n*,
577 U.S. 260 (2016) .......... 18

*Food & Drug Admin. v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 3, 4, 5

*Jama v. ICE*,
543 U.S. 335 (2005) .......... 21

*Kolackovsky v. Town of Rockport*,
165 F.4th 114 (1st Cir. 2026) .......... 2

*Kromnick v. School Dist. of Philadelphia*,
739 F.2d 894 (3d Cir. 1984) .......... 16

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 15

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 1

*NCDR v. Mauze & Bagby*,
745 F.3d 742 (5th Cir. 2014) .......... 16

*New York State Club Ass'n v. City of New York*,
487 U.S. 1 (1988) .......... 5

*Rauh, In re*,
119 F.3d 46 (1st Cir. 1997) .......... 16

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) .......... 5

*Singleton v. Wulff*,
428 U.S. 106 (1976) .......... 16

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 34

*Tota v. Gonzales*,
457 F.3d 161 (1st Cir. 2006) .......... 8, 25

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 9

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 33

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) .......... 13

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
587 F.3d 464 (1st Cir. 2009) .......... 31

**Statutes:**

5 U.S.C. § 704 .......... 17

5 U.S.C. § 705 .......... 1

8 U.S.C. § 1253(a)(1) .......... 21, 22, 23, 25, 27

26 U.S.C. § 6103(b)(2)(A) .......... 11

26 U.S.C. § 6103(b)(6) .......... 12

26 U.S.C. § 6103(i)(2) .......... 10, 33

26 U.S.C. § 6103(i)(2)(A) .......... 11, 14, 21, 22, 25

26 U.S.C. § 6103(i)(2)(A)(i)-(ii) .......... 20

26 U.S.C. § 6103(i)(2)(A)(ii) .......... 23, 26

26 U.S.C. § 6103(i)(2)(B)(iv) .......... 22

26 U.S.C. § 6103(i)(2)(C) .......... 11

26 U.S.C. § 7431(a) .......... 14

26 U.S.C. § 7431(b) .......... 14

26 U.S.C. § 7431(c) .......... 14

26 U.S.C. § 7431(d) .......... 14

**Regulatory Materials:**

26 C.F.R. § 301.6103(i)-1(b) .......... 24, 28

Exec. Order No. 14161,
90 Fed. Reg. 8451 (Jan. 20, 2025) .......... 26

**Legislative Material:**

S. Rep. No. 94-938, pt. 1 (1976) .......... 33

## GLOSSARY

| | |
|---|---|
| A | Appendix |
| APA | Administrative Procedure Act |
| CEDC | Plaintiff Community Economic Development Center of Southeastern Massachusetts |
| DHS | U.S. Department of Homeland Security |
| ICE | U.S. Immigration and Customs Enforcement |
| IRS | Internal Revenue Service |
| MOU | Memorandum of Understanding between DHS and the Treasury Department, dated April 7, 2025 |

## ARGUMENT

The district court abused its discretion in granting plaintiffs' motion for stay under 5 U.S.C. § 705 and for a preliminary injunction, and its order should be vacated.

### I. Plaintiffs have no likelihood of success on the merits

#### A. Plaintiffs lack Article III standing

##### 1. CEDC lacks organizational standing

CEDC failed to make a "clear showing" that it is likely to establish each element of standing, *Murthy v. Missouri*, 603 U.S. 43, 58 (2024), and the district court erred in concluding otherwise for the reasons we explained. (Blue Br. 24-30.) In response, CEDC asserts "four distinct injuries" allegedly caused by IRS's data sharing (Br. 28), but none of them suffices to demonstrate organizational standing.

*Decreased revenue*. First, CEDC says its funding is "tied to the number of returns it files" on behalf of its members and that, "in 2025, the number of returns it filed dropped by 14 percent because of the data-sharing arrangements." (Br. 28-29.) But the record does not show that less returns were filed in 2025 or that any reduction in the number of returns would have been caused by IRS's actions. The only evidence plaintiffs cite for their assertion that CEDC filed less returns in 2025 is

a declaration by its executive director, in which she said CEDC filed 1,666 returns in 2024 and 1,436 returns in 2025. (Br. 29; A188.) As we pointed out, she signed the declaration on November 3, 2025 (A191), two months before the year's end, so her declaration does not account for returns filed in November and December 2025 and fails to provide a complete tally for 2025, which may well have surpassed the number filed in 2024. There was no evidentiary basis for the district court to conclude that CEDC filed less returns in 2025 (A623), and its finding was clearly erroneous.

Nor have plaintiffs explained how CEDC's funding may be impacted by the number of tax filings, leaving the Court to guess whether the comparable number of filings in 2024 and 2025 would have any impact at all. (*See* Blue Br. 29-30.) Plaintiffs' "broad and vague injury allegations" about its funding cannot demonstrate Article III standing. *Kolackovsky v. Town of Rockport*, 165 F.4th 114, 120 (1st Cir. 2026).

*Interference with tax filing and tax advice services*. CEDC next asserts that IRS's data sharing has interfered with its "tax filing assistance and tax advice" services that it provides to members.

(Br. 29-30.) Again, the record tells a different story. Starting with the tax filing services, as explained above, the record shows that the number of returns CEDC filed for members in 2025 is comparable, and possibly surpassed, the number filed in 2024. Therefore, far from demonstrating that IRS's actions "directly affected and interfered with" CEDC's "core business activities," *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 395 (2024), the record shows that CEDC's tax filing services have not been significantly affected, if at all.

Similarly, as for CEDC's tax advice services, CEDC's executive director admits that CEDC has spent "substantial time" counseling its members and providing tax advice about IRS's data-sharing policy. (A187-188.) CEDC's own actions demonstrate that its ability to advise members remains unimpeded by IRS's actions, again refuting any argument that IRS's actions have "directly affected and interfered" with its "core business activities." *Alliance*, 602 U.S. at 395. At most, IRS's actions may have *indirectly* affected CEDC's tax advice services by influencing CEDC's own decisions about the nature or substance of the advice it chooses to give members. But that would be true anytime there is a change in tax law or policy and cannot support Article III

standing, lest organizations gain universal standing to "challenge almost every federal policy that they dislike." *Id.*

CEDC further claims it cannot provide tax filing and advice services because members are "too afraid to show up." (Br. 30.) As demonstrated above, the record does not support any decrease in tax filings, and CEDC itself confirmed that it continues to spend substantial time advising its members. (A187-188.) CEDC further asserts it has had to cancel some events "due to low expected turnout." (Br. 30.) But the events it canceled—a "movie night," a "block party," and a "cultural festival" (A188-189)—are not "core business activities," *Alliance*, 602 U.S. at 395, and the district court never found they were. In addition, any decrease in attendance at CEDC events is not the result of "direct" interference with CEDC's activities but is instead downstream from how IRS's actions have purportedly affected the independent decisions and behavior of CEDC's members and is, therefore, not the "kind of injury" required for organizational standing. *Id.*; *see* Blue Br. 28.

*Reputational harm*. CEDC also asserts reputational harm. (Br. 31.) But reputational harm is not itself a "core business activit[y],"

and CEDC has not otherwise demonstrated any "direct[] … interfere[nce]" with its core business activities, *Alliance*, 602 U.S. at 395, as explained above.

*First Amendment injury*. Last, CEDC asserts a First Amendment injury (Br. 31), but the district court did not find or rely on any such injury (A623-624). The Supreme Court has recognized "a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). Here, IRS's intra-governmental sharing of taxpayer address information with ICE does not infringe on CEDC's or its members' First Amendment rights because it does not affect "in any significant way" their ability to engage in any of these protected activities or require them in any manner "to abandon or alter" such activities. *E.g.*, *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 13 (1988). Nothing in the record suggests otherwise.

### 2. Plaintiffs lack associational standing

Plaintiffs' members who do not have a final order of removal are not at risk of having their taxpayer information shared with ICE under

the MOU.[1] Because there is no risk that these members' own information will be shared, the district court rested its associational standing ruling entirely on speculative theories that plaintiffs' members might be *misidentified* by IRS or ICE "due to administrative errors tied to similarities between names" or that ICE might *mistakenly* prosecute them based on an order of removal that is not final. (A623-624.) As we explained (Blue Br. 30-34), these speculative theories—which presume the agencies will commit errors in carrying out their official duties—have no support in the record, and the court erred by failing to apply the presumption of regularity that should have governed.

Plaintiffs' response (Br. 27) that "clear evidence" overcomes that presumption is unsupported. Plaintiffs cite news articles as support for their assertion that "ICE has wrongfully deported misidentified individuals" (*id.*), but none of the articles they cite addresses or even mentions individuals being deported because of misidentification based

---

[1] The MOU focuses on criminal enforcement against "aliens illegally present in the United States" who are "under final orders to remove them from the United States" (A341), and ICE's requests for taxpayer information under the MOU must include "the date of the final order of removal" (A343). Accordingly, ICE's request and IRS's August 2025 response identified only individuals with a final removal order. (A406-408, A418-419, A451.)

on errors tied to similarities between names—the theory the district court accepted. (A98-99, A107-126.) Plaintiffs also say IRS "failed to properly match names and addresses" (Br. 27), but, again, they cite no evidence of misidentification to support their theory. IRS has acknowledged that ICE's June 2025 request under the MOU provided potentially incomplete or insufficient address information for some individuals whose information was disclosed, but even so IRS positively identified each of those individuals based on their unique taxpayer identification number, so there was no risk of misidentification. (A658-661.) Last, plaintiffs assert that ICE has "flouted legal requirements" of § 6103 (Br. 27-28), but these unfounded allegations again have nothing to do with, and do not support, plaintiffs' theory of misidentification. Plaintiffs thus fail to cite any evidence in the record to support their baseless theory of misidentification. Furthermore, plaintiffs make no attempt at all to cite any evidence in the record in support of their additional theory that ICE has mistakenly prosecuted anyone based on a removal order that was not final, even though the court also relied on that implausible theory. Plaintiffs thus come nowhere close to demonstrating "clear evidence" to overcome the presumption of

regularity that should have applied here. *Tota v. Gonzales*, 457 F.3d 161, 168 (1st Cir. 2006).

Unable to defend the basis of the district court's ruling, plaintiffs assert other theories of injury the court did not adopt. First, plaintiffs say their members "who have a final removal order" are injured by IRS's data sharing because "ICE[] plans to use the data for arrests, deportation, and detention." (Br. 24, 26.) Plaintiffs, however, identify only three members with final removal orders (Br. 24), and the court did not find that these members are at greater risk of removal because of the MOU. Indeed, any risk of arrest, detention, and removal is traceable not to IRS's data sharing but to the fact that these members have had a final removal order entered against them. Therefore, this theory fails because the causation requirement for standing is lacking.

Plaintiffs further assert that their members are "chilled" from filing their tax returns and from exercising their First Amendment rights. (Br. 26.) But the district court did not find, and plaintiffs have not alleged, that members *with a final removal order* have been chilled from filing tax returns or from exercising their First Amendment rights because of the MOU; in fact, the court found no First Amendment

injury at all, and, as demonstrated above, the record does not show any decrease in tax filings for 2025. As for plaintiffs' members who are not subject to a final removal order, their taxpayer information is not at risk of being shared with ICE, *see supra* pp. 5-6 & n.1, and they cannot manufacture standing by declining to exercise their rights in response to their fear of future harm that is not "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

Finally, plaintiffs are incorrect (Br. 25) that the mere intra-governmental sharing of taxpayer address information is itself a cognizable "concrete" injury for Article III purposes. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021). Plaintiffs identify no common-law analog with a "close relationship" to their alleged injury, *id.*, and they concede (Br. 36) that federal law already requires aliens in the United States to provide their current address to DHS (*see* Blue Br. 38).

### B. Plaintiffs do not challenge a final agency action reviewable under the APA

The district court's preliminary injunction broadly enjoins "the implementation and/or enforcement of the IRS-ICE MOU" based, in part, on the court's erroneous conclusion that the MOU is a "final

agency action" reviewable under the APA. (A626-627, A642.) That ruling directly conflicts with the D.C. Circuit's later decision in *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1235-36 (D.C. Cir. 2026), which held that the MOU is not reviewable under the APA and rejected an injunction against it. This Court must create a circuit split to hold otherwise. Plaintiffs argue (Br. 38-39) that this case is different than *Centro* because they challenge not just the MOU but also its Implementing Agreement and IRS's August 2025 disclosure. But, as we demonstrated (Blue Br. 36-40), neither the Implementing Agreement nor IRS's August 2025 disclosure qualifies as "final agency action" either; and even if they did, that could not justify the district court's broad injunction against the MOU.

To be "final," an agency action must be one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). *Centro* correctly held that the MOU produces no legal consequences because it "merely clarifies IRS's existing duties under a statute"—namely, 26 U.S.C. § 6103(i)(2). 167 F.4th at 1236. In arguing otherwise, plaintiffs maintain that § 6103(i)(2) does not authorize IRS to honor "address-

only" requests, as does the MOU. (Br. 35-36.) Plaintiffs thus interpret § 6103(i)(2) to authorize disclosure of addresses so long as they are requested along with other (more sensitive) return information, but not if addresses are the *only* information sought by a requesting agency. *Centro* emphatically rejected this exact argument because it contravenes the statute's plain and unambiguous text. 167 F.4th at 1230-35.

Under the statute, "return information (other than taxpayer return information)" must be disclosed upon receipt of a compliant request. 26 U.S.C. § 6103(i)(2)(A). "Return information" includes "a taxpayer's identity." § 6103(b)(2)(A). Although "taxpayer return information" (defined in § 6103(b)(3)) is generally not disclosable under this provision, Congress specifically carved out from that non-disclosable category "a taxpayer's identity," which "[f]or purposes of this paragraph … shall not be treated as taxpayer return information." § 6103(i)(2)(C). The statute's plain text thus places "a taxpayer's identity" in the broad category of disclosable "return information" under § 6103(i)(2), which IRS is obligated to disclose upon receipt of a compliant request. And the term "taxpayer identity" includes a

taxpayer's "name" and "*mailing address*." *Id.* § 6103(b)(6) (emphasis added). *Centro* thus correctly held that the statute's text is "crystal clear" and "unambiguously authorizes IRS to disclose taxpayer address information when [its] requirements are met." 167 F.4th at 1230, 1231. The *Centro* court was not persuaded otherwise by neighboring provisions requiring a court order, legislative history, or informal IRS pronouncements lacking legal force and effect, *id.* at 1231-35, which plaintiffs here also cite in support of their erroneous interpretation (*see* Br. 8, 46).

Because § 6103(i)(2) has always required IRS to honor address-only requests, the MOU "merely clarifies IRS's existing duties under a statute" without producing any legal consequences of its own. *Centro*, 167 F.4th at 1236. It makes no difference if "IRS declined to honor address-only requests" in the past or if the MOU reflects a "new interpretation" by the agency. (Br. 35.) As *Centro* explained, even if such assertions were accepted, "the MOU merely reflects IRS's views on what § 6103(i)(2) allows it to do," and "an agency's statement that merely expresses its view of what the law requires is not final, and not reviewable." 167 F.4th at 1236. That is certainly true where, as here,

the MOU is based on a correct interpretation of what the statute has always required. *See id.* ("[The MOU is] consistent with what is plainly contemplated by § 6103(i)(2).").

As for the MOU's Implementing Agreement and IRS's August 2025 disclosure, neither is a final agency action for the reasons we explained. (Blue Br. 39-40.) Regarding IRS's August 2025 disclosure, plaintiffs concede (Br. 36) that federal law already requires aliens in the United States to provide DHS with their current address information (*see* Blue Br. 38). Therefore, IRS's disclosure of that same information to DHS likewise had no "direct and appreciable legal consequences," *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016), for plaintiffs or their members beyond what federal law already required. Plaintiffs thus fail to challenge any final agency action that is reviewable under the APA.

### C. Plaintiffs' APA claims are foreclosed by the Internal Revenue Code's exclusive remedy for § 6103 violations

Congress enacted a comprehensive remedial scheme for violations of § 6103. Section 7431 is broad in scope; it includes any violation by anyone, whether or not employed by the government, and regardless of

whether the violation was knowing or merely negligent. 26 U.S.C. § 7431(a). Congress provided a civil action for damages in any such case, and it crafted specific exceptions to liability. *Id.* § 7431(b), (c), (d). But Congress excluded injunctive relief, and that choice must be taken as deliberate. That means plaintiffs cannot obtain the relief they seek here, but a remedial scheme does not displace the APA only when it contains every conceivable remedy because the exclusion of certain remedies is as much a policy decision as their inclusion. *See, e.g.*, *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 208-09 (2004).

### D. Plaintiffs' APA claims fail on the merits

#### 1. Arbitrary and capricious

The district court's ruling that the MOU and its implementation reflect an arbitrary and capricious change from previous IRS policy (A629-630) was erroneous because § 6103(i)(2) does not give IRS discretion to withhold taxpayer addresses when validly requested. (Blue Br. 44-46.) Disclosure is mandatory under the statute, regardless of whether it accords with previous IRS policy. 26 U.S.C. § 6103(i)(2)(A) ("the Secretary shall disclose return information"). Plaintiffs' change-of-position argument is the same one rejected in *Centro*, 167 F.4th at

1236-39, and is foreclosed by *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

Plaintiffs' paltry effort to distinguish *Centro* is unavailing. *Centro*'s ruling did not rest on any "concession" (Br. 54) but rather on *Centro*'s correct view that § 6103(i)(2) requires IRS to disclose taxpayer addresses to a requesting agency. *Centro* explained that § 6103(i)(2) does not "delegate[] discretionary authority" to IRS. 167 F.4th at 1237 (quoting *Loper Bright*, 603 U.S. at 395). Therefore, "once the court determines the meaning of § 6103(i)(2), there is no reason to seek an agency's explanation as to why it may have changed its view on the meaning of the statute" because "the court's judgement is the final word," *id.*, and "the agency must act pursuant to the court's best reading of the statute," *id.* at 1238. Nothing about the "underlying facts" (Br. 54) here changes that straightforward legal analysis.

Because *Centro* is persuasive authority refuting their position on the MOU, plaintiffs raise a brand new argument on appeal, for the first time, that focuses instead on *ICE's requests* for taxpayer addresses, which plaintiffs now say were arbitrary and capricious in violation of the APA. (Br. 49-54.) That new argument is waived because plaintiffs

did not raise it in the district court, let alone argue that ICE's requests were reviewable final agency actions to begin with. (*See* A239-240, A242-244.) Because plaintiffs never raised the issue, ICE did not produce a certified administrative record on which such a determination could be based, and the district court never considered these arguments. (*See* A632-636.) This Court should decline to do so in the first instance. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."); *In re Rauh*, 119 F.3d 46, 51 (1st Cir. 1997) ("A party may not raise new arguments for the first time on appeal."); *see also Bradley v. Village of Univ. Park*, 59 F.4th 887, 897-98 (7th Cir. 2023) (appellees may waive arguments by not raising them in the district court); *NCDR v. Mauze & Bagby*, 745 F.3d 742, 752 (5th Cir. 2014) (same); *Kromnick v. School Dist. of Philadelphia*, 739 F.2d 894, 899 n.4 (3d Cir. 1984) (same).

Even if the Court were to consider plaintiffs' new argument over the government's objection, it is unavailing. Plaintiffs repeatedly attack ICE's requests as "deficient" under § 6103(i)(2) and, therefore, arbitrary and capricious, including requests that IRS never processed. (Br. 50-

53.) Obviously, an unprocessed request cannot be reviewable final agency action because it determines no rights or obligations and has no legal consequences. *Bennett*, 520 U.S. at 178. Even ICE's June 2025 request, which IRS partially processed, did not itself affect the rights or obligations of plaintiffs or their members because any legal consequences to them were contingent on IRS approving the request and ICE's later use of the information in a way that affects their rights. *See DRG Funding Corp. v. Secretary of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (agency action that affects the challenger's rights only "on the contingency of future administrative action" is not final). Therefore, ICE's requests are not reviewable final agency action. 5 U.S.C. § 704.

Nor were ICE's requests arbitrary and capricious in any event. Plaintiffs cannot cite evidence that *ICE* has ever "construed § 6103(i)(2) to prohibit disclosure of taxpayer addresses in response to address-only requests" or that *ICE* has reversed a "longstanding policy" disrupting "serious reliance interests." (Br. 50.) Therefore, ICE did not have to explain why it availed itself of a statutory tool Congress intended for its use as an aid in criminal enforcement. But even so, to the extent any

explanation was required, ICE's reasons for entering the MOU are set forth in the recitals (A327), and they articulate "a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 292 (2016).

**2. Section 6103**

Plaintiffs' contrary-to-law claim likewise fails, and the district court erred in ruling otherwise. (Blue Br. 46-62.) The MOU is fully consistent with § 6103(i)(2). *Centro*, 167 F.4th at 1230-35. Therefore, the court's sweeping preliminary injunction enjoining "the implementation and/or enforcement of the IRS-ICE MOU" (A642) was an abuse of discretion.

The district court's contrary-to-law analysis improperly focused on unique aspects of IRS's August 2025 disclosure, without determining that the disclosure was a final agency action reviewable under the APA. Yet the court could not properly enjoin the implementation or enforcement of the MOU based upon finding problems with the August 2025 disclosure. And while IRS has acknowledged an error in processing the August 2025 disclosure for a small percentage (less than

5%) of the 47,289 individuals whose addresses were disclosed, IRS is working with ICE to remediate that error (A657-662), and the court erred in concluding more generally that IRS's August 2025 disclosure violated § 6103(i)(2).

#### a. Plaintiffs' contrary-to-law argument rests on a flawed interpretation of § 6103(i)(2)

Plaintiffs' contrary-to-law argument suffers from a fundamentally flawed interpretation of § 6103(i)(2) that seeks to import into the statute requirements from surrounding provisions that Congress omitted from § 6103(i)(2).

First, plaintiffs argue that § 6103(i)(2) requires a "judicial determination" of a "specific criminal act" before IRS can disclose taxpayer addresses under the statute. (Br. 45.) Extrapolating from that alleged requirement, plaintiffs further maintain that ICE's "mass data requests" were improper because, in their view, § 6103(i)(2) authorizes disclosure only for "individualized criminal prosecutions." (Br. 41.) These interpretations, however, have no support in § 6103(i)(2)'s text, which imposes no such requirements. In advancing these arguments, plaintiffs improperly conflate § 6103(i)(2)'s provisions

with the neighboring provisions of § 6103(i)(1); indeed, they specifically cite § 6103(i)(1)(B) as the sole support for their erroneous interpretation. (Br. 45.) But § 6103(i)(1)(B) has no application whatsoever here, and ICE did not need a court order to obtain taxpayer addresses under § 6103(i)(2). *Centro*, 167 F.4th at 1232 ("[Section] 6103(i)(2) permits disclosure of address information without a court order.").

Nor is disclosure under § 6103(i)(2) limited to "individualized criminal prosecutions." (Br. 41.) Again, plaintiffs seek to import § 6103(i)(1)'s provisions to support their erroneous view. But § 6103(i)(2)—the provision at issue here—includes no such terms. To the contrary, § 6103(i)(2) expressly requires IRS to disclose return information, including taxpayer addresses, for ICE's use in "*any investigation* which *may* result in" a "judicial *or* administrative proceeding" described in § 6103(i)(1)(A)(i). 26 U.S.C. § 6103(i)(2)(A)(i)-(ii) (emphases added). Plaintiffs' narrow interpretation of the statute to authorize disclosure only for "individualized criminal prosecutions" (Br. 41) lies in stark contrast with the statute's plain—and much broader—text.

Last, plaintiffs argue, again without textual support, that information disclosed under § 6103(i)(2) may not be used "to locate people" under criminal investigation. (Br. 40, 42). Section 6103(i)(2)'s text imposes no such limitation, and courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply." *Jama v. ICE*, 543 U.S. 335, 341 (2005). Section 6103(i)(2) simply requires that the information disclosed be "for the use of" officers and employees "in" the criminal investigation or proceeding. 26 U.S.C. § 6103(i)(2)(A). That broad text easily encompasses using the information to locate a suspect or, as happened here, using current address information of aliens with a final removal order "to verify [their] presence within the United States of America" (A403-405), which is an element of the offense for each of the several felonies identified in 8 U.S.C. § 1253(a)(1) that ICE was investigating. (Blue Br. 48-50.) This argument also contradicts the D.C. Circuit holding, which explained that "Section 6103(i)(2) allows agencies to submit a taxpayer's name and address and request the taxpayer's current mailing address in return." *Centro*, 167 F.4th at 1231.

#### b. Plaintiffs' contrary-to-law argument lacks merit

Plaintiffs' contrary-to-law argument quickly falls apart once their erroneous legal interpretation of § 6103(i)(2) is rejected. Beyond the MOU itself, IRS's August 2025 disclosure and ICE's subsequent handling of the information also complied with the statute for the reasons we explained. (Blue Br. 47-62.)

**i.** First, ICE's request provided the "specific reason" why the disclosure of current taxpayer addresses "is, or may be, relevant" to its criminal investigation of aliens with a final removal order under 8 U.S.C. § 1253(a)(1). *See* 26 U.S.C. § 6103(i)(2)(B)(iv). Plaintiffs do not defend the district court's ruling on this issue, which was wrong for the reasons we explained (Blue Br. 48-50).

**ii.** Second, IRS's August 2025 disclosure was made to Assistant Director Jesse Williams, who was "personally and directly engaged" in the initial, broad-scale criminal investigation as we have described. (Blue Br. 51-55.) *See* 26 U.S.C. § 6103(i)(2)(A).

Plaintiffs defend the district court's untenable interpretation of § 6103(i)(2) as dictating to other federal agencies how they must conduct their criminal investigations in order to receive taxpayer

information from IRS. As plaintiffs interpret the statute, ICE could receive information from IRS only if ICE had first initiated and staffed "individual criminal … investigations" (Br. 43)—that is, a *separate* investigation for each of the 1.3 million individuals listed in ICE's request. But, as explained above, the statute uses very broad terms in authorizing disclosure of taxpayer information for use by another federal agency in "*any* investigation which may result in" a criminal judicial or administrative proceeding. 26 U.S.C. § 6103(i)(2)(A)(ii) (emphasis added).

As we explained (Blue Br. 52-55), ICE had discretion to initiate a *single*, broad-scale investigation that *begins* with a high-level review of address information that is directly relevant to determining, at the outset of the investigation, whether and how many of the 1.3 million individuals identified in ICE's request are still present in the United States after receiving a final removal order, in potential violation of 8 U.S.C. 1253(a)(1). That is not an improper "dragnet" approach (Br. 45); that is a responsible way for an agency with limited resources to carry out its criminal enforcement obligations, and it is the sort of task that is suitable for a single high-level ICE officer charged with enforcing

§ 1253(a)(1), with the aid of modern technology and help, as needed, from his information technology support staff and others. *See* 26 C.F.R. § 301.6103(i)-1(b) (permitting redisclosure to clerical or other personnel with specialized knowledge or technical skills needed for the investigation or prosecution).

Further, the record does not support plaintiffs' assertion (Br. 44) that Assistant Director Williams had no "direct role" in the broad-scale criminal investigation. The McShane declaration they cite (A459-463) does not even purport to describe Assistant Director Williams' role in the broad-scale criminal investigation here. Unlike the typical investigation described in the McShane declaration, the criminal investigation here was an "ICE led effort … being run out of ICE Headquarters in DC" and "supported by numerous law enforcement agencies." (A307.) ICE's request identified Assistant Director Williams as the officer "personally and directly engaged in" the criminal investigation (A418, A406-408) because he was the officer in charge of—and leading (not just overseeing (*see* Br. 44))—the broad-scale investigation in its initial stages. Therefore, disclosure to him was authorized under § 6103(i)(2).

**iii.** Third, the record demonstrates that IRS provided information to ICE "solely" for use in its criminal investigation. (Blue Br. 55-59). *See* 26 U.S.C. § 6103(i)(2)(A). Plaintiffs cannot cite "clear evidence," *Tota*, 457 F.3d at 168—which they concede is required to overcome the presumption of regularity (Br. 43)—that IRS violated this requirement or that ICE intended to use the information illegally for civil enforcement. And to the extent this provision imposes an ongoing obligation on ICE, it continues to apply and does not justify the district court's action.

Plaintiffs cite (Br. 40) the MOU's reference to Executive Order No. 14161, but it does not support their position. The MOU's introduction also referenced, in a more specific paragraph, criminal investigation and enforcement of 8 U.S.C. § 1253(a)(1). (A327.) Plaintiffs' argument disregards the specific purpose of this MOU and its *express text* limiting the permissible use of taxpayer information to criminal enforcement. (A343.) And to boot, the Executive Order directs agencies to pursue "additional actions to protect the American people" and directs that its provisions "shall be implemented consistent with applicable law," which

of course includes the strictures of the Internal Revenue Code. Exec. Order No. 14161, §§ 3(g), 4(b), 90 Fed. Reg. 8451, 8452 (Jan. 20, 2025).

Plaintiffs also cite ICE's "mass data requests" as evidence that ICE did not intend to use taxpayer addresses for "individualized criminal prosecutions." (Br. 41.) But this argument rests on plaintiffs' flawed interpretation of the statute as limiting disclosure to "individualized criminal prosecutions." As we demonstrated *supra* p. 20, it does not. Upon receipt of a compliant request, § 6103(i)(2) requires IRS to disclose taxpayer addresses for ICE's use in "any investigation which may result in" a "judicial or administrative proceeding" described in § 6103(i)(1)(A)(i). 26 U.S.C. § 6103(i)(2)(A)(ii). The statute does not mandate individualized requests, and it does not give IRS discretion to deny "mass data requests" that meet the statutory requirements. Nor does ICE's careful approach in pursuing criminal *prosecutions* (Br. 41) impinge on its ability to conduct a broad-scale *investigation* that begins with a high-level review of relevant address information of many individuals before devolving into individualized criminal proceedings in court.

The only other evidence plaintiffs cite in support of their contention that ICE's request was "pretextual" is ICE's inclusion in its request of aliens whose final removal order was less than 90 days old. (Br. 42.) But that argument ignores the other felonies identified in 8 U.S.C. § 1253(a)(1) that ICE was investigating, only one of which involves overstaying a final removal order more than 90 days. As we explained (Br. 49-50), ICE's request sought current address information (*i.e.*, the "last known address") for aliens with a final removal order "to verify [their] presence within the United States of America." (A418, A403-405.) An alien's presence in the United States after receiving a final removal order is an element of each of the felony offenses identified in § 1253(a)(1), and ICE appropriately included in its request aliens whose removal order was less than 90 days old.

In short, plaintiffs cite no clear evidence in the record that ICE intended to illegally use taxpayer information for civil, rather than criminal, enforcement, and the presumption of regularity should have controlled.[2]

---

[2] Plaintiffs try to discount the fact that ICE has never actually used the addresses it received from IRS in August 2025 for improper

*Continued on next page.*

**iv.** Last, plaintiffs repeat the district court's errors in arguing that ICE's handling and storage of taxpayer information violated § 6103. (Br. 47-49.) Plaintiffs fault Assistant Director Williams for using information technology support staff to aid in the retrieval, safeguarding, and computerized analysis required to effectively interpret and use the IRS data. As we explained (Blue Br. 59-61), however, § 6103(i)(2)'s implementing regulations specifically authorize redisclosure to "clerical personnel" and other ICE officers and employees with "special knowledge or technical skills" needed for the investigation. 26 C.F.R. § 301.6103(i)-1(b). Here, the record indicates that assistance from ICE personnel with technical skills in Homeland Security Investigations and in Enforcement and Removal Operations (Law Enforcement Systems and Analysis) were needed to retrieve, safeguard, and analyze the IRS data, which was transferred through Kiteworks, a secure file sharing platform. (A383, A385-388, A394-395; *see also* A506-508, A646-647.) Neither § 6103(i)(2) nor the regulation

---

purposes because the district court's preliminary injunction currently prevents such use. (Br. 40 n.6.) But the injunction against ICE did not issue until February 2026 (A642), so ICE had unrestricted use of the information for roughly half a year without any indication of improper use.

required that these individuals be "identified" (Br. 47) in ICE's request or elsewhere.

Plaintiffs also double-down on the district court's baseless conclusion that ICE is not "organizationally capable" of segregating IRS data. (Br. 48-49.) Like the court did, plaintiffs rely on a generic description of how ICE has in the past conducted certain investigations that did not involve a statutory obligation to segregate information, as here. (Br. 48 (citing A462-463).) The former ICE employee's declaration that plaintiffs also cite (Br. 48-49) confirms, against their position, that ICE not only *can* but *has* limited access to restricted data (A176 ¶ 19). Plaintiffs' argument thus lacks support in the record and is further contravened by ICE's repeated representations that IRS data would be used solely for criminal enforcement (A343, A418-419) and would be properly tagged, marked restricted, and designated for use in criminal investigations (A508).

## II. Plaintiffs failed to establish the remaining preliminary injunction factors

### A. Irreparable harm

The district court's irreparable harm finding rested on two theories. First, that plaintiffs' members have been "chilled from filing

taxes," "depriv[ing] [them] of necessary tax credits" and "complicat[ing] their immigration statuses"; second, that plaintiffs are harmed due to an "erosion of trust between the organizations and their members." (A637.) Both theories fail for the reasons we explained. (Blue Br. 63-67.)

On the district court's first theory, plaintiffs do not contest that any deprivation of tax credits is fully compensable by a monetary resolution and, therefore, is not irreparable. Nor do they dispute that data sharing under the MOU applies only to aliens with a final removal order. Instead, plaintiffs argue that aliens with a final removal order "are still entitled to immigration relief" and will be harmed if they do not file taxes. (Br. 61.) But the court did not find that plaintiffs' members who are subject to a final removal order and are present in the United States in violation of federal criminal law have been chilled by the MOU from filing their taxes. In fact, the record does not establish any decrease at all in the number of tax filings by plaintiffs' members, as we demonstrated *supra* pp. 1-2. And at all events, any injury to them from not filing taxes is self-inflicted and arises from their fear of

prosecution and removal because of the existence of a final removal order against them, not because of the MOU.

On the district court's second theory, plaintiffs have no answer to the government's argument that any erosion of trust caused from plaintiffs' failure to accurately advise their members of the law is self-inflicted and not irreparable, as they have only themselves to blame. (*See* Br. 62-63; Blue Br. 65.)

Plaintiffs raise several other theories of irreparable injury (Br. 59-63), but the district court did not accept any of them as a basis for its finding (A637-638). Therefore, none of plaintiffs' remaining theories is entitled to "deference" that is generally afforded to the district court. *See Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). And none of those theories demonstrates irreparable injury.

Plaintiffs say that IRS's data sharing under the MOU "threaten[s] CEDC's very existence" (Br. 62), but they cannot even show that IRS's actions "directly affected and interfered with" CEDC's "core business activities" for Article III standing purposes. *See supra* pp. 1-5. Plaintiffs further contend that their members are at risk of detention and deportation due to "misidentification" (Br. 59-60), but that theory is

entirely speculative and ignores the presumption of regularity that governs here. *See supra* pp. 6-8. Last, plaintiffs claim injury from the "disclosure of private, confidential information" (Br. 61), but they concede (Br. 36) that federal law already requires aliens with a final removal order to provide their current address information to DHS (*see* Blue Br. 38). Plaintiffs' members cannot suffer irreparable harm from IRS's disclosure to DHS of information that federal law already requires them to provide to DHS themselves.

### B. Balance of equities and public interest

The balance of equities and public interest weigh heavily against injunctive relief for the reasons we explained. (Blue Br. 66-67.) In response, plaintiffs largely repeat their failed theories addressed above. Two aspects of plaintiffs' response warrant further reply.

First, plaintiffs' assertion that "the district court's order does not prevent ICE from obtaining information in compliance with the law" (Br. 65) is flat out wrong. The preliminary injunction altogether enjoins "the implementation and/or enforcement of the IRS-ICE MOU" (A642) that the D.C. Circuit held was both lawful and entirely consistent with the requirements of § 6103(i)(2). *Centro*, 167 F.4th at 1230-35. Under

the district court's injunction, ICE is barred from obtaining taxpayer information from IRS, as Congress authorized it to do in § 6103(i)(2). And ICE is also precluded from using or even viewing the thousands of taxpayer addresses that IRS already lawfully disclosed. (A642.)

Second, plaintiffs invoke the "public interest" in "protecting the integrity and security of our federal tax system." (Br. 64.) But Congress has already balanced the competing policy interests between taxpayer confidentiality and federal agencies' legitimate need for taxpayer information in some circumstances, including for criminal immigration enforcement, in 26 U.S.C. § 6103(i)(2), which authorized disclosure here. *See* S. Rep. No. 94-938, pt. 1, at 318 (1976).

## III. The preliminary injunction is overbroad

The preliminary injunction is not limited to "administer[ing] complete relief *between the parties*" as *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025), requires. If it were to stand at all, it should be narrowed to apply only to plaintiffs and their members with standing. *Id.* at 861 (staying injunctions insofar as they were "broader than necessary to provide complete relief to each plaintiff with standing to sue"). Plaintiffs resist the need to identify their members for them to

receive tailored relief (Br. 67), but plaintiffs cannot seek relief on behalf of unidentified members on the theory that *some* unidentified members have standing. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 497-98 (2009). Plaintiffs thus cannot assert that their unidentified members are entitled to relief without providing the basic information necessary to establish their standing and to tailor any relief to their alleged injuries.

Finally, if the injunction were to stand at all, it should further be limited to specific aspects of IRS's data sharing under the MOU that this Court may determine violate the APA. The district court's complete ban on the implementation and enforcement of the MOU and on ICE's ability to request information under § 6103(i)(2) in the future or to use information it has already received cannot stand.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's February 5, 2026 order.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
ERIC D. MCARTHUR
*Deputy Assistant Attorney General*
AUGUST FLENTJE

*/s/ Jacob Christensen*
JACOB CHRISTENSEN
*Attorneys, Appellate Staff*
*Civil Division, Room 4629*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 307-0878*
*jacob.christensen@usdoj.gov*

August 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,500 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Jacob Christensen*
Jacob Christensen